Neville L. Johnson, State Bar No. 66329
Douglas L. Johnson, State Bar No. 209216
**Johnson & Johnson LLP**
439 North Canon Drive, Suite 200
Beverly Hills, California 90210
Tel:   310-975-1080
Fax:   310-975-1095
njohnson@jjllplaw.com
djohnson@jjllplaw.com

Steven. A Schwartz
**Chimicles Schwartz Kriner
& Donaldson-Smith LLP**
361 West Lancaster Avenue
Haverford, PA 19041
Tel.: 610-642-8500
Fax: 610-649-3633
steveschwartz@chimicles.com
*Pro Hac Vice Forthcoming*

Edward Siedle
**Law Offices of Edward Siedle**
17789 Fieldbrook Circle West
Boca Raton, FL 33496
Tel.: 561-703-5958
esiedle@aol.com
*Pro Hac Vice Forthcoming*

Robert J. Kriner, Jr.
Emily L. Skaug
**Chimicles Schwartz Kriner
& Donaldson-Smith LLP**
2711 Centerville Road, Suite 201
Wilmington, DE 19808
rjk@chimicles.com
els@chimicles.com
*Pro Hac Vice Forthcoming*

*Attorneys for Plaintiffs and the Class*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| EDWARD ASNER, MICHAEL BELL, RAYMOND HARRY JOHNSON, SONDRA JAMES WEIL, DAVID JOLLIFFE, ROBERT CLOTWORTHY, THOMAS COOK, AUDREY LOGGIA, DEBORAH WHITE, DONNA LYNN LEAVY, individually on behalf of themselves and the other similarly situated members of the Counts I and III Class and the Counts II and IV Class as defined herein, | **CASE NO.**<br><br>**CLASS ACTION COMPLAINT FOR RELIEF FOR:**<br><br>(1) **ENGAGING IN A PROHIBITED TRANSACTION IN VIOLATION OF ERISA**<br><br>(2) **FAILING TO DISCLOSE INFORMATION MATERIAL TO PLAN PARTICIPANTS IN VIOLATION OF ERISA** |

**COMPLAINT**

Plaintiffs,

v.

THE SAG-AFTRA HEALTH FUND;
THE BOARD OF TRUSTEES OF THE
SCREEN ACTORS GUILD-
PRODUCERS HEALTH PLAN; THE
BOARD OF TRUSTEES OF THE SAG-
AFTRA HEALTH FUND; DARYL
ANDERSON; HELAYNE ANTLER;
AMY AQUINO; TIMOTHY BLAKE;
JIM BRACCHITTA; ANN CALFAS;
JOHN CARTER BROWN; DUNCAN
CRABTREE-IRELAND; ERYN M.
DOHERTY; GARY M. ELLIOTT;
MANDY FABIAN; LEIGH FRENCH;
BARRY GORDON; J. KEITH
GORHAM; NICOLE GUSTAFSON;
JAMES HARRINGTON; DAVID
HARTLEY-MARGOLIN; HARRY
ISAACS; MARLA JOHNSON;
ROBERT W. JOHNSON; BOB
KALIBAN; SHELDON KASDAN;
MATTHEW KIMBROUGH; LYNNE
LAMBERT; SHELLEY LANDGRAF;
ALLAN LINDERMAN; CAROL A.
LOMBARDINI; STACY K. MARCUS;
RICHARD MASUR; JOHN T.
MCGUIRE; DIANE P. MIROWSKI;
D.W. MOFFETT; PAUL MURATORE;
TRACY OWEN; MICHAEL
PNIEWSKI; ALAN H. RAPHAEL;
JOHN E. RHONE; RAY RODRIGUEZ;
MARC SANDMAN; SHELBY SCOTT;
DAVID SILBERMAN; SALLY
STEVENS; JOHN H. SUCKE; KIM
SYKES; GABRIELA TEISSIER; LARA
UNGER; NED VAUGHN; DAVID
WEISSMAN; RUSSELL WETANSON;
DAVID P. WHITE; SAMUEL P.
WOLFSON

Defendants.

**(3) BREACH OF FIDUCIARY
DUTY BY A CO-FIDUCIARY
IN VIOLATION OF ERISA**

**(4) BREACH OF FIDUCIARY
DUTY BY A CO-FIDUCIARY
IN VIOLATION OF ERISA**

**DEMAND FOR JURY TRIAL**

# CLASS ACTION COMPLAINT

1. Plaintiffs, Edward Asner, Michael Bell, Raymond Harry Johnson, Sondra James Weil, David Jolliffe, Robert Clotworthy, Thomas Cook, Audrey Loggia, Deborah White, Donna Lynn Leavy, ("Plaintiffs"), by and through their attorneys, bring this action, under the Employee Retirement Income Security Act 29 U.S.C. §§ 1001-1461 ("ERISA"), asserting Counts I and III on behalf of themselves and the other participants in the Screen Actors Guild-Producers Health Plan ("SAG Health Plan") at the time of the merger of the SAG Health Plan with the AFTRA Health Fund ("AFTRA Health Plan"), effective January 1, 2017 ("Health Plans Merger"). Plaintiffs also bring this action under ERISA asserting Counts II and IV on behalf of themselves and other participants of the resulting, merged health plan, the SAG-AFTRA Health Fund ("SAG-AFTRA Health Plan").

## I.   NATURE OF ACTION

2. This action asserts claims for breaches of fiduciary duty under ERISA against the SAG Health Plan Board of Trustees relating to the trustees' consideration, approval and implementation of the Health Plans Merger, and against the SAG-AFTRA Health Plan Board of Trustees relating to the trustees' administration and management of the SAG-AFTRA Health Plan following the Health Plans Merger. Counts I and III of this action are brought against the former SAG Health Plan Trustees for conduct prior to the January 1, 2017 Health Plans Merger. Counts II and IV are against the SAG-AFTRA Health Plan Trustees for post-merger conduct.

3. The SAG Health Plan was formed in 1960 to provide health coverage to all Screen Actors Guild ("SAG") members. To provide seed funding for the pension and health plans, every SAG performer surrendered the entirety of their television residuals for movies made prior to 1960. Now, the same performers who made those tremendous sacrifices have been abandoned by the pension plan and a health plan. They are being eliminated from health coverage by the health plan as a result of the

January 1, 2017 merger of the SAG Health Plan with the AFTRA Health Plan, which union leadership touted would position the new health plan "to be financially sustainable for all members for years to come" and would "strengthen the overall financial health of the plan while ensuring comprehensive benefits for all participants."

4.     On August 12, 2020, in the midst of a pandemic and a work shutdown and economic crisis, the SAG-AFTRA Health Plan participants were shocked when the SAG-AFTRA Health Plan Trustees suddenly announced draconian changes to the SAG-AFTRA health benefits structure ("Benefit Cuts"). The trustees blame the COVID-19 pandemic for the suddenly urgent need to impose the Benefit Cuts and drop thousands of participants from SAG-AFTRA health coverage. This blame ignores the facts and readily available measures that could have addressed such a one-time event without dramatically ending SAG-AFTRA health coverage for primarily older participants including many performers who surrendered their right to pre-1960 film residuals to start the SAG pension and health plans for all members.

5.     The Benefit Cuts: substantially raise the covered earnings threshold for SAG-AFTRA health coverage eligibility for many participants; eliminate Senior Performers/surviving spouses lifetime SAG-AFTRA secondary health coverage ("Senior Coverage"); impose a penalty on participants 65 years of age and older who take their vested pension by no longer permitting residuals earnings from the covered earnings of these participants to qualify for SAG-AFTRA health coverage; increase quarterly premiums; and limit spousal coverage.

6.     The Benefit Cuts were projected by the plan's administrators to remove 10% of the plan's 33,000 participants and 9% of their 32,000 dependents from SAG-AFTRA health coverage. This estimate excludes the over 8,000 seniors who will lose Senior Coverage. In fact, the Benefit Cuts will likely drop more than one-third of health plan participants from coverage, while the plan is projected to continue to have

a "fund reserve" of more than $250 million at the end of 2020, which has been funded in part by the participants who will be cut from continued SAG-AFTRA coverage.

7.     As structured, the Benefit Cuts wrongfully and illegally discriminate based on age. The Benefit Cuts eliminated the Senior Coverage lifetime SAG-AFTRA secondary health coverage for members with 20 years vested accrued pension credit and took this accrued coverage from members or surviving spouses already receiving it. In addition, the Benefit Cuts imposed a penalty on participants 65 years of age or older who take their vested pension. Such participants get zero covered earnings credit for residuals earnings toward the new $25,950 earnings threshold for SAG-AFTRA health care eligibility, yet they continue to have contributions paid into the plan and dues calculated based on residuals and sessional earnings at the same rate as younger participants. All participants must take a pension at 70.5 years of age. The vast majority of participants 65 years of age or older taking a pension will not have $25,950 in sessional earnings to continue to qualify for coverage. In addition, prior to the Benefit Cuts, a participant's base earnings year was either: January 1-December 31; April 1-March 31; July 1-June 30; October 1-September 30. Effective immediately, the base earnings year for all participants 65 years of age or older is October 1-September 30. Where this resulted in a change, the time of the affected participant to seek sessional opportunities was limited. The Benefit year for all participants 65 and older was changed to January 1 – December 31. Further, the plan is refusing to credit sessional earnings for work that occurred prior to September 30 but for which checks were not received until later.

8.     Prior to the January 2017 Health Plans Merger, the "SAG-Producers Pension and Health Plan" unconditionally promised Senior Coverage to surviving spouses for life so long as the surviving spouse did not marry. The January 17, 2016 letter to surviving spouse Madonna Magee stated: "Under the rules of the Health Plan we are privileged to provide continuing benefits under the Extended Spousal Benefit

effective January 1, 2016. You are eligible for these benefits until you remarry or upon your demise." Plaintiff Audrey Loggia received the same promise following the December 2015 death of her spouse, Robert Loggia.

9.     The January 2017 Health Plans Merger was touted as having been "a complex undertaking," positioning the new health plan as one that would "be financially sustainable for all members for years to come" and that would "strengthen the overall financial health of the plan while ensuring comprehensive benefits for all participants." In actuality, the SAG Health Plan Trustees hastily proceeded with the Health Plans Merger for political purposes to benefit the union and union leadership, without a diligent pre-merger investigation and analysis to assess the impact of the merger on the SAG Health Plan and its participants' future health benefits under the funding structure of the merged plan, and what, if any, measures could be implemented in the merged plan to protect the participants and their benefits, as required by their fiduciary duties under ERISA. A diligent pre-merger investigation and analysis would have revealed the looming peril and the inadvisability of proceeding with the merger unless the merged plan and its funding and structure would protect and sustain the benefits for the SAG Health Plan participants. In fact, the SAG-AFTRA Health Plan Trustees knew soon after the Health Plans Merger that the health benefit structure was not sustainable in the merged plan under then-current funding. According to representations made by Defendant-trustees Richard Masur and Barry Gordon on August 19, 2020, cuts had been in the works for two years, with the trustees working nearly every day of those years to figure out how to preserve the benefit.

10.     During this two-year period, three major collective bargaining agreements were negotiated. Two of these agreements were approved by the SAG-AFTRA National Board members and put to a membership vote, while the third was negotiated by staff, approved by the SAG-AFTRA National Board, but not put to a

membership vote. The SAG-AFTRA Health Plan Trustees knew that strong negotiating power of the Union negotiating team was vital to protect health benefits in the merged plan and that union negotiators owed the duty of fair representation to the members. When these contracts were negotiated, the components of the package of value for the members were still in play, including contribution rates for sessional and residuals earnings, wages and working conditions. The contributions plus wages plus working conditions constitute the value package for the members in exchange for their work under the contracts. The SAG-AFTRA Health Plan Trustees, several of whom participated in the negotiations and the SAG-AFTRA National Board approvals of the contracts, failed to disclose to the non-health plan trustee members of the union negotiating teams and the SAG-AFTRA National Board, or to the membership, the funding structure necessary to sustain the health benefit structure, the imminence of benefit cuts or the insufficiency of the negotiated contract terms to sustain the health benefit structure. The non-trustee negotiators lacked information material to the funding terms and relative value of contributions versus wage increases or needed diversions to sustain the benefit structure. The non-health plan trustee union negotiating committee members and SAG-AFTRA National Board members and the membership lacked information that the contracts were insufficient to sustain the benefit structure, and to assess the value of the negotiated terms. The health plan trustee SAG-AFTRA National Board members failed to disclose the information in connection with the SAG-AFTRA National Board approval votes, failed recuse or to abstain from voting and voted to approve the contracts.

11. Further, as structured, the Benefit Cuts illegally discriminate based on age and violate the Age Discrimination and Employment Act of 1967, as amended, 29 U.S.C. §§ 621-634 ("ADEA") and the Unruh Civil Rights Act, Cal. Civ. Code §§ 51, 51.5 and 52 ("UCRA"), as well as Section 1557 of the Affordable Care Act, 42 U.S.C. Section 18116(a) ("ACA") including as it applies to the Section 1557

representation made by the trustees to the participants. Senior Coverage was eliminated and taken from members or surviving spouses receiving it. The Benefit Cuts impose a penalty on participants 65 years of age or older who take their vested pension. If they take the pension, they lose covered earnings credit for residuals earnings toward the new increased $25,950 earnings threshold for SAG-AFTRA health coverage eligibility, yet these participants' contributions and dues continue to be made based on residuals and sessional earnings at the same rate as younger participants. Further, the change of base earnings years for participants 65 years or older unfairly limited the time of participants affected by the change to obtain qualifying sessional earnings opportunities, and the change in benefit year took pre-qualified coverage from participants 65 and older. In approving the Benefit Cuts as structured, the SAG-AFTRA Health Plan Trustees breached their fiduciary duties to manage and administer the plan in compliance with positive law and the plan documents.

A. **Trustees' ERISA Fiduciary Duties**

12.    ERISA imposes strict fiduciary duties of loyalty and prudence upon Plan fiduciaries. Under 29 U.S.C. § 1104(a), ERISA provides:

(a) Prudent man standard of care

(1) . . . a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –

(A) for the exclusive purpose of:

(i) providing benefits to participants and their beneficiaries; and

(ii) defraying reasonable expenses of administering the plan; [and]

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the

conduct of an enterprise of like character and with like aims;

(C) by diversifying the investments of the plan so as to minimize the risk of large losses unless under the circumstances it is clearly prudent not to do so; and

(D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with [ERISA] . . . .

13.     29 U.S.C. § 1103(c)(1) provides that plan assets "shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan."

14.     ERISA prohibits a plan fiduciary from: dealing with the assets of the plan in his own interest or for his own account; in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries; or receive any consideration for his own personal account from any party dealing with the plan in connection with a transaction involving the assets of the plan. 29 U.S.C. § 1106(b).

15.     ERISA also imposes co-fiduciary liabilities on plan fiduciaries. 29 U.S.C. § 1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty:

(a) **Circumstances giving rise to liability.** In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

(1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;

(2) if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

16.     Under ERISA, a person is a fiduciary to the extent the person: (1) exercises any discretionary authority or control over management of the plan or the management or disposition of its assets; (2) renders investment advice regarding plan assets for a fee or the other compensation, or has the authority or responsibility to do so; or (3) has any discretionary authority or control over plan administration. 29 U.S.C. § 1002(21)(A).

17.     Prior to the January 1, 2017 Health Plans Merger, the SAG Health Plan Trustees acted as fiduciaries under ERISA in connection with the Health Plans Merger, as the consideration, approval and implementation of the merger constituted decisions and actions concerning the administration and management of the SAG Health Plan and its assets. The trustees' fiduciary duties required them to conduct a diligent, fully-informed investigation and analysis to determine the impact of the merger on the SAG Health Plan participants and their beneficiaries, and to proceed only if the merger is solely in the best interests of the participants and their beneficiaries. As alleged herein, the trustees failed to do so and disloyally pushed through the hasty merger to benefit SAG-AFTRA for the political purposes of union leadership at the unfair expense of the SAG Health Plan participants and their beneficiaries. The SAG-AFTRA Trustees knew by at least shortly after the merger the health benefit structure in the merged plan was not sustainable as then-funded, and cuts were looming.

18.     Following the January 1, 2017 Health Plans Merger, the SAG-AFTRA Health Plan Trustees acted as fiduciaries under ERISA in administering and managing

the SAG-AFTRA Health Plan. The SAG-AFTRA Health Plan Trustees knew for at least two years prior to the Benefit Cuts the SAG-AFTRA health benefit structure was not sustainably funded and benefit cuts were looming. Three major collective bargaining agreements were negotiated in this two-year period. The SAG-AFTRA Health Plan Trustees failed to disclose the health benefit structure was not sustainably funded, cuts were looming and the negotiated terms of the contracts were insufficient to sustain the benefit structure. The non-health plan trustee members of the union teams negotiating the contracts and the SAG-AFTRA National Board voting on the contracts, as well as the SAG-AFTRA members voting on the contracts, lacked this material information and those who were also members of the SAG-AFTRA National Board failed to abstain or recuse themselves from the SAG-AFTRA National Board votes and voted to approve the contracts. The trustees failed to disclose this material information in breach of their fiduciary under ERISA.

19.     The SAG-AFTRA Health Plan Trustees acted as fiduciaries in approving and implementing the Benefit Cuts, announced on August 12, 2020. The SAG-AFTRA Health Plan Trustees' fiduciary duties required them to manage and administer the plan in compliance with applicable law and the plan documents. As structured, the Benefit Cuts discriminate based on age and violate the ADEA and the UCRA and the ACA and the Section 1557 representation by the trustees. Senior Coverage was eliminated and taken from members and surviving spouses already receiving it. Senior Coverage gave SAG-AFTRA members with 20 years of accrued pension service and surviving spouses lifetime SAG-AFTRA health coverage. Further, the trustees imposed a penalty on participants 65 years of age and older to take their vested pension. By the Benefit Cuts, participants 65 years of age or older who take a pension lose covered earnings credit for residuals earnings toward the substantially increased $25,950 health coverage earnings threshold for Plan II participants, yet their contributions and dues continue to be based on residuals and sessional earnings at the same levels as younger participants. In addition, the base

earnings year of all participants 65 years or older was immediately set at October 1-September 30, unfairly limiting the time for the affected older participants to seek opportunities to obtain sessional earnings to qualify for coverage for the new base year. The change of the benefit year also took pre-qualified coverage from some participants 65 years of age or older.

20.   Section 1132(a)(2) of ERISA authorizes a participant to bring a civil action for appropriate relief under 29 U.S.C. §1109, which provides:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary. A fiduciary may also be removed for a violation of [29 U.S.C. § 1111].

21.   Section 1132 (a)(3) authorizes a participant to bring a civil action to "enjoin any act or practice which violates any provision of this subchapter or the terms of the plan," or " to obtain other appropriate equitable relief . . . to redress such violations or . . . to enforce any provisions of this title or the terms of the plan."

### B. Prohibited Transactions

22.   ERISA prohibits certain transactions between a plan and a "party in interest." 29 U.S.C. § 1106(a). A plan fiduciary is prohibited from causing the plan to engage in certain prohibited transactions, if the fiduciary knows or should know that a transaction constitutes a direct or indirect prohibited transaction. The prohibited transactions include among other things: sale or exchange, or leasing, of any property

between the plan and a party in interest; lending of money or other extension of credit between the plan and a party in interest; furnishing of goods, services, or facilities between the plan and a party in interest; transfer to, or use by or for the benefit of a party in interest, of any assets of the plan, or acquisition, on behalf of the plan, of any employer security or employer real property in violation of Section 1107(a). *Id*. §§ 1106(a)(1)(A)-(E).

23.     In the context of an employer benefit plan, a "party in interest" includes, *inter alia*:  (A) any fiduciary (including, but not limited to, any administrator, officer, trustee, or custodian), counsel, or employer of such employee benefit plan; (B) a person providing services to such plan; (C) an employer any of whose employees are covered by such plan; (D) an employee organization any of whose members are covered by such plan; (E) an owner, direct or indirect, of 50 percent or more of (i) the combined voting power of all classes of stock entitled to vote or the total value of shares of all classes of stock of a corporation[,] the capital interest or the profits interest of a partnership, or (iii) the beneficial interest of a trust or unincorporated enterprise, which is an employer or an employee organization described in subparagraph (C) or (D); and (F) a corporation, partnership, or trust or estate of which (or in which) 50 percent or more of (i) the combined voting power of all classes of stock entitled to vote or the total value of shares of all classes of stock of such corporation, (ii) the capital interest or profits interest of such partnership, or (iii) the beneficial interest of such trust or estate, is owned directly or indirectly, or held by persons described in subparagraph (A), (B), (C), (D), or (E). 29 U.S.C. §§ 1002(14)(A)-(E), (G). ERISA also exempts certain transactions from the prohibition. *See* 29 U.S.C. § 1114(c)(1).

24.     The SAG Health Plan Trustees caused the SAG Health Plan to engage in the Health Plans Merger, which the trustees knew constituted a direct or indirect prohibited transaction with a "Party in Interest." The SAG Health Plan Trustees proceeded hastily with the Health Plans Merger for the political purposes of union

leadership to benefit themselves and the union. SAG-AFTRA and SAG-AFTRA management were parties in interest.

## II.   JURISDICTION AND VENUE

25.    This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because it is an action under 29 U.S.C. §§ 1132(a)(2) and (3).

26.    This District is the proper venue for this action under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b), because the SAG Health Plan was administered and can be found in this District, and the SAG-AFTRA Health Plan is administered and can be found in this District.

27.    Plaintiffs have standing to bring this lawsuit on behalf of the SAG Health Plan and the SAG-AFTRA Health Plan under § 1132(a)(2) and (3). The plans are the victims of a fiduciary breach and prohibited transactions and will be the recipient of any recovery. Section 1132(a)(2) authorizes any participant or beneficiary to sue as a representative of the plans to seek relief on behalf of the plans. Section 1132(a)(3) authorizes any participant or beneficiaries to sue as a representative of the plans to enjoin any act or practice that violates ERISA or to obtain other appropriate equitable relief to redress violations and/or enforce the provisions of ERISA. As explained in detail below, the plans suffered substantial losses and harm caused by Defendants' fiduciary breaches and remain exposed to harm and continued harm. Those injuries may be redressed by a judgment of this Court in favor of Plaintiffs.

## III.   THE PARTIES

28.    Plaintiff, Edward Asner, was a participant in the SAG Health Plan at the time of the Health Plans Merger, and has been a participant in the SAG-AFTRA Health Plan since the Health Plans Merger. Edward Asner is over 65 and takes a pension. Prior the Benefit Cuts, Edward Asner had accrued Senior Coverage by 20 years of pension service. Prior to the Benefit Cuts, Edward Asner had more than

$25,950 in yearly covered earnings with residuals and sessional earnings. Edward Asner lost credit for residuals earnings by the Benefits Cuts.  As a result of the Benefit Cuts and the elimination of residuals earnings from covered earnings to qualify for coverage, Edward Asner will lose his SAG-AFTRA coverage and will not reach the qualifying threshold by sessional earnings.

29.     Plaintiff, Michael Bell, was a participant in the SAG Health Plan at the time of the Health Plans Merger, and has been a participant in the SAG-AFTRA Health Plan since the Health Plans Merger. Michael Bell is over 65 and takes a pension. Prior to the Benefit Cuts, Michael Bell had accrued Senior Coverage by 20 years of pension service. Prior to the Benefit Cuts, Michael Bell had more than $25,950 in yearly covered earnings with residuals and sessional earnings. Michael Bell lost credit for residuals earnings by the Benefit Cuts. As a result of the Benefits Cuts and the elimination of residuals from covered earnings, Michael Bell will lose his SAG-AFTRA health coverage and will not qualify for health coverage by residuals earnings.

30.     Plaintiff, Raymond Harry Johnson, was a participant in the SAG Health Plan at the time of the Health Plans Merger, and has been a participant in the SAG-AFTRA Health Plan since the Health Plans Merger. Raymond Harry Johnson is over 65 and takes a pension. Prior to the Benefit Cuts, Raymond Harry Johnson had accrued Senior Coverage by 20 years of pension service. Prior to the Benefit Cuts, Raymond Harry Johnson had more than $25,950 in yearly covered earnings with residuals and sessional earnings. Raymond Harry Johnson lost credit for residuals earnings by the Benefit Cuts. As a result of the Benefits Cuts and the elimination of residuals from covered earnings, Raymond Harry Johnson will not qualify for SAG-AFTRA health coverage.

31.     Plaintiff, Sondra James Weil, was a participant in the SAG Health Plan at the time of the Health Plans Merger, and has been a participant in the SAG-AFTRA Health Plan since the Health Plans Merger. Sondra James Weil is over 65 and takes a

pension. Prior to the Benefit Cuts, Sondra James Weil accrued Senior Coverage by 20 years of pension service. Prior to the Benefit Cuts, Sondra James Weil had more than $25,950 in yearly covered earnings with residuals and sessional earnings. Sondra James Weil lost credit for residuals earnings by the Benefit Cuts. As a result of the Benefits Cuts and the elimination of residuals from covered earnings, Sondra James Weil will not qualify for SAG-AFTRA health coverage.

32. Plaintiff, David Jolliffe, was a participant in the SAG Health Plan at the time of the Health Plans Merger, and has been a participant in the SAG-AFTRA Health Plan since the time of the Health Plans Merger. David Jolliffe is over 65 years of age and takes a pension. Prior to the Benefit Cuts, David Jolliffe accrued Senior Coverage by 20 years of pension service. The Benefit Cuts changed David Jolliffe's base earnings year effective immediately from April 1-March 31, to October 1-September 30. The change limited his time to obtain sessional opportunities. The Benefit Cuts also changed his benefit year to January 1 – December 31. Prior to the Benefit Cuts, David Jolliffe had pre-qualified for coverage through March 31, 2022. Under the changed benefit year in the Benefit Cuts, his end benefit date was rolled back to December 31, 2021, taking accrued advanced contributions already made.

33. Plaintiff, Robert Clotworthy, was a participant in the SAG Health Plan at the time of the Health Plans Merger, and has been a participant in the SAG-AFTRA Health Plan since the Health Plans Merger. Robert Clotworthy is over 65 and takes a pension. Prior to the Benefit Cuts, Robert Clotworthy would have qualified for Senior Coverage upon reaching age 65 on October 24, 2020. Prior to the Benefit Cuts, Robert Clotworthy had more than $25,950 in yearly covered earnings with residuals and sessional earnings. Robert Clotworthy lost credit for residuals earnings by the Benefit Cuts. As a result of the Benefits Cuts and the elimination of residuals from covered earnings, Robert Clotworthy will not qualify for SAG-AFTRA health coverage. In mid-2020, Robert Clotworthy contacted the plan to discuss his health coverage, as he was to turn 65 on October 24, 2020. The plan representative told him he had "the

golden ticket" of lifetime secondary SAG-AFTRA health coverage as a senior performer.

34.     Plaintiff, Thomas Cook, is 90 years of age and has been a SAG member and health coverage plan participant in the SAG-AFTRA Health Plan since the Health Plans Merger. Thomas Cook is over 65 and takes a pension.  Prior to the Benefits Cuts, Thomas Cook accrued Senior Coverage by 20 years of pension service. Prior to the Benefit Cuts, Thomas Cook had more than $25,950 in yearly covered earnings with residuals and sessional earnings. Thomas Cook lost credit for residuals earnings by the Benefit Cuts. As a result of the Benefit Cuts, Thomas Cook and his dependents will lose and not qualify for SAG-AFTRA Senior Coverage health coverage as of January 1, 2021.

35.     Plaintiff, Deborah White, has been a participant in the SAG-AFTRA Health Plan since the Health Plans Merger. Deborah White is over 65 and takes a pension. Prior to the Benefit Cuts, Deborah White had accrued Senior Coverage by 20 years of pension service. Prior to the Benefit Cuts, Deborah White had more than $25,950 in yearly covered earnings with residuals and sessional earnings. Deborah White lost credit for residuals earnings by the Benefit Cuts. As a result of the Benefits Cuts and the elimination of residuals from covered earnings, Deborah White will lose her SAG-AFTRA health coverage and will not qualify for health coverage by residuals earnings.

36.     Plaintiff, Donna Lynn Leavy, has been a participant in the SAG-AFTRA Health Plan since the Health Plans Merger. Donna Lynn Leavy is over 65 and takes a pension. Prior to the Benefit Cuts, Donna Lynn Leavy had accrued Senior Coverage by 20 years of pension service. Prior to the Benefit Cuts, Donna Lynn Leavy had more than $25,950 in yearly covered earnings with residuals and sessional earnings. Donna Lynn Leavy lost credit for residuals earnings by the Benefit Cuts. As a result of the Benefits Cuts and the elimination of residuals from covered earnings, Donna Lynn

Leavy will lose her SAG-AFTRA health coverage and will not qualify for health coverage by residuals earnings.

37.     Plaintiff, Audrey Loggia, is the surviving spouse of Robert Loggia, a SAG member with Senior Coverage who died in December 2015. Following Robert's death, the plan notified Audrey Loggia she was entitled to coverage as a surviving spouse for the remainder of her lifetime or until she remarried. Before either of those circumstances appreciated, however, the plan notified her on November 24 that she would lose coverage on September 30, 2021 under the Benefit Cuts.

38.     The SAG-AFTRA Health Fund is not alleged to be a fiduciary herein. The SAG-AFTRA Health Fund is joined as a party defendant to enable complete relief on the claims.

39.     The Board of Trustees of the SAG Health Plan at the time of the Health Plans 2017 Merger included the following SAG Health Plan Trustees: Union Trustees – Daryl Anderson, Amy Aquino, Timothy Blake, Jim Bracchitta, John Carter Brown, Duncan Crabtree-Ireland, Mandy Fabian, Leigh French, Barry Gordon, Bob Kaliban, Richard Masur, John T. McGuire, D.W. Moffett, Michael Pniewski, Ray Rodriguez, John H. Sucke, Kim Sykes, Ned Vaughn and David P. White; Management Trustees – Eryn M. Doherty, Gary M. Elliott, Nicole Gustafson, Marla Johnson, Robert W. Johnson, Sheldon Kasdan, Shelley Landgraf, Allan Linderman, Carol A. Lombardini, Stacy K. Marcus, Diane P. Mirowski, Paul Muratore, Alan H. Raphael, John E. Rhone, David Silberman, David Weissman, Russell Wetanson and Samuel P. Wolfson.

40.     The Board of Trustees of the SAG-AFTRA Health Plan since the Health Plans 2017 Merger includes the following individual SAG-AFTRA Health Plan Trustees: Union Trustees – Daryl Anderson, Amy Aquino, Timothy Blake, Jim Bracchitta, John Carter Brown, Duncan Crabtree-Ireland, Barry Gordon, David Hartley-Margolin, Matthew Kimbrough, Lynne Lambert, Richard Masur, John T. McGuire, Michael Pniewski, Ray Rodriguez, Shelby Scott, Sally Stevens, Kim Sykes,

Gabriela Teissier, Ned Vaughn and David P. White; and Producer Trustees – Helayne Antler, Ann Calfas, J. Keith Gorham, James Harrington, Harry Isaacs, Marla Johnson, Robert W. Johnson, Sheldon Kasdan, Allan Linderman, Carol Lombardini, Stacy K. Marcus, Diane P. Mirowski, Paul Muratore, Tracy Owen, Marc Sandman, Lara Unger, David Weissman, Russell Wetanson and Samuel P. Wolfson.

## IV.   SUBSTANTIVE ALLEGATIONS

### A. Background of the Health Plans Merger

41.    In 1960, all SAG performers gave away their right to all television residuals on all movies produced prior to 1960 in exchange for the studios commitment to seed and establish a pension and health plan for all members. As a result, these performers and their beneficiaries and surviving spouses have not received and do not receive a dime for television airings of their work. The health plan for which they personally sacrificed to begin for all members has now abruptly abandoned them.

42.    The governing boards of SAG and the American Federation of Radio and Television Artists ("AFTRA") merged the unions in 2012 ("Union Merger"). The Union Merger was approved by a majority vote of the respective memberships. The Union Merger was effective March 12, 2012. At the time of the Union Merger, Union leadership envisioned and aspired to merge the respective pension plans and welfare plans following the Union Merger.

43.    Prior to the Health Plans Merger, health benefits were provided to the respective eligible members of SAG and AFTRA by separate plans, the SAG Producers Health Plan ("SAG Health Plan") and the AFTRA Health Fund ("AFTRA Health Plan"), which each were managed and administered by separate Boards of Trustees.

44.    The SAG Health Plan and the AFTRA Health Plan were collectively bargained, joint-trusted labor-management trusts subject to ERISA. The SAG Health

Plan and the AFTRA Health Plan were funded primarily by employer contributions under collective bargaining agreements negotiated by each union and the respective producers. The SAG-AFTRA Health Plan likewise is a collectively bargained, joint-trusted labor-management trust subject to ERISA and is funded primarily by employer contributions under collective bargaining agreements negotiated by the union and the respective producers.

45.     The employer contribution levels for the SAG and AFTRA union members were disparate and resulted in far different contributions to the health plans for a given earnings level. Contribution levels were the same for performers under the TV/Theatrical and Commercials contracts. Currently, the rate is 19.5%. SAG and AFTRA broadcasters' contribution levels differed and were between 10% and 13% under the respective applicable station contracts. This disparity continues in the merged plan.

B. **Breach of Fiduciary Duty by the SAG Health Plan Trustees in Connection with the Health Plans Merger**

46.     In early June 2016, the SAG Health Plan Trustees approved the Health Plans Merger, which was not subject to approval by the participants of either plan. A June 8, 2016 Variety story stated the combination would "allow SAG-AFTRA members to combine covered earnings from all SAG-AFTRA contracts toward eligibility for coverage in a single health plan."[1] SAG-AFTRA President Gabrielle Carteris was quoted: "Our members deserve one outstanding health plan and this historic agreement ensures that all earnings under our contracts now credit to a single health plan. . . . [W]e have positioned our health plan to be financially sustainable for all members for years to come." SAG-AFTRA National Executive Director David White was quoted: "The new health plan is both comprehensive and forward-looking.

---

[1]   SAG and AFTRA Health Care Plans to Merge, VARIETY (June 8, 2016), available at https://variety.com/2016/tv/news/sag-aftra-health-care-merge-1201791269/

Merging these plans was a complex undertaking and I am proud that the trustees worked together to arrive at solutions that strengthen the overall financial health of the plan while ensuring comprehensive benefits for all participants."

47.     The Health Plans Merger was effective January 1, 2017. Combined into the SAG-AFTRA Health Plan, the plans were governed by the SAG-AFTRA Board of Trustees consisting of the SAG-AFTRA Trustee Defendants, pursuant to the Restated Agreement and Declaration of Trust Establishing the SAG-AFTRA Health Fund ("SAG-AFTRA Trust Agreement").

48.     On August 11, 2020, the SAG-AFTRA Health Plan participants were stunned when the SAG-AFTRA Health Plan Trustees suddenly announced the draconian Benefit Cuts and blamed the COVID-19 pandemic for the urgent need to impose the draconian changes now. In a webinar with the National Board the following week to announce the Benefit Cuts, SAG-AFTRA Health Plan Chief Executive Officer Michael Estrada stated that even with expected annual deficits, the plan without the Benefit Cuts would continue to have "crucial reserve" funds until 2024.

49.     The Benefit Cuts were described in a pamphlet titled: "Changing for our Future, Together" ("Pamphlet"). On the page titled "A quick look at what's changing," the Pamphlet states: "Our Plan changes will mean different things for different people. To learn about all the details, jump to the section(s) that best describe you."

50.     The Benefit Cuts substantially changed the criteria for SAG-AFTRA health coverage eligibility. Senior Coverage, which entitled participants to lifetime SAG-AFTRA secondary health coverage upon accruing 20 years of vested pension service, was eliminated and taken from participants who had accrued and were using it and the from surviving spouses of such participants. The plan, among other things, stated: "Effective January 1, 2021, medical, behavioral health, vision and prescription drug coverage through the SAG-AFTRA Health Plan will no longer be offered.

Instead, Senior Performers/surviving spouses will have new, expanded options through the Via Benefits private Medicare marketplace, including dental and vision coverage;" and "[t]he SAG-AFTRA Health Fund will partner with the Via Benefits Medicare marketplace plans to supplement health coverage for unmarried Medicare-eligible surviving spouses of Senior Performers through an annual financial allocation into the new SAG-AFTRA Health Plan Senior Performers Health Reimbursement Account, or 'HRA.' If you enroll in coverage through Via Benefits, you will receive $1,140.00 annually to pay for eligible health care expenses." The elimination and taking of Senior Coverage will cost many performers and their dependents and surviving spouses far more under the Via alternative.

51. The SAG Age & Service criteria to establish eligibility for participants 40 years or older were eliminated. The Age & Service covered earnings threshold was increased from $13,000 to $25,950. The covered earnings threshold for Plan II participants was increased substantially from $18,040 to $25,950. The alternative days eligibility threshold was increased from 84 days to 100 days worked during base earning period under specified contracts. For participants under age 65, covered earnings continue to include both sessional and residuals earnings. For participants 65 years of age and older and not taking a pension, covered earnings continue to include both sessional and residuals earnings so long as the participant has at least some sessional earnings reported.

52. The Benefit Cuts impose a penalty on participants who take their vested pension. Participants 65 years of age or older who take a pension lose covered earnings credit toward health care eligibility. Their covered earnings include ***only*** sessional earnings and exclude residuals earnings, although their contributions made to the plan and dues continue to be calculated based on sessional and residuals earnings. All participants age 70.5 must take a pension.

53. The Benefit Cuts substantially increased premium costs to participants as of January 1, 2021. Participant-only quarterly cost will be $375, increased from

$300 per quarter; participant plus one dependent will cost $531, increased from $348 per quarter; and participant plus two or more dependents will be $747, increased from $375 per quarter.

54.     In addition, the Benefit Cuts immediately set the base earnings year for all participants 65 years of age or older to October 1-September 30. Prior to the Benefit Cuts, base earnings years were either: January 1-December 31; April 1-March 31; July 1-June 30 or October 1-September 30. The trustees knew the Covid-19 pandemic had limited sessional opportunities for participants and the Benefit Cuts required $25,950 of yearly sessional earnings to qualify for Plan II SAG-AFTRA health coverage. The change unfairly limited the time for these affected older participants to urgently pursue sessional opportunities. The Benefit Cuts also set the benefit year for all participants 65 and older to January 1 – December 31. This took pre-qualified, already paid for coverage from some affected participants.

55.     Also included in the Pamphlet was the required Section 1557 Non-discrimination Notice: "The SAG-AFTRA Health Plan complies with applicable federal civil rights laws and does not discriminate on the basis of race, color, natural origin, age, disability or sex. The SAG-AFTRA Health Plan does not exclude people or treat them differently because of race, color, national origin, age, disability or sex." Section 1557 is the non-discrimination provision of the Affordable Care Act, 42 U.S.C. §18001 et seq. *See* 42 U.S.C. §18116(a). This statement was false. As alleged herein, the Benefit Cuts discriminate based on age against participants 65 years of age or older.

56.     Thus, contrary to the statements by SAG-AFTRA Health Plan President Gabrielle Carteris and Executive Director David White, the merger did not "ensure[] that all earnings under our contracts now credit to a single health plan," "position [] our health plan to be financially sustainable for all members for years to come" or "strengthen the overall financial health of the plan while ensuring comprehensive benefits for all participants."

57.     The consideration, approval and implementation of the Health Plans Merger could not have been the product of a prudent process by the SAG Health Plan Trustees to investigate and analyze the impact of the merger solely in the best interests of the SAG Health Plan participants. The SAG-AFTRA Trustees knew shortly after the merger the benefit structure in the merged plan as funded was in peril and cuts loomed. According to SAG-AFTRA Health Plan Trustee Richard Masur in August 2020, the Benefit Cuts had been in the works for two years. Trustee Barry Gordon said the trustees had worked nearly every day for two years prior to August 2020 trying to figure out how they could preserve the health benefit.

58.     As the administrators of the SAG Health Plan prior to the Health Plans Merger, the SAG-Health Plan Trustees were fiduciaries of the plan assets for the sole benefit of the participants and their beneficiaries. 29 U.S.C. § 1104(a)(1)(A)(i). Under the particular circumstances, the SAG Health Plan Trustees acted as fiduciaries in connection with the Health Plans Merger. The determination that the plans should combine and the approval and implementation of the merger constituted decisions about the administration and management of the SAG Health Plan and its assets.

59.     The SAG Health Plan Trustees failed to conduct a fully informed pre-merger investigation and analysis to assess the impact of the merger on the SAG Health Plan and its participants' health benefits and the sustainability of the benefit structure in the merged plan, and whether protections were required to and could be implemented in the merged plan in order for the merger to be advisable and solely in the best interests of the SAG Health Plan and its participants, as was required by their ERISA fiduciary duties.

60.     The SAG Health Plan Trustees knew the importance of fully informed pre-merger impact investigation and analysis concerning the protection of future health benefits. In 2003, SAG and AFTRA obtained from consulting firm Mercer a "Feasibility Study for Merging Health Care and Pension Plans and Administration for SAG and AFTRA." A February 24, 2012 Declaration of Alex M. Brucker, an expert

in plan sponsor mergers including pre-merger due diligence, submitted in litigation challenging the Union merger explained the vital importance of a pre-merger investigation and analysis ("Brucker Declaration"). *Sheen, et al. v. Screen Actors Guild, et al.,* No. 2:12-cv-01468 (C.D. Cal. Feb. 24, 2012). The Brucker Declaration stated:

> The purpose of this Declaration is to address the allegations set forth in Plaintiffs' request for injunctive relief. As set forth in greater detail below, full and fair disclosure would require an "ERISA Impact Report" which can be prepared by appropriate professionals to analyze and report the <u>impact</u> of (i) the Union Merger on the Plans and its co-sponsors; (ii) a Plan Merger on the Plans and on the present and future benefits of and costs to the participants and beneficiaries and co-sponsors of the Plans; and (iii) ERISA and the Code on the Plans, their fiduciaries, participants, beneficiaries and co-sponsors.

> By full and fair disclosure of an ERISA Impact Report, SAG would provide the information necessary for SAG members to intelligently cast their votes regarding the Union Merger.

> I am unaware of any ERISA Impact Report prepared for or considered by the Unions. I have reviewed all seven legal submissions, with particular emphasis on the "Feasibility Report" prepared for the Boards by Deborah M. Lerner of the law firm of Willig, Williams & Davidson, P.A. The Feasibility Report generally concludes and purports to assure the Unions that (1) there is no legal obstacle to prevent the Plan Merger; (2) federal law will protect all benefits earned by participants under the Plans as of the date of Plan Merger; and (3) there are some potential advantages to the Plan Merger. All of the "feasibility" letters reach similar general conclusions.

> What is <u>most</u> important about the Feasibility Report and related letters is what they do not say or consider.

> There is an important distinction between the terms "feasibility" and "impact." No one would disagree that the merger is feasible. But no one involved in this matter has studied the question of the impact of a merger of the Plans on the Plans' participants and beneficiaries or contributing employers. All involved participants are handicapped because of the SAG failure to procure an ERISA Impact Report. Even Ms. Lerner concedes this point on page 8 of the Feasibility Report as follows: "Based on a plan's financial health and its projected funding,

the trustees of a multiemployer pension plan may determine that it is necessary to <u>reduce future benefit accruals, which are not legally protected benefits.</u> … It is not possible to predict whether or not any plan's benefits (whether or not such plan is merged into another plan) will be improved or <u>reduced in the future</u>." (Emphasis added)

*Id*. ¶¶ 5-9.

61. Brucker further stated:

Since this major motivation for the Union Merger can realistically only be accomplished with a subsequent Plan Merger, it is my opinion that the Union Merger must be viewed, particularly from a member prospective, as indistinguishable from a Plan Merger. This is their only real opportunity to vote on this issue. In essence, the Plan Merger will take place if the Union Merger is consummated, without any need for member vote or input. Thus, the issues resulting from the Union Merger cannot be considered separately from the issues surrounding the Plan Merger. An ERISA Impact Report is needed to disclose to the SAG and AFTRA members how their pension and health benefits may be affected by the eventual Plan Merger.

It is my opinion, based on my careful consideration of this issue, that a Plan Merger raises complex issues, could create serious problems and conflicts, and could result in loss of benefits for both SAG members and AFTRA members. The precise impact on Plan benefits (or required member and co-sponsor contributions) cannot be properly assessed without an ERISA Impact Report. Accordingly, consistent with the Joint Boards of Trustees (which govern the Boards) ERISA fiduciary duties to the Plans and the participants and beneficiaries, the "best practice" approach is to thoroughly investigate all these issues <u>prior to</u> the vote of the membership, not after, particularly when the Plan Merger appears to be inevitable once the Union Merger is complete.

Based on my 30+ years of experience advising clients considering plan sponsor mergers, sponsors of ERISA covered plans, Administrative Committees, Unions, Association and employees alike, and my extensive knowledge of ERISA and the Code, it would be in accordance with the spirit of ERISA and in the best interests of the Plans' participants, beneficiaries and co-sponsors for the Unions to first conduct and carefully consider an ERISA Impact Report prior to the Union Merger vote.

*Id*. ¶¶ 16-18.

62.    Brucker further stated:

Until a full and formal ERISA Impact Report of how to address and quantify these problems is completed, no , one, [sic] not even pension experts, can intelligently evaluate or quantify the probable negative impact on the members' pension and health benefits. The Union Merger is so inextricably interconnected with the Plan Merger that members cannot be asked to evaluate and vote on the Union Merger until issues relating to the Plan Merger have been resolved and concrete proposals formulated so that the members can make informed choices.

A similar study was done in 2003. It is referred to as the Mercer Report. It is attached hereto as Exhibit B. It isolated the merger variable and concluded:

"If one design is to apply to SAG and AFTRA participants, suggested approach will be to determine a combined future benefit design…"

***

"… this will almost certainly mean either that contributions will need to increase or that benefits will be lower than current benefits for most members…."

***

"… Combined plan will not be able to afford all of the desirable features for both plans – absent contribution increases…"

Essentially, the Mercer study confirmed what is fairly obvious: you cannot merge a rich plan (SAG) with a relatively poor plan (AFTRA) and thereby produce two SAG level plans. Either benefits must be cut or contributions must be increased. Studying this issue is the due diligence required.

63.    Further, the January 25, 2012 "Feasibility Report of Deborah M. Lerner" ("Lerner Report") to SAG and AFTRA to "provide a general overview of the issues and likely legal impact on the pension and health plans of… [SAG and AFTRA] in the event the two unions merge" addressed "what, if any, merger plan can be achieved which will satisfy the requirements of the law and the protection of all eligible members against loss of benefits, presently or in the future," and noted while "a health plan generally may reduce participants' benefits or increase employee premiums for

coverage subject only to certain advance notice requirements . . . , [a] merger of health plans may be effected for the purpose of preventing future benefit cuts and strengthening the contribution base of the combined plan . . . , a plan merger would eliminate the problems of many individuals who work under the jurisdiction of both unions but have insufficient covered earnings under either health plan to qualify for benefits . . . [and] [t]he basic fiduciary analysis used to determine whether or not two health plans should be merged is similar although not identical to that used for pension plans." Lerner Report at 1, 9.

64.    The Lerner report did not opine that a merger of the health plans was advisable for any participants. Nor did the Lerner report analyze or opine on the impact of a merger of the health plans on participants' future health benefits. The Lerner Report, in fact, concluded without analysis that steps "could" be taken to address the "concerns of participants" and "some of the issues surrounding the combination of the plans." *Id*. at 10.

65.    The Health Plans Merger did not "protect all eligible members" or "prevent [ ] future benefit cuts." A diligent pre-merger investigation and analysis would have revealed the peril, the unsustainability of the benefit structure in the merged plan and whether protective measures were required to and could be implemented in the merged plan in order for the merger to be solely in the interests of the SAG Health Plan and its participants. As alleged herein, the SAG-AFTRA Health Plan Trustees knew by at least soon after the merger the health benefit structure in the merged plan was not sustainable at the then-current funding levels, and benefit cuts were looming.

66.    As alleged above, prior to the Health Plans Merger, the contribution levels varied for SAG and AFTRA participants. The merged plan retained the disparity. The collective bargaining agreements dictate the contribution levels. Performers' contributions are currently made at 19.5% of covered earnings, which

include sessional and residuals earnings, while broadcasters' contributions are made at 10-13% of current wages under the applicable station contracts.

### C. Prohibited Transaction in the Health Plans Merger

67.    The SAG Health Plan Trustees caused the SAG Health Plan to proceed with the Health Plans Merger, which the trustees knew constituted a direct or indirect prohibited transaction between the SAG Health Plan and a "Party in Interest," in violation of ERISA.

68.    The SAG Health Plan Trustees hastily proceeded with the Health Plan's Merger to benefit the political objectives of union leadership and the union set in motion at the time of the Unions merger, at the expense of the SAG Health Plan participants and SAG pension plan participants.

### D. Breach of Fiduciary Duty By the SAG-AFTRA Health Plan Trustees Following the Health Plans Merger

#### 1. Failure to Disclose to Looming Benefit Cuts and Funding Required to Sustain Health Coverage and Eligibility Structure

69.    The collective bargaining agreements negotiated to fund the SAG-AFTRA Health Plan are the most vital part of the plan. Article I Section 8 of the SAG-AFTRA Trust Agreement provides: "Any such Collective Bargaining Agreement shall be deemed to incorporate, specifically, the terms and conditions of… [the SAG-AFTRA Trust] Agreement, and by executing such Collective Bargaining Agreement, each Employer that is a party to such agreement thereby agrees to comply with, and be bound by, each and every provision of the SAG-AFTRA Health Fund and… [the SAG-AFTRA Trust] Agreement (as such documents may be amended from by the [SAG-AFTRA Health Plan Board of Trustees] from time to time."

70.    Article V of the SAG-AFTRA Trust Agreement requires employers to contribute to the SAG-AFTRA Health Plan the amounts required by the negotiated collective bargaining contract between the union and the employer.

71.     The collective bargaining contracts determine the benefit package for the members, including the wages, working conditions and the welfare plan contribution components. The contracts also determine the rates of contributions based on earnings and where the new money (increases) is directed or dedicated.

72.     The SAG-AFTRA Trustees knew the collective bargaining contracts were a vital part of the plan and the matters subject to negotiation, and the negotiation power of the Union bargaining team to obtain funding and terms was vital to protect benefits and participant eligibility for coverage.  The Lerner Report stated: "The only sources of a pension plan's income are employer contributions and investment gain. Investment gain or loss is primarily a function of the returns of the securities markets. However, the negotiating parties will have the ability to obtain higher plan contributions. The success of the union in negotiating higher contributions will depend in large part on the strength of the union, assuming financially viable contributing employers." Lerner Report at 4. In fact, 90% of health plan funding comes directly from employer contributions.

73.     The negotiation of the terms of the collective bargaining agreements involves the package of value to be obtained by the members under the contracts in exchange for their work. The package includes wage increases, pension and welfare plan contributions and working conditions. The union negotiators seek to maximize the total value for members and allocate the total package value among these components. The contract negotiations are also an opportunity for the negotiating team to include diversions of wage increases, and such diversions are commonly included and permit the union board to divert a portion of the negotiated wage increases to other funding such as the health plan. It is thus vital to the efficacy of the negotiations that the union negotiators are fully informed concerning all information material to the relative value to the members of the respective components.

74.     As alleged above, the SAG-AFTRA Health Plan Trustees knew for at least two years the benefit structure in the merged plan was in peril and cuts loomed.

Trustee Richard Masur stated the Benefit Cuts were in the works for two years, and trustee Barry Gordon said the trustees had worked nearly every day for two years trying to figure out how they could preserve the health benefit.

75.     The three major collective bargaining agreements were negotiated in this two-year period. The "Commercials" contract was negotiated in February and March 2019. The Commercials contract was presented to the union SAG-AFTRA National Board, some of the members of which were also SAG-AFTRA Health Plan Trustees, for approval and was put to a membership vote and approved in April 2019. The contract date was March 31, 2019.  The "Netflix" contract was negotiated by union staff only negotiators and these terms were presented to the full union negotiating team for approval in the Summer of 2019, and the contract was presented for approval to the SAG-AFTRA National Board, some of the members of which were also health plan trustees. The Netflix contract was not put to a membership vote. The "TV/Theatrical" contract was negotiated in the April-June 2020 period.   The TV/Theatrical contract was presented for approval to the SAG-AFTRA National Board on June 29, 2020.  The TV/Theatrical contract was put to a membership vote and approved in July 2020.  The membership was notified of the SAG-AFTRA Health Plan changes on August 12, 2020. The SAG-AFTRA National Board was told on August 11, 2020. In a webinar with the National Board, SAG-AFTRA Health Plan CEO Michael Estrada stated without the Benefit Cuts the plan would deplete its "crucial reserve" in 2024. This Crucial reserve was funded in part by participants who will lose SAG-AFTRA health coverage under the Benefit Cuts.

76.     The SAG-AFTRA Health Plan Trustees knew but did not disclose to the non-health plan trustee members of the union negotiating team or the SAG-AFTRA National Board, or to the membership, in connection with the negotiations and votes to approve the contracts. The withheld material information included the looming peril, the unsustainability of the health benefit structure and the insufficiency of the negotiated terms to sustain the benefit structure. Further, the SAG-AFTRA Health

Plan Trustees who were members of the union negotiating teams and the SAG-AFTRA National Board did not abstain or recuse themselves from the approval votes and voted to approve the contracts.

77.  The union negotiating team could have directed much more money into the SAG-AFTRA Health Plan had the team known the funding required to sustain the health benefit and eligibility of participants for coverage. Postcards were sent to the membership by the union urging members to approve the TV/Theatrical contract. The post cards urged "Vote Yes," touting "transformative gains," increase of "up to $54 million" to the health plan and "26% increase in fixed streaming residuals." The membership was not informed the up to $54 million was insufficient to sustain the health benefit or that residuals earnings would no longer count toward covered earnings for health coverage of Retirees.

78.  SAG-AFTRA Health Plan Trustees David White and Ray Rodriguez were the lead negotiators on all three contract negotiations. Four trustees - David White, Ray Rodriguez, Linda Powell and Michael Pniewski - participated in the negotiation or approval of the 2020 TV/Theatrical and Netflix contracts. The Netflix contract was negotiated by the union contract staff only, David White and Ray Rodriguez, who presented the negotiated terms to the full union negotiating team for approval. The members of the TV/Theatrical negotiating committee included Linda Powell and Michael Pniewski.  Many members of the management negotiating committee for the TV/Theatrical and Commercials contracts were SAG-AFTRA Health Plan Trustees, including Carol Lombardini and several others. The Commercials contract management negotiators were also SAG-AFTRA Health Plan Trustees, including Stacey Marcus. SAG-AFTRA Union Trustee David Hartley-Margolin also participated in the negotiations concerning the Commercials contract. Yet, none of these individuals ever disclosed, to any of the non-trustee members of the negotiating committee, the non-health plan trustee members of the union board that approved the contracts or the membership, that the plan was in critical condition

or that drastic changes were coming and that the negotiated contract terms were insufficient to sustain the health benefit structure. Notably, the theme of the TV/Theatrical negotiations was: Do no harm.

79.    The SAG-AFTRA Health Plan Trustees knew the Union negotiating team was bound by the duty of fair representation and the contracts were a vital part of the plan, providing the primary source of plan funding through employer contributions. Article I Section 8 of the SAG-AFTRA Trust Agreement provides: "Any such Collective Bargaining Agreement shall be deemed to incorporate, specifically, the terms and conditions of… [the SAG-AFTRA Trust] Agreement, and by executing such Collective Bargaining Agreement, each Employer that is a party to such agreement thereby agrees to comply with, and be bound by, each and every provision of the SAG-AFTRA Health Fund and… [the SAG-AFTRA Trust] Agreement (as such documents may be amended from by the [SAG-AFTRA Health Plan Board of Trustees] from time to time." Article V requires employers to contribute amounts provided by the contracts.

80.    Further, in boasting the benefits of the Health Plans Merger in June 2016, Gabrielle Carteis and David White stated that the merger "ensure[ed] that all earnings under our contracts now credit to a single health plan," "position[ed] our health plan to be financially sustainable for all members for years to come" and "strengthen[ed] the overall financial health of the plan while enduring comprehensive benefits for all participants."

81.    The SAG-AFTRA Health Plan Trustees failed to disclose fundamentally material information: the looming peril of the health benefits structure, the unsustainability of the benefit structure under then-current funding and the insufficiency of the negotiated contract terms to sustain the benefit structure for all participants and their earnings under the contracts. The union negotiators, the SAG-AFTRA National Board and voting membership lacked material information in negotiating and approving the contracts. The failure to disclose this information to the

Union negotiating team and the voting membership constituted a breach of the SAG-AFTRA Health Plan Trustees' fiduciary duty to disclose material information to the plan and the participants.

### 2. Approval and Implementation of Illegal Benefit Cuts

82.   The SAG-AFTRA Trust Agreement required the plan to be managed and administered in compliance with plan documents, ERISA, the Internal Revenue Code and other applicable law. Article II Section 2 of the SAG-AFTRA Trust Agreement provides: "Purpose. The Health Fund is established for the exclusive purpose of providing certain health and welfare benefits (which may include medical, death, and other related benefits that may be provided by an organization exempt from income tax under Code Section 501(a) by virtue of being an organization described in Code Section 501(c)(9)) to Participants and their Beneficiaries, and shall further provide the means for financing and maintaining the operation and administration of the Health Fund and the Plan in accordance with this Agreement, the Plan, ERISA, the Code and other applicable law."

83.   Article XIV Section 2 of the SAG-AFTRA Trust Agreement provides: "Choice of Law. This Agreement and the Health Fund created hereby shall be construed, regulated, enforced and administered in accordance with the internal laws of the State of California applicable to contracts made and to be performed within the County of Los Angeles (without regard to any conflict of laws provisions), to the extent that such laws are not preempted by the provisions of ERISA (or any other applicable laws of the United States)."

84.   Article XIV Section 11 of the SAG-AFTRA Trust Agreement provides: "Construction. Anything in this Agreement, or any amendment hereof, to the contrary notwithstanding, no provision of this Agreement shall be construed so as to violate the requirements of ERISA, the Code, or other applicable law."

85.   The SAG-AFTRA Trustee Defendants' fiduciary duties under ERISA required the trustees to administer and manage the plan in compliance with positive law and the documents that govern the plan. The approval and implementation of the Benefit Cuts constituted breaches of the SAG-AFTRA Health Plan Trustees' fiduciary duty to do so.

86.   The Benefit Cuts impose a penalty on participants who take their vested pensions. Participants age 65 and older who do not take a vested pension are credited for all sessional and residuals earnings long as they have $1 of sessional earnings. Participants who take their pension lose credit for residuals earnings toward SAG-AFTRA health coverage eligibility at age 65, in breach of the trustees' fiduciary duty.

87.   The health plan trustees and the pension trustees knew they were imposing a penalty on an accrued pension benefit by the Benefit Cuts. There is currently a significant overlap of members on the board of trustees of the SAG-AFTRA Health Plan and the boards of the SAG Pension Plan and the AFTRA Retirement Fund.  Specifically, other than Defendants Kim Sykes, James Harrington, Marla Johnson, and Lara Unger, approximately 90% of the 39-member board of trustees for the SAG-AFTRA Health Plan also serves on the board of either the SAG Pension Plan or the AFTRA Retirement Fund. Of the current members of the SAG-AFTRA Health Plan board of trustees, the following currently serve on board of the SAG Pension Plan: Union Trustees - Daryl Anderson, Amy Aquino, Timothy Blake, Jim Bracchitta, John Carter Brown, Duncan Crabtree-Ireland, Barry Gordon, Richard Masur, John T. McGuire, Michael Pniewski, Ray Rodriguez, Ned Vaughn, David P. White; Producer Trustees - Helayne Antler, J. Gorham Keith, Robert W. Johnson, Sheldon Kasdan, Allan Liderman, Carol A. Lombardini, Stacy K. Marcus, Diane P Mirowski, Paul Muratore, Tracy Owen, Marc Sandman, David Weissman, Russell Wetanson, and Samuel P. Wolfson.  Of the current members of the SAG-AFTRA Health Plan board of trustees, the following currently serve on the board of the AFTRA Retirement Fund: Union Trustees - David Hartley-Margolin, Matthew

Kimbrough, Lynne Lambert, Shelby Scott, Sally Stevens, Ned Vaughn, and David P. White; Producer Trustees - Ann Calfas, J. Gorham Keith, Harry Isaacs and Marc Sandman.

88.     As structured, the Benefit Cuts illegally discriminate on the basis of age in violation of the ADEA, 29 U.S.C. § 621 et seq., the UCRA, Cal. Civ. Code § 51 et seq., and the ACA, 42 U.S.C. § 18001 et seq.

89.     The Age Discrimination in Employment Act of 1967 ("ADEA") prohibits discrimination on the basis of age against individuals 40 years of age or older. The ADEA makes it unlawful for a labor organization to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. §§ 623(a)(1), (f)(2). As discussed herein, the SAG-AFTRA Health Plan Trustees were motivated by Plaintiffs' ages in creating Benefits Cuts designed to preclude participants 65 and older from health coverage by the SAG-AFTRA Health Plan, in violation of ADEA § 623. Alternatively, the Benefits Cuts have a significant discriminatory impact upon plan participants 40 years of age or older in violation of ADEA § 623.

90.     The Unruh Civil Rights Act, Cal. Civ. Code § 51 et seq., provides that all persons are entitled to the "full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever," regardless of age. By the conduct alleged herein, each of the SAG-AFTRA Heath Plan Trustees denied, aided or incited in the denial of, discriminated or made a distinction that denied Plaintiffs and other participants full and equal advantages, privileges and services to Plaintiffs and other participants, and that participants' ages were a substantially motivating reason informing this conduct, and such conduct by the SAG-AFTRA Health Plan Trustees constitutes a violation of the Unruh Act.

91.     Under Section 1557 of the Affordable Care Act, an individual shall not, on the ground prohibited under . . . the Age Discrimination Act of 1975 (42. U.S.C. 6101 et seq.) . . . be excluded from participation in, be denied the benefits of, or be

subjected to discrimination under, any health program or activity. 42 U.S.C. § 18116(a). *See* 45 C.F.R. §§ 92.1-92.3. Section 1557 expressly incorporates the enforcement provisions of the Age Discrimination Act, which provides that "no person in the United States shall, on the basis of age, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any program or activity receiving Federal financial assistance." 42 U.S.C. § 6102. The SAG-AFTRA Heath Plan Trustees included a "Section 1557 Non-discrimination Notice" representation in the disclosure of the Benefit Cuts to participants.

92.     The increase in the coverage eligibility threshold from $18,040 to $25,950 for Plan II participants, the increase in the Age & Service coverage eligibility threshold from $13,000 to $25,950 and the elimination of residuals from covered earnings for participants 65 years of age or older and taking a pension to qualify for SAG-AFTRA health coverage, while these participants' contributions and dues continue to be based on residuals and sessional earnings at the same rate as younger participants, together with the elimination of Senior Coverage and taking of it from already vested participants and surviving spouses, and the change of the base earnings year for all participants 65 or older, illegally discriminates based on age, contrary to the express representations in the "Section 1557 Non-discrimination Notice" provided to the participants.

93.     In contrast to sessional earnings, which is a performer's pay for actual work in a performance, residuals earnings are compensation paid to performers for use of a theatrical motion picture, television program and commercials beyond the use covered by performer's initial compensation. Residuals include payments made for free TV, basic cable, video/DVD, New Media and theatrical productions. Residuals have historically been the subject of difficult fights and strikes to maintain and increase the important source of income. According to SAG-AFTRA: "Oftentimes, residuals linked to the continued exhibition of union projects are the

'long tail' of income for performers and their heirs."[2] Residuals are a vital part of a participant's earnings until the day the participant dies.

94.   Under the current and past contracts, residuals earnings pay the exact same contribution rate (for a given corresponding earnings year) as sessional earnings. The SAG-AFTRA Health Plan provided participants earnings credit for residuals after age 65 as long as participants had $1 in sessional earnings. The Benefit Cuts penalize participants 65 and older who take their vested pension. Participants who take their pension lose credit for residuals earnings toward health coverage at age 65, yet these participants' contributions based on residuals earnings will continue to be made at the same rate as younger participants and their dues will continue to be calculated based on residuals and sessional earnings. Retirees by definition receive little, if any, sessional earnings, but contribute to the SAG-AFTRA Health Plan based on residuals earnings and pay dues at the same rate as younger members. Retirees therefore cannot meet the $25,950 eligibility threshold, yet they contribute at the same rates as younger participants. These contribution rates were negotiated with wage increases and working conditions as a benefits package in exchange for the members' work under the contracts. Under the Benefit Cuts, the contributions based on residuals earnings will be worthless to members 65 and older who take their vested pension and penalize members who take their vested pension. Union dues also remain the same for all SAG-AFTRA members based on all earnings including residuals. Further, the Benefit Cuts eliminate Senior Coverage, which provided lifetime health coverage under the health plan for members with 20 years of accrued vested pension credit, and take accrued Senior Coverage from participants and surviving spouses already receiving it.

95.   In addition, the base earnings year for all participants 65 years of age or older was immediately set to October 1-September 30. This unfairly limited the time

---

[2]   *Residuals Claims Connects with You*, SAG-AFTRA (May 23, 2018), available at https://www.sagaftra.org/residuals-claims-connects-you

for affected older participants from seeking opportunities urgently for sessional earnings, when the trustees knew sessional opportunities have been limited by the Covid-19 pandemic. The benefit year for all participants 65 or older was set to January 1 - December 31. The change took pre-qualified coverage from some participants 65 and older.

96.     Further, the disparity in contribution rates between performers and broadcasters will result in broadcasters qualifying for coverage based on far lower earnings. For example, a broadcaster with $26,000 in earnings will have contributions made of approximately $2,600 and be eligible for health coverage. A performer with just $20,000 in earnings, however, will have contributions made of approximately $4,000 and will not be eligible for health coverage. In other words, broadcasters will qualify, while performers who have had higher contributions to the plan than the broadcaster will not.

97.     Following the Benefit Cuts, Commercials performers over 65 years of age will have no practical ability to qualify for health coverage, as approximately 95% of their earnings are from residuals.

98.     Moreover, the participants who are 65 and older, taking a pension and losing SAG-AFTRA coverage have contributed to what the plan's CEO calls the "fund reserve." An August 25, 2020 report in "Deadline" quoted SAG-AFTRA Health Plan CEO Michael Estrada, speaking and answering questions in an informational webinar to SAG-AFTRA members in August 2020.[3] Quoting Estrada, Deadline report stated:

> "Our trustees must manage the money coming into the Plan, and the money going out to pay for skyrocketing health care costs," Estrada said. "It would be nearly impossible for a health care plan like ours to perfectly maintain that balance every year, and that's why the Health

---

[3] *SAG-AFTRA Health Plan CEO Michael Estrada Describes "Perfect Storm" That Required Action To Save Plan*, DEADLINE (Aug. 25, 2020), available at https://deadline.com/2020/08/sag-aftra-health-plan-ceo-benefits-changes-perfect-storm-1203023261/.

Plan maintains a fund reserve. Think of this reserve as the Plan's savings account. This reserve is absolutely critical to the long-term sustainability of our Health Plan, and is designed to help the Plan continue to pay for the health care needs of our participants, even in years when our revenue is lower than expected or our participants' health care costs are higher than expected."

The SAG-AFTRA Health Plan, which came into existence in 2017 with the merger of the old SAG and AFTRA health funds, recorded an $18 million surplus that first year, as revenue sources were greater than expenses. "Another way to think about the surplus is that we added $18 million to our savings account, which at the end of 2017 totaled about $500 million," he said.

In 2018, the Health Plan experienced its first deficit – $48 million. "Our income was lower than expected, and health care costs for our participants were higher than expected," he said. "Since expenses were higher than our income, we had to use about 10% of our reserves to pay for our participants' health care expenses.

"Last year, our Health Plan had another deficit – of $50 million. In 2019, our income was actually higher than projected, but our expenses were even higher than that due to skyrocketing health care costs."

This, he said, "was further proof that the Health Plan was facing a structural issue, where health care expenses for our participants were far exceeding revenue coming into the Plan." To address the problem, the trustees implemented changes that took effect this year to help balance the plans' books. But then the shutdown hit, and for the past five-plus months of the pandemic, employer contributions have all but dried up.

"Our trustees are continuously reviewing projections and possible changes to Plan benefits," Estrada said. "And in the middle of 2019 – just seven months after the 2018 deficit and before realizing the full 2019 deficit – the trustees announced several benefit changes that went into effect in 2020 that would help address these deficits. In addition to the automatic annual 2% increase to eligibility thresholds, the trustees also reduced out-of-network co-insurance, increased out-of-pocket maximums, and made changes to our prescription drug benefit.

"As we ended 2019 and entered 2020, the Health Plan had reduced the size of its critical reserves by about 20% – or $100 million. And the trustees were beginning to evaluate the impact from the benefit changes that had just been implemented, as well as continuing their evaluation of several options for addressing the structural deficits that were now facing

the Health Plan. And then the unthinkable happened – the outbreak of COVID-19 and the resulting production shutdown. So while the trustees took immediate steps to help our participants, including a 50% reduction in second quarter premiums – the production shutdown is having a significant negative impact on employer contributions coming into the Plan. This truly is a perfect storm of increasing costs and reduced contributions, making our projected deficits even worse. This year, we are projecting deficits of $141 million because of continued high health care costs and lost contributions, which is our primary source of income.

"In 2021, our actuaries are also projecting the Plan to have a deficit of $83 million. And if the trustees didn't adopt structural changes, the deficits would continue and the Plan would run out of its crucial reserves by the year 2024. It was unequivocally clear to our trustees, that in order to safeguard our Health Plan, they needed to be proactive and implement structural changes for the benefit of our current, as well as our future, participants. Delayed action would only make the situation worse. Our trustees have made the very difficult, but absolutely necessary decision, to make structural changes to our Health Plan. As a result of these changes, the Health Plan is now projected to run surpluses, and begin rebuilding our critically important fund reserve in order to safeguard our Health Plan – not only to pay for the health needs of current participants, but also the health needs of future participants and their families."

99.   Michael Estrada also informed participants in a webinar on August 19, 2020 that the plan had reserves until 2024.

100.   Participants who will no longer qualify for SAG-AFTRA health coverage have contributed to the "fund reserve" but will be eliminated from coverage and their contributions to the health plan will continue to be made at the same rate based on residuals earnings. The Senior Coverage lifetime health care for all members with 20 years of pension service has been eliminated and it has been taken from participants and surviving spouses already receiving it.

101.   Contrary to the trustees' claims, the Covid-19 pandemic did not urgently necessitate immediate draconian cuts in health coverage for older members. Employer contributions have not "all but dried up," and "the Plan's savings account," funded in part by members losing health coverage, is not gone.  Far less draconian and equitable

adjustments were available for a one-time event like Covid-19, such as increased diversions.

## V.   CLASS ACTION ALLEGATIONS

### A. **Counts I and III Class**

102.   Pursuant to 29 U.S.C. §1132(a)(2), ERISA authorizes any participant or beneficiary of a plan to bring an action individually on behalf of the plan to enforce fiduciary liability to the plan under 29 U.S.C. §1109(a). Further, ERISA Section 1132(a)(3) authorizes any participant or beneficiary to sue as a representative of the plan to enjoin any act or practice that violates ERISA or to obtain other appropriate equitable relief to redress violations and/or enforce the provisions of ERISA. 29 U.S.C. §1132(a)(3).

103.   In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the SAG Health Plan prior to the Health Plans Merger, as an alternative to direct individual actions on behalf of the plan under 29 U.S.C. § 1132(a)(2) and (3), Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the SAG Health Plan at the time of the Health Plans Merger. Plaintiffs seek to certify, and to be appointed as representatives of, the following class (the "Counts I and III Class"):

104.   All participants and beneficiaries of the SAG Health Plan at the effective time of the Health Plans Merger.

105.   Excluded from the Class are Defendants and any plan fiduciaries. Plaintiffs reserve the right to modify, change, or expand the Class definition based upon discovery and further investigation.

106.   This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons.

107.   **Numerosity**: The members of Counts I and III Class are so numerous that joinder of all members is impracticable. While the exact number and identities of

individual members of the Counts I and III Class are unknown at this time, such information being in the sole possession of Defendants and obtainable by Plaintiffs only through the discovery process, Plaintiffs believe, and on that basis allege, that many thousands of persons comprise the Class. On the basis of Form 5500 filed with the DOL for the Plan year ending December 31, 2019, the Class includes at least 37,248_plan participants, inclusive of active participants, retired or separated participants receiving benefits, other retired or separated participants entitled to benefits, and beneficiaries of deceased participants who are receiving or are entitled to receive benefits.

108. **Existence and Predominance of Common Questions of Fact and Law:** Common questions of law and fact exist as to all members of the Counts I and III Class because Defendants owed fiduciary duties to the plan and to all participants and beneficiaries, and took the actions and omissions alleged herein as to the Plan and not as to any individual participant. These questions predominate over the questions affecting individual Counts I and III Class Members. These common legal and factual questions include, but are not limited to:

a. who are the fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a);

b. to whom are the fiduciaries liable for the remedies provided by 29 U.S.C. §1109(a);

c. whether Defendants were fiduciaries to the Plan under ERSIA in the challenged conduct;

d. whether Defendants breached fiduciary duties to the Plan, participants, and beneficiaries by the challenged conduct in violation of ERISA;

e. if so, the amount of damages or monetary relief that should be provided to the Plan and its participants; and

f.      what equitable and other relief should be imposed in light of Defendants' breaches.

Given that Defendants have engaged in a common course of conduct as to Plaintiffs and the Counts I and III Class, similar or identical injuries and violations are involved and common questions far outweigh any potential individual questions.

109.  **Typicality:** All of Plaintiffs' claims are typical of the claims of the Counts I and III Class because Plaintiffs were participants during the Counts I and III Class Period and all plan participants were harmed by the uniform acts and conduct of Defendants discussed herein. Plaintiffs, all Counts I and III Class Members, and the plan sustained monetary and economic injuries arising out of Defendants' breaches of their fiduciary duties to the plan.

110.  **Adequacy:** Plaintiffs are an adequate representatives for the Counts I and III Class because their interests do not conflict with the interests of the members of the Counts I and III Class they seek to represent; they were participants in the plan during the Counts I and III Class Period; and they are committed to vigorously representing the Counts I and III Class. Plaintiffs' retained counsel, Chimicles Schwartz Kriner & Donaldson-Smith LLP, Johnson & Johnson LLP and Law Offices of Edward Seidle, are highly competent and experienced in complex class action litigation – including ERISA and other complex financial class and derivative actions – and counsel intend to prosecute this action vigorously. The interests of the Counts I and III Class will be fairly and adequately protected by Plaintiffs and their counsel.

111.  **Superiority:** A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all plan participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small, and it would be impracticable for individual members to enforce their rights through individual actions. Even if Counts I and III Class members could afford individual litigation, the court system could not. Individualized litigation

presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, an economy of scale, and comprehensive supervision by a single court. Upon information and belief, members of the Counts I and III Class can be readily identified and notified based on, *inter alia*, the records (including databases, e-mails, etc.) that Defendants maintain regarding the plan. Given the nature of the allegations, no Counts I and III Class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action.

112. Prosecution of separate actions by individual participants and beneficiaries for the breaches of fiduciary duties would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants regarding their fiduciary duties and personal liability to the plan under 29 U.S.C. §1109(a), and adjudications by individual participants and beneficiaries regarding the breaches of fiduciary duties and remedies for the plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests. Therefore, this action should be certified as a class action under Fed. R. Civ. P. 23(b)(1)(A) or (B). Alternatively, then this action may be certified as a class action under Rule 23(b)(3) if it is not certified under Rule 23(b)(1)(A) and (B).

113. Defendants have acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Counts I and III Class, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Counts I and III Class as a whole.

### B. **Counts II and IV Class**

114.   Pursuant to 29 U.S.C. §1132(a)(2), ERISA authorizes any participant or beneficiary of a plan to bring an action individually on behalf of the plan to enforce fiduciary liability to the plan under 29 U.S.C. §1109(a). Further, ERISA Section 1132(a)(3) authorizes any participant or beneficiary to sue as a representative of the plan to enjoin any act or practice that violates ERISA or to obtain other appropriate equitable relief to redress violations and/or enforce the provisions of ERISA.

115.   In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the SAG-AFTRA Health Plan following the Health Plans Merger, as an alternative to direct individual actions on behalf of the plan under 29 U.S.C. § 1132(a)(2) and (3), Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the SAG-AFTRA Health Plan. Plaintiffs seek to certify, and to be appointed as representatives of, the following class (the "Counts II and IV Class"):

All participants and beneficiaries of the SAG-AFTRA Health Plan.

116.   Excluded from the Class are Defendants and any plan fiduciaries. Plaintiffs reserve the right to modify, change, or expand the Class definition based upon discovery and further investigation.

117.   This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons.

118.   **Numerosity**: The Counts I and III Class are so numerous that joinder of all members is impracticable. While the exact number and identities of individual members of the Counts I and III Class are unknown at this time, such information being in the sole possession of Defendants and obtainable by Plaintiffs only through the discovery process, Plaintiffs believe, and on that basis allege, that many thousands of persons comprise the Class. On the basis of Form 5500 filed with the DOL for the Plan year ending December 31, 2016, the Class includes at least 27,271 plan participants, inclusive of active participants, retired or separated participants

receiving benefits, other retired or separated participants entitled to benefits, and beneficiaries of deceased participants who are receiving or are entitled to receive benefits.

119. **Existence and Predominance of Common Questions of Fact and Law:** Common questions of law and fact exist as to all members of the Counts II and IV Class because Defendants owed fiduciary duties to the plan and to all participants and beneficiaries, and took the actions and omissions alleged herein as to the Plan and not as to any individual participant. These questions predominate over the questions affecting individual Counts II and IV Class members. These common legal and factual questions include, but are not limited to:

    a.  who are the fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a);

    b.  to whom are the fiduciaries liable for the remedies provided by 29 U.S.C. §1109(a);

    c.  whether Defendants were fiduciaries to the Plan under ERSIA in the challenged conduct;

    d.  whether Defendants breached fiduciary duties to the Plan, participants, and beneficiaries by the challenged conduct in violation of ERISA;

    e.  if so, the amount of damages or monetary relief that should be provided to the Plan and its participants; and

    f.  what equitable and other relief should be imposed in light of Defendants' breaches.

Given that Defendants have engaged in a common course of conduct as to Plaintiffs and the Counts II and IV Class, similar or identical injuries and violations are involved and common questions far outweigh any potential individual questions.

120. **Typicality:** All of Plaintiffs' claims are typical of the claims of the Counts II and IV Class because Plaintiffs were participants during the Counts II and

IV Class Period and all plan participants were harmed by the uniform acts and conduct of Defendants discussed herein. Plaintiffs, all Counts II and IV Class members, and the plan sustained monetary and economic injuries arising out of Defendants' breaches of their fiduciary duties to the plan.

121. **Adequacy:** Plaintiffs are an adequate representatives for the Counts II and IV Class because their interests do not conflict with the interests of the Counts II and IV Class that they seek to represent; they were participants in the plan during the II and IV Class Period; and they are committed to vigorously representing the Counts II and IV Class. Plaintiffs' retained counsel, Chimicles Schwartz Kriner & Donaldson-Smith LLP, Johnson & Johnson LLP and Law Offices of Edward Seidle, are highly competent and experienced in complex class action litigation – including ERISA and other complex financial class actions – and counsel intend to prosecute this action vigorously. The interests of the Counts II and IV Class will be fairly and adequately protected by Plaintiffs and their counsel.

122. **Superiority:** A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all plan participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small, and it would be impracticable for individual members to enforce their rights through individual actions. Even if Counts II and IV Class Members could afford individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, an economy of scale, and comprehensive supervision by a single court. Upon information and belief, members of the Counts II and IV Class can be readily identified and notified based on, *inter alia*, the records (including

databases, e-mails, etc.) that Defendants maintain regarding the plan. Given the nature of the allegations, no Counts II and IV Class Member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action.

123. Prosecution of separate actions by individual participants and beneficiaries for the breaches of fiduciary duties would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants regarding their fiduciary duties and personal liability to the plan under 29 U.S.C. §1109(a), and adjudications by individual participants and beneficiaries regarding the breaches of fiduciary duties and remedies for the plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests. Therefore, this action should be certified as a class action under Fed. R. Civ. P. 23(b)(1)(A) or (B). Alternatively, then this action may be certified as a class action under Rule 23(b)(3) if it is not certified under Rule 23(b)(1)(A) and (B).

124. Defendants have acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Counts II and IV Class, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Counts II and IV Class as a whole.

## VI.    CLAIMS

### COUNT I

### Violations of ERISA § 404(a)(1)(A)-(D)

### (Against the SAG Health Plan Board of Trustees and the SAG Health Plan Trustee Defendants)

125. Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

126.   As fiduciaries of the SAG Health Plan, the SAG Board of Trustees and the SAG Trustee Defendants were required, pursuant to ERISA §404(a)(1), to act solely in the interest of the participants and beneficiaries of the Plan "(A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan" (B) to discharge their duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims," (C) to diversify the investments of the Plan so as to minimize the risk of large losses, ERISA § 404(a)(1)(C), 29 U.S.C. §1104 (a)(1)(C), and (D) to act in accordance with the documents and instruments governing the Plan, ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).

127.   The SAG Board of Trustees and the SAG Trustee Defendants were required to manage and administer the SAG Health Plan and its assets solely for the benefit of the participants and their beneficiaries.

128.   The SAG Board of Trustees and the SAG Trustee Defendants considered, approved and implemented the Health Plans Merger without conducting a diligent, fully informed pre-merger investigation and analysis to assess the impact of the merger on the SAG Health Plan and its participants' future health benefits and the continued viability of the continued health coverage structure in the merged plan of the sustainability of the SAG Health Plan benefit under the funding structure of the merger plan and whether protections could be implemented for the merger to proceed solely in the best interest of the SAG Health Plan and its participants. The SAG Health Plan Trustees knowingly or recklessly disregarded the looming peril to the SAG Health Plan participants and unsustainability of the health benefit in the funding structure of the merged plan, in considering, approving and implementing the Health Plans Merger.

129.   The SAG Board of Trustees and the SAG Trustee Defendants caused the SAG Health Plan to proceed with the Health Plan's Merger, which the trustees knew constituted a prohibited transaction with a Party in Interest, at the expense of the participants. The merger benefitted the union and its leadership at the unfair expense of the SAG Health Plan participants and beneficiaries.

130.   By the foregoing, the SAG Board of Trustees and the SAG Trustee Defendants (a) failed to act solely in the interest of the participants and beneficiaries of the Plans for the exclusive purpose of providing them benefits, in violation of ERISA §404(a)(1)(A), 29 U.S.C. §1104(a)(1)(A); (b) failed to act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of ERISA §404(a)(1)(B), 29 U.S.C. §1104(a)(1)(B); and (c) failed to act in accordance with the documents and instruments governing the Plan, ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).

131.   As a result of their breaches, the SAG Health Plan Board of Trustees and the SAG Health Plan Trustee Defendants caused the SAG Health Plan and its participants to suffer losses for which they are liable.

## COUNT II

### Violations of ERISA § 404(a)(1)(A)-(D)

### (Against The SAG-AFTRA Health Plan Board of Trustees and the SAG-AFTRA Health Plan Trustee Defendants)

132.   Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

133.   As fiduciaries of the SAG-AFTRA Health Plan, the SAG-AFTRA Health Plan Board of Trustees and the SAG-AFTRA Health Plan Trustee Defendants were required, pursuant to ERISA §404(a)(1), to act solely in the interest of the participants and beneficiaries of the Plan "(A) for the exclusive purpose of: (i)

providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan" (B) to discharge their duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims," (C) to diversify the investments of the Plan so as to minimize the risk of large losses, ERISA § 404(a)(1)(C), 29 U.S.C. §1104 (a)(1)(C), and (D) to act in accordance with the documents and instruments governing the Plan, ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).

134.   The SAG-AFTRA Health Plan Board of Trustees and the SAG-AFTRA Health Plan Trustee Defendants were required to administer and manage the SAG-AFTRA Health Plan and its assets solely for the benefit of the participants and their beneficiaries.

135.   As alleged herein, the SAG-AFTRA Health Plan Board of Trustees and the SAG-AFTRA Health Plan Trustee Defendants knew but failed to disclose to the non-health plan trustee members of the Union negotiating teams and the SAG-AFTRA National Board, and to the membership, the imminent peril of the health benefit, the unsustainability of the benefit under then-current funding or the insufficiency of the negotiated terms of three collective bargaining contracts negotiated and approved in the two years prior to the Benefit Cuts.

136.   The SAG-AFTRA Health Plan Board of Trustees and the SAG-AFTRA Health Plan Trustee Defendants approved and implemented benefit changes by the Benefit Cuts that penalize participants who take their vested pension and discriminate based on age in violation of positive law including the UCRA and the ADEA the ACA and plan documents, as alleged herein.

137.   By the foregoing, the SAG-AFTRA Health Plan Board of Trustees and the SAG-AFTRA Health Plan Trustee Defendants (a) failed to act solely in the interest of the participants and beneficiaries of the Plans for the exclusive purpose of providing them benefits, in violation of ERISA §404(a)(1)(A), 29 U.S.C.

§1104(a)(1)(A); (b) failed to act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of ERISA §404(a)(1)(B), 29 U.S.C. §1104(a)(1)(B); and (c) failed to act in accordance with the documents and instruments governing the Plan, ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).

138.   As a result of its breaches, the plan and its participants suffered losses for which the trustees are liable.

## COUNT III

## Violations of ERISA § 1105(a)

### (Against the SAG Health Plan Board of Trustees and the SAG Health Plan Trustee Defendants)

139.   Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

140.   ERISA §405(a), 29 U.S.C. §1105(a), imposes liability on a fiduciary, in addition to any liability which the fiduciary may have had under any other provision of ERISA, if:

(1) the fiduciary participates knowingly in or knowingly undertakes to conceal an act or omission of such other fiduciary knowing such act or omission is a breach;

(2) the fiduciary fails to comply with ERISA §404(a)(1) in the administration of the specific responsibilities which give rise to the status as a fiduciary, the fiduciary has enabled such other fiduciary to commit a breach; or

(3) the fiduciary knows of a breach by another fiduciary and fails to make reasonable efforts to remedy it.

141.   Defendants, who are fiduciaries within the meaning of ERISA, and, by the nature of their fiduciary duties with respect to the Plan, knew of each breach of fiduciary duty alleged herein arising out of the Health Plans Merger, and knowingly

participated in, breached their own duties enabling other breaches, and/or took no steps to remedy these and the other fiduciary breaches.

142.   Despite this knowledge, Defendants failed to act to remedy the several violations of ERISA, as alleged in Counts I-III.

143.   As such, Defendants are liable for the breaches by the other Defendants pursuant to ERISA §405(a)(1) and (2).

144.   Had Defendants discharged their fiduciary duties prudently as described above, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct result of the breaches of fiduciary duty alleged herein, the SAG Health Plan, the Plaintiffs, and the other Counts I and III Class members have suffered losses.

## COUNT IV

### Violations of ERISA § 1105(a)

### (Against the SAG-AFTRA Board of Trustees and the SAG-AFTRA Trustee Defendants)

145.   Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

146.   ERISA §405(a), 29 U.S.C. §1105(a), imposes liability on a fiduciary, in addition to any liability which the fiduciary may have had under any other provision of ERISA, if:

> (1) the fiduciary participates knowingly in or knowingly undertakes to conceal an act or omission of such other fiduciary knowing such act or omission is a breach;

> (2) the fiduciary fails to comply with ERISA §404(a)(1) in the administration of the specific responsibilities which give rise to the status as a fiduciary, the fiduciary has enabled such other fiduciary to commit a breach; or

> (3) the fiduciary knows of a breach by another fiduciary and fails to make reasonable efforts to remedy it.

147.   Defendants, who are fiduciaries within the meaning of ERISA, and, by the nature of their fiduciary duties with respect to the Plan, knew of each breach of fiduciary duty alleged herein arising out of the management and administration of the plan and its assets following the Health Plans Merger, including the failure to disclose material information and the approval and implementation of the Benefit Cuts and changes to base year, and knowingly participated in, breached their own duties enabling other breaches, and/or took no steps to remedy these and the other fiduciary breaches.

148.   Despite this knowledge, Defendants failed to act to remedy the several violations of ERISA, as alleged in Counts II and IV.

149.   As such, Defendants are liable for the breaches by the other Defendants pursuant to ERISA §405(a)(1) and (2).

## VII.   PRAYER FOR RELIEF

150.   By virtue of the violations set forth in the foregoing paragraphs, Plaintiffs and the members of the Class are entitled to sue each of the Defendants pursuant to ERISA §502(a)(2), 29 U.S.C. §1132(a)(2), for relief on behalf of the Plan as provided in ERISA §409, 29 U.S.C. §1109, including for (a) recovery of losses to the Plan, (b) the recovery of any profits resulting from the breaches of fiduciary duty, and (c) such other equitable or remedial relief as the Court may deem appropriate including restoration of SAG-AFTRA health coverage benefits to participants affected by the wrongful Benefit Cuts.

151.   By virtue of the violations set forth in the foregoing paragraphs, Plaintiffs and the members of the Class are entitled, pursuant to ERISA §502(a)(3), 29 U.S.C. §1132(a)(3), to sue any of the Defendants for any appropriate equitable relief to redress the wrongs described above.

152.   WHEREFORE, Plaintiffs, on behalf the SAG Health Plan, the SAG-AFTRA Health Plan, themselves and the Class, pray that judgment be entered against Defendants on all claims, and request that the Court award the following relief:

A. A declaration that the Defendants breached their fiduciary duties under ERISA;

B. An Order compelling each fiduciary found to have breached his/her/its fiduciary duties to the plans jointly and severally to restore all losses to the plans which resulted from the breaches of fiduciary duty or by virtue of liability pursuant to ERISA §405;

C. An Order requiring (a) the disgorgement of profits made by any Defendant, (b) a declaration of a constructive trust over any assets received by any breaching fiduciary in connection with their breach of fiduciary duties or violations of ERISA, (c) an Order requiring the plans to cure illegal and inequitable action, or (d) any other appropriate equitable or monetary relief, whichever is in the best interest of the plans and their participants;

D. Ordering, pursuant to ERISA §206(d)(4), that any amount to be paid to or necessary to satisfy any breaching fiduciary's liability can be satisfied, in whole or in part, by attaching their accounts in or benefits from the plans;

E. Appointing an independent fiduciary, at the expense of the breaching fiduciaries, to administer the plans and manage the plans' assets and/or determination of benefits and/or to correct and reverse the wrongful changes to the benefit structure alleged herein;

F. Ordering the plans' fiduciaries to provide a full accounting of all fees paid, directly or indirectly, by the plans;

G. Awarding Plaintiffs and the Class their attorneys' fees and costs and prejudgment interest pursuant to ERISA §502(g), 29 U.S.C. §1132(g), the common benefit doctrine and/or the common fund doctrine;

H. Awarding pre-judgment and post-judgment interest; and

1   I.   Awarding all such other remedial or equitable relief as the Court deems
2        appropriate including an order requiring correction and reversal of the wrongful
3        benefit changes.

4                    **NOTICE PURSUANT TO ERISA SECTION 502 (h)**

5        To ensure compliance with the requirements of 29 U.S.C. § 1132(h), the
6   undersigned affirms, that upon this filing of this Class Action Complaint, a true and
7   correct copy of this Class Action Complaint will be served upon the Secretary of
8   Labor and the Secretary of Treasury by certified mail, return receipt requested.

9

10  DATED: December 1, 2020           **JOHNSON & JOHNSON LLP**

11

12

13                                    By:    /s/ Neville L. Johnson
14                                          Neville L. Johnson
                                            Douglas L. Johnson
15                                          Johnson & Johnson LLP
                                            439 N. Canon Drive, Suite 200
16                                          Beverly Hills, CA 90210
                                            Tel.: 310-9751080
17                                          Fax.:310-975-1095
                                            njohnson@jjllplaw.com
18                                          djohnson@jjllplaw.com

19                                          Steven. A Schwartz
                                            **Chimicles Schwartz Kriner**
20                                          **& Donaldson-Smith LLP**
                                            361 West Lancaster Avenue
21                                          Haverford, PA 19041
                                            Tel.: 610-642-8500
22                                          Fax: 610-649-3633
23                                          steveschwartz@chimicles.com

24                                          Robert J. Kriner, Jr.
25                                          Emily L. Skaug
                                            **Chimicles Schwartz Kriner**
26                                          **& Donaldson-Smith LLP**
27                                          2711 Centerville Road, Suite 201
                                            Wilmington, DE 19808
28

rjk@chimicles.com
els@chimicles.com

*and*

Edward Siedle
**Law Offices of Edward Siedle**
17789 Fieldbrook Circle West
Boca Raton, FL 33496
Tel.: 561-703-5958
esiedle@aol.com

*Attorneys for Plaintiffs and the Class*

## DEMAND FOR JURY TRIAL

A jury trial is hereby demanded.

DATED: December 1, 2020          **JOHNSON & JOHNSON LLP**

By:    /s/ Neville L. Johnson
Neville L. Johnson
Douglas L. Johnson
Johnson & Johnson LLP
439 N. Canon Drive, Suite 200
Beverly Hills, CA 90210
Tel.: 310-9751080
Fax.:310-975-1095
njohnson@jjllplaw.com
djohnson@jjllplaw.com

Steven. A Schwartz
**Chimicles Schwartz Kriner**
**& Donaldson-Smith LLP**
361 West Lancaster Avenue
Haverford, PA 19041
Tel.: 610-642-8500

1

2

Fax: 610-649-3633
steveschwartz@chimicles.com

Robert J. Kriner, Jr.
Emily L. Skaug
**Chimicles Schwartz Kriner
& Donaldson-Smith LLP**
2711 Centerville Road, Suite 201
Wilmington, DE 19808
rjk@chimicles.com
els@chimicles.com

*and*

Edward Siedle
**Law Offices of Edward Siedle**
17789 Fieldbrook Circle West
Boca Raton, FL 33496
Tel.: 561-703-5958
esiedle@aol.com

3

4

5

6

7

8

9

10

11

12

13

14

15

16

*Attorneys for Plaintiffs and the Class*

17

18

19

20

21

22

23

24

25

26

27

28

**COMPLAINT**