1   Neville L. Johnson, State Bar No. 66329
    Douglas L. Johnson, State Bar No. 209216
2   **Johnson & Johnson LLP**
    439 North Canon Drive, Suite 200
3   Beverly Hills, California 90210
    Tel:   310-975-1080
4   Fax:   310-975-1095
    njohnson@jjllplaw.com
5   djohnson@jjllplaw.com

6   Steven. A Schwartz                    Edward Siedle
    **Chimicles Schwartz Kriner**         **Law Offices of Edward Siedle**
7   **& Donaldson-Smith LLP**             17789 Fieldbrook Circle West
8   361 West Lancaster Avenue             Boca Raton, FL 33496
    Haverford, PA 19041                   Tel.: 561-703-5958
9   Tel.: 610-642-8500                    esiedle@aol.com
    Fax: 610-649-3633                     *Admitted Pro Hac Vice*
10  steveschwartz@chimicles.com
11  *Admitted Pro Hac Vice*

12  Robert J. Kriner, Jr.
    Emily L. Skaug
13  **Chimicles Schwartz Kriner**
    **& Donaldson-Smith LLP**
14  2711 Centerville Road, Suite 201
15  Wilmington, DE 19808
    rjk@chimicles.com
16  els@chimicles.com
    *Admitted Pro Hac Vice*
17
    *Attorneys for Plaintiffs and the Classes*

18
## UNITED STATES DISTRICT COURT
19
## CENTRAL DISTRICT OF CALIFORNIA
20

21   EDWARD ASNER, MICHAEL BELL,        **CASE NO. 2:20-cv-10914-CAS-JEM**
     RAYMOND HARRY JOHNSON,
22   SONDRA JAMES WEIL, DAVID           **FIRST AMENDED CLASS ACTION**
     JOLLIFFE, ROBERT CLOTWORTHY,       **COMPLAINT FOR RELIEF FOR:**
23   THOMAS COOK, AUDREY LOGGIA,
     DEBORAH WHITE, DONNA LYNN          **(1)BREACH OF FIDUCIARY**
24   LEAVY, individually on behalf of       **DUTY IN VIOLATION OF**
     themselves and the other similarly     **ERISA**
25   situated members of the Counts I and III
     Class and the Counts II and IV Class as **(2)BREACH OF FIDUCIARY**
26   defined herein,                         **DUTY IN VIOLATION OF**
                                             **ERISA**
27

28

| | |
|---|---|
| Plaintiffs, | **(3) BREACH OF FIDUCIARY DUTY BY A CO-FIDUCIARY IN VIOLATION OF ERISA** |
| v. | |
| THE SAG-AFTRA HEALTH FUND; THE BOARD OF TRUSTEES OF THE SCREEN ACTORS GUILD-PRODUCERS HEALTH PLAN; THE BOARD OF TRUSTEES OF THE SAG-AFTRA HEALTH FUND; DARYL ANDERSON; HELAYNE ANTLER; AMY AQUINO; TIMOTHY BLAKE; JIM BRACCHITTA; ANN CALFAS; JOHN CARTER BROWN; DUNCAN CRABTREE-IRELAND; ERYN M. DOHERTY; GARY M. ELLIOTT; MANDY FABIAN; LEIGH FRENCH; BARRY GORDON; J. KEITH GORHAM; NICOLE GUSTAFSON; JAMES HARRINGTON; DAVID HARTLEY-MARGOLIN; HARRY ISAACS; MARLA JOHNSON; ROBERT W. JOHNSON; BOB KALIBAN; SHELDON KASDAN; MATTHEW KIMBROUGH; LYNNE LAMBERT; SHELLEY LANDGRAF; ALLAN LINDERMAN; CAROL A. LOMBARDINI; STACY K. MARCUS; RICHARD MASUR; JOHN T. MCGUIRE; DIANE P. MIROWSKI; D.W. MOFFETT; PAUL MURATORE; TRACY OWEN; MICHAEL PNIEWSKI; ALAN H. RAPHAEL; JOHN E. RHONE; RAY RODRIGUEZ; MARC SANDMAN; SHELBY SCOTT; DAVID SILBERMAN; SALLY STEVENS; JOHN H. SUCKE; KIM SYKES; GABRIELA TEISSIER; LARA UNGER; NED VAUGHN; DAVID WEISSMAN; RUSSELL WETANSON; DAVID P. WHITE; SAMUEL P. WOLFSON | **(4) BREACH OF FIDUCIARY DUTY BY A CO-FIDUCIARY IN VIOLATION OF ERISA**<br><br>**DEMAND FOR JURY TRIAL** |
| Defendants. | |

## FIRST AMENDED CLASS ACTION COMPLAINT

1.     Plaintiffs, Edward Asner, Michael Bell, Raymond Harry Johnson, Sondra James Weil, David Jolliffe, Robert Clotworthy, Thomas Cook, Audrey Loggia, Deborah White, Donna Lynn Leavy ("Plaintiffs"), by and through their attorneys, bring this action, under the Employee Retirement Income Security Act 29 U.S.C. §§ 1001-1461 ("ERISA"), asserting Counts I and III on behalf of themselves and the other participants of the former Screen Actors Guild-Producers Health Plan ("SAG Health Plan") at the time of the merger of the SAG Health Plan with the AFTRA Health Fund ("AFTRA Health Plan"), effective January 1, 2017 ("Health Plans Merger"). Plaintiffs also bring this action under ERISA asserting Counts II and IV on behalf of themselves and other participants of the resulting, merged health plan, the SAG-AFTRA Health Fund ("SAG-AFTRA Health Plan").

### I.   NATURE OF ACTION

2.     This action asserts claims under ERISA for breaches of fiduciary duty against the SAG Health Plan Board of Trustees relating to the trustees' consideration, approval and implementation of the Health Plans Merger, and the SAG-AFTRA Health Plan Board of Trustees relating to the trustees' administration and management of the SAG-AFTRA Health Plan following the Health Plans Merger. Counts I and III of this action are brought against the former SAG Health Plan Trustees for conduct prior to the January 1, 2017 Health Plans Merger. Counts II and IV are against the SAG-AFTRA Health Plan Trustees for post-merger conduct.

3.     The SAG Health Plan was formed in 1960 to provide health coverage to all members of the Screen Actors Guild ("SAG"). To provide seed funding for the pension and health plans, every SAG performer surrendered the entirety of their television residuals earnings for movies made prior to 1960. Now, the same older performers who made those tremendous sacrifices have been abandoned and will

not be eligible for the Union health benefit, while employer contributions based on *all* of their earnings will continue to be made to fund the health plan, and *all* of their earnings will be used to assess Union dues, income taxes and the cost of an individual health plan.

4.     In 2012, SAG members commenced litigation seeking to stop the merger ("Union Merger") of SAG and the American Federation of Television and Radio Artists ("AFTRA") unions. SAG members were concerned (justifiably, as it turned-out) that the expected future mergers of the respective SAG and AFTRA benefit plans would adversely impact the benefits of SAG members. The members contended, among other things, SAG had not evaluated the impact of the expected future benefit plan mergers on SAG members and their health and pension benefits. In opposing the members' claims, SAG told the members and the court that any future merger of the unions' benefit plans would be within the purview of the benefit plan trustees, who would consider all impact information to determine whether a merger was in the best interests of the participants and their beneficiaries, in accordance with their ERISA fiduciary duties.

5.     The Union Merger was approved, and SAG and AFTRA merged into SAG-AFTRA, effective in March 2012 ("Union"). The respective SAG and AFTRA health and pension plans continued separately.

6.     In June 2016, Union leadership announced that the respective health benefit plans' trustees had agreed to merge the SAG Health Plan with the AFTRA Health Plan. Union President Gabrielle Carteris stated that the merger would position the new health plan "to be financially sustainable for all members for years to come." SAG Health Plan Trustee, Defendant David White, stated that the merger would "strengthen the overall financial health of the plan while ensuring comprehensive benefits for all participants," and would provide "a robust

foundation of healthcare for our membership, which the trustees can continue to improve upon, nurture and grow over time."

7.     The Health Plans Merger was effective January 1, 2017. In the merged plan, Senior Performer Coverage, which provided lifetime Union health coverage at age 65 to performers (and their dependents and surviving spouse) with the requisite years of Union pension service credit, continued for all performers already receiving it, and would be available to all performers  at age 65 with the required pension credit. In addition, *all* earnings for *all* participants age 65 and older were counted toward eligibility for the Union health benefit, so long as the participant had at least $1 in sessional earnings in the period.

8.     Just three and one-half years after the Health Plans Merger, on August 12, 2020, in the midst of the COVID-19 pandemic and the related work shutdown and economic crisis, the health plan shocked participants with the sudden announcement of draconian changes to the health plan benefit structure that targeted participants age 65 and older based on age, and prevented thousands of health plan participants from qualifying for the Union health benefit ("Benefit Cuts"). According to the health plan, the Benefit Cuts were purportedly driven by the health plan's dire financial condition, on which the plan opportunistically and misleadingly blamed the COVID-19 pandemic.

9.     As alleged more particularly herein, the Benefit Cuts, among other things, eliminated Senior Performer Coverage, disqualified residuals earnings of participants age 65 and older who are taking a Union pension from counting toward earnings-based eligibility for the Union health benefit, and immediately altered the base earnings period for all participants age 65 and older to October 1 – September 30.

10.     In addition, prior to the Benefit Cuts, the health plan had unconditionally assured Senior Performer Coverage to surviving spouses of

**FIRST AMENDED COMPLAINT**

performers for the remainder of their lifetime so long as he or she did not remarry. The January 17, 2016 letter to surviving spouse Madonna Magee stated: "Under the rules of the Health Plan we are privileged to provide continuing benefits under the Extended Spousal Benefit effective January 1, 2016. You are eligible for these benefits until you remarry or upon your demise." Plaintiff Audrey Loggia received the same promise following the December 2015 death of her spouse, Robert Loggia. The Benefit Cuts eliminated this benefit.

11. Employer contributions, which are by far the primary funding source for the health plan, are determined and mandated by the operative collective bargaining agreements, and are based on *all* earnings of each participant, regardless of age or whether the performer takes a Union pension. The health plan collects contributions from employers based on a participant's residual earnings at the very same rate it collects contributions based on the participant's sessional earnings, regardless of age or whether the performer is taking a Union pension. Union membership dues likewise are assessed based on a member's total earnings, regardless of age or whether the performer is taking a Union pension. Federal and state taxes and health premiums, too, are assessed based on *all* performer earnings.

12. Health plan trustees Richard Masur and Barry Gordon told participants in early August 2020, after the announcement of the Benefit Cuts, that the health plan trustees had known for *two years* that the merged plan's benefit structure was not sustainable under the operative collective bargaining agreements without additional funding. On April 1, 2020, the Union and the health plan had announced a temporary three-month reduction of health plan premiums and an extension of the Union dues deadline, in response to the COVID-19 pandemic. In announcing these measures, Gabrielle Carteris and health plan trustee David White stated nothing whatsoever about looming benefit cuts. In fact, they said "[i]n March alone we processed 312,000 residuals checks totaling $73 million."

13. The COVID-19 excuse for the Benefit Cuts ignores the readily available measures that could have been taken to address such a one-time event without targeting for elimination from the Union health benefit participants age 65 and older, many of whom surrendered their pre-1960 film residual rights to establish the SAG pension and health plans for all members. When the Benefit Cuts were announced, the health plan stated that the Benefit Cuts would remove 10% of the plan's 33,000 participants and 9% of their 32,000 dependents from SAG-AFTRA health coverage. This number, however, omitted the over 8,000 participants who were obtaining Senior Performer Coverage and will be prevented by the Benefit Cuts from obtaining the Union health benefit. In fact, the Benefit Cuts will likely eliminate more than one-third of health plan participants from the Union health benefit, while employers will continue to contribute to the health plan based on *all* earnings of these participants under the operative collective bargaining agreements, and Union dues will continue to be assessed based on *all* earnings of these participants.

14. Moreover, the health plan was projected to have a more than $250 million "fund reserve" at the end of 2020, which was funded in-part based on *all* earnings of the very participants who will be prevented by the cuts from obtaining the SAG-AFTRA health benefit.

15. Contrary to the June 2016 statements by Union President Carteris and SAG Health Plan Trustee Defendant David White, the January 2017 Health Plans Merger did not position the plan to "be financially sustainable for all members for years to come," "strengthen the overall financial health of the plan while ensuring comprehensive benefits for all participants," or provide "a robust foundation of healthcare for our  membership." The trustees of the merged plan knew by at least mid-2018 that the terms of the operative collective bargaining agreements were insufficient to sustain the health benefit structure for all participants. SAG-AFTRA

Health Plan trustee-defendants Richard Masur and Barry Gordon represented on August 19, 2020 that the Benefit Cuts had been in the works for two years, and that the trustees had worked nearly every day of those two years trying to figure out how to preserve the Union health benefit.

16.     During this two-year period in which the health plan trustees spent working to figure out how to preserve the Union health benefit, the three major collective bargaining agreements were negotiated and approved. Two of these agreements were approved by the SAG-AFTRA National Board and put to a membership vote, and the third was negotiated by Union staff and approved by the SAG-AFTRA National Board but not put to a membership vote. When these contracts were negotiated, the fundamental components of the total package of value for members in exchange for their work were up for bargaining by the members' representatives, including some new money, employer health plan contribution rates (based on *all* earnings of *all* members), wages, working conditions and potential diversions of wage increases.

17.     The SAG-AFTRA Health Plan Trustees, several of whom both participated directly in the contract negotiations as representatives of the health plan participants and voted as SAG-AFTRA National Board members to approve the contracts, failed to disclose the funding needed to sustain the Union health benefit structure, that the newly negotiated contract terms were insufficient to sustain the health benefit structure for all participants, and that massive cuts to eliminate thousands of participants from the Union health benefit were coming without increased funding. The health plan trustees who participated in the negotiations and votes to approve the contracts, in fact, approved and voted to approve the terms and the contracts.

18.     Health plan CEO Michael Estrada and health plan trustees White, Masur and Gordon effectively confirmed the materiality of the withheld

**FIRST AMENDED COMPLAINT**

information, in Zoom conferences with Union members shortly after the announcement of the Benefit Cuts, stating that employer contributions negotiated by the Union during the collective bargaining agreements have not kept up with the cost of providing Union health coverage to the 33,000 participants and their 32,000 family members.

19.   This action asserts that the SAG Health Plan Trustees breached their ERISA fiduciary duties in effecting the Health Plans Merger and the related amendments to the SAG Health Plan Trust Agreement. Their ERISA fiduciary duties required them to act solely in the interests of the SAG Health Plan participants and their beneficiaries, for the exclusive purpose of providing benefits to the participants and their beneficiaries, defraying reasonable administrative expenses, and with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims. *See* 29 U.S.C. § 1104(a). A diligent pre-merger investigation and analysis would have revealed that the merged health plan would not have a benefit structure sustainable for all participants under the operative collective bargaining agreements, and the inadvisability of proceeding with the merger given the detrimental impact it would have on the interests of the SAG Health Plan participants and their beneficiaries. Soon after the Health Plans Merger, by mid-2018, the SAG-AFTRA Health Plan Trustees knew the operative collective bargaining agreements would not sustain the health benefit structure for all participants in the merged plan. The SAG Health Plan Trustees either failed to prudently evaluate the sustainability of the health benefit structure in the merged plan, or discovered the benefit structure was not sustainable for all participants and nevertheless proceeded to effect the merger and amendments to the trust agreement. In either factual scenario, the SAG Health Plan Trustees breached their ERISA fiduciary duties.

**FIRST AMENDED COMPLAINT**

20.     This action also asserts that, following the Health Plans Merger, the SAG-AFTRA Health Plan Trustees breached their ERISA fiduciary duties by failing to disclose material information to the health plan participants and their representatives in connection with the three major contract negotiations and approvals. The SAG-AFTRA Health Plan Trustees, several of whom participated directly in the negotiations as representatives of the participants, and voted to approve the negotiated contracts as SAG-AFTRA National Board members, knew but failed to disclose the funding required to sustain the health benefit structure, that the newly negotiated terms were insufficient to sustain the health benefit structure and that massive cuts to eliminate thousands of participants from the Union health benefit were coming without increased funding. The withheld information was vitally material to the participants and their representatives in the negotiations and approvals, as the contracts were inextricably related to the participants' health benefit and the health plan. The failure to disclose the material information, particularly as several health plan trustees directly participated and approved the contract terms, violated the health plan trustees' ERISA fiduciary duties.

21.     The action also asserts the SAG-AFTRA Health Plan Trustees breached their ERISA fiduciary duties in effecting the Benefit Cuts targeting participants 65 or older for elimination from the Union health benefit based on age. The targeting of the participants age 65 and older to prevent these participants from obtaining the Union health benefit based on age improperly and illegally discriminated against these participants based on age, in contravention of the documents that govern the plan and in breach of the trustees' ERISA fiduciary duties. The plan documents, including the SAG-AFTRA Health Plan Summary Plan Description ("SPD"), prohibit discrimination against any participant in any way to prevent participants from obtaining benefits under the health plan. The SAG-AFTRA Health Plan Trust Agreement requires the trustees to administer and operate the plan in compliance

with applicable law. The Benefit Cuts discriminate against plan participants age 65 and older to prevent these participants from obtaining the Union health benefit based on age, and discriminate based on the participants' age in violation of the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. §§ 621-634 ("ADEA") and the Unruh Civil Rights Act, Cal. Civ. Code §§ 51, 51.5 and 52 ("UCRA"), as well as Section 1557 of the Affordable Care Act, 42 U.S.C. Section 18116(a) ("ACA"), including as the ACA applies to the Section 1557 representation made by the trustees to the participants. At least 13 participants have filed discrimination claims with the Equal Employment Opportunity Commission ("EEOC") against the SAG-AFTRA Health Plan. The plan's outside counsel, Cohen Weiss & Simon, has been retained by the plan to oppose, and has submitted position statements by the plan in opposition to, the claims.

22.     The action also asserts claims against the defendant trustees for co-fiduciary liability under ERISA.

## II.     Trustees' ERISA Fiduciary Duties

23.     ERISA imposes strict fiduciary duties of loyalty and prudence upon Plan fiduciaries. ERISA Section 404(a), 29 U.S.C. § 1104(a), provides the following, in relevant part:

(a) **Prudent man standard of care**

(1) [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –

(A) for the exclusive purpose of:

(i) providing benefits to participants and their beneficiaries; and

(ii) defraying reasonable expenses of administering the plan; [and]

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims;

(C) by diversifying the investments of the plan so as to minimize the risk of large losses unless under the circumstances it is clearly prudent not to do so; and

(D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with [title I] and title IV.

24.     ERISA Section 403(c)(1), 29 U.S.C. § 1103(c)(1), provides that plan assets "shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan."

25.     ERISA also imposes co-fiduciary liabilities on plan fiduciaries. Section 405(a), 29 U.S.C. § 1105(a), provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty:

(a) **Circumstances giving rise to liability.** In addition to any liability which he may have under any other provisions of this part [29 U.S.C. § 1101 et seq.], a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

(1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;

(2) if, by his failure to comply with section 404(a)(1) [29 U.S.C. § 1104(a)(1)] of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

26.     Under ERISA, a person is a fiduciary with respect to a plan to the extent the person: (1) exercises any discretionary authority or discretionary control over management of the plan or exercises any authority and control over the management or disposition of its assets; (2) renders investment advice regarding

plan assets for a fee or the other compensation (direct or indirect), or has the authority or responsibility to do so; or (3) has any discretionary authority or discretionary responsibility over plan administration. 29 U.S.C. § 1002(21)(A).

27.    In connection with the Health Plans Merger, the SAG Health Plan Trustees acted as ERISA fiduciaries: (1) SAG and several defendants in this action represented to members and the court in opposing members' claims to stop the Union Merger in 2012 that any future benefit plan merger would be within the purview of the benefit plan trustees, who would consider and evaluate all relevant impact information in the interests of the participants and their beneficiaries in accordance with their ERISA fiduciary duties; (2) the SAG Health Plan Trust Agreement and the SAG Health Plan SPD specifically provided that the trustees were subject to ERISA fiduciary duties in exercising their powers and duties as health plan trustees; and (3) considering, approving and implementing the merger and the related SAG-AFTRA Health Plan Trust Agreement amendments, and transferring the assets of the SAG Health Plan into the combined plan, constituted decisions and actions by the plan trustees regarding the administration and management of the SAG Health Plan and its assets under the SAG Health Plan Trust Agreement. The trustees' fiduciary duties required them to conduct a diligent, fully-informed investigation and analysis to determine the impact of the merger on the SAG Health Plan participants and their beneficiaries considering the transfer of plan assets, and to proceed only if the merger was solely in the best interests of the participants and their beneficiaries.

28.    Following the January 1, 2017 Health Plans Merger, the SAG-AFTRA Health Plan Trustees acted as fiduciaries under ERISA and the amended SAG Health Plan Trust Agreement in administering and managing the SAG-AFTRA Health Plan and in communicating with plan participants and their representatives. The trustees' ERISA fiduciary duties required them to disclose material information to the participants and their representatives concerning the plan assets and

participants' benefits, particularly where, as here, the failure to disclose known information under the circumstances is materially misleading. The negotiations of the collective bargaining agreements that determine, among other things, the employer contributions to the health plan based on participants' earnings under the contracts, and the votes whether to approve of these agreements, required the health plan trustees to disclose known information material to matters under the negotiation and vote concerning the collective bargaining agreements, which directly and inextricably relate to the rights and benefits of plan participants and the health plan.

29.     The SAG-AFTRA Health Plan Trustees acted as fiduciaries in operating the plan and approving and implementing the Benefit Cuts. The SAG-AFTRA Health Plan Trustees' ERISA fiduciary duties required them to manage and administer the plan in compliance with applicable law and in accordance with the governing plan documents including the plan trust agreement and SPD.

30.     ERISA Section 502(a)(2), 29 U.S.C. § 1132(a)(2), authorizes a participant to bring a civil action for appropriate relief under Section 409 of ERISA, 29 U.S.C. §1109, which provides:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary. A fiduciary may also be removed for a violation of Section 411 of this Act [29 U.S.C. § 1111].

31.     Section 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant to bring a civil action to "enjoin any act or practice which violates any provision of this title or the terms of the plan," or "to obtain other appropriate equitable relief . . . to

redress such violations or . . . to enforce any provisions of this title or the terms of the plan."

### III.   JURISDICTION AND VENUE

32.    This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because it is an action arising under 29 U.S.C. §§ 1132(a)(2) and (3).

33.    This District is the proper venue for this action under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because the SAG Health Plan was administered and can be found in this District, and the SAG-AFTRA Health Plan is administered and can be found in this District.

34.    Plaintiffs have standing to bring this lawsuit on behalf of the SAG Health Plan and the SAG-AFTRA Health Plan under 29 U.S.C. § 1132(a)(2) and (3). The plans are the victims of a fiduciary breach and will be the recipient of any recovery. Section 1132(a)(2) authorizes any participant or beneficiary to sue as a representative of the plans to seek relief on behalf of the plans. Section 1132(a)(3) authorizes any participant or beneficiaries to sue as a representative of the plans to enjoin any act or practice that violates ERISA or to obtain other appropriate equitable relief to redress violations and/or enforce the provisions of ERISA. As explained in detail below, the plans suffered substantial losses and harm caused by Defendants' fiduciary breaches and continue to remain exposed to harm. In addition, each individual Plaintiff has been injured by the trustees' fiduciary breaches. Those injuries may be redressed by a judgment of this Court in favor of Plaintiffs.

### IV.   THE PARTIES

35.    Plaintiff Edward Asner was a participant in the SAG Health Plan at the time of the Health Plans Merger, and has been a participant in the SAG-AFTRA Health Plan since the Health Plans Merger. Mr. Asner is over 65 and takes a pension. Prior the Benefit Cuts, Mr. Asner had accrued Senior Performer Coverage

by 20 years of pension service. The Benefit Cuts immediately changed Mr. Asner's base earnings period, which had been from April 1-March 31 for 59 years, to October 1-September 30, and Mr. Asner's benefit period, which had been from July 1-June 30 for 59 years, to January 1-December 31. Prior to the Benefit Cuts, Mr. Asner had more than $25,950 in yearly covered earnings with residuals and sessional earnings. Mr. Asner lost credit for residuals earnings by the Benefits Cuts. As a result of the Benefit Cuts and the elimination of Senior Performer Coverage and the elimination of residuals earnings from covered earnings to qualify for coverage, Mr. Asner will lose his SAG-AFTRA coverage and will not reach the qualifying earnings threshold by sessional earnings only.

36.     Plaintiff Michael Bell was a participant in the SAG Health Plan at the time of the Health Plans Merger, and has been a participant in the SAG-AFTRA Health Plan since the Health Plans Merger. Mr. Bell is over 65 and takes a pension. Prior to the Benefit Cuts, Mr. Bell had accrued Senior Performer Coverage by 20 years of pension service. Prior to the Benefit Cuts, Mr. Bell had more than $25,950 in yearly covered earnings with residuals and sessional earnings. Mr. Bell lost credit for residuals earnings by the Benefit Cuts. As a result of the Benefits Cuts and the elimination of residuals from covered earnings, Mr. Bell will lose his SAG-AFTRA health coverage and will not qualify for health coverage by residuals earnings.

37.     Plaintiff Raymond Harry Johnson was a participant in the SAG Health Plan at the time of the Health Plans Merger, and has been a participant in the SAG-AFTRA Health Plan since the Health Plans Merger. Mr. Johnson is over 65 and takes a pension. Prior to the Benefit Cuts, Mr. Johnson had accrued Senior Performer Coverage by 20 years of pension service. The Benefit Cuts immediately changed Mr. Johnson's base earnings period, which had been from April 1-March 31 for 44 years, to October 1-September 30, and Mr. Johnson's benefit period, which had been from July 1-June 30 for 44 years, to January 1-December 31. Prior to the Benefit Cuts, Mr. Johnson had more than $25,950 in yearly covered earnings

with residuals and sessional earnings. Mr. Johnson lost credit for residuals earnings by the Benefit Cuts. As a result of the Benefits Cuts and the elimination of residuals from covered earnings, Mr. Johnson will not qualify for SAG-AFTRA health coverage after June 30, 2021.

38.    Plaintiff Sondra James Weil was a participant in the SAG Health Plan at the time of the Health Plans Merger, and has been a participant in the SAG-AFTRA Health Plan since the Health Plans Merger. Ms. Weil is over 65 and takes a pension. The Benefit Cuts immediately changed Ms. Weil's base earnings period, which had been from January 1-December 31 for 30 years, to October 1-September 30, and Ms. Weil's benefit period, which had been from October 1-September 30 for 30 years, to January 1-December 31. Prior to the Benefit Cuts, Ms. Weil accrued Senior Performer Coverage by 20 years of pension service. Prior to the Benefit Cuts, Ms. Weil had more than $25,950 in yearly covered earnings with residuals and sessional earnings. Ms. Weil lost credit for residuals earnings by the Benefit Cuts. As a result of the Benefits Cuts and the elimination of residuals from covered earnings, Ms. Weil will not qualify for SAG-AFTRA health coverage.

39.    Plaintiff David Jolliffe was a participant in the SAG Health Plan at the time of the Health Plans Merger, and has been a participant in the SAG-AFTRA Health Plan since the time of the Health Plans Merger. Mr. Jolliffe is over 65 years of age and takes a pension. Prior to the Benefit Cuts, Mr. Jolliffe accrued Senior Performer Coverage by 20 years of pension service. The Benefit Cuts changed Mr. Jolliffe's base earnings period effective immediately from January 1-December 31 to October 1-September 30. Mr. Jolliffe was not notified by the health plan until late-October 2020 that his earnings period had already begun on October 1, despite that his earnings period had begun on January 1 for 53 years. The change limited his time to obtain sessional opportunities. The Benefit Cuts also changed Mr. Jolliffe's benefit period from April 1-March 31 to January 1-December 31. Prior to the Benefit Cuts, Mr. Jolliffe had pre-qualified for coverage through March 31, 2022.

Under the changed benefit period in the Benefit Cuts, his end benefit date was rolled back to December 31, 2021, taking accrued advanced contributions already made.

40.     Plaintiff Robert Clotworthy was a participant in the SAG Health Plan at the time of the Health Plans Merger, and has been a participant in the SAG-AFTRA Health Plan since the Health Plans Merger. Mr. Clotworthy is over 65 and takes a pension. Prior to the Benefit Cuts, Mr. Clotworthy would have qualified for Senior Performer Coverage upon reaching age 65 on October 24, 2020. The Benefit Cuts immediately changed Mr. Clotworthy's base earnings period, which had been from July 1-June 30 for nearly 50 years, to October 1-September 30, and Mr. Clotworthy's benefit period, which had been from October 1-September 30 for nearly 50 years, to January 1-December 31. Prior to the Benefit Cuts, Mr. Clotworthy had more than $25,950 in yearly covered earnings with residuals and sessional earnings. Mr. Clotworthy lost credit for residuals earnings by the Benefit Cuts. As a result of the Benefits Cuts and the elimination of residuals from covered earnings, Mr. Clotworthy will not qualify for SAG-AFTRA health coverage. In mid-2020, Mr. Clotworthy contacted the plan to discuss his health coverage, as he was to turn 65 on October 24, 2020. The plan representative told him he had "the golden ticket" of lifetime secondary SAG-AFTRA health coverage as a senior performer.

41.     Plaintiff Thomas Cook is 90 years of age and has been a SAG member and health coverage plan participant in the SAG-AFTRA Health Plan since the Health Plans Merger. Mr. Cook is over 65 and takes a pension.  Prior to the Benefits Cuts, Mr. Cook accrued Senior Performer Coverage by 20 years of pension service. Prior to the Benefit Cuts, Mr. Cook had more than $25,950 in yearly covered earnings with residuals and sessional earnings. Mr. Cook lost credit for residuals earnings by the Benefit Cuts. As a result of the Benefit Cuts, Mr. Cook and his dependents will lose and not qualify for SAG-AFTRA Senior Performer Coverage health coverage as of January 1, 2021.

42.     Plaintiff Deborah White has been a participant in the SAG-AFTRA Health Plan since the Health Plans Merger. Ms. White is over 65 and takes a pension. Prior to the Benefit Cuts, Ms. White had accrued Senior Performer Coverage by 20 years of pension service. The Benefit Cuts immediately changed Ms. White's base earnings period, which had been from April 1-March 31 for 50 years, to October 1-September 30, and Ms. White's benefit period, which had been from April 1-March 31 for nearly 50 years, to January 1-December 31. Prior to the Benefit Cuts, Ms. White had prequalified for coverage through March 31, 2022. Under the changed benefit period in the Benefit Cuts, her end benefit date was rolled back to December 31, 2021, taking accrued advanced contributions already made. Prior to the Benefit Cuts, Ms. White had more than $25,950 in yearly covered earnings with residuals and sessional earnings. Ms. White lost credit for residuals earnings by the Benefit Cuts. As a result of the Benefits Cuts and the elimination of residuals from covered earnings, Ms. White will lose her SAG-AFTRA health coverage and will not qualify for health coverage by residuals earnings.

43.     Plaintiff Donna Lynn Leavy has been a participant in the SAG-AFTRA Health Plan since the Health Plans Merger. Ms. Leavy is over 65 and takes a pension. Prior to the Benefit Cuts, Donna Lynn Leavy had accrued Senior Performer Coverage by 20 years of pension service. Prior to the Benefit Cuts, Ms. Leavy had more than $25,950 in yearly covered earnings with residuals and sessional earnings. Ms. Leavy lost credit for residuals earnings by the Benefit Cuts. As a result of the Benefits Cuts and the elimination of residuals from covered earnings, Ms. Leavy will lose her SAG-AFTRA health coverage and will not qualify for health coverage by residuals earnings.

44.     Plaintiff Audrey Loggia is the surviving spouse of Robert Loggia, a SAG member with Senior Performer Coverage who died in December 2015. Following Robert's death, the plan notified Ms. Loggia she was entitled to coverage as a surviving spouse for the remainder of her lifetime or until she remarried. Before

either of those circumstances appreciated, however, the plan notified her on November 24, 2020 that she would lose coverage on September 30, 2021 under the Benefit Cuts.

45.     The SAG-AFTRA Health Fund is joined as a party defendant to facilitate comprehensive relief on the claims and is not alleged to be a fiduciary herein.

46.     The Board of Trustees of the SAG Health Plan at the time of the Health Plans 2017 Merger included the following 37 SAG Health Plan Trustees: Union Trustees – Daryl Anderson, Amy Aquino, Timothy Blake, Jim Bracchitta, John Carter Brown, Duncan Crabtree-Ireland, Mandy Fabian, Leigh French, Barry Gordon, Bob Kaliban, Richard Masur, John T. McGuire, D.W. Moffett, Michael Pniewski, Ray Rodriguez, John H. Sucke, Kim Sykes, Ned Vaughn and David P. White; Management Trustees –     Eryn M. Doherty, Gary M. Elliott, Nicole Gustafson, Marla Johnson, Robert W. Johnson, Sheldon Kasdan, Shelley Landgraf, Allan Linderman, Carol A. Lombardini, Stacy K. Marcus, Diane P. Mirowski, Paul Muratore, Alan H. Raphael, John E. Rhone, David Silberman, David Weissman, Russell Wetanson and Samuel P. Wolfson.

47.     The Board of Trustees of the SAG-AFTRA Health Plan immediately following the Health Plans 2017 Merger included the following 39 individual SAG-AFTRA Health Plan Trustees: Union Trustees – Daryl Anderson, Amy Aquino, Timothy Blake, Jim Bracchitta, John Carter Brown, Duncan Crabtree-Ireland, Barry Gordon, David Hartley-Margolin, Matthew Kimbrough, Lynne Lambert, Richard Masur, John T. McGuire, D.W. Moffett, Michael Pniewski, Ray Rodriguez, Shelby Scott, Sally Stevens, Kim Sykes, Ned Vaughn and David P. White; and Producer Trustees – Helayne Antler, Ann Calfas, J. Keith Gorham, James Harrington, Harry Isaacs, Marla Johnson, Robert W. Johnson, Sheldon Kasdan, Allan Linderman, Carol Lombardini, Stacy K. Marcus, Diane P. Mirowski, Paul Muratore, Tracy

Owen, Marc Sandman, Lara Unger, David Weissman, Russell Wetanson and Samuel P. Wolfson.

48.    The current Board of Trustees of the SAG-AFTRA Health Plan, as of 2021, includes the following 38 individual SAG-AFTRA Health Plan Trustees: Union Trustees – Daryl Anderson, Amy Aquino, Timothy Blake, Jim Bracchitta, John Carter Brown, Duncan Crabtree-Ireland, Barry Gordon, David Hartley-Margolin, Matthew Kimbrough, Lynne Lambert, Richard Masur, John T. McGuire, Michael Pniewski, Linda Powell, Ray Rodriguez, Shelby Scott, Sally Stevens, Kim Sykes, Gabriela Teissier, Ned Vaughn and David P. White; and Producer Trustees – Helayne Antler, J. Keith Gorham, James Harrington, Harry Isaacs, Robert W. Johnson, Sheldon Kasdan, Allan Linderman, Carol Lombardini, Stacy K. Marcus, Diane P. Mirowski, Paul Muratore, Tracy Owen, Marc Sandman, Kim Stevens, Lara Unger, David Weissman, Russell Wetanson and Samuel P. Wolfson.

## V.   SUBSTANTIVE ALLEGATIONS

### A. SAG Performers Sacrificed Earnings to Form the SAG Benefit Plans

49.    In 1960, every SAG performer surrendered their right to all residual earnings from all films produced before 1960 in exchange for a one-time payout from producers of $2.25 million to seed and establish a pension and health plan for all SAG members. As a result, these performers, their beneficiaries and surviving spouses have never received, and continue not to receive, a cent from television airings of their pre-1960s work. Today, the $2.25 million of seed capital obtained by the members in negotiations over their pre-1960 films residuals would be worth nearly $1 billion, compounding since 1960 in the S&P 500.

50.    Now, after having been sold the 2012 Union Merger as creating a merged union that would improve benefits, and having been sold the 2017 Health Plans Merger as "position[ing] our health plan to be financially sustainable for all members for years to come," "strengthen[ing] the overall financial health of the plan

while ensuring comprehensive benefits for all participants," and "provid[ing] a robust foundation of health care for our membership," these performers who personally sacrificed have suddenly been abandoned and left ineligible for the Union health benefit by the plan they personally sacrificed to create. The health plan has dramatically changed the benefit structure to drop thousands of mostly older participants by targeting those aged 65 and older to prevent them from obtaining the Union health benefit based on age, while employers will continue to contribute to the health plan based on *all* earnings of the targeted participants under the operative collective bargaining agreements. Union dues, taxes and health coverage costs will likewise continue to be assessed based on all earnings of the targeted participants.

### B. SAG Benefit Plan Trustees Would Be In Charge of and Bound By ERISA Fiduciary Duties In Any Future Benefit Plan Merger

51.   The governing board of SAG agreed in January 2012 to merge SAG with AFTRA. The Union Merger was subject to approval by a majority vote of the respective memberships.

52.   In January 2012, pension and health benefits were provided to the respective members of SAG and AFTRA by separate pension and welfare (health) plans, which were collectively bargained, joint-trusted labor-management trusts subject to ERISA. At the time of the Union Merger, it was expected that the SAG and AFTRA benefits plans would merge in the near future. According to Gabrielle Carteris, former Executive Vice President of SAG-AFTRA and current second-term President of SAG-AFTRA, "during the movement to merge SAG and AFTRA [the late], Ken Howard [then-President] and [Carteris], along with members from around the country, made a promise that we would work tirelessly toward a merged health plan," described as a "critical goal." *SAG and AFTRA Health Care Plans to Merge*, VARIETY (June 8, 2016), available at https://variety.com/2016/tv/news/sag-aftra-health-care-merge-1201791269/.

**FIRST AMENDED COMPLAINT**

53.     After SAG announced the agreement for the Union Merger, members of SAG commenced litigation to stop it, asserting claims under the Labor Management Reporting and Disclosure Act ("LMRDA") and the Labor Management Relations Act ("LMRA") against SAG and certain individuals, including Defendant White, Ken Howard, Defendant Aquino, Defendant Vaughn, Mike Hodge and Defendant Hartley-Margolin. *See Sheen v. SAG*, No. 2:12-cv-01468 (C.D. Cal. Feb. 22, 2012). The members were concerned (justifiably, as it turned out) that the expected future merger of the respective SAG and AFTRA benefit plans would adversely impact the benefits of SAG members funded under the operative bargaining agreements. The members claimed, among other things, that SAG had not adequately studied, evaluated and disclosed the impact of the expected future mergers of the unions' separate pension plans and separate health plans. *See generally* First Amended Complaint, *Sheen v. SAG*, supra (ECF No. 32).

54.     In support of their claims to stop the Union Merger, the SAG members submitted the Declaration of Alex M. Brucker, an expert in pre-merger due diligence for ERISA plan mergers ("Brucker Declaration"). The Brucker Declaration stated:

> The purpose of this Declaration is to address the allegations set forth in Plaintiffs' request for injunctive relief. As set forth in greater detail below, full and fair disclosure would require an "ERISA Impact Report" which can be prepared by appropriate professionals to analyze and report the <u>impact</u> of (i) the Union Merger on the Plans and its co-sponsors; (ii) a Plan Merger on the Plans and on the present and future benefits of and costs to the participants and beneficiaries and co-sponsors of the Plans; and (iii) ERISA and the [Internal Revenue] Code on the Plans, their fiduciaries, participants, beneficiaries and co-sponsors.

> By full and fair disclosure of an ERISA Impact Report, SAG would provide the information necessary for SAG members to intelligently cast their votes regarding the Union Merger.

> I am unaware of any ERISA Impact Report prepared for or considered by the Unions. I have reviewed all seven legal submissions,

with particular emphasis on the "Feasibility Report" prepared for the Boards by Deborah M. Lerner of the law firm of Willig, Williams & Davidson, P.A. The Feasibility Report generally concludes and purports to assure the Unions that (1) there is no legal obstacle to prevent the Plan Merger; (2) federal law will protect all benefits earned by participants under the Plans as of the date of Plan Merger; and (3) there are some potential advantages to the Plan Merger. All of the "feasibility" letters reach similar general conclusions.

What is <u>most</u> important about the Feasibility Report and related letters is what they do not say or consider.

There is an important distinction between the terms "feasibility" and "impact." No one would disagree that the merger is feasible. But no one involved in this matter has studied the question of the impact of a merger of the Plans on the Plans' participants and beneficiaries or contributing employers. All involved participants are handicapped because of the SAG failure to procure an ERISA Impact Report. Even Ms. Lerner concedes this point on page 8 of the Feasibility Report as follows: "Based on a plan's financial health and its projected funding, the trustees of a multiemployer pension plan may determine that it is necessary to <u>reduce future benefit accruals, which are not legally protected benefits.</u> . . . It is not possible to predict whether or not any plan's benefits (whether or not such plan is merged into another plan) will be improved or <u>reduced in the future</u>." (Emphasis added)

*Id*. ¶¶ 5-9.

55.   Brucker continued:

Since this major motivation for the Union Merger can realistically only be accomplished with a subsequent Plan Merger, it is my opinion that the Union Merger must be viewed, particularly from a member prospective, as indistinguishable from a Plan Merger. This is their only real opportunity to vote on this issue. In essence, the Plan Merger will take place if the Union Merger is consummated, without any need for member vote or input. Thus, the issues resulting from the Union Merger cannot be considered separately from the issues surrounding the Plan Merger. An ERISA Impact Report is needed to disclose to the SAG and AFTRA members how their pension and health benefits may be affected by the eventual Plan Merger.

It is my opinion, based on my careful consideration of this issue, that a Plan Merger raises complex issues, could create serious problems

**FIRST AMENDED COMPLAINT**

and conflicts, and could result in loss of benefits for both SAG members and AFTRA members. The precise impact on Plan benefits (or required member and co-sponsor contributions) cannot be properly assessed without an ERISA Impact Report. Accordingly, consistent with the Joint Boards of Trustees (which govern the Boards) ERISA fiduciary duties to the Plans and the participants and beneficiaries, the "best practice" approach is to thoroughly investigate all these issues <u>prior to</u> the vote of the membership, not after, particularly when the Plan Merger appears to be inevitable once the Union Merger is complete.

Based on my 30+ years of experience advising clients considering plan sponsor mergers, sponsors of ERISA covered plans, Administrative Committees, Unions, Association and employees alike, and my extensive knowledge of ERISA and the Code, it would be in accordance with the spirit of ERISA and in the best interests of the Plans' participants, beneficiaries and co-sponsors for the Unions to first conduct and carefully consider an ERISA Impact Report prior to the Union Merger vote.

*Id.* ¶¶ 16-18.

56.    Brucker further stated:

Until a full and formal ERISA Impact Report of how to address and quantify these problems is completed, no , one, [sic] not even pension experts, can intelligently evaluate or quantify the probable negative impact on the members' pension and health benefits. The Union Merger is so inextricably interconnected with the Plan Merger that members cannot be asked to evaluate and vote on the Union Merger until issues relating to the Plan Merger have been resolved and concrete proposals formulated so that the members can make informed choices.

A similar study <u>was</u> done in 2003. It is referred to as the Mercer Report. It is attached hereto as Exhibit B. It isolated the merger variable and concluded:

"If one design is to apply to SAG and AFTRA participants, suggested approach will be to determine a combined future benefit design…"

***

"… this will almost certainly mean either that contributions will

need to increase or that benefits will be lower than current benefits for most members…."

∗∗∗

"… Combined plan will not be able to afford all of the desirable features for both plans – absent contribution increases…"

Essentially, the Mercer study confirmed what is fairly obvious: you cannot merge a rich plan (SAG) with a relatively poor plan (AFTRA) and thereby produce two SAG level plans. Either benefits must be cut or contributions must be increased. Studying this issue is the due diligence required.

57.     SAG opposed the members' claims to stop the Union Merger. In doing so, SAG posited that in the event of any future benefit plan merger, the plan trustees would determine whether to proceed with a merger by considering and evaluating all material information in the best interest of the participants and their beneficiaries, in accordance with their ERISA fiduciary duties. SAG asserted that future plan mergers would be within the plans' trustees' purview, and the plan "trustees would have to review 'all relevant facts and circumstances" including "the funded status of the resulting merged plan, as well as the long-term financial viability of such plan[,]" and "whether or not SAG and AFTRA multiemployer plans merge will be a decision for the trustees to consider after they have reviewed all such information and data." Opp'n. to Pls.' Mot. for Prelim. Inj. at 10 n.11, *Sheen v. SAG*, supra (ECF No. 33). In its opposition to the plaintiffs' request to enjoin the merger, SAG cited a Department of Labor Opinion addressing plan trustees' ERISA fiduciary duties in a plan merger. *Id*. (citing DOL Advisory Op. 89-29A).

58.     SAG also submitted the Declaration of SAG Health Plan Trustee, Defendant John McGuire. McGuire stated, among other things, the SAG Health Plan, "[a]s required by law, . . . [was] governed by an equal number of trustees appointed by SAG, on the one hand, and by management, on the other[,]" and that "[t]hose trustees govern[ed] in accordance with the Trust Agreement[] of . . . [the]

Plan. . . . [a] copy of [which] [was] attached [to his Declaration]." Decl. of McGuire ¶ 2, *Sheen v. SAG*, supra (ECF No. 33-7).

59.     The SAG Health Plan Trust Agreement submitted to the court provided that the SAG Health Plan Trustees were subject to ERISA fiduciary duties in exercising their powers and duties as trustees in all matters concerning the plan. Under Article IV the "Powers and Duties of Trustees," the SAG Trust Agreement provided: "Section 3. Fiduciary Responsibility: Subject to the provisions of Section 5 of Article VII, the Plan Trustees and any other fiduciary shall discharge their respective duties set forth in the Health Plan solely in the interest of the Participants and their beneficiaries, and:

    a) For the exclusive purpose of providing benefits to Participants and their beneficiaries and defraying reasonable expenses of administering the Health Plan.

    b) With the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

    c) By diversifying the investments of the Health Fund so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so.

    d) The Plan Trustees shall not be liable for the proper application of any part of the funds of the Health Plan or for any other liabilities arising in connection with the administration thereof.

    e) The Plan Trustees may from time to time consult with the Health Plan's Legal Counsel and shall be fully protected in acting upon the advice of said counsel with respect to legal questions.

    f) Nothing herein contained shall exempt any Plan Trustee from liability arising out of his own willful misconduct, fraud or bad faith.

Section 3 stated the ERISA fiduciary duty standard. Further, "Health Plan" was defined to "mean and include this trust agreement, the Health Fund, and any plan or plans of welfare eligibilities and benefits adopted by the Plan Trustees pursuant to

this agreement." Definitions, Section 7.

60.    Section 2 of Article VI Plans of Health Eligibilities and Benefits, titled "Compliance with Applicable Laws," provided: "It is the intention of the parties that the Health Plan and any and all amendments thereto shall at all times . . . [b]e and remain in compliance and conformity with all applicable laws and regulations, including but not limited to all applicable provisions of the Labor Management Relations Act and any other applicable valid federal or state laws or rules or regulations . . . ."

61.    Article VIII, Section 2, Limitation on Right of Amendment, provided:

> No amendment of or change in the Health Plan may be adopted which will alter the basic principles hereof or be in conflict with the then existing collective bargaining agreements or contrary to any applicable law or governmental rule or regulation. No amendment may be adopted which will cause any of the assets of the Health Fund to be used for or diverted to purposes other than those herein authorized or which will retroactively deprive any person of any vested benefit; except any amendment may be made which is required as a condition to obtaining or retaining the approval of the Health Plan by the Internal Revenue Service under the Internal Revenue Code or the Franchise Tax Board under the California Revenue and Taxation Code as either are now in effect or hereafter amended to the end that any contributions made to the Health Fund by the Producers are deductible for federal income tax and California state franchise tax purposes.

62.    Article VIII, Section 11, Validity of Action, provided: "No action determined by the vote of the Plan Trustees, directly or through the vote of an umpire as herein contemplated, shall be valid or effective which shall interpret or apply any provisions of the Health Plans in any manner or to any extent so as to be contrary to any applicable law or governmental rule or regulation or which would exceed the powers given to the Plan Trustees as set forth hereunder or change or enlarge the express purpose hereof."

63.    Article VIII, Section 6, Use of Funds, provided: "The Plan Trustees shall use and apply the assets of the Health Fund for the following purposes only: a)

To pay all reasonable and necessary expenses incurred in the establishment and administration of the Health Plan, and b) To pay for the benefits or for the cost of insurance to provide the benefits provided for in any plan of welfare eligibilities and benefits to be adopted pursuant hereto."

64. In opposing the members' claims, SAG also submitted a "Feasibility Report" by attorney Deborah Lerner, supported by, among others, Cohen Weiss & Simon, which also had been provided to all members ("Lerner Report"). The Executive Summary of the Lerner Report described the report as "a review of the feasibility of combining [the respective health benefit plans]" that consisted of "a thorough legal analysis by [Lerner] . . . as well as correspondence from [several other experts]," described as being "among the most experienced ERISA attorneys in the country . . . ." Feasibility Review at 2. The Executive Summary stated that, "[t]ogether[,] these experts conclude[d]" among other things, "[w]hile the merger of the Unions would not automatically result in the immediate combination of the [benefit] plans, [a] Union merger would facilitate the possibility of doing so if it is in the interests of the participants." *Id.*

65. The Lerner Report "provide[d] a general overview of the issues and likely legal impact on the pension and health plans of… [SAG and AFTRA] in the event the two Unions merge[d]" addressed "what, if any, merger plan can be achieved which will satisfy the requirements of the law and the protection of all eligible members against loss of benefits, presently or in the future." The Lerner Report noted that while "a health plan generally may reduce participants' benefits or increase employee premiums for coverage subject only to certain advance notice requirements[,] . . . *[a] merger of health plans may be effected for the purpose of preventing future benefit cuts and strengthening the contribution base of the combined plan*[.]" The Lerner Report also observed that "a plan merger would eliminate the problems of many individuals who work under the jurisdiction of both

**FIRST AMENDED COMPLAINT**

Unions but have insufficient covered earnings under either health plan to qualify for benefits[,]" and that "[t]he basic fiduciary analysis used to determine whether or not two health plans should be merged is similar although not identical to that used for pension plans." Lerner Report at 1, 9. In this regard, the Lerner Report stated:

> Acting as plan fiduciaries, a majority of the trustees of each plan would have to conclude separately that a merger would be in the best interests of their plan participants. This would require each board to study the economic impact of merging the plans in comparison to the impact of letting each plan to continue on a stand-alone basis. Such an analysis required a detailed study, by each fund's actuary, in consultation with the other professional advisors and the fund staff, to determine the likely financial impact of each alternative. Because there is no legal requirement multiemployer plans be merged merely because the sponsoring Union of such plans has merged with another Union, each plan's board of trustees is free to accept or reject *any merger proposal*.

*Id*. at 5-6 (emphasis in original, footnotes omitted). The Lerner Report stated that when the plan documents provide that the plan trustees are subject to ERISA fiduciary duties, ERISA fiduciary duties apply. *Id*. at 5 & n.6 (citing DOL Field Assistance Bulletin 2002-2).

66.     SAG additionally submitted a Declaration of SAG-AFTRA Deputy National Executive Director and General Counsel and SAG Health Plan Trustee, Defendant Crabtree-Ireland. *See* Decl. of Crabtree-Ireland, *Sheen v. SAG*, supra (ECF No. 33-1). Crabtree-Ireland's Declaration included the same DOL Advisory Opinion relating to the ERISA fiduciary duties of plan trustees in a merger cited by SAG, supra, for support of the proposition that the plan trustees would be required to consider all relevant information prior to implementing a plan merger, including the impact of the merger and future financial viability of a merged plan. *Id*. ¶ 10.

67.     SAG also submitted a Declaration of David Venuti, an actuary and "frequent speaker at conferences of the International Foundation of Employee Benefit Plans… on various pension and benefits-related topics including pension

plan mergers." Decl. of Venuti ¶ 3, *Sheen v. SAG*, supra (ECF No. 33-10). Venuti averred the following:

> Multiemployer plans themselves are governed by independent joint-boards of trustees consisting of employee and employer representatives. The board of trustees sets the benefit and eligibility terms of the plan. The trustees have a fiduciary responsibility under [ERISA] to act in the best interests of plan participants and beneficiaries. Any decision to merge the plan as approved of the terms of a plan merger is the responsibility of the board of trustees.

*Id*. ¶ 7. Venuti further stated: "In approving a merger and the terms of the merger as they relate to future benefit levels and costs, trustees have the sole obligation to act in the best interests of plan participants." *Id*. ¶ 14.

### C. The Health Plans Merger Purportedly Positioned the Plan to Sustain Comprehensive Benefits for All Participants.

68.     In early June 2016, the SAG Health Plan Trustees approved the Health Plans Merger. The Health Plans Merger was not subject to the approval of the participants of either plan. A report by *Variety* published June 8, 2016 stated that the unified health plan would "allow SAG-AFTRA members to combine covered earnings from all SAG-AFTRA contracts toward eligibility for coverage in a single health plan."[1] SAG-AFTRA President Gabrielle Carteris was quoted as saying: "Our members deserve one outstanding health plan and this historic agreement ensures that all earnings under our contracts now credit to a single health plan. . . . [W]e have positioned our health plan to be financially sustainable for all members for years to come." SAG-AFTRA National Executive Director and SAG Health Plan Trustee, Defendant White, was quoted as saying: "The new health plan is both comprehensive and forward-looking. Merging these plans was a complex undertaking and I am proud that the trustees worked together to arrive at solutions

---

[1] SAG and AFTRA Health Care Plans to Merge, Variety (June 8, 2016), available at https://variety.com/2016/tv/news/sag-aftra-health-care-merge-1201791269/.

that strengthen the overall financial health of the plan while ensuring comprehensive benefits for all participants."

69.  According to SAG-AFTRA, "[m]erging the health plans was one of the goals of the [Union] [M]erger, but extensive study was needed before the process of unifying the plans and funds could begin. *That's because the plans are separate from the union and not administered by the union; the boards of trustees are comprised of representatives of labor and employers who contribute to the plans."* SAG-AFTRA

Mag, Vol. 5, No. 2 at 23 (Summer 2016), available at  https://www.sagaftra.org/files /sag-aftra_-_summer_2016_-_member.pdf (emphasis in original).

70.  In a letter to SAG-AFTRA members in the Summer of 2016, SAG Health Plan Trustee, Defendant White, stated the following:

> It was with extreme satisfaction that I first reported to our elected leadership in June that the respective boards of trustees for the SAG Health Plan and AFTRA Health Fund voted to merge into a single health plan effective Jan. 1, 2017.  This is tremendous news for our membership on many fronts. Fully 65,000 souls who depend on these plans will become beneficiaries of a single, financially strengthened plan that offers automatic family coverage for all participants.  The merger will immediately help thousands of our members seeking eligibility next year who currently contend with the scourge of split earnings when working under our television agreements.  The new plan will offer first-class service for participants, provided by staff who are being trained – right now, as I write this letter – in the various features of the new plan, many of which are similar to the current SAG Health Plan model.  I hope that all of you who are interested in the details of the new plan were able to attend one of the many educational sessions we offered in partnership with plan staff, or that you have taken a moment to peruse the comprehensive website dedicated to the merged plan, sagaftrahealth.org.  The establishment of this single, unified plan represents the achievement of a major goal asserted by our membership even before our unions merged.  It provides a robust foundation of healthcare for our membership, which the trustees can continue to improve upon, nurture and grow over time.

*Id.* at 12.

71.     The SAG members and the court considering members' claims to stop the Union Merger in 2012 were told that any future merger of the benefit plans would be within the purview of the respective plan trustees, and that the trustees would consider all information in the best the interest of the participants and their beneficiaries to determine whether the benefit plans should merge, in accordance with their ERISA fiduciary duties. In June 2016 after the trustees approved the Health Plans Merger, the participants were told that the trustees had undertaken a complex and extensive process to position the health plan to be financially sustainable for all members for years to come, to ensure comprehensive benefits for all members in the merged plan, and to provide a robust foundation of healthcare for the membership which the trustees could continue to improve upon, nurture and grow over time.

72.     As of December 31, 2016, according to the Form 5500 filed by the SAG Health Plan for the 2016 plan year, the SAG Health Plan had 27,271 participants, and net assets of approximately $242.3 million. As of January 1, 2017, the AFTRA Health Plan had 9,711 participants and net assets of $0, including a $235.5 million transfer out of the plan. As of December 1, 2017, the SAG Health Plan had net assets of $236.1 million.

73.     The historically disparate level of employer contributions between the SAG members and AFTRA members for a given earnings level has resulted in far different contributions to the health plans. Contribution levels were the same for performers under the TV/Theatrical and Commercials contracts. Currently, the rate for TV/Theatrical signatories is 19.5%, which will increase to 20% on July 1, 2021. The current rate for Commercial contract signatories is 18.5%. SAG and AFTRA broadcasters' contribution levels differed and were between 10% and 13% under the respective applicable station contracts. This disparity continued in the merged plan.

74.     Effective January 1, 2017, the health plans were merged into the SAG-AFTRA Health Plan. Under the Restated Agreement and Declaration of Trust Establishing the SAG-AFTRA Health Fund ("SAG-AFTRA Trust Agreement"), an amendment of the SAG Trust Agreement effected by the SAG Health Plan Trustees, the merged health plan was to be governed by the SAG-AFTRA Trustee Defendants. The SAG Health Plan Trustees effected the merger and the related amendments of the SAG Health Plan Trust Agreement pursuant to their powers and duties of the trust agreement. *See* SAG-AFTRA Health Plan Trust Agreement at 1 ("WHEREAS, the Board of Trustees of the SAG Health Fund… pursuant to Article IV, Section I of the SAG Health Fund, and the plan benefits thereunder…, with other employee welfare benefit plans; and, pursuant to Article VI, Section 1 of the SAG Trust, the SAG Board has the authority to amend the SAG Trust . . . .").

75.     The benefits provided under the merged plan continued Senior Performer Coverage for SAG and AFTRA participants. Senior Performer Coverage provided the Union health benefit to all members (and their qualified dependents and surviving spouses) who were age 65 and older, receiving a pension from either the SAG pension plan or AFTRA pension plan (if eligible for a pension from both, the member needed only be taking a pension from the SAG plan), and had a certain number of Union pension credits from years of service. Senior Performer Coverage was secondary to Medicare, unless the participant qualified for SAG-AFTRA as primary coverage through "Earned Eligibility," based on the participant's total earnings. A participant whose earnings included only residuals was eligible only for secondary coverage under the SAG-AFTRA Health Plan. Still, as long as the participant had at least $1 in sessional earnings during the relevant period, *all* earnings counted toward eligibility for SAG-AFTRA primary coverage.

76.     Under the operative collective bargaining agreements, the merged health plan was funded based on *all* earnings of *all* members, regardless of the

members' age or whether the member was taking a pension from the SAG or AFTRA pension plans.

### D. SAG Health Plan Trustees Breached their ERISA Fiduciary Duties in Effecting the Merger and Related Amendments

77.     Contrary to the statements by SAG-AFTRA Union President Carteris and SAG Health Plan Trustee Defendant White, the Health Plans Merger did not "ensure[] that all earnings under our contracts now credit to a single health plan," "position [] our health plan to be financially sustainable for all members for years to come," "strengthen the overall financial health of the plan while ensuring comprehensive benefits for all participants," or provide "a robust foundation of healthcare for our membership." In fact, just three and one-half years after the Health Plans Merger, the Union health plan stunned participants with the sudden announcement of the draconian Benefit Cuts that would prevent thousands of participants from obtaining the SAG-AFTRA health benefit under the operative collective bargaining agreements by targeting participants age 65 and older.

78.     In announcing the Benefit Cuts, the health plan trustees opportunistically and misleadingly blamed the COVID-19 pandemic for the dire need to prevent thousands of mostly older participants from obtaining the Union health benefit under the operative collective bargaining agreements. In early April 2020, Gabrielle Carteris and Defendant David White announced a three-month reduction in health plan premiums and an extension of the Union dues deadline, in response to the COVID-19 pandemic. Carteris and White stated nothing whatsoever about looming drastic cuts to the Union health benefit structure. In fact, they stated: "Please know that through all of this, the Union's core functions, including residuals processing and contract enforcement, continue. In March alone we processed 312,000 residuals checks totaling 73 million." *SAG-AFTRA COVID-19 Update: Relief is Coming*, SAG-AFTRA NEWS UPDATES (Apr. 1, 2020), available at https://www.sagaftra.org/sag-aftra-covid-19-update-relief-coming.

79.     The SAG Health Plan Trustees' consideration, approval and implementation of the Health Plans Merger could not have been the product of a prudent process to investigate and analyze the impact of the merger on the participants and their benefits solely in the best interests of the SAG Health Plan participants and their beneficiaries. The SAG-AFTRA Health Plan Trustees knew by at least shortly after the merger in mid-2018 that the plan's funding under the operative collective bargaining contracts would not sustain the merged plan's benefit structure for all participants, and that without increased funding massive benefit cuts were looming. According to SAG-AFTRA Health Plan Trustee, Defendant Richard Masur in August 2020, the Benefit Cuts had been in the works for two years. SAG-AFTRA Health Plan Trustee, Defendant Barry Gordon said the trustees had worked nearly every day for two years prior to August 2020 to figure out how they could preserve the participants' health benefits.

80.     In their capacity as the administrators of the SAG Health Plan, as provided by the SAG Health Plan Trust Agreement and as represented to the members and the court in 2012, the SAG Health Plan Trustees functioned as ERISA fiduciaries in evaluating, approving and implementing the Health Plans Merger and the related amendments to the SAG Health Plan Trust Agreement. The trustees thus were required to discharge their duties solely in the interests of the participants and their beneficiaries, and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the plan, with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims. 29 U.S.C. § 1104(a)(1)(A)(i); SAG Health Plan Trust Agreement Article IV Section 3. The SAG Health Plan SPD provided:

> Prudent Actions by Plan Fiduciaries: In addition to creating rights for plan participants, ERISA imposes duties upon the people who are

responsible for the operation of the employee benefit plan. The people who operate your plan, called "fiduciaries" of the Plan, have a duty to do so prudently and in the interest of you and other plan participants and beneficiaries. No one, including your employer, your union, or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining benefits under the Plan or exercising your rights under ERISA.

SAG-Producers Health Plan SPD at 102 (effective July 1, 2013). Under the circumstances of the merger and the related amendments, the SAG Health Plan Trustees acted as ERISA fiduciaries in exercising their powers and duties as plan trustees under the SAG Health Plan Trust Agreement to determine that the plans should combine, and to approve and implement the merger and the related amendments to the trust agreement.

81.     The SAG Health Plan Trustees either: failed to conduct a prudent fully informed pre-merger investigation and analysis to assess the impact of the merger on the SAG Health Plan and its participants' health benefits and the sustainability of the benefit structure in the merged plan; or disregarded the analysis and information revealed concerning the financial condition of the merged plan and the sustainability of the health benefit structure under the operative collective bargaining agreements, and nevertheless proceeded with the merger. A diligent pre-merger investigation and analysis would have revealed the looming peril to the benefit structure in the merged plan under the operative collective bargaining agreements. As alleged herein, the SAG-AFTRA Health Plan Trustees knew by at least mid-2018 the health benefit structure in the merged plan was not sustainable for all participants under the operative collective bargaining agreements, and that without increased funding massive cuts were looming. If the SAG Health Plan Trustees failed to conduct a prudent pre-merger evaluation, the trustees breached their ERISA fiduciary duties. If the trustees in fact knew the benefit structure would not be sustainable in the merged plan under the operative collective bargaining agreements and proceeded nevertheless, the trustees breached their ERISA fiduciary duties.

82.   As alleged above, prior to the Health Plans Merger, the contribution levels varied for SAG and AFTRA participants. The merged plan retained the disparity. The collective bargaining agreements dictate the contribution levels. Performers' contributions are currently made at 19.5% (TV/Theatrical) and 18.5% (Commercials) of covered earnings, which include sessional and residuals earnings, while broadcasters' contributions are made at 10-13% of current wages under the applicable station contracts.

83.   By transferring the plan's $242.3 million of assets (as of December 31, 2016) in connection to the plan merger, the SAG Health Plan Trustees were not acting solely in the interests of the SAG Health Plan participants and their beneficiaries. The Health Plans Merger deployed these assets despite that such decision was not made in the sole interest of, and to provide benefits to, the SAG Health Plan participants and their beneficiaries.

### E. The Benefit Cuts

84.   The Benefit Cuts were described to participants in a booklet titled: "Changing for our Future, Together." SAG-AFTRA Health Plan Newsletter, available     at https://documents.viabenefits.com/website/sagaftrahp/SAG-AFTRA-Newsletter.pdf. On the page titled "A quick look at what's changing," the Pamphlet states: "Our Plan changes will mean different things for different people. To learn about all the details, jump to the section(s) that best describe you."

85.   The Benefit Cuts targeted participants age 65 and older based on age to prevent these participants from obtaining the Union health benefit. Under the Benefit Cuts, Senior Performer Coverage, which entitled participants (and their dependents and surviving spouses) to a lifetime SAG-AFTRA health benefit at age 65 upon accruing 20 years of vested pension service (or fewer years of pension credit in certain circumstances), was eliminated and taken from participants who had accrued and were using it, and was taken from surviving spouses who had been unconditionally promised it. Employers, however, will continue to contribute to the

health plan based on *all* earnings of these participants, and the Union dues of participants will continue to be assessed based on all earnings of these participants.

86.     Changes to earnings-based eligibility for participants also targeted participants age 65 and older to prevent these participants from obtaining the Union health benefit. For all participants under age 65 whether or not taking a pension, all earnings are counted toward eligibility for the Union health benefit. For participants 65 years of age and older and not taking a pension, all earnings are counted until they take a Union pension, so long as the participant has at least $1 in sessional earnings in the period. For participants age 65 and older who are taking a Union pension, only sessional earnings count toward eligibility for the Union health benefit, yet employers will continue to contribute to the Health Plan based on *all* earnings (sessional *and* residuals) of these participants, and the Union dues, federal and state income taxes and premiums for health coverage will continue to be assessed based on all earnings of these participants.

87.     The participants who had been entitled to Senior Performer Coverage and are no longer eligible for the Union health benefit were directed to a private market broker: Via Benefits. The Pamphlet read: "Effective January 1, 2021, medical, behavioral health, vision and prescription drug coverage through the SAG-AFTRA Health Plan will no longer be offered. Instead, Senior Performers/surviving spouses will have new, expanded options through the Via Benefits private Medicare marketplace, including dental and vision coverage." It further stated:

> The SAG-AFTRA Health Fund will partner with the Via Benefits Medicare marketplace plans to supplement health coverage for unmarried Medicare-eligible surviving spouses of Senior Performers through an annual financial allocation into the new SAG-AFTRA Health Plan Senior Performers Health Reimbursement Account, or "HRA." If you enroll in coverage through Via Benefits, you will receive $1,140.00 annually to pay for eligible health care expenses.

The elimination of Senior Performer Coverage has forced senior performers to obtain coverage under the Via Benefits (or other private market alternatives), which

will cost many performers and their dependents and surviving spouses up to four times more than the SAG-AFTRA health benefit provided to them for decades. The price of this new, individual coverage varies depending on a senior performer's total earnings (residuals included). The employer contributions which fund the health plan will also continue to base contribution amounts on a participant's total earnings.

88.     Via Benefits is a commercial broker that receives a sales commission for each plan sold. Prior to announcing the Benefits Cuts, the plan had already provided participant information to Via Benefits. The plan steered participants to Via Benefits, despite other options including the Motion Picture Television Fund and The Actors Fund. The Pamphlet did not disclose these other options, instead stating that the participant would be eligible for the annual $1,140 "[i]f [they] enroll in coverage through Via Benefits."

89.     In addition, the Benefit Cuts immediately set the base earnings year for all participants 65 years of age or older to October 1-September 30. Prior to the Benefit Cuts, base earnings years were either: January 1-December 31; April 1-March 31; July 1-June 30 or October 1-September 30. The trustees knew the Covid-19 pandemic had limited sessional opportunities for participants and the Benefit Cuts required $25,950 of yearly sessional earnings to qualify for SAG-AFTRA health coverage. The change unfairly limited the time for these affected older participants to urgently pursue sessional opportunities. The Benefit Cuts also set the benefit period for all participants 65 and older to January 1 – December 31. This took pre-qualified, already paid for coverage from some affected participants. The base earnings year for participants younger than 65 remained unchanged. The purported reason for the change was to co-ordinate with the Medicare enrollment period. This is non-sensical, as any participant who loses SAG-AFTRA coverage can enroll in Medicare at any time. Further, in announcing the COVID-19-based reduction of health plan premiums and extension of the Union dues deadline,

Carteris and White gave no warning whatsoever to these participants to get sessional work in view of the looming dramatic changes to the Union health benefit structure.

90.     The SAG Age & Service criteria to establish eligibility for participants 40 years or older has been eliminated. The Age & Service covered earnings threshold increased from $13,000 to $25,950. The covered earnings threshold for Plan II participants increased substantially from $18,040 to $25,950. The alternative days eligibility threshold increased from 84 days to 100 days worked under specified contracts during a participant's base earning period.

91.     The Benefit Cuts also substantially increased premium costs to participants beginning January 1, 2021. Participant-only quarterly cost increased from $300 per quarter to $375; participants with one dependent increased from $348 per quarter to $531; and participants with two or more dependents increased from $375 per quarter to $747.

92.     Also included in the disclosure of the Benefit Cuts to the members was the required Section 1557 Non-discrimination Notice: "The SAG-AFTRA Health Plan complies with applicable federal civil rights laws and does not discriminate on the basis of race, color, natural origin, age, disability or sex. The SAG-AFTRA Health Plan does not exclude people or treat them differently because of race, color, national origin, age, disability or sex." Section 1557 is the non-discrimination provision of the Affordable Care Act, 42 U.S.C. §18116(a).  This representation was false. As alleged herein, the Benefit Cuts targeted and discriminate against participants age 65 years and older to prevent them from obtaining the Union health benefit based on their age, while employers will continue to contribute to the health plan under the operative collective bargaining agreements based on *all* earnings of these participants, and Union dues will continue to be assessed based on all earnings.

**F. Failure to Disclose Material Information to Participants and their Representatives**

93.     Following the Health Plans Merger, the health plan was administered by the SAG-AFTRA Board of Trustees. The trustees were bound by their fiduciary duties provided for by ERISA, including the duty to disclose material information in communications regarding plan assets and benefits to the plan participants and their representatives, particularly in circumstances where the failure to disclose information is materially misleading.

94.     The SAG AFTRA Health Plan Trustees knew the participants had been told in June 2016 that the Health Plans Merger would strengthen the financial sustainability of the plan for all members for years to come, ensure comprehensive benefits for all participants and provide a robust foundation of healthcare for our membership. As alleged above, however, the SAG-AFTRA Health Plan Trustees knew for at least two years by mid-2018 that the merger neither strengthened the plan's financial sustainability for all members for years to come nor ensured comprehensive benefits for all participants, that the merged plan's benefit structure was not sustainable under the operative collective bargaining agreements, and that massive benefit cuts to drop thousands of participants from the Union health benefit loomed without increased funding. Trustee Richard Masur stated the Benefit Cuts were in the works for two years, and trustee Barry Gordon said the trustees had worked nearly every day for two years trying to figure out how they could preserve the health benefit. In addition, the SAG-AFTRA Health Plan Trust Agreement required the trustees to receive and evaluate projections concerning the sustainability of the benefit structure at every meeting. Article XIII of the SAG-AFTRA Health Plan Trust Agreement required the trustees to engage a Benefit Consultant and to "at all times endeavor to maintain twelve (12) months of [benefit and administrative expenses, as projected by the Benefit Consultant, that the plan's reserves will fund the plan of benefits and its operations]," and to receive and evaluate projections at every board meeting. Article XIII, Section 2.

95.    The collective bargaining agreements negotiated to fund the SAG-AFTRA Health Plan with employer contributions based on *all* earnings of participants are the most vital part of the health plan's funding. Article I Section 8 of the SAG-AFTRA Trust Agreement provides:

> Any such Collective Bargaining Agreement shall be deemed to incorporate, specifically, the terms and conditions of… [the SAG-AFTRA Trust] Agreement, and by executing such Collective Bargaining Agreement, each Employer that is a party to such agreement thereby agrees to comply with, and be bound by, each and every provision of the SAG-AFTRA Health Fund and… [the SAG-AFTRA Trust] Agreement (as such documents may be amended from by the [SAG-AFTRA Health Plan Board of Trustees] from time to time.

The negotiated contributions are based on *all* earnings of all members, regardless of the member's age or whether the member is taking a SAG or AFTRA pension.

96.    Article V of the SAG-AFTRA Trust Agreement requires employers to contribute to the SAG-AFTRA Health Plan in the amounts required by the negotiated collective bargaining contract between the Union and the employer.

97.    The contract negotiations determine the value of the package of elements provided to members for their work as performers, including the amount of new money, the amount of contributions by employers to the benefit plans based on members' earnings, and potential diversions of wage increases. Diversions are commonly included and permit the Union board to divert a portion of the negotiated wage increases to other funding such as the health plan. It is thus vital to the funding of the health plan and the efficacy of the negotiations for the participants and their beneficiaries that the Union negotiators, who by law are the fiduciary representatives of the health plan participants, are fully informed concerning all information material to the members' stake in the contracts, including their Union health benefit and the funding of the health plan to be made by the employer contributions based on their earnings.

98.    It is evident that the funding under the operative collective bargaining agreements at the time of the Health Plans Merger was insufficient to sustain the health benefit structure for all participants, a fact known by the SAG-ATRA Health Plan Trustees by mid-2018. The three major collective bargaining agreements were negotiated and approved in the two-year period, during which the health plan trustees knew but did not disclose the funding needed to sustain the health benefit structure, that the negotiated terms were not sufficient to fund the health benefit structure for all participants, and that massive cuts loomed to drop thousands of participants from the Union health benefit without increased funding.

99.    The "Commercials" contract, negotiated from February to March 2019, was presented to the SAG-AFTRA National Board members, some of whom were also SAG-AFTRA Health Plan Trustees, for approval. The Commercial contract was subsequently put to a membership vote and approved in April 2019. The contract is dated March 31, 2019.

100.    The "Netflix" contract was negotiated by SAG-AFTRA staff negotiators and presented to the full SAG-AFTRA negotiating team in the Summer of 2019 for approval. The contract was thereafter presented for approval to the SAG-AFTRA National Board members, some whom were also SAG-AFTRA Health Plan Trustees. The Netflix contract was not put to a membership vote.

101.    The "TV/Theatrical" contract was negotiated in the April-June 2020 period and, on June 29, 2020, presented to the SAG-AFTRA National Board for approval.  The TV/Theatrical contract was put to a membership vote and approved in July 2020.

102.    SAG-AFTRA Health Plan Trustees David White and Ray Rodriguez (Chief Contracts Officer) were the lead negotiators on all three contract negotiations. Four trustees – Defendants David White, Ray Rodriguez, Linda Powell and Michael Pniewski - participated in the negotiation or approval of the 2020 TV/Theatrical and Netflix contracts. The Netflix contract was negotiated by the

union contract staff only, Defendants David White and Ray Rodriguez, who presented the negotiated terms to the full Union negotiating team for approval. The members of the TV/Theatrical negotiating committee included Defendants Powell and Pniewski.  Many members of the management negotiating committee for the TV/Theatrical contracts were health plan trustees, including Defendant Carol Lombardini and several others. The Commercials contract management negotiators were also health plan trustees, including Defendant Stacey Marcus. Health plan trustee Defendant David Hartley-Margolin also participated in the negotiations concerning the Commercials contract.  Yet, none of these individuals disclosed to any of the other members of the Union negotiating committee, the Union National Board that approved the contracts or the membership, the funding needed to sustain the benefit structure, that the negotiated contract terms were insufficient to sustain the health benefit structure for all participants or that massive cuts were coming to drop thousands of participants from the Union health benefit without increased funding. Notably, the theme of the TV/Theatrical negotiations was "Do no harm." Moreover, the health plan trustees who participated without disclosing the material information further misled the participants and their representatives by themselves approving and voting to approve the insufficient contracts.

103.    Further, postcards were sent to the membership by the Union urging members to approve the TV/Theatrical contract. The post cards urged "Vote Yes", touting "transformative gains", increase of "up to $54 million" to the Health Plan and "26% increase in fixed streaming residuals". The membership was not informed the up to $54 million was insufficient to sustain the health benefit or that residuals earnings would no longer count toward covered earnings for health coverage of Retirees.

104.    Similarly, an April 2, 2019 report by SHOOTonline quoted several of the Union negotiators on the Commercials Contract as follows:

SAG-AFTRA president and Negotiating Committee chair Gabrielle

Carteris said the tentative agreement delivers essential gains while positioning performers and the industry for growth in a rapidly changing environment.

"This agreement represents a real step forward for actors in this space. It modernizes the commercials contracts making them more relevant to the industry now and into the future. It is a monumental advancement in growing our jurisdiction. We are proud to have helped create this important benchmark that clearly speaks to the needs of the membership and the evolution of our industry," Carteris said. "I also want to congratulate the members of the negotiating committee for their foresight, hard work and diligence. I particularly wish to recognize chief negotiator David White and chief contracts officer Ray Rodriguez for their ferocious advocacy on behalf of SAG-AFTRA members."

Joint Policy Committee chief negotiator Stacy Marcus said, "The members of our respective committees worked cooperatively to address the serious needs of both the industry and the SAG-AFTRA membership. The result of that hard work and committed partnership is a landmark agreement that protects industry and member interests, while creating a structure that will also grow the opportunities for years to come. Both the industry and SAG-AFTRA should be proud of their collective accomplishment."

SAG-AFTRA national executive director and chief negotiator David White said, "President Carteris and this member negotiating committee worked diligently for more than two years to prepare and negotiate this transformative agreement. Representing members from across the country, they worked relentlessly to design real solutions to the challenges facing the advertising industry. I also want to recognize the extraordinary work of the negotiations staff, in particular chief contracts officer Ray Rodriguez, chief economist David Viviano, associate national executive director Mathis Dunn, sr. advisor John McGuire and associate executive director of commercials contracts Lori Hunt. Working alongside dozens of our exceptional colleagues, this team brought passion, diligence and an aggressive pursuit of members' interests to this negotiation, and their efforts will benefit our membership for generations to come."

*SAG-AFTRA, JPC Reach Tentative Deal On Commercials Contracts*, SHOOTONLINE (Apr. 2, 2019).

**FIRST AMENDED COMPLAINT**

105.   The SAG-AFTRA Health Plan Trustees knew but did not disclose to the health plan participants or their representatives in connection with the negotiations or approvals of the contracts: the funding needed to sustain the Union health benefit structure for all participants; that the negotiated contract terms were insufficient to sustain the health benefit structure for all participants; and that massive cuts to eliminate thousands of participants from the Union health benefit were coming without increased funding. Several SAG Health Plan Trustees actually participated as Union negotiators on behalf of the participants, and failed to disclose the material information and approved the negotiated terms. Further, the health plan trustees who were members of the SAG-AFTRA National Board did not disclose the information to other board members, did not abstain or recuse themselves from the approval votes, and voted to approve the insufficient terms of the contracts.

106.   Under the circumstances, the withheld information concerning needed funding to sustain the benefit structure, the insufficiency of the negotiated contract terms to sustain the health benefit structure and the coming massive cuts without increased funding was material to the plan participants and their representatives in the negotiations and approvals of the contracts. The health plan trustees' failure to disclose the information, and the participation by the health plan trustees in the negotiations and approvals of the contracts without disclosure, were materially misleading to the participants and their representatives. Possessed of the withheld material information, the Union negotiating team could have directed and/or negotiated much more money into the SAG-AFTRA Health Plan had the team known the funding required to sustain the health benefit and eligibility of participants for coverage. Likewise, possessed of the withheld information, members could have made informed decisions concerning the value of the package to them, in voting on the contracts. The failure to disclose this information to the Union negotiating team and the voting National Board and membership was

materially misleading and constituted a breach of the SAG-AFTRA Health Plan Trustees' ERISA fiduciary duty to disclose material information to the plan and the participants concerning plan assets and benefits, particularly where, as here, the failure to disclose while negotiating and voting to approve the contracts was materially misleading, given the contracts were inextricably related to the Union health benefit and funding of the health plan.

107.   The membership was notified of the Benefit Cuts on August 12, 2020. The SAG-AFTRA National Board was informed on August 11, 2020. In a webinar with the National Board, SAG-AFTRA Health Plan CEO Michael Estrada said that, without the Benefit Cuts, the plan would deplete its "crucial reserve" by 2024. This crucial reserve was funded in part by participants who will lose the Union health benefit under the Benefit Cuts.

108.   In Zoom conferences with members following the August 2020 announcement of the Benefit Cuts, plan CEO Michael Estrada and Defendants White, Masur and Gordon, effectively confirmed the materiality of the withheld information. According to an August 18, 2020 report in Deadline, Estrada, White, Masur and Gordon told members employer contributions under the Union collective bargaining agreements had not kept up with the cost of health coverage to the 33,000 participants and their 32,000 family members. *SAG-AFTRA Health Plan Trustees Say Employer Contributions Haven't Kept Up With Soaring Health Care Costs*, DEADLINE (Aug. 18, 2020).

### G. SAG-AFTRA Health Plan Trustees' Approval and Implementation of Discriminatory Illegal Benefit Cuts

109.   As alleged above, the SAG Health Plan Trust Agreement required the plan trustees to maintain the health plan and any amendments in compliance with all applicable positive law: Article VI, Section 2, provided: "It is the intention of the

parties that the Health Plan and any and all amendments thereto shall at all times . . . [b]e and remain in compliance and conformity with all applicable laws and regulations, including but not limited to all applicable provisions of the Labor Management Relations Act and any other applicable valid federal or state laws or rules or regulations . . . ."

110.    The SAG Health Plan Trust Agreement also prohibited amendments and changes to the Health Plan that would alter the basic principles of the agreement, conflict with collective bargaining contracts or contravene applicable positive law. Article VIII Section 2, provided:

> No amendment of or change in the Health Plan may be adopted which will alter the basic principles hereof or be in conflict with the then existing collective bargaining agreements or contrary to any applicable law or governmental rule or regulation. No amendment may be adopted which will cause any of the assets of the Health Fund to be used for or diverted to purposes other than those herein authorized or which will retroactively deprive any person of any vested benefit; except any amendment may be made which is required as a condition to obtaining or retaining the approval of the Health Plan by the Internal Revenue Service under the Internal Revenue Code or the Franchise Tax Board under the California Revenue and Taxation Code as either are now in effect or hereafter amended to the end that any contributions made to the Health Fund by the Producers are deductible for federal income tax and California state franchise tax purposes.

111.    The SAG Health Plan Trust Agreement deemed invalid and ineffective any action by the trustees to interpret the Health Plan so as to contravene applicable positive law or as to exceed the powers of the trustees under the trust agreement. Article VIII Section 11, provided: "No action determined by the vote of the Plan Trustees, directly or through the vote of an umpire as herein contemplated, shall be valid or effective which shall interpret or apply any provisions of the Health Plans in any manner or to any extent so as to be contrary to any applicable law or governmental rule or regulation or which would exceed the powers given to the Plan Trustees as set forth hereunder or change or enlarge the express purpose hereof."

112.   The SAG-AFTRA Health Plan Trust Agreement is an amendment of the SAG Health Plan Trust Agreement and, as such required the SAG Health Plan Trust Agreement, requires the plan to be managed and administered in compliance with plan documents, ERISA, the Internal Revenue Code and other applicable law. Article II Section 2 of the SAG-AFTRA Trust Agreement provides:

> Purpose. The Health Fund is established for the exclusive purpose of providing certain health and welfare benefits (which may include medical, death, and other related benefits that may be provided by an organization exempt from income tax under Code Section 501(a) by virtue of being an organization described in Code Section 501(c)(9)) to Participants and their Beneficiaries, and shall further provide the means for financing and maintaining the operation and administration of the Health Fund and the Plan in accordance with this Agreement, the Plan, ERISA, the Code and other applicable law.

113.   Article XIV Section 2 of the SAG-AFTRA Trust Agreement provides: "Choice of Law. This Agreement and the Health Fund created hereby shall be construed, regulated, enforced and administered in accordance with the internal laws of the State of California applicable to contracts made and to be performed within the County of Los Angeles (without regard to any conflict of laws provisions), to the extent that such laws are not preempted by the provisions of ERISA (or any other applicable laws of the United States)."

114.   Article XIV Section 11 of the SAG-AFTRA Trust Agreement provides: "Construction. Anything in this Agreement, or any amendment hereof, to the contrary notwithstanding, no provision of this Agreement shall be construed so as to violate the requirements of ERISA, the Code, or other applicable law."

115.   The SAG-AFTRA Trustee Defendants' fiduciary duties under ERISA required the trustees to administer and manage the plan in compliance with positive law and in accordance with the documents that govern the plan. The approval and implementation of the illegal Benefit Cuts constituted breaches of the SAG-AFTRA Health Plan Trustees' fiduciary duty to do so.

116.   The Summary Plan Description of the SAG-AFTRA Health Plan is a plan document and includes "Prudent Actions Required of Plan Fiduciaries." SAG-AFTRA SPD at 95 (effective Jan. 1, 2021). The SPD states:

> In addition to creating rights for plan participants, ERISA imposes duties upon the people who are responsible for the operation of the employee benefit plan. The people who operate your Plan, called "fiduciaries" of the Plan, have a duty to do so prudently and in the interest of you and the other plan participants and beneficiaries. No one, including your employer, your union or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining benefits under the Plan or exercising your rights under ERISA.

*Id.*

117.   By targeting participants age 65 and older to prevent these participants from obtaining the Union health benefit based on age, the SAG-AFTRA Health Plan Trustees breached their ERISA fiduciary duty to administer the plan in accordance with the documents that govern the plan, including the trust agreement and the SPD.

118.   The Benefit Cuts targeted and discriminated based on the age against participants age 65 and older, in several ways. First, Senior Performer Coverage applied to participants age 65 and older with qualifying vested pension credit, which are years of work already irrevocably achieved. This provided a lifetime SAG-AFTRA health benefit to the participants and dependents and surviving spouses. In addition, the notices to surviving spouses unconditionally promised coverage until death or remarriage of the surviving spouse. The Benefit Cuts eliminated Senior Performer Coverage for participants and their surviving spouses.

119.   Second, the earnings-based eligibility for the Union health benefit discriminates based on age. All earnings of participants younger than 65 count toward health benefit eligibility, regardless whether the participant is taking a Union pension. All earnings of participants age 65 and older count toward Union health benefit eligibility only if the participant has at least some sessional earnings. No

residuals earnings of participants age 65 and older and taking a Union pension count toward Union health benefit eligibility, yet employers will continue to contribute to the health plan based on *all* earnings of these participants under the collective bargaining agreements, and the Union dues of these participants will continue to be assessed based on *all* earnings.

120.   Further, the disparity in contribution rates between performers and broadcasters will result in broadcasters qualifying for coverage based on far lower contributions. For example, a broadcaster with $26,000 in earnings will have contributions made as low as $2,600 and still be eligible for health coverage. A performer with just $20,000 in earnings, however, will have contributions made of approximately $4,000 and will not be eligible for health coverage. In other words, broadcasters will qualify, while performers who have had higher contributions to the plan than the broadcaster will not.

121.   Following the Benefit Cuts, Commercials performers age 65 and older will have no practical ability to obtain the Union health benefit, as the overwhelming majority of their earnings come from residuals. The current commercial day rate is $712, meaning it would take 37 days (commercials) for a participant 65 and older who is taking a pension to get the Union health benefit. On average, a good year for a commercial actor would be approximately five commercials. Accordingly, for all practical purposes, no participant age 65 and older taking a pension will ever again obtain the SAG-AFTRA health benefit.

122.   Third, the base earnings year for all participants 65 years of age and older was immediately set to October 1-September 30. This unfairly limited the time for affected older participants from seeking opportunities urgently for sessional earnings, when the trustees knew sessional opportunities had been limited by the Covid-19 pandemic. The benefit period for all participants 65 and older was set to January 1 - December 31. The change also took pre-qualified coverage from some

participants 65 and older. Plaintiff, David Jolliffe, lost three months of coverage for which he had already qualified.

123.   The operative collective bargaining agreements fund the health plan based on all earnings of all members, regardless of the member's age or whether the member is taking a SAG or AFTRA pension. Members' Union dues likewise are assessed based on all earnings of the member. State and federal tax too are assessed based on all earnings as are premiums for health coverage. Union members pay dues to the Union assessed based on all earnings of the member as a performer. The operative collective bargaining agreements determine the compensation paid to the member performers in exchange for their work, including wages, working conditions and employer contributions to the Union benefit plans based on all their work and earnings. Employer contributions to the health plan are based on all earnings of a member, regardless of the member's age or whether the member is taking a SAG or AFTRA pension from the separate jointly-trusted pension plans. State and federal income taxes also are assessed based on all earnings of a member performer, as is a premium for health coverage in the marketplace.

124.   The residuals earnings of SAG-AFTRA members are earnings from the members' work under the Union contracts. Residuals earnings are compensation paid to performers for use of a theatrical motion picture, television program and commercials beyond the use covered by performer's initial compensation. Residuals include payments made for free TV, basic cable, video/DVD, New Media and theatrical productions. Residuals have historically been the subject of difficult fights and strikes to maintain and increase the important source of income. According to SAG-AFTRA: "Oftentimes, residuals linked to the continued exhibition of Union projects are the 'long tail' of income for performers and their heirs."[2] Residuals are

---

[2] *Residuals Claims Connects with You*, SAG-AFTRA (May 23, 2018), available at https://www.sagaftra.org/residuals-claims-connects-you

a vital part of a member's earnings, continuing to the participant's heirs and beneficiaries even after death.

125.   Likewise, *all* earnings of *all* Union members are treated identically for the vital funding of the health plan. Under the current and past contracts, employers pay the exact same contribution rate (for a given corresponding earnings period) on residuals earnings as sessional earnings.

126.   Moreover, the participants who are 65 and older and taking a SAG or AFTRA pension and losing the SAG-AFTRA health benefit have funded what the plan's CEO calls the "fund reserve." An August 25, 2020 report in "Deadline" quoted SAG-AFTRA Health Plan CEO Michael Estrada, speaking and answering questions in an informational webinar to SAG-AFTRA members in August 2020.[3] Quoting Estrada, Deadline report stated:

> "Our trustees must manage the money coming into the Plan, and the money going out to pay for skyrocketing health care costs," Estrada said. "It would be nearly impossible for a health care plan like ours to perfectly maintain that balance every year, and that's why the Health Plan maintains a fund reserve. Think of this reserve as the Plan's savings account. This reserve is absolutely critical to the long-term sustainability of our Health Plan, and is designed to help the Plan continue to pay for the health care needs of our participants, even in years when our revenue is lower than expected or our participants' health care costs are higher than expected."

> The SAG-AFTRA Health Plan, which came into existence in 2017 with the merger of the old SAG and AFTRA health funds, recorded an $18 million surplus that first year, as revenue sources were greater than expenses. "Another way to think about the surplus is that we added $18 million to our savings account, which at the end of 2017 totaled about $500 million," he said.

> In 2018, the Health Plan experienced its first deficit – $48 million. "Our income was lower than expected, and health care costs for our

---

[3] *SAG-AFTRA Health Plan CEO Michael Estrada Describes "Perfect Storm" That Required Action To Save Plan*, DEADLINE (Aug. 25, 2020), available at https://deadline.com/2020/08/sag-aftra-health-plan-ceo-benefits-changes-perfect-storm-1203023261/.

**FIRST AMENDED COMPLAINT**

participants were higher than expected," he said. "Since expenses were higher than our income, we had to use about 10% of our reserves to pay for our participants' health care expenses.

"Last year, our Health Plan had another deficit – of $50 million. In 2019, our income was actually higher than projected, but our expenses were even higher than that due to skyrocketing health care costs."

This, he said, "was further proof that the Health Plan was facing a structural issue, where health care expenses for our participants were far exceeding revenue coming into the Plan." To address the problem, the trustees implemented changes that took effect this year to help balance the plans' books. But then the shutdown hit, and for the past five-plus months of the pandemic, employer contributions have all but dried up.

"Our trustees are continuously reviewing projections and possible changes to Plan benefits," Estrada said. "And in the middle of 2019 – just seven months after the 2018 deficit and before realizing the full 2019 deficit – the trustees announced several benefit changes that went into effect in 2020 that would help address these deficits. In addition to the automatic annual 2% increase to eligibility thresholds, the trustees also reduced out-of-network co-insurance, increased out-of-pocket maximums, and made changes to our prescription drug benefit.

"As we ended 2019 and entered 2020, the Health Plan had reduced the size of its critical reserves by about 20% – or $100 million. And the trustees were beginning to evaluate the impact from the benefit changes that had just been implemented, as well as continuing their evaluation of several options for addressing the structural deficits that were now facing the Health Plan. And then the unthinkable happened – the outbreak of COVID-19 and the resulting production shutdown. So while the trustees took immediate steps to help our participants, including a 50% reduction in second quarter premiums – the production shutdown is having a significant negative impact on employer contributions coming into the Plan. This truly is a perfect storm of increasing costs and reduced contributions, making our projected deficits even worse. This year, we are projecting deficits of $141 million because of continued high health care costs and lost contributions, which is our primary source of income.

"In 2021, our actuaries are also projecting the Plan to have a deficit of $83 million. And if the trustees didn't adopt structural changes, the deficits would continue and the Plan would run out of its crucial

**FIRST AMENDED COMPLAINT**

reserves by the year 2024. It was unequivocally clear to our trustees, that in order to safeguard our Health Plan, they needed to be proactive and implement structural changes for the benefit of our current, as well as our future, participants. Delayed action would only make the situation worse. Our trustees have made the very difficult, but absolutely necessary decision, to make structural changes to our Health Plan. As a result of these changes, the Health Plan is now projected to run surpluses, and begin rebuilding our critically important fund reserve in order to safeguard our Health Plan – not only to pay for the health needs of current participants, but also the health needs of future participants and their families."

*SAG-AFTRA Health Plan CEO Michael Estrada Describes "Perfect Storm" That Required Action To Save Plan*, DEADLINE (Aug. 25, 2020).

127.   Michael Estrada also informed participants in a webinar on August 19, 2020 that the plan had reserves until 2024.

128.   Participants who will no longer qualify for the Union health benefit have funded the "fund reserve" through their earnings, and employer contributions to the health plan will continue to be made at the same rate based on *all* their earnings under the operative collective bargaining agreements while they cannot obtain the Union health benefit. The Senior Performer Coverage lifetime health benefit for all members with 20 years of pension service (or fewer in certain circumstances) has been eliminated and it has been taken from participants and surviving spouses already receiving it. The participant losing SAG-AFTRA health benefit and forced in to Medicare will pay higher premiums for secondary coverage than the Union health benefit, and will be required to buy dental, vision and prescription benefits.

129.   The Benefit Cuts breached the trustees' ERISA fiduciary duties by failing to administer and operate the plan in accordance with the trust agreement requirements to comply with applicable positive law. The Benefit Cuts illegally discriminate on the basis of age in violation of the ADEA, 29 U.S.C. § 621 et seq., the UCRA, Cal. Civ. Code § 51 et seq., and the ACA, 42 U.S.C. § 18001 et seq. At

least 13 participants have filed claims with the EEOC challenging the cuts. Plan outside counsel, Cohen Weiss & Simon, has been retained by the Plan to oppose and has submitted responses in opposition to the participants' EEOC claims. Position Statement of Respondent SAG-AFTRA Health Plan, EEOC Charge No. 480-2020-04521 (Jan. 25, 2021). The Benefit Cuts have exposed the Health Plan and its assets to expense and liability.

130.    The Age Discrimination in Employment Act of 1967 prohibits discrimination on the basis of age against individuals 40 years of age or older. Under the ADEA, it is unlawful for a labor organization to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. §§ 623(a)(1), (f)(2). As discussed herein, the SAG-AFTRA Health Plan Trustees were motivated by Plaintiffs' ages in creating Benefits Cuts designed to preclude participants 65 and older from qualifying for health coverage by the SAG-AFTRA Health Plan, in violation of ADEA § 623. Alternatively, the Benefits Cuts have a significant discriminatory impact upon plan participants 40 years of age or older in violation of ADEA § 623.

131.    The Unruh Civil Rights Act, Cal. Civ. Code § 51 et seq., provides that all persons are entitled to the "full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever," regardless of age. By the conduct alleged herein, each of the SAG-AFTRA Heath Plan Trustees denied, aided or incited in the denial of, discriminated or made a distinction that denied Plaintiffs and other participants full and equal advantages, privileges and services to Plaintiffs and other participants, and that participants' ages were a substantially motivating reason informing this conduct, and such conduct by the SAG-AFTRA Health Plan Trustees constitutes a violation of the Unruh Act.

132.    Under Section 1557 of the Affordable Care Act, an individual shall not, on the ground prohibited under . . . the Age Discrimination Act of 1975 (42. U.S.C.

6101 et seq.) . . . be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity. 42 U.S.C. § 18116(a). *See* 45 C.F.R. §§ 92.1-92.3. Section 1557 expressly incorporates the enforcement provisions of the Age Discrimination Act, which provides that "no person in the United States shall, on the basis of age, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any program or activity receiving Federal financial assistance." 42 U.S.C. § 6102. The SAG-AFTRA Heath Plan Trustees included a "Section 1557 Non-discrimination Notice" representation in the disclosure of the Benefit Cuts to participants.

133. The Benefit Cuts targeting participants age 65 and older also breached the trustees' ERISA fiduciary duties to administer all operate the plan in accordance with the SPD, by discriminating against these participants to prevent them from obtaining the Union health benefit based on age.

134. The Benefit Cuts also impose a penalty on participants age 65 and older who take a Union pension, as participant's decision whether to take a vested pension is taxed with the loss of residuals earnings toward the Union health benefit. The imposition of this pension-based penalty in the terms of the health benefit breached the trustees' fiduciary duties to act solely in the interests of plan participants and their beneficiaries. Whether a health plan participant is taking a Union pension from a separate Union pension plan is irrelevant to the earnings or work of the participants under the operative collective bargaining agreements.

135. There is currently a significant overlap of members on the board of trustees of the SAG-AFTRA Health Plan and the boards of the SAG Pension Plan and the AFTRA Retirement Fund. Specifically, other than Defendants Kim Sykes, James Harrington, Marla Johnson, and Lara Unger, approximately 90% of the currently 38-member board of trustees for the SAG-AFTRA Health Plan also serve on the board of either the SAG Pension Plan or the AFTRA Retirement Fund. Of the current members of the SAG-AFTRA Health Plan board of trustees, the following

currently also serve on board of the SAG Pension Plan: Union Trustees - Daryl Anderson, Amy Aquino, Timothy Blake, Jim Bracchitta, John Carter Brown, Duncan Crabtree-Ireland, Leigh French, Barry Gordon, Richard Masur, John T. McGuire, Michael Pniewski, Ray Rodriguez, Ned Vaughn, David P. White; Producer Trustees - Helayne Antler, J. Gorham Keith, Robert W. Johnson, Sheldon Kasdan, Allan Liderman, Carol A. Lombardini, Stacy K. Marcus, Diane P Mirowski, Paul Muratore, Tracy Owen, Marc Sandman, David Weissman, Russell Wetanson, and Samuel P. Wolfson.  Of the current members of the SAG-AFTRA Health Plan board of trustees, the following currently serve on the board of the AFTRA Retirement Fund: Union Trustees - David Hartley-Margolin, Matthew Kimbrough, Lynne Lambert, Shelby Scott, Sally Stevens, Ned Vaughn, and David P. White; Producer Trustees - Ann Calfas, J. Gorham Keith, Harry Isaacs and Marc Sandman.

136.  Contrary to the trustees' claims, the COVID-19 pandemic did not urgently necessitate immediate draconian cuts in health coverage for older members. Employer contributions have not "all but dried up," and "the Plan's savings account," funded in part by members losing the Union health benefit, is not gone. Far less draconian and equitable adjustments were available for a one-time event like COVID-19, such as increased diversions.

## VI.   CLASS ACTION ALLEGATIONS
### A. Counts I and III Class

137.  Pursuant to 29 U.S.C. §1132(a)(2), ERISA authorizes any participant or beneficiary of a plan to bring an action individually on behalf of the plan to enforce fiduciary liability to the plan under 29 U.S.C. §1109(a). Further, ERISA Section 1132(a)(3) authorizes any participant or beneficiary to sue as a representative of the plan to enjoin any act or practice that violates ERISA or to

obtain other appropriate equitable relief to redress violations and/or enforce the provisions of ERISA. 29 U.S.C. §1132(a)(3).

138.   In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the SAG Health Plan prior to the Health Plans Merger, as an alternative to direct individual actions on behalf of the plan under 29 U.S.C. § 1132(a)(2) and (3), Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the SAG Health Plan at the time of the Health Plans Merger. Plaintiffs seek to certify, and to be appointed as representatives of, the following class (the "Counts I and III Class"):

139.   All participants and beneficiaries of the SAG Health Plan at the effective time of the Health Plans Merger.

140.   Excluded from the Class are Defendants and any plan fiduciaries. Plaintiffs reserve the right to modify, change, or expand the Class definition based upon discovery and further investigation.

141.   This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons.

142.   **Numerosity**: The members of Counts I and III Class are so numerous that joinder of all members is impracticable. While the exact number and identities of individual members of the Counts I and III Class are unknown at this time, such information being in the sole possession of Defendants and obtainable by Plaintiffs only through the discovery process, Plaintiffs believe, and on that basis allege, that many thousands of persons comprise the Class. On the basis of Form 5500 filed with the DOL for the Plan year ending December 31, 2016, the Class includes at least 27,271 plan participants, inclusive of active participants, retired or separated participants receiving benefits, other retired or separated participants entitled to benefits, and beneficiaries of deceased participants who are receiving or are entitled to receive benefits.

143.  **Existence and Predominance of Common Questions of Fact and Law:** Common questions of law and fact exist as to all members of the Counts I and III Class because Defendants owed fiduciary duties to the plan and to all participants and beneficiaries, and took the actions and omissions alleged herein as to the Plan and not as to any individual participant. These questions predominate over the questions affecting individual Counts I and III Class Members. These common legal and factual questions include, but are not limited to:

a.  who are the fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a);

b.  to whom are the fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a);

c.  whether Defendants were fiduciaries to the Plan under ERSIA in the challenged conduct;

d.  whether Defendants breached fiduciary duties to the Plan, participants, and beneficiaries by the challenged conduct in violation of ERISA;

e.  if so, the amount of damages or monetary relief that should be provided to the Plan and its participants; and

f.  what equitable and other relief should be imposed in light of Defendants' breaches.

Given that Defendants have engaged in a common course of conduct as to Plaintiffs and the Counts I and III Class, similar or identical injuries and violations are involved and common questions far outweigh any potential individual questions.

144.  **Typicality:** All of Plaintiffs' claims are typical of the claims of the Counts I and III Class because Plaintiffs were participants during the Counts I and III Class Period and all plan participants were harmed by the uniform acts and conduct of Defendants discussed herein. Plaintiffs, all Counts I and III Class

Members, and the plan sustained monetary and economic injuries arising out of Defendants' breaches of their fiduciary duties to the plan.

145. **Adequacy:** Plaintiffs are an adequate representatives for the Counts I and III Class because their interests do not conflict with the interests of the members of the Counts I and III Class they seek to represent; they were participants in the plan during the Counts I and III Class Period; and they are committed to vigorously representing the Counts I and III Class. Plaintiffs' retained counsel, Chimicles Schwartz Kriner & Donaldson-Smith LLP, Johnson & Johnson LLP and Law Offices of Edward Siedle, are highly competent and experienced in complex class action litigation – including ERISA and other complex financial class and derivative actions – and counsel intend to prosecute this action vigorously. The interests of the Counts I and III Class will be fairly and adequately protected by Plaintiffs and their counsel.

146. **Superiority:** A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all plan participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small, and it would be impracticable for individual members to enforce their rights through individual actions. Even if Counts I and III Class members could afford individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, an economy of scale, and comprehensive supervision by a single court. Upon information and belief, members of the Counts I and III Class can be readily identified and notified based on, *inter alia*, the records (including databases, e-mails, etc.) that Defendants maintain

regarding the plan. Given the nature of the allegations, no Counts I and III Class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action.

147. Prosecution of separate actions by individual participants and beneficiaries for the breaches of fiduciary duties would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants regarding their fiduciary duties and personal liability to the plan under 29 U.S.C. §1109(a), and adjudications by individual participants and beneficiaries regarding the breaches of fiduciary duties and remedies for the plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests. Therefore, this action should be certified as a class action under Fed. R. Civ. P. 23(b)(1)(A) or (B). Alternatively, then this action may be certified as a class action under Rule 23(b)(3) if it is not certified under Rule 23(b)(1)(A) and (B).

148. Defendants have acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Counts I and III Class, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Counts I and III Class as a whole.

### B. Counts II and IV Class

149. Pursuant to 29 U.S.C. §1132(a)(2), ERISA authorizes any participant or beneficiary of a plan to bring an action individually on behalf of the plan to enforce fiduciary liability to the plan under 29 U.S.C. §1109(a). Further, ERISA Section 1132(a)(3) authorizes any participant or beneficiary to sue as a representative of the plan to enjoin any act or practice that violates ERISA or to

obtain other appropriate equitable relief to redress violations and/or enforce the provisions of ERISA.

150.   In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the SAG-AFTRA Health Plan following the Health Plans Merger, as an alternative to direct individual actions on behalf of the plan under 29 U.S.C. § 1132(a)(2) and (3), Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the SAG-AFTRA Health Plan. Plaintiffs seek to certify, and to be appointed as representatives of, the following class (the "Counts II and IV Class"):

All participants and beneficiaries of the SAG-AFTRA Health Plan.

151.   Excluded from the Class are Defendants and any plan fiduciaries. Plaintiffs reserve the right to modify, change, or expand the Class definition based upon discovery and further investigation.

152.   This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons.

153.   **Numerosity**: The Counts II and IV Class are so numerous that joinder of all members is impracticable. While the exact number and identities of individual members of the Counts II and IV Class are unknown at this time, such information being in the sole possession of Defendants and obtainable by Plaintiffs only through the discovery process, Plaintiffs believe, and on that basis allege, that many thousands of persons comprise the Class. On the basis of Form 5500 filed with the DOL for the Plan year ending December 31, 2019, the Class includes at least 37,248 plan participants, inclusive of active participants, retired or separated participants receiving benefits, other retired or separated participants entitled to benefits, and beneficiaries of deceased participants who are receiving or are entitled to receive benefits.

154.   **Existence and Predominance of Common Questions of Fact and Law:** Common questions of law and fact exist as to all members of the Counts II and IV Class because Defendants owed fiduciary duties to the plan and to all participants and beneficiaries, and took the actions and omissions alleged herein as to the Plan and not as to any individual participant. These questions predominate over the questions affecting individual Counts II and IV Class members. These common legal and factual questions include, but are not limited to:

a.  who are the fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a);

b.  to whom are the fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a);

c.  whether Defendants were fiduciaries to the Plan under ERISA in the challenged conduct;

d.  whether Defendants breached fiduciary duties to the Plan, participants, and beneficiaries by the challenged conduct in violation of ERISA;

e.  if so, the amount of damages or monetary relief that should be provided to the Plan and its participants; and

f.  what equitable and other relief should be imposed in light of Defendants' breaches.

Given that Defendants have engaged in a common course of conduct as to Plaintiffs and the Counts II and IV Class, similar or identical injuries and violations are involved and common questions far outweigh any potential individual questions.

155.  **Typicality:** All of Plaintiffs' claims are typical of the claims of the Counts II and IV Class because Plaintiffs were participants during the Counts II and IV Class Period and all plan participants were harmed by the uniform acts and conduct of Defendants discussed herein. Plaintiffs, all Counts II and IV Class

members, and the plan sustained monetary and economic injuries arising out of Defendants' breaches of their fiduciary duties to the plan.

156. **Adequacy:** Plaintiffs are an adequate representatives for the Counts II and IV Class because their interests do not conflict with the interests of the Counts II and IV Class that they seek to represent; they were participants in the plan during the II and IV Class Period; and they are committed to vigorously representing the Counts II and IV Class. Plaintiffs' retained counsel, Chimicles Schwartz Kriner & Donaldson-Smith LLP, Johnson & Johnson LLP and Law Offices of Edward Siedle, are highly competent and experienced in complex class action litigation – including ERISA and other complex financial class actions – and counsel intend to prosecute this action vigorously. The interests of the Counts II and IV Class will be fairly and adequately protected by Plaintiffs and their counsel.

157. **Superiority:** A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all plan participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small, and it would be impracticable for individual members to enforce their rights through individual actions. Even if Counts II and IV Class Members could afford individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, an economy of scale, and comprehensive supervision by a single court. Upon information and belief, members of the Counts II and IV Class can be readily identified and notified based on, *inter alia*, the records (including databases, e-mails, etc.) that Defendants maintain regarding the plan. Given the nature of the allegations, no Counts II and IV Class

**FIRST AMENDED COMPLAINT**

Member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action.

158. Prosecution of separate actions by individual participants and beneficiaries for the breaches of fiduciary duties would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants regarding their fiduciary duties and personal liability to the plan under 29 U.S.C. §1109(a), and adjudications by individual participants and beneficiaries regarding the breaches of fiduciary duties and remedies for the plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests. Therefore, this action should be certified as a class action under Fed. R. Civ. P. 23(b)(1)(A) or (B). Alternatively, then this action may be certified as a class action under Rule 23(b)(3) if it is not certified under Rule 23(b)(1)(A) and (B).

159. Defendants have acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Counts II and IV Class, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Counts II and IV Class as a whole.

## VII.  CLAIMS

### COUNT I

### Violations of ERISA § 404(a)(1)(A)-(D)

### (Against the SAG Health Plan Board of Trustees and the SAG Health Plan Trustee Defendants)

160. Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

161.   This Count is brought against the SAG Health Plan Board of Trustees and the SAG Health Plan Trustee Defendants, except Ann Calfas, Eryn Doherty, Gary Elliot, Mandy Fabian, Leigh French, Nicole Gustafson, Marla Johnson, Bob Kaliban, Shelley Landgraf, Alan H. Raphael, John E. Rhone, John H. Sucke and Kim Sykes who have been dismissed from the action without prejudice pursuant to the Tolling and Dismissal Agreement between the parties.

162.   As alleged herein, the SAG Health Plan Trustees functioned as ERISA fiduciaries in effecting the Health Plans Merger and the related amendments to the SAG Health Plan Trust Agreement.

163.   As ERISA fiduciaries, the SAG Board of Trustees and the SAG Trustee Defendants were required, pursuant to ERISA §404(a)(1), to act solely in the interest of the participants and beneficiaries of the Plan "(A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan" (B) to discharge their duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims," … and (C) to act in accordance with the documents and instruments governing the Plan, ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).

164.   The SAG Board of Trustees and the SAG Trustee Defendants were required to manage and administer the SAG Health Plan and its assets solely for the benefit of the participants and their beneficiaries.

165.   In considering, approving and implementing the Health Plans Merger and the related amendments to the SAG Health Plan Trust Agreement, the SAG Health Plan Trustees either: failed to conduct a diligent, fully informed pre-merger investigation and analysis to assess the impact of the merger on the SAG Health Plan and its participants' future health benefits and the sustainability of the Union health benefit structure for the participants under the operative collective bargaining

agreements; or knowingly or recklessly disregarded the looming peril and unsustainability of the health benefit structure in the merged plan under the operative collective bargaining agreements.

166.   By the foregoing, the SAG Board of Trustees and the SAG Trustee Defendants (a) failed to act solely in the interest of the participants and beneficiaries of the Plans for the exclusive purpose of providing them benefits, in violation of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A); (b) failed to act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B); and (c) failed to act in accordance with the documents and instruments governing the Plan, ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).

167.   As a result of their breaches, the SAG Health Plan Board of Trustees and the SAG Health Plan Trustee Defendants caused the SAG Health Plan and its participants to suffer losses for which they are liable.

## COUNT II

### Violations of ERISA § 404(a)(1)(A)-(D)

### (Against The SAG-AFTRA Health Plan Board of Trustees and the SAG-AFTRA Health Plan Trustee Defendants)

168.   Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

169.   This Count is brought against the SAG-AFTRA Health Plan Board of Trustees and the SAG-AFTRA Health Plan Trustee Defendants, except Ann Calfas, Eryn Doherty, Gary Elliot, Mandy Fabian, Leigh French, Nicole Gustafson, Marla Johnson, Bob Kaliban, D.W. Moffett, John H. Sucke and Kim Sykes who have been dismissed from the action without prejudice pursuant to the Tolling and Dismissal Agreement between the parties.

170.   As alleged herein, the SAG-AFTRA Health Plan Trustees functioned as ERISA fiduciaries in exercising their powers and duties under the amended SAG Health Plan Trust Agreement following the Health Plans Merger, including in communication with the plan participants and their representatives, and in effecting the Benefit Cuts.

171.   As ERISA fiduciaries, the SAG-AFTRA Health Plan Board of Trustees and the SAG-AFTRA Health Plan Trustee Defendants were required, pursuant to ERISA § 404(a)(1), to act solely in the interest of the participants and beneficiaries of the Plan "(A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan" (B) to discharge their duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims," … and (C) to act in accordance with the documents and instruments governing the Plan, ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).

172.   The SAG-AFTRA Health Plan Board of Trustees and the SAG-AFTRA Health Plan Trustee Defendants were required to administer and manage the SAG-AFTRA Health Plan and its assets solely for the benefit of the participants and their beneficiaries.

173.   As alleged herein, the SAG-AFTRA Health Plan Board of Trustees and the SAG-AFTRA Health Plan Trustee Defendants knew but failed to disclose to the Health Plan participants and their representatives in connection with the negotiation and approvals of the collective bargaining agreements: the funding needed to sustain the Union health benefit structure for the participants, that the health benefit structure was not sustainable under the negotiated terms of the three major collective bargaining contracts negotiated and approved in the two years prior to the announcement of the Benefit Cuts, and that dramatic benefit cuts to eliminate

thousands of participants from the Union health benefit were coming without increased funding. Several of the Defendant trustees actually participated in the contract negotiations and approved the contracts as representatives of the participants. The withheld information was material and the omission was materially misleading to the participants and their representatives, under the circumstances.

174.   Further, the SAG-AFTRA Health Plan Board of Trustees and the SAG-AFTRA Health Plan Trustee Defendants approved and implemented the Benefit Cuts that targeted and discriminated against participants age 65 and older based on their age to prevent these participants from obtaining the Union health benefit.

175.   By the foregoing, the SAG-AFTRA Health Plan Board of Trustees and the SAG-AFTRA Health Plan Trustee Defendants (a) failed to act solely in the interest of the participants and beneficiaries of the Plans for the exclusive purpose of providing them benefits, in violation of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A); (b) failed to act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B); and (c) failed to act in accordance with the documents and instruments governing the Plan, ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).

176.   The plan documents including the Health Plan trust agreement and the Health Plan SPD required the trustees to administer and operate the plan in compliance with law and prohibit discrimination against participants in any way to prevent participants from obtaining health benefits under the plan. As alleged here, the Benefit Cuts illegally discriminate based on age in violation of positive law, and discriminate against participants based on age to prevent the participants from obtaining the Union health benefit, while the employer contributions under the collective bargaining agreement will continue to be based on all earnings of these

participants, and the Union dues of these participants will continue to be assessed based on all earnings.

177.   As a result of its breaches, the plan and its participants suffered losses for which the trustees are liable.

## COUNT III

### Violations of ERISA § 1105(a)

### (Against the SAG Health Plan Board of Trustees and the SAG Health Plan Trustee Defendants)

178.   Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

179.   This Count is brought against the SAG Health Plan Board of Trustees and the SAG Health Plan Trustee Defendants, except Ann Calfas, Eryn Doherty, Gary Elliot, Mandy Fabian, Leigh French, Nicole Gustafson, Marla Johnson, Bob Kaliban, Shelley Landgraf, Alan H. Raphael, John E. Rhone, John H. Sucke and Kim Sykes who have been dismissed from the action without prejudice pursuant to the Tolling and Dismissal Agreement between the parties.

180.   ERISA § 405(a), 29 U.S.C. § 1105(a), imposes liability on a fiduciary, in addition to any liability which the fiduciary may have had under any other provision of ERISA, if:

(1) the fiduciary participates knowingly in or knowingly undertakes to conceal an act or omission of such other fiduciary knowing such act or omission is a breach;

(2) the fiduciary fails to comply with ERISA § 404(a)(1) in the administration of the specific responsibilities which give rise to the status as a fiduciary, the fiduciary has enabled such other fiduciary to commit a breach; or

(3) the fiduciary knows of a breach by another fiduciary and fails to make reasonable efforts to remedy it.

181.   Defendants, who are fiduciaries within the meaning of ERISA, and, by the nature of their fiduciary duties with respect to the Plan, knew of each breach of fiduciary duty alleged herein arising out of the Health Plans Merger, and knowingly participated in, breached their own duties enabling other breaches, and/or took no steps to remedy these and the other fiduciary breaches.

182.   Defendants also knew the statements made to participants by SAG Health Plan Trustee David White concerning the merger, and failed to correct the statements.

183.   Despite this knowledge, Defendants failed to act to remedy the several violations of ERISA, as alleged in Count I.

184.   As such, Defendants are liable for the breaches by the other Defendants pursuant to ERISA § 405(a)(1) and (2).

185.   Had Defendants discharged their fiduciary duties prudently as described above, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct result of the breaches of fiduciary duty alleged herein, the SAG Health Plan, the Plaintiffs, and the other Counts I and III Class members have suffered losses.

## COUNT IV

### Violations of ERISA § 1105(a)

### (Against the SAG-AFTRA Board of Trustees and the SAG-AFTRA Trustee Defendants)

186.   Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

187.   This Count is brought against the SAG-AFTRA Health Plan Board of Trustees and the SAG-AFTRA Health Plan Trustee Defendants, except Ann Calfas, Eryn Doherty, Gary Elliot, Mandy Fabian, Leigh French, Nicole Gustafson, Marla Johnson, Bob Kaliban, D.W. Moffett, John H. Sucke and Kim Sykes who have been

dismissed from the action without prejudice pursuant to the Tolling and Dismissal Agreement between the parties.

188.   ERISA § 405(a), 29 U.S.C. § 1105(a), imposes liability on a fiduciary, in addition to any liability which the fiduciary may have had under any other provision of ERISA, if:

> (1) the fiduciary participates knowingly in or knowingly undertakes to conceal an act or omission of such other fiduciary knowing such act or omission is a breach;

> (2) the fiduciary fails to comply with ERISA § 404(a)(1) in the administration of the specific responsibilities which give rise to the status as a fiduciary, the fiduciary has enabled such other fiduciary to commit a breach; or

> (3) the fiduciary knows of a breach by another fiduciary and fails to make reasonable efforts to remedy it.

189.   Defendants, who are fiduciaries within the meaning of ERISA, and, by the nature of their fiduciary duties with respect to the Plan, knew of each breach of fiduciary duty alleged herein arising out of the management and administration of the plan and its assets following the Health Plans Merger, including the failure to disclose material information and the approval and implementation of the Benefit Cuts and changes to base year, and knowingly participated in, breached their own duties enabling other breaches, and/or took no steps to remedy these and the other fiduciary breaches.

190.   Despite this knowledge, Defendants failed to act to remedy the several violations of ERISA, as alleged in Counts II and IV.

191.   As such, Defendants are liable for the breaches by the other Defendants pursuant to ERISA § 405(a)(1) and (2).

## VIII.   PRAYER FOR RELIEF

192.   By virtue of the violations set forth in the foregoing paragraphs, Plaintiffs and the members of the Classes are entitled to sue each of the Defendants pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), for relief on behalf of the

Plan as provided in ERISA § 409, 29 U.S.C. § 1109, including for (a) recovery of losses to the Plan, (b) the recovery of any profits resulting from the breaches of fiduciary duty, and (c) such other equitable or remedial relief as the Court may deem appropriate including restoration of SAG-AFTRA health coverage benefits to participants affected by the wrongful Benefit Cuts.

193.   By virtue of the violations set forth in the foregoing paragraphs, Plaintiffs and the members of the Classes are entitled, pursuant to ERISA §502(a)(3), 29 U.S.C. § 1132(a)(3), to sue any of the Defendants for any appropriate equitable relief to redress the wrongs described above.

194.   WHEREFORE, Plaintiffs, on behalf the SAG Health Plan, the SAG-AFTRA Health Plan, themselves and the Classes, pray that judgment be entered against Defendants on all claims, and request that the Court award the following relief:

A. A declaration that the Defendants breached their fiduciary duties under ERISA;

B. An Order compelling each fiduciary found to have breached his/her/its fiduciary duties to the plans jointly and severally to restore all losses to the plans which resulted from the breaches of fiduciary duty or by virtue of liability pursuant to ERISA § 405, 29 U.S.C. § 1105;

C. An Order requiring (a) the disgorgement of profits made by any Defendant, (b) a declaration of a constructive trust over any assets received by any breaching fiduciary in connection with their breach of fiduciary duties or violations of ERISA, (c) an Order requiring the plans to cure illegal and inequitable action, or (d) any other appropriate equitable or monetary relief, whichever is in the best interest of the plans and their participants;

D. Appointing an independent fiduciary, at the expense of the breaching fiduciaries, to administer the plans and manage the plans' assets and/or

determination of benefits and/or to correct and reverse the wrongful changes to the benefit structure alleged herein;

E. Ordering the plans' fiduciaries to provide a full accounting of all fees paid, directly or indirectly, by the plans;

F. Awarding Plaintiffs and the Classes their attorneys' fees and costs and prejudgment interest pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g), the common benefit doctrine and/or the common fund doctrine;

G. Awarding pre-judgment and post-judgment interest; and

H. Awarding all such other remedial or equitable relief as the Court deems appropriate including an order requiring correction and reversal of the wrongful benefit changes.

## <u>NOTICE PURSUANT TO ERISA SECTION 502 (h)</u>

To ensure compliance with the requirements of 29 U.S.C. § 1132(h), the undersigned affirms, that upon this filing of this First Amended Class Action Complaint, a true and correct copy of this First Amended Class Action Complaint will be served upon the Secretary of Labor and the Secretary of Treasury by certified mail, return receipt requested.

DATED: March 26, 2021          **JOHNSON & JOHNSON LLP**

By: ___/s/ Neville L. Johnson___
Neville L. Johnson
Douglas L. Johnson
Johnson & Johnson LLP
439 N. Canon Drive, Suite 200
Beverly Hills, CA 90210
Tel.: 310-9751080
Fax.:310-975-1095
njohnson@jjllplaw.com
djohnson@jjllplaw.com

Steven. A Schwartz
**Chimicles Schwartz Kriner**

**FIRST AMENDED COMPLAINT**

1

**& Donaldson-Smith LLP**
361 West Lancaster Avenue
Haverford, PA 19041
Tel.: 610-642-8500
Fax: 610-649-3633
steveschwartz@chimicles.com
*Admitted Pro Hac Vice*

Robert J. Kriner, Jr.
Emily L. Skaug
**Chimicles Schwartz Kriner
& Donaldson-Smith LLP**
2711 Centerville Road, Suite 201
Wilmington, DE 19808
rjk@chimicles.com
els@chimicles.com
*Admitted Pro Hac Vice*

*and*

Edward Siedle
**Law Offices of Edward Siedle**
17789 Fieldbrook Circle West
Boca Raton, FL 33496
Tel.: 561-703-5958
esiedle@aol.com
*Admitted Pro Hac Vice*

*Attorneys for Plaintiffs and the Classes*

**FIRST AMENDED COMPLAINT**

1

## **<u>DEMAND FOR JURY TRIAL</u>**

2

     A jury trial is hereby demanded.

3

4

5

6

DATED: March 26, 2021       **JOHNSON & JOHNSON LLP**

7

8

By:   <u>/s/ Neville L. Johnson</u>

9

Neville L. Johnson
Douglas L. Johnson

10

Johnson & Johnson LLP
439 N. Canon Drive, Suite 200

11

Beverly Hills, CA 90210
Tel.: 310-9751080

12

Fax.:310-975-1095
njohnson@jjllplaw.com

13

djohnson@jjllplaw.com

14

Steven. A Schwartz

15

**Chimicles Schwartz Kriner
& Donaldson-Smith LLP**

16

361 West Lancaster Avenue

17

Haverford, PA 19041

18

Tel.: 610-642-8500

Fax: 610-649-3633

19

steveschwartz@chimicles.com

*Admitted Pro Hac Vice*

20

21

Robert J. Kriner, Jr.

Emily L. Skaug

22

**Chimicles Schwartz Kriner
& Donaldson-Smith LLP**

23

2711 Centerville Road, Suite 201

24

Wilmington, DE 19808

rjk@chimicles.com

25

els@chimicles.com

26

*Admitted Pro Hac Vice*

27

*and*

28

**FIRST AMENDED COMPLAINT**

Edward Siedle
**Law Offices of Edward Siedle**
17789 Fieldbrook Circle West
Boca Raton, FL 33496
Tel.: 561-703-5958
esiedle@aol.com
*Admitted Pro Hac Vice*

*Attorneys for Plaintiffs and the Classes*