Steven. A Schwartz*
steveschwartz@chimicles.com
CHIMICLES SCHWARTZ KRINER
& DONALDSON-SMITH LLP
361 West Lancaster Avenue
Haverford, PA 19041
Tel.: 610-642-8500
Fax: 610-649-3633

Robert J. Kriner, Jr.*
rjk@chimicles.com
CHIMICLES SCHWARTZ KRINER
& DONALDSON-SMITH LLP
2711 Centerville Road, Suite 201
Wilmington, DE 19808
Tel.: 302-656-2500
Fax: 302-656-9053

* admitted pro hac vice

Neville L. Johnson (SBN 66329)
njohnson@jjllplaw.com
Douglas L. Johnson (SBN 209216)
djohnson@jjllplaw.com
JOHNSON & JOHNSON LLP
439 North Canon Drive, Suite 200
Beverly Hills, California 90210
Tel.: 310-975-1080
Fax: 310-975-1095

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| EDWARD ASNER, *et al.*,<br><br>    Plaintiffs,<br><br>    vs.<br><br>THE SAG-AFTRA HEALTH FUND, *et al.*,<br><br>    Defendants. | Case No. 2:20-cv-10914-CAS (JEM)<br><br>**PLAINTIFFS' NOTICE OF MOTION AND UNOPPOSED MOTION FOR PRELIMINARY SETTLEMENT APPROVAL; MEMORANDUM OF LAW IN SUPPORT THEREOF**<br><br>Date: May 8, 2023<br>Time: 10:00 a.m.<br>Courtroom: 8D<br>Judge: Christina A. Snyder |

## NOTICE OF MOTION AND MOTION

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on May 8, 2023, at 10:00 a.m., or such other time as the Court may direct, in Department 8D of the above-captioned Court, located at 350 W. First Street, Courtroom 8D, 8th Floor, Los Angeles, CA 90012, the Honorable Christina A. Snyder presiding, Plaintiffs Michael Bell, Raymond Harry Johnson, David Jolliffe, Robert Clotworthy, Thomas Cook, Audrey Loggia, Deborah White, and Donna Lynn Leavy[1] ("Plaintiffs" or "Class Representatives"), on behalf of themselves all others similarly situated, will, and hereby do, move this Court to:

1.  Preliminarily approve the settlement described in the Settlement Agreement, attached as Exhibit 1 to the Joint Declaration ("Joint Decl.") of Steven A. Schwartz and Robert J. Kriner, Jr.;

2.  Conditionally certify the Settlement Class;

3.  Appoint Plaintiffs as Class Representatives;

4.  Appoint the undersigned counsel as Class Counsel;

5.  Approve distribution of the proposed Notice of Class Action Settlement and the Health Reimbursement Account ("HRA") Notice to the Settlement Class and deadlines for any objections;

6.  Appoint AB Data Group as the Settlement Administrator; and

7.  Set a hearing date and briefing schedule for Final Settlement Approval and Plaintiffs' motion for fees and expenses.

This Motion is based upon: (1) this Notice of Motion and Motion for Preliminary Approval of Class Action Settlement and Class Notice; (2) the Memorandum of Points and Authorities in Support of Motion for Preliminary Approval of Class Action Settlement and Class Notice; (3) the Joint Declaration of Steven A. Schwartz and Robert

---

[1] Edward Asner and Sondra James Weil are omitted from the Class Representatives due to their deaths on August 29, 2021 and September 12, 2021, respectively.

J. Kriner, Jr.  (4) the Declaration of Robert A. Meyer of JAMS ("Meyer Decl"); (5) the Declaration of Eric Schachter of AB Data Group ("Schachter Decl."); (6) the Settlement Agreement; (7) the records, pleadings, and papers filed in this action; and (8) such other documentary and oral evidence or argument as may be presented to the Court at or prior to the hearing of this Motion.

A form of proposed Preliminary Approval is attached the Settlement Agreement as Exhibit A and has been separately lodged with the Court in accordance with the Local Rules. This motion is made following extensive consultation with counsel for Defendants pursuant to L.R. 7-3. Defendants do not oppose to relief requested in this Motion.

Dated:  April 10, 2023               By:     */s/Steven A. Schwartz*
Steven. A Schwartz*
CHIMICLES SCHWARTZ KRINER
& DONALDSON-SMITH LLP
361 West Lancaster Avenue
Haverford, PA 19041
Tel.: 610-642-8500
Fax: 610-649-3633
SteveSchwartz@chimicles.com

Robert J. Kriner, Jr.*
CHIMICLES SCHWARTZ KRINER
& DONALDSON-SMITH LLP
2711 Centerville Road, Suite 201
Wilmington, DE 19808
rjk@chimicles.com

Neville L. Johnson
Douglas L. Johnson
JOHNSON & JOHNSON LLP
439 N. Canon Drive, Suite 200
Beverly Hills, CA 90210
Tel.: 310-9751080
Fax.:310-975-1095
njohnson@jjllplaw.com
djohnson@jjllplaw.com

Edward Siedle*
Law Offices of Edward Siedle
17789 Fieldbrook Circle West
Boca Raton, FL 33496
Tel.: 561-703-5958
esiedle@aol.com

* admitted *pro hac vice*

*Attorneys for Plaintiffs and the*
*proposed Class*

PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL
(Case No. 2:20-cv-10914-CAS (JEM))

# **TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................ 1

II.   BACKGROUND ................................................................................ 3

    A.   Plaintiffs' Allegations................................................................ 3

    B.   Response to the 2020 Amendments ............................................ 5

    C.   Initial Motion Practice............................................................... 6

    D.   Early Mediation ........................................................................ 7

    E.   Discovery and Schedule Battles................................................. 7

    F.   Resumed Mediation and Settlement........................................... 8

III.  TERMS OF THE SETTLEMENT ...................................................... 9

    A.   The Settlement Class Definition .............................................. 10

    B.   The Settlement Terms .............................................................. 10

        1.   The $15 Million Fund –
            Compensation for 2022-2023 Damages ......................... 10

        2.   The HRA Amendments – Up to $700,000 in Annual HRA
            Allocations from 2023-2030 ....................................... 11

        3.   Non-Monetary Provisions ............................................ 12

IV.   THE COURT SHOULD GRANT PRELIMINARY APPROVAL .................... 13

    A.   The Class Action Settlement Process........................................ 13

    B.   The Standard for Preliminary Approval..................................... 14

V.    THIS SETTLEMENT SATISFIES THE RULE 23(E)(2) FACTORS................ 16

    A.   Class Representatives and Class Counsel Are Adequate........................... 16

    B.   The Settlement Is The Product Of Good Faith, Informed,
        And Arm's-Length Negotiations, And It Is Fair........................ 17

    C.   The Settlement Provides Significant Valuable Benefits In
        Exchange For The Compromise Of Strong, Albeit Risky, Claims........... 17

i

1.  The Settlement Mitigates the Risks, Expenses, and
Delays the Class would Bear with Continued Litigation................. 18

2.  The Settlement Allows Class Members to Obtain
Relief Easily and does not Require the Submission
of any Claims or Other Proof........................................................... 20

3.  Counsel will seek Reasonable Attorneys' Fees and Costs .............. 20

D.  The Allocation Plan Is Fair And Complies
With Governing Standards ........................................................................ 21

E.  The Service Awards Are Reasonable........................................................ 22

VI.  CERTIFICATION IS APPROPRIATE FOR SETTLEMENT PURPOSES ....... 23

A.  The Settlement Class Meets The Requirements Of Rule 23(a) ................ 23

1.  Numerosity...................................................................................... 23

2.  There are Common Questions of Law and Fact ............................. 23

3.  Plaintiffs' Claims are Typical ........................................................ 24

4.  Class Counsel and the Class Representatives are Adequate........... 25

B.  The Settlement Class Meets the Requirements of Rule 23(b)(1) ............. 26

VII.  THE PROPOSED NOTICE PROGRAM SHOULD BE APPROVED............... 27

VIII.  THE COURT SHOULD SET A SCHEDULE FOR FINAL APPROVAL......... 28

IX.  CONCLUSION.................................................................................................. 30

# TABLE OF AUTHORITIES

## CASES

*Amchem Prods. v. Windsor*,
   521 U.S. 591 (1997)................................................................ 23

*Bellinghausen v. Tractor Supply Co.*,
   306 F.R.D. 245 (N.D. Cal. 2015)........................................ 22

*Byrne v. Santa Barbara Hospitality Services, Inc.*,
   2017 WL 5035366 (C.D. Cal. 2017) .................................. 16

*Cassell v. Vanderbilt Univ.*,
   2019 U.S. Dist. LEXIS 242062 (M.D. Tenn. Oct. 22, 2019)................... 21

*Cates v. Trustees of Columbia Univ. in City of New York*,
   2021 U.S. Dist. LEXIS 200890 (S.D.N.Y. Oct. 18, 2021)...................... 21

*Churchill Vill., L.L.C., v. GE*,
   361 F.3d 566 (9th Cir. 2004) ............................................ 27

*Class Plaintiffs v. City of Seattle*,
   955 F.2d 1268 (9th Cir. 1992) .......................................... 14

*Cohen v. Trump*,
   303 F.R.D. 376 (S.D. Cal. 2014) ...................................... 23

*Cunningham v. Cornell Univ.*,
   No. 1:16-cv-6525, Dkt. 441 (S.D.N.Y. Dec. 22, 2020)....................... 21

*Del Castillo v. Cmty. Child Care Council of Santa Clara Cty., Inc.*,
   2021 U.S. Dist. LEXIS 202329 (N.D. Cal. Oct. 20, 2021) ................... 20

*Evon v. Law Offices*,
   688 F.3d 1015 (9th Cir. 2012) .................................... 24, 25

*Grabek v. Northrop Grumman Corp.*,
   346 F. App'x 151 (9th Cir. 2009)...................................... 26

*Hanlon v. Chrysler Corp.*,
   150 F.3d 1011 (9th Cir. 1998) ........................................ 15

*Harris v. Amgen Inc.*,
2017 U.S. Dist. LEXIS 222697 (C.D. Cal. Apr. 4, 2017) .......................................... 20

*Hefler v. Wells Fargo & Co.*,
2018 WL 6619983 (N.D. Cal. 2018) ...................................................................... 22

*Henderson v. Emory Univ.*,
2020 U.S. Dist. LEXIS 218676 (N.D. Ga. Nov. 4, 2020) .......................................... 21

*In re Apple Inc. Device Performance Litigation*,
50 F.4th 769 (9th Cir. 2022) .............................................................................. 16

*In re: Cathode Ray Tube (CRT) Antitrust Litig.*,
2016 WL 6778406 (N.D. Cal., 2016) .................................................................... 21

*In re Countrywide Fin. Corp. Mortg. Mktg. & Sales Practices Litig.*,
2011 WL 6325877 (S.D. Cal. Dec. 16, 2011) ........................................................ 19

*In re Mego Fin. Corp. Sec. Litig.*,
213 F.3d at 459 ................................................................................................ 16

*In re MyFord Touch Consumer Litig.*,
No. 13-cv-03072-EMC (N.D. Cal. 2019), Dkt. No. 526 .......................................... 22

*In re Syncor ERISA Litig.*,
516 F.3d 1095 (9th Cir. 2008) ............................................................................ 14

*In re Toys R Us-Del., Inc. FACTA Litig.*,
295 F.R.D. 438 (C.D. Cal. 2014) ........................................................................ 22

*In re Zoom Video Commc'ns, Inc. Priv. Litig.*,
2022 WL 1593389 (N.D. Cal. Apr. 21, 2022) ........................................................ 22

*Jimenez v. Allstate Ins. Co.*,
765 F.3d 1161 (9th Cir. 2014) ............................................................................ 23

*Kanawi v. Bechtel Corp.*,
254 F.R.D. 102 (N.D. Cal 2008) ................................................................... 26, 27

*Karg v. Transamerica Corp.*,
2021 U.S. Dist. LEXIS 261158 (N.D. Iowa Nov. 22, 2021) .................................... 20

*Kelly v. Johns Hopkins University*,
2020 U.S. Dist. LEXIS 14772 (D. Md. Jan. 28, 2020) ............................................ 21

PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL
(Case No. 2:20-cv-10914-CAS (JEM))

*Kenneth Glover, et al. v. City of Laguna Beach, et al.*,
  2018 WL 6131601 (C.D. Cal. 2018) ................................................................ 16

*Khoja v. Orexigen Therapeutics, Inc.*,
  2021 WL 5632673 (S.D. Cal. 2021) ................................................................ 21

*Kim v. Space Pencil, Inc.*,
  2012 WL 5948951 (N.D. Cal. Nov. 28, 2012) ................................................ 19

*Krueger v. Ameriprise Fin., Inc.*,
  2015 U.S. Dist. LEXIS 91385 (D. Minn. Jul. 13, 2015) ................................ 21

*Lane v. Facebook, Inc.*,
  696 F.3d 811 (9th Cir. 2012), *cert. denied*, 134 S.Ct. 8 (2013) ................. 14

*Lechner v. Mut. of Omaha Ins. Co.*,
  2021 U.S. Dist. LEXIS 23742 (D. Neb. Feb. 8, 2021) ................................... 20

*Loritz v. Exide Technologies*,
  2015 WL 6790247 (C.D. Cal. Apr. 21, 2016) ................................................ 25

*Marshall v. Northrop Grumman Corp.*,
  2020 U.S. Dist. LEXIS 177056 (C.D. Cal. Sept. 18, 2020) ........................... 20

*Mullane v. Central Hanover Bank & Trust Co.*,
  339 U.S. 306 (1950) ........................................................................................ 27

*Negrete v. Allianz Life Ins. Co. of N. Am.*,
  238 F.R.D. 482 (C.D. Cal. 2006) .................................................................... 24

*Nicolas v. Trustees of Princeton Univ.*,
  Dkt. 72 (D.N.J. Dec. 22, 2020) ....................................................................... 21

*Nobles v. MBNA Corp.*,
  2009 WL 1854965 (N.D. Cal. June 29, 2009) ................................................ 18

*Officers for Justice v. Civil Service Comm'n*,
  688 F.2d 615 (9th Cir. 1982) .................................................................... 14, 15

*Parsons v. Ryan*,
  754 F.3d 657 (9th Cir. 2014) .......................................................................... 24

*Radcliffe v. Experian Info. Sols., Inc.*,
  715 F.3d 1157 (9th Cir. 2013) ........................................................................ 25

*Rodriguez v. Hayes*,
   591 F.3d 1105 (9th Cir. 2010) ................................................................ 24

*Rodriguez v. W. Publ'g Corp.*,
   563 F.3d 948 (9th Cir. 2009) ................................................................ 22

*Sacerdote v. New York University*,
   328 F. Supp. 3d 273 (S.D.N.Y. 2018), *rev'd in part*, 9 F. 4th 95 (2d Cir. 2021)...... 19

*Schuman v. Microchip Tech. Inc.*,
   2020 WL 887944 (N.D. Cal. Feb. 24, 2020) ............................................. 26

*Slaven v. BP Am., Inc.*,
   190 F.R.D. 649 (C.D. Cal. 2000) ........................................................... 23

*Stockwell v. City & Cty. of San Francisco*,
   749 F.3d 1107 (9th Cir. 2014) .............................................................. 23

*Sweda v. University of Pennsylvania*,
   2021 U.S. Dist. LEXIS 23990 (E.D. Pa. Dec. 14, 2021)........................... 21

*Tussey v. ABB, Inc.*,
   2019 U.S. Dist. LEXIS 138880 (W.D. Mo. Aug. 16, 2019) ...................... 20

*Vizcaino v. Microsoft Corp.*,
   290 F. 3d. 1043 (9th Cir. 2002) ............................................................ 21

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011)........................................................................ 23, 24

*Waldbuesser v. Northrop Grumman Corp.*,
   2017 U.S. Dist. LEXIS 223293 (C.D. Cal. Oct. 24, 2017) ....................... 20

## OTHER AUTHORITIES

Fed. R. Civ. P. 23 *et seq.* ..................................................................... *passim*

Herbert B. Newberg & Alba Conte,
   *Newberg on Class Actions* (5th ed.) ..................................................... 14

*Manual for Complex Litigation (Fourth)* (2004). ................................... 14, 23

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Plaintiffs are pleased to report that they have reached a proposed Settlement of this class action that provides a substantial monetary recovery along with other benefits.

The SAG-AFTRA Health Plan ("Plan") resulted from a merger of the Screen Actors Guild-Producers Health Plan ("SAG Health Plan") and the AFTRA Health Plan (the "Merger"). The Plan provides health benefits to the members of SAG-AFTRA who are employed by contributing employers pursuant to SAG-AFTRA collective bargaining agreements and meet the Plan's eligibility requirements. Plaintiffs filed the action in December 2020, following the Plan's August 2020 announcement of major changes to the benefit structure and eligibility requirements that, in effect, eliminated Plan health coverage for certain Plan participants age 65 and older and pushed them to Medicare coverage ("2020 Amendments"). Plaintiffs claim that breaches of fiduciary duties by the Plan Trustees in connection with the Merger and breaches by the Plan Trustees thereafter caused losses in Plan assets and led to the 2020 Amendments.

The Settlement provides substantial valuable monetary and prospective structural relief to the Class. The Defendants and their fiduciary liability insurers will pay $15 million ($7.5 million each) which, after deduction of any Court-approved attorneys' fees and costs (the "Net Settlement Amount"), will be paid to Senior Performers (and their spouses) who are Senior Performers who lost either active (*i.e.*, primary) or secondary health coverage from the Plan due to the 2020 Amendments. The Net Settlement Amount will be sufficient to provide a substantial net recovery of the damages they suffered in 2021 and 2022 due to losing the Plan coverage. The target net payments for 2021 and 2022 damages are $4,400 for Senior Performers who lost Plan health coverage in 2021 due to the elimination of the Dollar Sessional Rule; $2,200 for Senior Performers who otherwise lost coverage in 2021 due to the 2020 Amendments; $1,100 to Senior Performers who first lost coverage in 2022 due to the 2020 Amendments; and $400 to

Senior Performers who lost secondary coverage (*i.e.*, coverage secondary to Medicare) in 2021 due to the 2020 Amendments.

The Plan will also allocate up to an additional $700,000 per year for eight years, from 2023 through 2030 (for a maximum of $5.6 million), to the Health Reimbursement Accounts ("HRAs") of Senior Performers who will not qualify for Plan coverage for those years due to 2020 Amendments' elimination of the "Dollar Sessional Rule," which counted the reported residuals earnings toward the Plan's earnings eligibility threshold for members age 65+ and taking a pension from the related SAG or AFTRA pension plan ("Union pension") Union pension as long as the Senior Performer had $1 in sessional earnings in the qualifying year. Those HRA allocations, which will be based on the relative residuals earnings of those Senior Performers, represent a substantial net recovery of the monetary damages those performers will suffer from 2023-2030 due to the 2020 Amendments (*i.e.*, the cost of Advantage or "Medigap" coverage).

The Settlement also requires the Plan to implement important non-monetary relief which will benefit all Plan participants, including: making periodic disclosures to SAG-AFTRA of the Plan's projected financial condition for purposes of anticipating whether additional changes to the Plan will be needed; making financial disclosures to the Union and its negotiators in advance of various collective bargaining negotiations; and retaining a consultant to provide advice on how to further reduce the costs of providing health coverage to Plan participants.

In sum, the Settlement directly addresses and provides substantial relief for the injuries sustained as a result of the claimed breaches and represents a better and more comprehensive result than could have likely been achieved by a judgment after trial. Accordingly, Plaintiffs request that the Court grant preliminary approval, approve the proposed notices to the Settlement Class, and set a date for the Final Approval Hearing.

## II.   BACKGROUND

### A.   Plaintiffs' Allegations

The Plan is funded primarily by employer contributions based on the sessional and residuals earnings of SAG-AFTRA-represented participants under collective bargaining contracts negotiated periodically between the Union and the employers. The Plan provides health coverage for participants represented by the SAG AFTRA Union who meet the eligibility requirements for coverage established by the Trustees.

Plaintiffs allege in the Amended Complaint that Defendants violated ERISA and breached their fiduciary duties based on the following: (i) statements made in 2012 suggesting that any future merger process would involve investigation and/or would be subject to fiduciary duties; (ii) the SAG Health Plan Trustees either failed to perform a diligent pre-merger investigation or approved the Merger despite knowing that the benefit structure of the merged Plan was not sustainable; (iii) the SAG Health Plan Trustees depletion of substantial assets from the "Retiree Reserve" to fund plan costs prior to the merger ; (iv) statements made in June 2016 suggesting that the Merger would strengthen the financial health of the Plan and ensure comprehensive benefits in the future for all participants; (v) the SAG-AFTRA Health Plan Trustees knew by at least mid-2018 that employer contributions and investment income would be insufficient to sustain the Plan's benefit structure; (vi) the SAG-AFTRA Health Plan Trustees failed to disclose the Plan's funding condition and amount of funding required to sustain the benefit structure, which prevented the Union negotiators, of the 2019 Commercials CBA, 2019 Netflix CBA, and 2020 TV/Theatrical CBA, including Plaintiff David Jolliffe, from leveraging that information to help secure additional funding; and (vii) the Plan Trustees secretly planned for over 2 years to address the deficit that resulted from their imprudent actions by eliminating the cost of Plan coverage for Senior Performers age 65 and older

by the 2020 Amendments and announced the 2020 Amendments in August 2020, in the midst of an industry-wide shut-down due to the COVID-19 pandemic.[2]

Four aspects of the 2020 Amendments eliminated Plan coverage for many performers age 65 and older.

First, the 2020 Amendments eliminated the "Dollar Sessional Rule." Under the 2020 Amendments, the residuals earnings no longer counted for Senior Performers, even though employers continued to make contributions to the Plan based on the Senior Performer's residuals earnings, and even though all reported earnings (residuals and sessional) of participants younger than 65 count toward health benefit eligibility, regardless of whether the participant is taking a Union pension. *Id.* A participant with ten qualifying years can take a pension at age 55. As a result, hundreds of Senior Performers whose combined sessional and residuals earnings exceeded the $25,950 qualifying threshold, which generated substantial contributions to the Plan, lost their Plan health coverage.

Second, the 2020 Amendments also eliminated the "Age and Service Rule," which provided a lower threshold of earnings (only $13,000) for Plan participants 40 and older with 10 years of qualifying service to qualify for Plan health coverage. The elimination of the Age and Service Rule eliminated coverage for hundreds of performers and surviving spouses, who were forced to Medicare.

Third, the 2020 Amendments raised the earnings threshold to qualify for coverage, which eliminated coverage for a smaller number of Senior Performers (and some younger participants).

Fourth, the 2020 Amendments eliminated secondary coverage for all Senior Performers who did not qualify for active (primary) coverage from the Plan.

---

[2] Defendants deny committing any wrongdoing.

PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL
(Case No. 2:20-cv-10914-CAS (JEM))

Other aspects of the 2020 Amendments selectively affected Senior Performers. For example, the base earnings year for only participants 65 years of age and older taking their pensions was immediately set to October 1-September 30. This unfairly limited the time for affected older participants from seeking opportunities urgently for sessional earnings, when the Trustees knew sessional opportunities had been limited by the Covid-19 pandemic. Further, the benefit period for all participants 65 and older taking a pension was set to January 1 - December 31. The change also took pre-qualified coverage from some participants 65 and older. For example, Plaintiff David Jolliffe lost three months of coverage for which he had already qualified.

Under the 2020 Amendments, the Plan established a new Senior Performers Health Reimbursement Account Plan and allocated $95 per month ($1,140 per year) to the HRA accounts of those Senior Performers who had at least 20 qualifying years and $20 per month ($240 per year) for those Senior Performers with fewer than 20 qualifying years, but this was not nearly enough to purchase the replacement Medicare coverage sufficient to provide a reasonable facsimile of the Plan's coverage.

## B.     Response to the 2020 Amendments

The 2020 Amendments shocked Plan participants, many of whom were left to scramble to qualify for or obtain health coverage in the midst of the pandemic. Many organized to mount a massive campaign against the Amendments. *See e.g.*, video featuring prominent performers at https://youtu.be/4LgRxJnxI8o. Many also sought legal counsel to explore options for legal action to challenge the 2020 Amendments. Many prominent class action and ERISA lawyers decided the case was too risky to take on a contingent basis. Joint Decl., ¶¶ 2-4. Only one firm, Chimicles Schwartz Kriner & Donaldson-Smith LLP, based on their success in connection with another ERISA case with respect to a Taft Hartley plan in the entertainment field (the American Federation of Musicians-Employers Pension Fund), which also presented complex and risky ERISA claims (and which many other prominent law firms also declined as too risky), agreed to

take the case.[3] *Id.* The Chimicles Schwartz firm, working intimately with several Class Representatives and other leaders of the opposition to the 2020 Amendments, spent almost four months conducting an extensive investigation of the facts and evaluation of the legal issues. *Id.*

Class Counsel knew attacking the 2020 Amendments faced a likely defense that the defendant Trustees acted in the "Settlor" function and not as ERISA fiduciaries, and in any event, engaged in a prudent process. Accordingly, Class Counsel carefully crafted the Complaint to navigate the vicissitudes of ERISA and protect against the expected defenses and navigate around expected coverage defenses by the Plan's fiduciary liability insurers. *Id.* Class Counsel took great care to identify and allege conduct by the Trustees in the management and administration of the SAG Health Plan and the Plan that caused the alleged injuries, including pre-Merger mismanagement of assets that depleted the reserve assets maintained to fund senior benefits, misrepresentations that the Merger would strengthen the plan and ensure comprehensive benefits for all participants and post-Merger Plan administration to hide the Plan funding crisis while secretly plotting to balance the books by eliminating the cost of covering seniors with age-based eligibility rules. *Id.* ¶ 5.

### C.   Initial Motion Practice

Class Counsel filed a refined Amended Complaint in response to Defendants' motion to dismiss the original Complaint. Defendants' moved to dismiss the Amended Complaint, making numerous arguments including arguments that the Amended Complaint failed to plausibly allege they committed any fiduciary breaches and arguments based on the Settlor Function defense. The Court denied that motion and Defendants' subsequent request to file an interlocutory appeal. ECF Nos. 61, 70.

---

[3] The Chimicles Schwartz firm was assisted by local counsel Johnson & Johnson LLP, a prominent entertainment-industry law firm, and Edward Siedle, an attorney who is recognized as one of, if not the, leading economic forensic analyst of ERISA and pension plans. *Id.*

### D.    Early Mediation

In the wake of Plaintiffs' victories, the parties agreed to initially focus their efforts on an early mediation process under the auspices of Robert A. Meyer of JAMS, one of the country's leading mediators in complex Class and ERISA cases.[4]  They focused their initial discovery efforts on information to facilitate and informed mediation. This included exchanging initial disclosures, drafting confidentiality and ESI protocol agreements, serving and responding to document requests, and early exchange relevant documents, including board minutes, various reports provided to the Defendant Trustees, various Plan documents, documents including documents such as attorneys' notes of meetings and various communications and analyses by the Plan's attorneys produced pursuant to ERISA's "fiduciary exception" for attorney-client documents, and insurance policies. *See generally* ECF No. 71 at 2-4.; Joint Decl., ¶ 6.

Based on that focused discovery, the parties prepared two rounds of detailed mediation briefs and engaged in a full-day mediation on March 4, 2022 with Mr. Meyer. Joint Decl., ¶ 7; Meyer Decl., ¶ 4-6. The mediation proved unsuccessful. The parties had divergent views of the merits of Plaintiffs' claims. Moreover, as expected, Defendants' fiduciary liability insurers contested coverage based on the argument that Plaintiffs' claims were in essence "benefits denial" claims, which are typically not covered under fiduciary liability insurance policies. *Id*. Accordingly, while the parties and Mediator Meyer continued to engage in discussions, the parties shifted gears and proceeded to full-fledged litigation.

### E.    Discovery and Schedule Battles

As reflected in the parties' Joint Amended Discovery Plan filed in May 2022 (ECF No. 77), the parties had widely divergent views on regarding the scope of discovery and a schedule for motion practice. Plaintiffs pushed for extensive document production,

---

[4] Mr. Meyer mediated the *Snitzer v. AFM* case, which involved the same counsel and many of the same insurers involved in this case. Joint Decl., ¶ 6

including production of relevant emails of all the Defendant Trustees, and depositions of each defendant Trustee plus 15 non-parties such as the Plan's many advisors. Defendants sough to limit document production to only 12 of the 36 Defendant Trustees and limit plaintiffs to only 15 depositions (including non-parties). *See* ECF No. 77.

With respect to class certification, Defendants requested that the Court either force Plaintiffs to prematurely file their class certification motion before the substantial completion of discovery or permit Defendants to file an early "kill shot" motion to deny class certification before Plaintiffs completed substantial discovery. *Id.* After an extensive hearing where the Court was dissatisfied with the parties and their inability to reach any common ground, the Court instructed the parties to try to narrow their differences. ECF No. 81. Those efforts proved largely unsuccessful. As reflected in the parties' updated Joint Report (ECF No. 88), the parties had a strong command of the facts and their respective legal arguments but remained far apart.

After another extensive hearing, the Court largely agreed with Plaintiffs' proposed scope of discovery and proposed schedule, which resulted in the entry of a scheduling order on July 22, 2022. *See* ECF No. 117. Armed with this victory, Plaintiffs aggressively pursued discovery against the Defendant Trustees, and the Defendants did the same with respect to the class representative Plaintiffs. Joint Decl., ¶ 8.

## F.   Resumed Mediation and Settlement

Simultaneously with these battles over discovery and class certification, the parties, with the extensive involvement of Mediator Meyer, continued to engage in settlement discussions. Meyer Decl., ¶ 7-8. Complicating those discussions was the reality that the Plan's fiduciary liability insurance policies were "wasting" policies, meaning that every dollar spent on the defense of the action was one less dollar available to contribute to a settlement. Other complications included the fact that there were four layers of fiduciary liability insurance (one primary policy and three excess policies), and the insurers' continued insistence that they had a strong basis to contest coverage. Joint

Decl., ¶ 9. Despite these realities, Class Counsel was unwilling to take their foot off the pedal on the litigation until there was substantial progress in the negotiations that would justify their giving up their leverage in pressing forward with discovery. *Id*.

Eventually, due to the tireless efforts of Mediator Meyer and hard work by the parties and their counsel, sufficient progress was made in negotiations to justify a pause of the most expensive portions of formal discovery in favor of focusing on discovery targeted toward settlement. Meyer Decl., ¶ 8. Because of the complicated nature of the issues and complicated structure of the settlement, substantial negotiations were required to create an outline of the terms and structure of a settlement, refine those terms and structure, and fund that structure with sufficient money to be satisfactory to Plaintiffs. The parties also needed to engage in extensive negotiations to complement the monetary portions of the settlement with important non-monetary relief. Thereafter, the parties engaged in an extensive process to draft a complicated set of settlement documents. Joint Decl., ¶ 10.

## III.   TERMS OF THE SETTLEMENT

The Settlement Agreement is attached as Exhibit 1 to the Joint Declaration. The Settlement accomplishes three primary goals of the litigation: (1) providing compensation to Senior Performers and spouses who lost health coverage under the Plan in 2021 and 2022 due to the 2020 Amendments; (2) providing compensation in future years to Senior Performers who would have qualified for Plan coverage based on earnings under the eliminated Dollar Sessional Rule, and (3) requiring the Plan to enact structural provisions that will assist Senior Performers to meet eligibility thresholds, help control Plan costs, and provide information about the Plan's funding needs to relevant SAG-AFTRA Union officials and Union negotiators to arm the Union and its negotiators with leverage to address Plan funding in  negotiations with Producers.[5]

---

[5] Plaintiffs remain disturbed and disappointed that the Plan's promises to Seniors were not kept, that the 2020 Amendments were sprung on participants in the midst of a pandemic and discriminated against Seniors, and that the Trustees have not restored, and

9

### A.     The Settlement Class Definition

The Settlement class includes: All individuals who (i) were enrolled in health coverage under the Plan at any time during the Class Period, (ii) were notified that they qualified for health coverage under the Plan for any time during the Class Period, and/or (iii) qualified or had qualified as a Senior Performer as of the beginning of or during the Class Period, but excluding the Trustee Defendants. *See* SA §2.68.

### B.     The Settlement Terms

#### 1.     The $15 Million Fund – Compensation for 2022-2023 Damages

Defendants and the Plan's fiduciary liability insurers have each agreed to pay $7.5 million, for a total of $15 million, which, after deducting the amount the Court approves for Attorneys' Fees and Costs to Plaintiffs' attorneys and any Service Awards to Plaintiffs and the costs to administer the Settlement, will be used to compensate Senior Performers and their spouses who lost either primary or secondary health coverage from the Plan solely due to the 2020 Amendments. SA § 7.1. The Plan of Allocation for the Net Settlement (SA Exhibit 6) provides for the following target payments:

- **$4,400** for those who lost active coverage in 2021 due to the elimination of the Dollar Sessional Rule;

- **$2,200** for those who lost active coverage in 2021 due to the other provisions of the 2020 Amendments (elimination of the Age and Service Rule and/or raising of the earnings eligibility thresholds);

- **$1,100** for Senior Performers who first lost active coverage in 2022 due to the 2020 Amendments; and

- **$400** for those who lost secondary coverage (*i.e.*, secondary to Medicare) from the Plan.

---

the Settlement does not restore, the coverage available before the implementation of the 2020 Amendments. Nothing in the Settlement prevents the Plan's current or future trustees from doing so if the Plan's financial condition permits.

These payments will be automatically allocated into eligible class members' HRA accounts without the need to submit a claim (or paid via check if the Senior Performer does not have an HRA account). Depending on the amount of attorneys' fees costs approved by the Court and Administrative Expenses incurred by the Settlement Administrator, these target payments may be increased or decreased *pro rata*.

The relative allocation of the four groups is based on the strength of each group's claims, their relative damages, and the equities. The $4,400 group generated substantial contributions to the Plan via their residuals but now get zero corresponding benefit from the Plan (other than the $95/$20 per month HRA allocations). The $2,200 group made substantially smaller funding contributions to the Plan. The $1,100 group did not lose coverage in 2021 and therefore had half the damages of those in the prior two groups who lost coverage in 2021 and 2022, and they also had an extra year to plan to try and meet the new thresholds or arrange for alternate insurance. And unlike the first three groups, who lost the Plan's coverage, the $400 group was already on Medicare and only lost secondary coverage from the Plan.

These payments provide a substantial net recovery of damages measured as the cost to acquiring Medicare or Medigap coverage to most-closely replicate the scope of the Plan's coverage and taking account of the fact that as part of the 2020 Amendments, many eligible class members who had an HRA were allocated $95 or $20 per month ($1,140 or $240 per year) from the Plan. Joint Decl., ¶ 12.

### 2. The HRA Amendments – Up to $700,000 in Annual HRA Allocations from 2023-2030

In addition, the Plan will allocate up to an additional $700,000 for each of the eight years from 2023 through 2030 (for a potential maximum of $5.6 million) to the HRA accounts of Qualifying Senior Performers who become ineligible for active Plan health coverage in one or more of those years solely as a result of the 2020 Amendments'

elimination of the Dollar Sessional Rule. SA §10.[6] The aggregate amount of these additional HRA allocations in each year will be equal to one-half of the aggregate contributions made to the Plan in the previous year with respect to the Qualifying Senior Performers' residual earnings reported to the Plan (which earnings will be capped at $125,000 per Qualifying Senior Performer). SA §10.2.1. That aggregate amount will be allocated to each Qualifying Senior Performer based on their relative amount of residual earnings reported to the Plan (again subject to the $125,000 cap). SA §10.2.2.

The purpose of this provision is to address the inequity of Qualifying Senior Performers providing funding for the Plan via their residuals earnings without getting the benefit of the Plan providing them active (primary) health coverage due to the elimination of the Dollar Sessional Rule. The $700,000 annual HRA allocations, in conjunction with the pre-existing $95 or $20 per month allocations, represents a substantial share of the cost to purchase Medicare or Medigap coverage. *Id*.

### 3.    *Non-Monetary Provisions*

In addition to the monetary payments described above, the Settlement requires the Trustees to make important disclosures and administrative changes and keep those provisions in place for at least four years after the Settlement Effective Date. *See* SA § 11 for details. These provisions are tailored to address specific concerns raised in the Amended Complaint.

**Disclosures**: The Plan will make timely disclosures to the SAG-AFTRA National Board or SAG-AFTRA Executive Committee about projections, reports and plans related to proposed changes to participant premiums, eligibility thresholds, or benefits and detailed financial disclosures about and the Plan's financial condition prior to the commencement of collective bargaining negotiations relating to the Commercials CBA, Netflix CBA, or TV/Theatrical CBA. SA § 11.2.4. This term is critical. Plaintiffs alleged

---

[6] The Settlement Agreement does permit the Trustees to cease the 2023-2030 allocations if projections of the Plan's Continuation Value are so dire that modifications to the Plan are required under Article XIII, Section 3 of the Trust Agreement. *See* SA § 10.3.

that Defendants failed to disclose Plan funding information in connection with the 2019/2020 collective bargaining process, while secretly planning to eliminate Senior Performers from Plan coverage. After this Court denied the motion to dismiss, in connection with the negotiation of the 2022 Commercials Contract, the Plan provided detailed information to the Union negotiators (including Plaintiff Jolliffe) concerning Plan funding and the amount of funding required to sustain the benefit structure, which led to negotiations which secured a substantial increase in the contribution rate to fund the Plan. Joint Decl., ¶ 13; SA, §11.2.4. The requirement to disclose funding information and benefit changes under consideration will also help prevent a repeat of 2020, when the Trustees blindsided participants with the 2020 Amendments. Had such a warning been provided, it is possible the Trustees could have been persuaded to either forgo the 2020 Amendments or modify them to limit the disproportionate impact on Senior Performers.

- **Cost Consultant**: The Plan will conduct a Request of Proposal for a cost consultant to provide advice and oral and written reports about potential cost-saving measures.

- **Plan Amendment**: The Plan's Trustees will amend the manner in which Retirees' (including Senior Performers') sessional earnings are applied for purposes of qualifying for active coverage under the Plan to permit Senior Performers extra time to use additional sessional earnings to qualify for Plan health coverage.

- **Notice of Additional Credited Earnings Opportunity**:  The Plan will make enhanced disclosures on the Plan website and via email notifying Senior Performers about their progress for qualifying for Plan health coverage.

## IV.   THE COURT SHOULD GRANT PRELIMINARY APPROVAL

### A.      The Class Action Settlement Process

Under Rule 23(e) of the Federal Rules of Civil Procedure, class actions "may be settled, voluntarily dismissed, or compromised only with the court's approval." As a matter of "express public policy," federal courts favor and encourage settlements,

particularly in class actions, where the costs, delays, and risks of continued litigation might otherwise overwhelm any potential benefit the class could hope to obtain. *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992); *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1101 (9th Cir. 2008); Herbert B. Newberg & Alba Conte, *Newberg on Class Actions ("Newberg")* §13:1 (5th ed.).

The *Manual for Complex Litigation (Fourth)* (2004) (the "*Manual*") describes a three-step procedure for approval of class action settlements: (1) preliminary approval of the proposed settlement; (2) dissemination of the notice of the settlement to class members, providing for, among other things, a period for potential objectors and dissenters to raise challenges to the settlement's reasonableness; and (3) a formal fairness and final settlement approval hearing. *Id.* at §21.63. The *Manual* characterizes the preliminary approval stage as an "initial evaluation" of the fairness of the proposed settlement made by the court on the basis of written submissions and informal presentations from the settlement parties. *Id.* at § 21.632.

**B.    The Standard for Preliminary Approval**

The "settlement or fairness hearing is not to be turned into a trial or rehearsal for trial on the merits." *Officers for Justice v. Civil Service Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982). Moreover, a district court should not "reach any ultimate conclusions on the contested issues of fact and law which underlie the merits of the dispute, for it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements." *Id.* Rather, a district court's only role in reviewing the substance of [a] settlement is to ensure that it is 'fair, adequate, and free from collusion.'" *Lane v. Facebook, Inc.*, 696 F.3d 811, 819 (9th Cir. 2012), *cert. denied*, 134 S.Ct. 8 (2013), *quoting Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998).

Rule 23(e)(2) includes a list of relevant factors to determine whether a settlement is fair, reasonable, and adequate:

(A) whether the class representatives and class counsel have adequately represented the class;

(B) whether the proposal was negotiated at arm's length;

(C) whether the relief provided for the class is adequate, taking into account:

(i) the costs, risks, and delay of trial and appeal;

(ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

(iii) the terms of any proposed award of attorney's fees, including timing of payment; and

(iv) any agreement required to be identified under Rule 23(e)(3); and

(D) whether the proposal treats class members equitably relative to each other. The Ninth Circuit has identified the following factors to be used in determining whether a settlement is fair, reasonable, and adequate to all concerned:

> the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement.

*Hanlon*, 150 F.3d at 1026. "The relative degree of importance to be attached to any particular factor will depend upon and be dictated by the nature of the claim(s) advanced, the type(s) of relief sought, and the unique facts and circumstances presented by each individual case." *Officers for Justice*, 688 F.2d at 625.

"If the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls within the range of possible approval, the court should grant preliminary approval of the class

15

and direct notice of the proposed settlement to the class." *Kenneth Glover, et al. v. City of Laguna Beach, et al.*, 2018 WL 6131601, at *2 (C.D. Cal. 2018) (quotations and citations omitted).

## V.   THIS SETTLEMENT SATISFIES THE RULE 23(E)(2) FACTORS

Because the "settlement follow[s] sufficient discovery and genuine arms-length negotiation," it should be "presumed fair" for purposes of preliminary approval." *Nat'l Rural Telecommunications Coop.*, 221 F.R.D. at 527.[7]

### A.   Class Representatives and Class Counsel Are Adequate

The Class Representatives and Class Counsel have prosecuted this action on behalf of the Class with vigor. *See* Fed. R. Civ. P. 23(e)(2)(A). To approve a proposed settlement, "[t]he parties must have engaged in sufficient investigation of the facts to enable the court to intelligently make an appraisal of the settlement." *Byrne v. Santa Barbara Hospitality Services,* 2017 WL 5035366, at *8 (C.D. Cal. 2017) (citation omitted). Here, Class Counsel conducted an extensive investigation to evaluate potential claims of class members and drafted complaints that satisfied the standards under ERISA and defeated Defendants' motion to dismiss and subsequent request for interlocutory review. *See, e.g.*, *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d at 459 ("significant investigation, discovery and research" supported "district court's conclusion that the Plaintiffs had sufficient information to make an informed decision about the Settlement"). Class Counsel thereafter largely won the battle over the scope of discovery and the schedule for class certification and marshaled the evidence produced in discovery to craft compelling bases to secure class certification and establish liability and damages to make a compelling presentation before this Court and in connection with mediation. Class Counsel also skillfully and aggressively negotiated a favorable settlement.

---

[7] Because the Settlement was reached before a class was certified, at Final Approval, the Court should apply heightened scrutiny and to look for subtle signs of collusion or self-dealing. *See In re Apple Inc. Device Performance Litigation*, 50 F.4th 769 (9th Cir. 2022). Plaintiffs submit this Settlement meets this heightened standard.

16

The Class representatives were actively engaged prior to and after the commencement of this action and throughout the litigation and mediation and settlement processes. They actively participated in counsel's pre-suit investigation of the claims and have continued to consult with and be responsive to counsel and the discovery process. Plaintiff David Jolliffe—a Union member for 55 years, Union negotiator for 25 years and current National Board Member and Los Angeles Vice-President—rendered invaluable assistance and knowledge to counsel and the litigation and the mediation and settlement process, zealously advocating the interests of the Class members. Joint Decl., ¶ 14.

## B. The Settlement Is The Product Of Good Faith, Informed, And Arm's-Length Negotiations, And It Is Fair

The proposed Settlement Agreement arises out of serious, informed, and non-collusive negotiations facilitated by a highly-respected mediator. Meyer Decl., ¶¶ 9-13. Class Counsel vigorously prosecuted this action, the mediation and the settlement. Negotiations were difficult, protracted, and often spirited. The parties' negotiations were aided by Mr. Meyer's tireless attention, including extensive "shuttle diplomacy." He played a crucial role in supervising the negotiations and helping the parties bridge their differences and evaluate the strengths and weaknesses of their respective positions. Joint Decl. at ¶ 15. The adversarial nature of the litigation and the aid provided by Mr. Meyer are factors that weigh in favor of preliminary approval. *See Rosales*, 2015 WL 4460918, at *16, *quoting In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011) ("presence of a neutral mediator [is] a factor weighing in favor of a finding of non-collusiveness.'").

## C. The Settlement Provides Significant Valuable Benefits In Exchange For The Compromise Of Strong, Albeit Risky, Claims

The Settlement provides substantial Class relief, considering (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of the proposed distribution plan; and (iii) the fair terms of the proposed award of attorney's fees. *See* Fed. R. Civ. P.

17

23(e)(2)(C). The Settlement compensates Senior Performers who, due to the 2020 Amendments, lost active (primary) or secondary health coverage in 2021 and 2022, and compensates Senior Performers for another eight years who lost active coverage from the Plan due to the elimination of the Dollar Sessional Rule. The Settlement also provides important disclosures and structural changes designed to maximize the Plan's financial condition.

### 1.   The Settlement Mitigates the Risks, Expenses, and Delays the Class would Bear with Continued Litigation

The Settlement secures significant valuable benefits despite the inherent risks and uncertainty of continued litigation. Despite the strong equities underlying their claims, Plaintiffs faced substantial risks. While Plaintiffs defeated Defendants' motion to dismiss, Plaintiffs still faced a substantial risk that our some or all of the claims would be dismissed at summary judgement, trial or on appeal due to the "Settlor Function" defense. In addition, the Plan, via its Summary Plan Document and other communications, had advised Plan participants that the Plan reserved the right to reduce, modify or eliminate health benefits or the thresholds to qualify for health benefits, which posed another substantial risk. Joint Decl., ¶ 17. More fundamentally, while Plaintiffs believe that the Defendants did not engage in a prudent process in connection with the Merger, 2019/2020 Contracts, and implementation of the 2020 Amendments, it is undisputed that Defendants conducted a series of meetings, and received advice and numerous reports from various financial and legal advisors, which may have insulated them from liability even if the Court ultimately concluded, as a matter of fact, that the decisions Defendants made were objectively imprudent, unfair and inequitable. Joint Decl., ¶ 16. Compromise in exchange for certain and timely provision of the benefits under the Settlement is an unquestionably reasonable outcome. *See Nobles v. MBNA Corp.*, 2009 WL 1854965, at *2 (N.D. Cal. June 29, 2009) ("The risks and certainty of recovery in continued litigation are factors for the Court to balance in determining

whether the Settlement is fair."); *Kim v. Space Pencil, Inc.*, 2012 WL 5948951, at \*5 (N.D. Cal. Nov. 28, 2012) ("The substantial and immediate relief provided to the Class under the Settlement weighs heavily in favor of its approval compared to the inherent risk of continued litigation, trial, and appeal, as well as the financial wherewithal of the defendant."); *Nat'l Rural Telecommunications Coop.*, 221 F.R.D. at 526 ("In most situations, unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results.") (cleaned up).

The proposed Settlement is a product of the Parties' assessment of the merits of Plaintiffs' case, the merits of Defendants' defenses, the risks and uncertainty associated with continued litigation, and the possibility that Defendants might have been successful in defeating class certification, or winning summary judgment, winning at trial or at appeal, or even just dragging out the litigation long enough to wear out elderly Senior Performers, many of whom have pressing health issues that increase the importance of, if not critical need, for an early resolution. *See In re Countrywide Fin. Corp. Mortg. Mktg. & Sales Practices Litig.*, 2011 WL 6325877 (S.D. Cal. Dec. 16, 2011); *see also Sacerdote v. New York University*, 328 F. Supp. 3d 273 (S.D.N.Y. 2018), *rev'd in part*, 9 F. 4th 95, 113-117 (2d Cir. 2021) (defense trial victory in ERISA breach of fiduciary duty case). There was also risk that any victory in the litigation would be a pyrrhic victory if  it resulted in a judgment which gave the Defendant Trustees an opportunity to engage in a renewed process whereby they enacted similar limitations on coverage albeit pursuant to a prudent process guided by their attorneys; or if it were ultimately determined that the insurers do not have to provide coverage for any judgment obtained or if the insurers ceased providing coverage for defense costs, which would have imposed a significant financial burden on the Plan.

### 2.    *The Settlement Allows Class Members to Obtain Relief Easily and does not Require the Submission of any Claims or Other Proof*

The distribution method agreed upon for this Settlement provides significant benefits for the Class members as there will be no need to fill out claim forms or submit a claim. The monetary relief from the Settlement will automatically be allocated to the HRA accounts of Senior Performers or alternatively paid via check for those who do not have an HRA account.

### 3.    *Counsel will seek Reasonable Attorneys' Fees and Costs*

Per the Settlement Agreement, Class Counsel will seek fees of no more than one-third of the Maximum Gross Monetary Settlement Amount (*i.e.*, the $15 million Gross Settlement Fund and the maximum $5.6 million in HRA contributions from 2023-2030) or $6,866,667. SA § 9. Class Counsel and Defendants did not discuss fees at all until they negotiated the material terms and amount of the Settlement (Joint Decl., ¶ 18,) and as reflected at Section 9.2 of the Settlement Agreement, there is no "clear sailing" agreement and Defendants reserve all rights to oppose any fee request.

Courts in the Ninth Circuit, and around the country, have generally award attorney fees of one-third of the common fund (and sometimes a bit higher)in ERISA cases due to the risks and complexity of such cases. *Marshall v. Northrop Grumman Corp.*, 2020 U.S. Dist. LEXIS 177056 (C.D. Cal. Sept. 18, 2020) (collecting cases demonstrating that courts in the district routinely award attorneys' fees amounting to one-third of the settlement fund); *accord Waldbuesser v. Northrop Grumman Corp.*, 2017 U.S. Dist. LEXIS 223293, at *8 (C.D. Cal. Oct. 24, 2017); *Harris v. Amgen Inc.*, 2017 U.S. Dist. LEXIS 222697, at *23-24 (C.D. Cal. Apr. 4, 2017) (45% fee award); *Del Castillo v. Cmty. Child Care Council of Santa Clara Cty., Inc.*, 2021 U.S. Dist. LEXIS 202329, at *21 (N.D. Cal. Oct. 20, 2021); *Davis v. Washington Univ. in St.* Louis, No. 4:17-cv-01641, Dkt. 152 (E.D. Mo. Aug. 31, 2022); *Lechner v. Mut. of Omaha Ins. Co.*, 2021 U.S. Dist. LEXIS 23742, at *12 (D. Neb. Feb. 8, 2021); *Karg v. Transamerica Corp.*, 2021 U.S. Dist. LEXIS 261158, at *12 (N.D. Iowa Nov. 22, 2021); *Tussey v. ABB, Inc.*,

20

2019 U.S. Dist. LEXIS 138880, at *13 (W.D. Mo. Aug. 16, 2019); *Krueger v. Ameriprise Fin., Inc.*, 2015 U.S. Dist. LEXIS 91385, at *7 (D. Minn. Jul. 13, 2015); *Sweda v. University of Pennsylvania*, 2021 U.S. Dist. LEXIS 23990, *19 (E.D. Pa. Dec. 14, 2021); *Cates v. Trustees of Columbia Univ. in City of New York*, 2021 U.S. Dist. LEXIS 200890, at *19 (S.D.N.Y. Oct. 18, 2021)(; *Henderson v. Emory Univ.*, 2020 U.S. Dist. LEXIS 218676, at *4-5 (N.D. Ga. Nov. 4, 2020); *Cunningham v. Cornell Univ.*, No. 1:16-cv-6525, Dkt. 441 (S.D.N.Y. Dec. 22, 2020); *Kelly v. Johns Hopkins University*, 2020 U.S. Dist. LEXIS 14772, at *7 (D. Md. Jan. 28, 2020); *Nicolas v. Trustees of Princeton Univ.*, Dkt. 72 (D.N.J. Dec. 22, 2020); *Cassell v. Vanderbilt Univ.*, 2019 U.S. Dist. LEXIS 242062, at *7 (M.D. Tenn. Oct. 22, 2019).

An attorney fee award of 33⅓% is, thus, within the range of awards that is fair and reasonable. Moreover, this case involved more risk and unique issues than most if not all of the cases cited above, and, if granted, a one-third fee award would result in a lodestar multiplier of less than 2x, well within Ninth Circuit standards. *See Vizcaino v. Microsoft Corp.*,290 F. 3d. 1043, 1051 (9th Cir. 2002). Consistent with best practices, Class Counsel Class Counsel will provide information on the amount of attorneys' fees and costs sought in the class notice, and in a fee application that discusses why an upward adjustment to the Ninth Circuit's 25% benchmark is appropriate. The fee petition and supporting evidence will be posted on the Settlement Website and Class Members will have the opportunity to comment on or object prior to the final approval hearing.

**D.    The Allocation Plan Is Fair And Complies With Governing Standards**

"Approval of a plan of allocation of settlement proceeds in a class action . . . is governed by the same standards of review applicable to approval of the settlement as a whole: the plan must be fair, reasonable and adequate." *In re: Cathode Ray Tube (CRT) Antitrust Litig.*, 2016 WL 6778406, at *3 (N.D. Cal., 2016). The Plan of Allocation meets this standard because it treats all class members fairly in relation to the strength of their claims. *See Khoja v. Orexigen Therapeutics, Inc.*, 2021 WL 5632673, at *7 (S.D. Cal.

2021) ("A plan of allocation that reimburses class members based on the extent of their injuries is generally reasonable."); *Hefler v. Wells Fargo & Co*., 2018 WL 6619983, at *12 (N.D. Cal. 2018); *In re MyFord Touch Consumer Litig*., No. 13-cv-03072-EMC (N.D. Cal. 2019), Dkt. No. 526 at 4-5 (approving settlement paying lower dollar amount based on the strength of their claims). Here, the relative target payments from the Net settlement Amount for 2022-2023 damages complies with these standards for the reasons described above. So too do the HRA allocations to be made from 2023-2030.

### E. The Service Awards Are Reasonable

Class Counsel also requests $5,000 service awards for the Settlement Class Representatives. Such service awards "are fairly typical in class action cases" and "are intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 958-59 (9th Cir. 2009). "[A] $5,000 payment is presumptively reasonable," and awards "typically range from $2,000 to $10,000." *Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 266 (N.D. Cal. 2015) (collecting cases); *see, e.g., In re Zoom Video Commc'ns, Inc. Priv. Litig.*, 2022 WL 1593389, at *12 (N.D. Cal. Apr. 21, 2022); *In re Toys R Us-Del., Inc. FACTA Litig.*, 295 F.R.D. 438, 470–72 (C.D. Cal. 2014).

Service awards are appropriate here. No Class Representative was promised, nor conditioned their representation or approval of the Settlement on the expectation of a service award. They have spent many hours over the years developing the case, conferring with counsel, answering discovery requests, searching for and producing documents, and evaluating the proposed Settlement. Joint Decl. ¶ 14.

Taken together, the Rule 23(e)(2) factors support preliminary approval. The Settlement's substantial and extensive benefits and the procedurally fair manner in which it was reached strongly favor preliminary approval.

## VI.   CERTIFICATION IS APPROPRIATE FOR SETTLEMENT PURPOSES[8]

### A.   The Settlement Class Meets The Requirements Of Rule 23(a)

Before granting preliminary approval, the Court should determine that the proposed settlement class meets the requirements of Rule 23 of the Federal Rules of Civil Procedure. *Amchem Prods. v. Windsor*, 521 U.S. 591, 620 (1997); *Manual* § 21.632. An analysis of the requirements of Rule 23(a) and Rule 23(b)(1) shows that certification of this proposed Settlement Class is appropriate.

#### 1.   *Numerosity*

Rule 23(a)(1) requires the class to be so large that joinder of all members is impracticable. Numerosity is generally satisfied when the class exceeds forty members. *Slaven v. BP Am., Inc.*, 190 F.R.D. 649, 654 (C.D. Cal. 2000). Here, the Plan's records indicate that there are approximately 93,500 class members and over 10,000 Senior performers (or their spouses) will be entitled to payment from the Net Settlement Fund. Joint Decl., ¶ 18.

#### 2.   *There are Common Questions of Law and Fact*

"Federal Rule of Civil Procedure 23(a)(2) conditions class certification on demonstrating that members of the proposed class share common 'questions of law or fact.'" *Stockwell v. City & Cty. of San Francisco*, 749 F.3d 1107, 1111 (9th Cir. 2014). Commonality "does not turn on the number of common questions, but on their relevance to the factual and legal issues at the core of the purported class' claims." *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1165 (9th Cir. 2014). "Even a single question of law or fact common to the members of the class will satisfy the commonality requirement." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 369 (2011).

Courts routinely find commonality where the class claims arise from the defendant's uniform course of conduct. *Cohen v. Trump*, 303 F.R.D. 376, 382 (S.D. Cal.

---

[8] When "[c]onfronted with a request for settlement only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems … for the proposal is that there will be no trial." *Amchem*, 521 U.S. at 620.

2014); *Negrete v. Allianz Life Ins. Co. of N. Am.*, 238 F.R.D. 482, 488 (C.D. Cal. 2006). Here, Plaintiffs allege that the Defendant Trustees committed breaches of fiduciary duty with respect to their management and administration of the Plan in connection with the Merger, contract negotiations, and Amendments to the Plan. Class members' claims are rooted in common questions of fact as to whether Defendants breached their fiduciary duty, and answering this question would generate common answers "apt to drive the resolution of the litigation" for the Settlement Class as a whole. *See Dukes*, 564 U.S. at 350. Numerous courts certify ERISA breach of fiduciary duty claims for class treatment and settlement. *See* Section V(C)(3) *supra*.

### 3.    Plaintiffs' Claims are Typical

Rule 23(a)(3)'s typicality requirement counsels that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." *Parsons v. Ryan*, 754 F.3d 657, 685 (9th Cir. 2014), *quoting* Fed. R. Civ. P. 23(a)(3). "Like the commonality requirement, the typicality requirement is 'permissive' and requires only that the representative's claims are 'reasonably co-extensive with those of absent class members; they need not be substantially identical.'" *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010), *quoting Hanlon*, 150 F.3d at 1020. Typicality "assure[s] that the interest of the named representative aligns with the interests of the class." *Wolin*, 617 F.3d at 1175, *quoting Hanlon*, 976 F.2d at 508. Thus, where a plaintiff suffered a similar injury and other class members were injured by the same course of conduct, typicality is satisfied. *Parsons*, 754 F.3d at 685; *Evon v. Law Offices,* 688 F.3d 1015, 1030 (9th Cir. 2012) ("The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct."). Here, Plaintiffs claims and injuries are typical of the claims of and injuries suffered by the Class because they lost eligibility for Plan coverage as a result of the 2020 Amendments and were Plan participants for many years before the Defendant Trustees engaged in the

alleged breaches that caused negative impacts to the Plan's financial condition that led
to the 2020 Amendments. Thus, Plaintiffs' interest in obtaining a fair, reasonable, and
adequate settlement of the claims asserted are identical to the interests of the Settlement
Class members. Under the Settlement Agreement here, Class members will be
compensated based on an identical methodology based on a fair and appropriate
allocation consistent with the claims asserted.

### 4.   Class Counsel and the Class Representatives are Adequate

Rule 23(a)(4)'s adequacy requirement is met where, as here, "the representative
parties will fairly and adequately protect the interests of the class." This requirement is
"rooted in due-process concerns - 'absent class members must be afforded adequate
representation before entry of a judgment which binds them.'" *Radcliffe v. Experian Info.
Sols., Inc.*, 715 F.3d 1157, 1165 (9th Cir. 2013), *quoting Hanlon*, 150 F.3d at 1020.
Adequacy entails a two-prong inquiry: "(1) do the named plaintiffs and their counsel
have any conflicts of interest with other class members and (2) will the named plaintiffs
and their counsel prosecute the action vigorously on behalf of the class?" *Evon*, 688 F.3d
at 1031, *quoting Hanlon*, 150 F.3d at 1020. Both prongs are satisfied here. Plaintiffs have
no interests that conflict with the class members and will continue to vigorously protect
class interests, as they have throughout this litigation. The Class Representatives
understand their duties as class representatives, have agreed to consider the interests of
absent Class members, and have actively participated in this litigation and will continue
to do so. Joint Decl. at ¶ 14; *Loritz v. Exide Technologies*, 2015 WL 6790247, at *6 (C.D.
Cal. Apr. 21, 2016) ("All that is necessary is a 'rudimentary understanding of the present
action and a demonstrated willingness to assist counsel in the prosecution of the
litigation.'"). Moreover, Class Counsel, who have decades-long experience of obtaining
substantial and in many instances ground-breaking recoveries for the classes they have
represented, are more than adequate. *See* Joint Declaration, ¶ 19 and attorney biographies

at   https://chimicles.com/steven-a-schwartz/,   https://chimicles.com/robert-j-kriner-jr/, https://www.jjllplaw.com/neville-l-johnson and https://siedlelawoffices.com/.

## B.   The Settlement Class Meets the Requirements of Rule 23(b)(1)

Under Rule 23(b)(1), a class may be certified if prosecution of separate actions by individual class members would create a risk of: (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Satisfaction of either prong makes certification under the Rule proper. "Rule 23(b)(1)(A) considers possible prejudice to a defendant, while 23(b)(1)(B) looks to prejudice to the putative class members." *Kanawi v. Bechtel Corp.*, 254 F.R.D. 102, 111 (N.D. Cal 2008). Rule 23(b)(1)(A) is met because there are over 90,000 class members. If each individual participant filed suit against Defendants based on the same alleged misconduct, this would create a high risk of "incompatible standards of conduct" for Defendants absent certification. See *Kanawi*, 254 F.R.D. at 111. The claims asserted here fit squarely within the "'[c]lassic example' of a Rule 23(b)(1)(B) action," as it "charg[es] a breach of trust by an indenture trustee or other fiduciary similarly affecting the members of a large class of beneficiaries." *Grabek v. Northrop Grumman Corp.*, 346 F. App'x 151, 153 (9th Cir. 2009). Because of this dynamic, certification under both prongs of Rule 23(b)(1) is appropriate in this case because ERISA fiduciaries are being alleged to have failed to provide reasonable, uniform standards to a large number of beneficiaries which could lead either to inconsistent adjudications or prejudice to the Defendants. *Schuman v. Microchip Tech. Inc*., 2020 WL 887944, at *9 (N.D. Cal. Feb. 24, 2020); *Foster*, 2019 WL 4305538, at *2 ("Certification under 23(b)(1) is typical for ERISA class actions."), *citing Harris v. Amgen, Inc*., 2016 WL 7626161, at *4 (C.D. Cal. Nov. 29, 2016);

*Kanawi.*, 254 F.R.D. at 111. The Court should, therefore, certify this case under Rule 23(b)(1).

## VII.  THE PROPOSED NOTICE PROGRAM SHOULD BE APPROVED

Proposed Settlement Administrator AB Data Group has substantial experience in administering class settlements, including ERISA cases. *See* Schachter Declaration. Rule 23(e)(1) requires the Court to "direct notice in a reasonable manner to all class members who would be bound by the proposal." The notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to object." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). "Notice is satisfactory if it 'generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and come forward and be heard.'" *Churchill Vill., L.L.C., v. GE*, 361 F.3d 566, 575 (9th Cir. 2004) (quoting *Mendoza v. Tucson Sch. Dist. No. 1*, 623 F.3d 1338, 1352 (9th Cir. 1980)).

Here, as reflected in the Settlement Agreement at Section 3.2 and Exhibits 2 and 4, AB Data will utilize a Settlement Website (http://sagaftrahealthplansettlement.com) to provide Settlement Class members with detailed information about the case and access to key documents, including Settlement notices, the Settlement Agreement and its exhibits, the Amended Complaint, the motion to dismiss decision, the Preliminary Approval Order,  and the motions for final approval and for fees, expenses and service awards. See SA § 3.2.3. This website address will be prominently displayed on all notice documents, and the Plan's website as well. AB Data will also disseminate notice to all Settlement Class members via email. The Notice includes a thorough series of questions and answers (FAQs) designed to explain the Settlement in clear terms and in a well-organized and reader-friendly format. Among other things, it includes an overview of the litigation, an explanation of the benefits available under the Settlement, and detailed instructions on how to comment on or participate in the settlement. This notice covers

all of the elements outlined in Rule 23(c)(2)(B). Critically, the email notice will be individualized so class members who are entitled to payment for damages suffered in 2021 and 2022 will be eligible to receive a target payment of $4,400, 2,200, $1,100 or $400. AB Data will also take the necessary steps to send a backup summary postcard notice to Settlement Class members for whom the Plan does not have an email address or for bad email addresses that "bounceback." *See* Schachter Declaration. Given the prominence of the parties and previous press coverage of the litigation, there will undoubtedly be extensive coverage of the Settlement in the press, including the entertainment-industry publications. To help avoid confusion (sometimes caused by erroneous reporting of class settlements), the parties will issue a joint press release directing interested parties to the Settlement website and the court-approved notices. SA, § 13.2.

## VIII. THE COURT SHOULD SET A SCHEDULE FOR FINAL APPROVAL

In order to effectuate final approval, the parties respectfully request the Court set the following schedule for final approval proceedings:

| Date | Event |
|------|-------|
| *Within 10 days of Preliminary Approval* | AB Data and/or Defendants to provide notice to appropriate state and federal officials in accordance with the Class Action Fairness Act. |
| *May 1 or May 8, 2023* | Preliminary Approval Hearing |
| *Within 30 days of preliminary approval* | Class Notice Disseminated |
| *At least 60 days before the final approval hearing* | Motions for Final Approval and Attorneys' Fees and Expenses filed |
| *At least 28 days before the final approval hearing* | Objection Deadline |
| *At least 14 days before the final approval hearing* | Reply Memoranda in Support of Final Approval & Fee and Expense Application filed |
| *At least 110 days from Preliminary Approval* | Settlement Fairness Hearing |

## IX.   CONCLUSION

Plaintiffs respectfully request that the Court: (1) preliminarily approve the Settlement; (2) conditionally certify the Settlement Class; (3) Appoint the Settlement Class Representatives; (4) appoint Chimicles Schwartz Kriner & Donaldson-Smith as Lead Class Counsel under Rule 23(g) for purposes of settlement; (5) approve distribution of the proposed Notices; (6) appoint AB Data as the Settlement Administrator; and (7) set a hearing date and briefing schedule for Final Settlement Approval proceedings.

Dated:  April 10, 2023          By:     */s/ Steven A. Schwartz*
                                                Steven A. Schwartz*
                                                CHIMICLES SCHWARTZ KRINER
       & DONALDSON-SMITH LLP
       361 West Lancaster Avenue
       Haverford, PA 19041
       Tel.: 610-642-8500
       Fax: 610-649-3633
       SteveSchwartz@chimicles.com

       Robert J. Kriner, Jr.*
       CHIMICLES SCHWARTZ KRINER
       & DONALDSON-SMITH LLP
       2711 Centerville Road, Suite 201
       Wilmington, DE 19808
       rjk@chimicles.com

       Neville L. Johnson
       Douglas L. Johnson
       JOHNSON & JOHNSON LLP
       439 N. Canon Drive, Suite 200
       Beverly Hills, CA 90210
       Tel.: 310-9751080
       Fax.:310-975-1095
       njohnson@jjllplaw.com
       djohnson@jjllplaw.com

Edward Siedle*
Law Offices of Edward Siedle
17789 Fieldbrook Circle West
Boca Raton, FL 33496
Tel.: 561-703-5958
esiedle@aol.com

* admitted *pro hac vice*

*Attorneys for Plaintiffs and the Class*

PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL
(Case No. 2:20-cv-10914-CAS (JEM))

## **CERTIFICATE OF SERVICE**

     Pursuant to Local Rule 5-3.2, I certify that on April 10, 2023 a copy of the foregoing document, along with all concurrently filed documents, were served via ECF upon all ECF registrants in this action

Dated: April 10, 2023

/s/    *Steven A. Schwartz*

               Steven A. Schwartz