Steven. A Schwartz*
steveschwartz@chimicles.com
CHIMICLES SCHWARTZ KRINER
& DONALDSON-SMITH LLP
361 West Lancaster Avenue
Haverford, PA 19041
Tel.: 610-642-8500

Robert J. Kriner, Jr.*
rjk@chimicles.com
CHIMICLES SCHWARTZ KRINER
& DONALDSON-SMITH LLP
2711 Centerville Road, Suite 201
Wilmington, DE 19808
Tel.: 302-656-2500

Neville L. Johnson (SBN 66329)
njohnson@jjllplaw.com
Douglas L. Johnson (SBN 209216)
djohnson@jjllplaw.com
JOHNSON & JOHNSON LLP
439 North Canon Drive, Suite 200
Beverly Hills, California 90210
Tel.: 310-975-1080

Edward Siedle*
Law Offices of Edward Siedle
17789 Fieldbrook Circle West
Boca Raton, FL 33496
Tel.: 561-703-5958
esiedle@aol.com

* admitted *pro hac vice*

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

| | |
|---|---|
| **EDWARD ASNER, et al.,**<br><br>**Plaintiffs,**<br><br>vs.<br><br>**THE SAG-AFTRA HEALTH FUND, et al.,**<br><br>**Defendants.** | **Case No. 2:20-cv-10914-CAS (JEM)**<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTIONS FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT; AND FOR ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES, AND SERVICE AWARDS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**<br><br>**Date: September 11, 2023**<br>**Time: 10:00 a.m.**<br>**Courtroom: 8D**<br>**Judge: Christina A. Snyder** |

<u>**NOTICE OF MOTION AND MOTION**</u>

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on September 11, 2023, at 10:00 a.m., or such other time as the Court may direct, in Department 8D of the above-captioned Court, located at 350 W. First Street, Courtroom 8D, 8th Floor, Los Angeles, CA 90012, the Honorable

Christina A. Snyder presiding, Plaintiffs Michael Bell, Raymond Harry Johnson, David Jolliffe, Robert Clotworthy, Thomas Cook, Audrey Loggia, Deborah White, and Donna Lynn Leavy ("Plaintiffs" or "Class Representatives"), on behalf of themselves all others similarly situated, and undersigned Class Counsel, will, and hereby do, move this Court, pursuant to Federal Rules of Civil Procedure 23, to:

1.    Grant final approval of the settlement described in the Settlement Agreement ("SA") previously filed at ECF 128-1;

2.    Certify the Settlement Class;

3.    Appoint Plaintiffs as Class Representatives;

4.    Appoint the undersigned counsel as Class Counsel

5.    Approve Class Counsel's request for attorneys' fees and reimbursement of their litigation expenses; and

6.    Approve service awards for the Class Representatives.

This Motion is based upon: (1) this Notice of Motion and the accompanying Memorandum of Points and Authorities; (2) the Declarations of Steven A. Schwartz, Neville Johnson and Edward Siedle; Robert A. Meyer of JAMS previously filed at ECF No. 129; Plaintiff David Joliffe; the Settlement Administrator AB Data, LTD. ("Nordskog Decl."); the Declaration of Myron Rumeld (previously filed at ECF No. 140); and the Joint Declaration in Support of Preliminary Approval of Steven A. Schwartz and Robert J. Kriner, Jr. ("Joint Decl.") previously filed at ECF No. 128; (3) the Settlement Agreement; (4) the records, pleadings, and papers filed in this action; and (5) such other documentary and oral evidence or argument as may be presented to the Court at or prior to the hearing of this Motion.

# **TABLE OF CONTENTS**

I.   INTRODUCTION ............................................................................................. 1

II.  STATEMENT OF FACTS ............................................................................. 6

    A.   Background of the SAHP ...................................................................... 6

    B.   The 2020 Amendments ......................................................................... 7

    C.   The Risks of Litigation Challenging the 2020 Amendments .............. 8

    D.   The Litigation ..................................................................................... 11

        1.   Initial Motion Practice ............................................................. 11

        2.   Early Mediation ........................................................................ 11

        3.   Discovery and Schedule Battles ............................................... 12

        4.   Resumed Mediation and Settlement ......................................... 13

    E.   The Settlement .................................................................................... 13

        1.   The Settlement Provides a Monetary Recovery 14
            of up to $20.6 million ............................................................... 14

            a.   $15 Million Cash Fund – Compensation
                for 2022-2023 Damages .............................................. 14

            b.   Up to $700,000 in Annual HRA Allocations
                from 2023-2030 .......................................................... 15

            c.   Valuable Prospective Non-Monetary Relief
                and Protections ........................................................... 16

    F.   Notice ................................................................................................. 18

III. ARGUMENT .............................................................................................. 19

    A.   The Court Should Grant Final Approval of the Settlement ............... 19

        1.   The Class Action Settlement Process ....................................... 19

        2.   The Standard for Final Approval .............................................. 20

    B.   The Settlement Satisfies the Rule 23(e)(2) Factors .......................... 21

        1.   Class Representatives and Class Counsel Are Adequate .......... 21

        2.   The Settlement Is the Product Of Good Faith, Informed,
            And Arm's-Length Negotiations, And It Is Fair ..................... 23

3.     The Settlement Provides Significant Valuable Benefits In Exchange For The Compromise Of Strong, But Risky, Claims ............................................... 24

4.     The Settlement Mitigates the Risks, Expenses, and Delays the Class would Bear with Continued Litigation ......... 24

5.     The Settlement Allows Class Members to Obtain Relief Easily without the Submission of any Claims or Other Proof .................. 27

     a.     Class Counsel seek Reasonable Attorneys' Fees and Costs ...................................................... 27

     b.     The Allocation Plan Is Fair and Complies with Governing Standards ...................................... 27

C.     Class Certification is Appropriate for Settlement Purposes .................... 28

D.     The Court Should Award Class Counsel's Requested Attorneys' Fees ... 28

E.     The Court Should Determine Class Counsel's Fee as a Percentage of the Common Fund ........................................ 29

F.     The Court Should Award a Fee of One-Third of the Monetary Recovery ........................................................ 30

1.     The Relief Obtained for the Class Is an Excellent and Timely Result .................................................. 31

2.     Class Counsel Undertook Significant Risk in Taking this Complex Case on a Fully Contingent Basis ........................ 33

3.     Successfully Prosecuting the Case Required a High Level of Skill ................................................ 35

4.     A Comparison to Awards in ERISA Cases Demonstrates that the Requested Fee Is Reasonable .......... 37

5.     A Lodestar Cross-Check Confirms the Fairness and Reasonableness of the Requested Fee Amount ............ 38

G.     The Expense Reimbursement Should Be Approved ................................ 41

H.     The Court Should Award $5,000 Service Awards for the Class Representatives ......................................................... 42

IV.     CONCLUSION ............................................................. 43

# TABLE OF AUTHORITIES

## CASES

*Aarons v. BMW of N. Am., LLC*,
2014 U.S. Dist. LEXIS 118442 (C.D. Cal. 2014) ..................................................... 34

*AdTrader, Inc. v. Google LLC*,
No. 2022 U.S. Dist. LEXIS 199905 (N.D. Cal. Nov. 1, 2022) ................................ 33

*Allagas v. BP Solar Int'l, Inc.*,
2016 U.S. Dis. LEXIS 187785 (N.D. Cal. Dec. 22, 2016)........................................ 35

*Andrews v. Plains All Am. Pipeline L.P.*,
2022 U.S. Dist. LEXIS 172183 (C.D. Cal. Sept. 20, 2022) ..................................... 36

*Barbosa v. Cargill Meat Solutions Corp.*,
297 F.R.D. 431 ..................................................................................................... 31, 36

*Bellinghausen v. Tractor Supply Co.*,
306 F.R.D. 245 (N.D. Cal. 2015)........................................................................ 39, 42

*Betancourt v. Advantage Human Resourcing, Inc.*,
2016 U.S. Dist. LEXIS 10361 (N.D. Cal. Jan. 28, 2016)......................................... 37

*Blount v. Host Healthcare, Inc.*,
2022 U.S. Dist. LEXIS 67891 (S.D. Cal., 2022)...................................................... 41

*Blum v. Stenson*,
465 U.S. 886 (1984) (Brennan, J., concurring) ........................................................ 33

*Boeing Co. v. Van Gemert*,
444 U.S. 472 (1980).................................................................................................. 29

*Brown v. 22nd Dist. Agric. Ass'n*,
2017 U.S. Dist. LEXIS 115321 (S.D. Cal. July 21, 2017)....................................... 33

*Byrne v. Santa Barbara Hospitality Services, Inc.*,
2017 U.S. Dist. LEXIS 184050 (C.D. Cal. 2017) .................................................... 21

*Carlin v. DairyAm. Inc.*,
380 F. Supp. 3d 998 (E.D. Cal. 2019) ...................................................................... 35

*Cassell v. Vanderbilt Univ.*,
2019 U.S. Dist. LEXIS 242062 (M.D. Tenn. Oct. 22, 2019)................................... 38

*Cates v. Trustees of Columbia Univ.*,
  2021 U.S. Dist. LEXIS 200890 (S.D.N.Y. Oct. 18, 2021) ....................................... 38

*Chambers v. Whirlpool Corp.*,
  214 F. Supp. 3d 877 (2016), *aff'd in part, vacated in part, and remanded on other
  grounds*, 980 F.3d 645 (9th Cir. 2020) ..................................................................... 40

*Ching v. Siemens Indus.*,
  2014 U.S. Dist. LEXIS 89002 (N.D. Cal. Jun. 27, 2014) .......................................... 33

*Churchill Village, L.L.C. v. Gen. Elec.*,
  361 F.3d 566 (9th Cir. 2004) ..................................................................................... 21

*Class Plaintiffs v. City of Seattle*,
  955 F.2d 1268 (9th Cir. 1992) ................................................................................... 19

*Cunningham v. Cornell Univ.*,
  No. 1:16-cv-6525, Dkt. 441 (S.D.N.Y. Dec. 22, 2020) ............................................ 38

*Curtis-Bauer v. Morgan Stanley & Co., Inc.*,
  2008 U.S. Dist. LEXIS 85028 (N.D. Cal. Oct. 22, 2008) ......................................... 24

*Curtis-Wright Corp. v. Schoonejongen*,
  514 U.S. 73 (1995) ....................................................................................................... 9

*Davis v. Washington Univ. in St. Louis*,
  No. 4:17-cv-01641, Dkt. 152 (E.D. Mo. Aug. 31, 2022) .......................................... 37

*Del Castillo v. Cmty. Child Care Council of Santa Clara Cty., Inc.*,
  2021 U.S. Dist. LEXIS 202329 (N.D. Cal. 2021) ..................................................... 37

*Durham v. Sachs Elec. Co.*,
  2022 U.S. Dist. LEXIS 113075 (N.D. Cal. June 27, 2022) ....................................... 30

*Feller v. Transamerica Life Ins. Co.*,
  2019 U.S. Dist. LEXIS 19440 (C.D. Cal. Feb. 6, 2019) ........................................... 38

*Fischel v. Equitable Life Assur. Soc'y of the United States*,
  307 F.3d 997 (9th Cir. 2002) ..................................................................................... 33

*Fisher v. Screen Actors Guild-American Federation of Television and Radio Artists,
  et al.*,
  No. 21-cv-05215-CAS (JEM) ...................................................................................... 4

*Fleming v. Impax Lab'ys Inc.*,
   2022 U.S. Dist. LEXIS 125595 (N.D. Cal. 2022) ...................................................... 41

*Floyd v. First Data Merch. Servs. LLC*,
   2022 U.S. Dist. LEXIS 184192 (N.D. Cal. 2022) ............................................... 41, 42

*Foster v. Adams & Assocs.*,
   2022 U.S. Dist. LEXIS 25071 (N.D. Cal. Feb. 11, 2022) .................................... 5, 37

*Gamino v. KPC Healthcare Holdings, Inc.*,
   2023 U.S. Dist. LEXIS 82910 (C.D. Cal. Mar. 11, 2023).......................................... 30

*Graves v. United Indus. Corp.*,
   2020 U.S. Dist. LEXIS 33781 (C.D. Cal. Feb. 24, 2020) ......................................... 30

*Gunter v. Ridgewood Energy Corp.*,
   223 F.3d 190 (3d Cir. 2000) ...................................................................................... 35

*Hanlon v. Chrysler Corp.*,
   150 F.3d 1011 (9th Cir. 1998) ................................................................................... 21

*Harris v. Amgen*,
   2017 U.S. Dist. LEXIS 222697 (C.D. Cal. Apr. 4, 2017).................................... 32, 37

*Harris v. County of Orange*,
   902 F.3d 1061 (9th Cir. 2018) ................................................................................... 10

*Harris v. Marhoefer*,
   24 F.3d 16 (9th Cir. 1994) ......................................................................................... 41

*Hefler v. Wells Fargo & Co.*,
   2018 U.S. Dist. LEXIS 213045 (N.D. Cal. 2018) .................................................... 27

*Henderson v. Emory Univ.*,
   2020 U.S. Dist. LEXIS 218676 (N.D. Ga. Nov. 4, 2020) ........................................ 38

*Hensley v. Eckerhart*,
   461 U.S. 424 (1983)................................................................................................... 31

*Hope Med. Enters., Inc. v. Fagron Compounding Serv.*,
   LLC, 2022 U.S. Dist. LEXIS 49151 (C.D. Cal. Mar. 14, 2022) .............................. 39

*Howard v. Shay*,
   100 F.3d 1484 (9th Cir. 1996) ................................................................................ 9, 34

*Hurtado v. Rainbow Disposal Co.*,
2021 U.S. Dist. LEXIS 105692 (C.D. Cal. May 21, 2021) ...................................... 39

*In re Apple Inc. Device Performance Litig.*,
50 F.4th 769 (9th Cir. 2022) ..................................................................... 21

*In re Bluetooth Headset Prods. Liab. Litig.*,
654 F.3d 935 (9th Cir. 2011) ............................................................. 23, 31

*In re Capacitors Antitrust Litig.*,
2018 U.S. Dist. LEXIS 169764 (N.D. Cal. Sept. 21, 2018) .............................. 29, 30

*In re: Cathode Ray Tube (CRT) Antitrust Litig.*,
2016 U.S. Dist. LEXIS 159099 (N.D. Cal. 2016) ...................................... 27

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
2016 U.S. Dist. LEXIS 5383 (N.D. Cal. Jan. 14, 2016) ............................. 31

*In re Chrysler-Dodge-Jeep EcoDiesel Mktg., Sales Practices, & Prods. Liab. Litig.*,
2019 U.S. Dist. LEXIS 21990 (N.D. Cal. Feb. 11, 2019) ............................ 20

*In re Countrywide Fin. Corp. Mortg. Mktg. & Sales Practices Litig.*,
2011 U.S. Dist. LEXIS 147689 (S.D. Cal. Dec. 16, 2011) ...................... 26

*In re Google Inc. St. View Elec. Commc'ns Litig.*,
21 F.4th 1102 (9th Cir. 2021) ...................................................... 30

*In re Heritage Bond Litig. v. U.S. Trust Co. of Tex., N.A.*,
2005 U.S. Dist. LEXIS 13627 (C.D. Cal. June 10, 2005) ...................... 35

*In re Hyundai*,
926 F.3d at 571-572 ............................................................... 39

*In re Korean Air Lines Co. Antitrust Litig.*,
2013 U.S. Dist. LEXIS 186262 (C.D. Cal. Dec. 23, 2013) ...................... 29

*In re MacBook*,
ECF No. 455 ...................................................................... 40

*In re MacBook Keyboard Litigation*,
2023 U.S. Dist. LEXIS 92063 (N.D. Cal. May 25, 2023) ...................... 24

*In re Media Vision Tech. Sec. Litig.*,
913 F. Supp. 1362 (N.D. Cal. 1995) ........................................... 41

*In re Mego Fin. Corp. Sec. Litig.*,
213 F.3d 454 (9th Cir. 2000) ...................................................... 22

*In re MyFord Touch Consumer Litig.*,
No. 13-cv-03072-EMC (N.D. Cal. 2019), Dkt. No. 526 ........................ 28

*In re Quantum Health Resources, Inc. Sec. Litig.*,
962 F. Supp. 1254 (C.D. Cal. 1997) ............................................ 33

*In re Rite Aid Corp. Sec. Litig.*,
396 F.3d 294 (3d Cir. 2005) ..................................................... 39

*In re Syncor ERISA Litig.*,
516 F.3d 1095 (9th Cir. 2008) ................................................... 19

*In re Toys R Us-Del., Inc. FACTA Litig.*,
295 F.R.D. 438 (C.D. Cal. 2014) ................................................ 42

*In re Washington Pub. Power Supply Sys. Sec. Litig.*,
19 F.3d 1291 (9th Cir. 1994) ................................................ 29, 33

*Jarrell v. Amerigas Propane, Inc.*,
2018 U.S. Dist. LEXIS 58619 (N.D. Cal. Apr. 5, 2018)....................... 37

*Johnson v. General Mills, Inc.*,
2013 U.S. Dist. LEXIS 90338 (C.D. Cal. June 17, 2013) ..................... 41

*Karg v. Transamerica Corp.*,
2021 U.S. Dist. LEXIS 261158 (N.D. Iowa Nov. 22, 2021).................... 38

*Kelly v. Johns Hopkins University*,
2020 U.S. Dist. LEXIS 14772 (D. Md. Jan. 28, 2020)..................... 38, 39

*Kendall v. Odonate Therapeutics, Inc.*,
2022 U.S. Dist. LEXIS 101021 (S.D. Cal. 2022)............................... 41

*Khoja v. Orexigen Therapeutics, Inc.*,
2021 U.S. Dist. LEXIS 230105 (S.D. Cal. 2021)............................... 27

*Kim v. Space Pencil, Inc.*,
2012 U.S. Dist. LEXIS 169922 (N.D. Cal. Nov. 28, 2012) .................... 25

*Krueger v. Ameriprise Fin., Inc.*,
2015 U.S. Dist. LEXIS 91385 (D. Minn. Jul. 13, 2015) ...................... 38

*Ky. Ret. Sys. v. EEOC*,
    554 U.S. 135 (2008) ............................................................................................. 10

*Lalli v. First Team Real Estate—Orange Cty.*,
    2022 U.S. Dist. LEXIS 161756 (C.D. Cal. Sep. 6, 2022) ........................................ 35

*Lane v. Facebook, Inc.*,
    696 F.3d 811 (9th Cir. 2012), *cert. denied*, 571 U.S. 1003 (2013) ......................... 20

*Lechner v. Mut. of Omaha Ins. Co.*,
    2021 U.S. Dist. LEXIS 23742 (D. Neb. Feb. 8, 2021) ....................................... 37, 39

*Linney v. Cellular Alaska P'ship*,
    151 F.3d 1234 (9th Cir. 1998) ............................................................................. 21

*Lozano v. AT&T Wireless Servs.*,
    2010 U.S. Dist. LEXIS 151235 (C.D. Cal. Nov. 22, 2010) .................................... 39

*Marshall v. Northrop Grumman Corp.*,
    2020 U.S. Dist. LEXIS 177056 (C.D. Cal. Sep. 18, 2020) ................... 28, 30, 31, 37

*Moreyra v. Fresenius Med. Care Holdings, Inc.*,
    2013 U.S. Dist. LEXIS 201983 (C.D. Cal. Aug. 7, 2013) ...................................... 35

*Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*,
    221 F.R.D. 523 (C.D. Cal. 2004) ..................................................................... 24, 25

*Negrete v. Allianz Life Ins. Co. of N. Am.*,
    2015 U.S. Dist. LEXIS 168586 (C.D. Cal. Mar. 17, 2015) .................................... 39

*Nelson v. Avon Prods.*,
    2017 U.S. Dist. LEXIS 26451 (N.D. Cal. Feb. 24, 2017) ...................................... 37

*Nicolas v. Trustees of Princeton Univ.*,
    No. 17-3695, Dkt. 72 (D.N.J. Dec. 22, 2020) ....................................................... 38

*Nobles v. MBNA Corp.*,
    2009 U.S. Dist. LEXIS 59435 (N.D. Cal. June 29, 2009) ...................................... 25

*Officers for Justice v. Civil Service Comm'n*,
    688 F.2d 615 (9th Cir. 1982) ........................................................................... 20, 21

*Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt.*,
    712 F.3d 705 (2d Cir. 2013) .................................................................................. 9

*Rodman v. Safeway Inc.*,
  2018 U.S. Dist. LEXIS 143867 (N.D. Cal. Aug. 22, 2018) ..................................... 40

*Rodriguez v. West Publ'g Corp.*,
  563 F.3d 948 (9th Cir. 2009), *remanded on other grounds to* 2010 U.S. Dist. LEXIS
  24155 (C.D. Cal. Feb. 3, 2010).......................................................................... 36, 42

*Roes, 1-2 v. SFBSC Mgmt., LLC*,
  944 F.3d 1035 (9th Cir. 2019) .................................................................................... 21

*Rosales v. El Rancho Farms*,
  2015 U.S. Dist. LEXIS 95756 (E.D. Cal. July 21, 2015)........................................... 23

*Sacerdote v. New York University*,
  328 F. Supp. 3d 273 (S.D.N.Y. 2018), *rev'd in part*, 9 F. 4th 95 (2d Cir. 2021)..... 26

*Schwartz v. Cook*,
  2017 U.S. Dist. LEXIS 102458 (N.D. Cal. June 30, 2017)........................................ 38

*Shaw v. Delta Airlines*,
  463 U.S. 85 (1983)....................................................................................................... 10

*Six Mexican Workers v. Ariz. Citrus Growers*,
  904 F.2d 1301 (9th Cir. 1990) .............................................................................. 29, 30

*Staton v. Boeing Co.*,
  327 F.3d 938 (9th Cir. 2003) ...................................................................................... 39

*Stewart v. Apple Inc.*,
  2022 U.S. Dist. LEXIS 139222 (N.D. Cal. Aug. 4, 2022) ......................................... 29

*Sweda v. University of Pennsylvania*,
  2021 U.S. Dist. LEXIS 239990 (E.D. Pa. 2021) ........................................................ 38

*Tibble v. Edison Int'l.*,
  2010 U.S. Dist. LEXIS 69119 (C.D. Cal. July 8, 2010)............................................... 9

*Tibble v. Edison Int'l*,
  2010 U.S. Dist. LEXIS (C.D. Cal. July 8, 2010)........................................................ 34

*Tussey v. ABB, Inc.*,
  2019 U.S. Dist. LEXIS 138880 (W.D. Mo. Aug. 16, 2019) ...................................... 38

*Urakchin v. Allianz Asset Mgmt. of Am., L.P.*,
  2018 U.S. Dist. LEXIS 127131 (C.D. Cal. July 30, 2018)......................................... 39

*Vellali v. Yale Univ.*,
No. 3:16-01345 (D. Conn.) ....................................................................... 26

*Vizcaino v. Microsoft Corp.*,
290 F.3d 1043 (9th Cir. 2002) ........................................................... passim

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
396 F.3d 96 (2d Cir. 2005) ...................................................................... 29

*Waldbuesser v. Northrop Grumman Corp.*,
2017 U.S. Dist. LEXIS 223293 (C.D. Cal. Oct. 24, 2017) ..................... 37

*Williams v. SuperShuttle Int'l, Inc.*,
2015 U.S. Dist. LEXIS 19341 (N.D. Cal. Feb. 12, 2015) ........................ 41

*Wing v. Asarco Inc.*,
114 F.3d 986 (9th Cir. 1997) ................................................................... 36

*Wit v. United Behav. Health*,
58 F.4th 1080 (9th Cir. 2023) ................................................................. 26

*Zepada v. PayPal, Inc.*,
2017 U.S. Dist. LEXIS 43672 (N.D. Cal. Mar. 24, 2017) ...................... 35

## OTHER AUTHORITIES

Fed. R. Civ. P. 23 *et seq.* ........................................................................ *passim*

Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* § 13:1 (5th ed.)........ 19

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   INTRODUCTION

Plaintiffs commenced this action on December 1, 2020, seeking redress in the wake of dramatic changes to the SAG-AFTRA Union health benefit structure provided by the SAG-AFTRA Health Plan ("SAHP"). The changes were suddenly announced without warning in August 2020 in the midst of the COVID-19 pandemic ("2020 Amendments") as an urgently needed cost cutting measure that had been in the works for two years. The 2020 Amendments cut costs primarily by changing the coverage eligibility rules to push participants and their spouses age 65 and older from SAHP coverage to Medicare and gap coverage at the participant's expense.

To push the age 65+ demographic from SAHP coverage, the 2020 Amendments eliminated (1) the so-called "Dollar Sessional Rule," (2) the "Senior Performer" coverage and (3) the "Age & Service" coverage. The Dollar Sessional Rule counted residual earnings toward earnings-based eligibility for participants age 65+ and taking a pension, so long as the participant had $1 of sessional earnings for the annual period. "Senior Performer" coverage provided coverage secondary to Medicare to participants age 65+ and taking pension (and their spouses and surviving spouses) who did not have sufficient earnings to qualify for SAHP coverage but who were considered "Senior Performers" by virtue of having accumulated the required length of service through past work with the required Union pension credits. Age & Service coverage applied to participants age 40+ with the required pension credits. The 2020 Amendments also changed the measuring period for the annual earnings of performers age 65+.

The 2020 Amendments shocked and panicked SAHP participants. A core group of participants, which included Plaintiff David Jolliffe, formed an information platform to communicate and interact regarding the 2020 Amendments. The group also sought legal counsel to explore legal options. About a dozen prominent law firms refused to undertake the matter on a contingent basis. Only Chimicles Schwartz Kriner &

Donaldson-Smith LLP ("CSKD") agreed to undertake the matter to investigate and, if warranted, prosecute claims, on a fully contingent basis.[1]

Following more than four months of investigation in a complex and challenging legal landscape, Class Counsel, on behalf of Plaintiffs, filed this action under the Employee Retirement Income Security Act ("ERISA"), seeking redress for breaches of fiduciary duty that led to the funding crisis and the 2020 Amendments. Plaintiffs claimed that the SAG Health Plan Trustees breached their ERISA fiduciary duties in effecting the 2017 merger of SAG Health Plan ("SHP") with the AFTRA Health Plan ("AHP") ("HP Merger") to form the SAHP, alleging that a duly diligent pre-merger investigation would have revealed that the HP Merger would not, contrary to public statements touting the HP Merger, strengthen the financial health of the plan and ensure a benefit structure for all participants. Plaintiffs further claimed that, following the HP Merger, the SAHP Trustees breached their ERISA fiduciary duties by failing to disclose the spiraling SAHP funding crisis, the impending doom of the benefit structure to the participants, and the Union and its negotiators in the 2019 and 2020 major collective bargaining agreement ("CBA") processes that fund the SAHP; and by approving and implementing without warning a discriminatory age-based benefit structure to manage the SAHP's spiraling costs, in violation of law and Plan documents.

Through aggressive and zealous representation in the litigation and a mediation conducted by a nationally renowned and experienced mediator, Class Counsel ultimately achieved an excellent, valuable and timely result for the Class in the Settlement, against an exceedingly complex and risky legal landscape and preeminent defense counsel.

The Settlement provides a combination of an up to $20.6 million monetary component plus valuable non-monetary components that directly address the claims and benefit the Class. The up-to $20.6 million monetary includes: (1) $15 million, which, net of attorneys' fees and expenses and administrative expenses, will be paid immediately to

---

[1] CSKD affiliated with Law Offices of Edward Seidle and Johnson & Johnson LLP, (collectively "Class Counsel").

Senior Performers and their age 65+ spouses who lost SAHP coverage in 2021 or 2022, as a result of the 2020 Amendments, and (2) up to $700,000 per year for eight years (total $5.6 million) commencing in 2023 to be paid annually to the Senior Performers who would have qualified for SAHP coverage for those years but for the elimination of the Dollar Sessional Rule, in an amount equal to approximately one-half of the amount of the residual-based employer contributions to the SAHP on behalf of the participant. These *annual* payments, which will likely range from approximately $438 to $4,375 per Qualifying Senior Performer,[2] represent a substantial percentage of damages measured as the average cost to acquire Medicare or Medigap coverage to most-closely replicate the scope of the SAHP coverage and taking account of the fact that under the 2020 Amendments, many eligible class members who had an HRA were provided an HRA allocation of $95 or $20 per month ($1,140 or $240 per year) towards the cost of obtaining replacement coverage. Schwartz Decl., ¶ 2.

The non-monetary components of the Settlement require the SAHP prospectively to: (1) disclose to the Union the annual SAHP funding information regarding projections, surpluses or deficits and any proposed benefit changes; (2) disclose to the Union, prior to the commencement of CBA negotiations, detailed reports regarding SAHP funding and the funding required to sustain the benefit structure; (3) retain a cost consultant to advise on potential cost-saving measures for the SAHP; (4) permit Senior Performers two opportunities from 2023 through 2028 to use additional sessional earnings reported to the SAHP within 45 days of the end of their Base Earnings Period toward active qualification; and (5) provide a link on the SAHP Website that permits Senior Performers to review their reported sessional earnings to date in real time, and notice of their ability to determine the amount of their sessional earnings and the 45-day period in (4) above.

---

[2] The Plan has calculated that if all of the Senior Performers who it has identified as having lost their entitlement to Plan coverage due to the elimination of the Dollar Sessional Rule have HRA accounts by May 1, 2024 as provided in the settlement, the total payments for 2023 will be over $625,000 and the average payment will be over $1,600 per Qualifying Senior Performer. Schwartz Decl., ¶ 2.

In addition, Class Counsel submits that this litigation was the catalyst for an increase in SAHP funding negotiated in the 2022 Commercials CBA process, which commenced in February 2022, following this Court's denial of Defendants' Motion to Dismiss. Unlike in the 2019 and 2020 CBA processes, the SAHP provided detailed information regarding the funding condition and the funding required to maintain the health benefit structure in the SAHP to SAG-AFTRA and its negotiators in the 2022 Commercials CBA process. As a result, the SAG-AFRA negotiators, including Plaintiff Jolliffe, used that important information to aggressively pursue increased funding for the SAHP in the 2022 Commercials CBA negotiation, where they achieved an increased contribution rate that would preserve current benefits.[3] Class Counsel contend that the prosecution of the litigation was a substantial factor in causing the disclosure by the SAHP that led to the funding increase. Further, discussed herein, the Settlement requires the SAHP to continue the same detailed disclosure in future CBA processes.[4]

Given the excellent, comprehensive recovery in the face of substantial litigation risks, Plaintiffs request that the Court grant final approval of the Settlement.

Class Counsel also seek an award of $6,686,667 in attorneys' fees and $50,954.13 in expenses for investigating and prosecuting this matter on a fully contingent basis. The requested amount equates to one-third of the up-to $20.6 million amount of the monetary component of the Settlement, which, as discussed above, also includes valuable non-monetary prospective relief for the Class.

---

[3] *See* Jolliffe Decl. ¶ 13.

[4] The Settlement also requires dismissal of plaintiffs' appeal in the related *Fisher v. Screen Actors Guild-American Federation of Television and Radio Artists, et al.*, No. 21-cv-05215-CAS (JEM) currently pending in the Ninth Circuit Court of Appeals. The plaintiffs in *Fisher* have agreed in principle to dismiss their appeal in exchange for SAG AFTRA's commitment to monitor, facilitate, and use reasonable efforts to ensure compliance by the SAHP and its Board of Trustees with the rights and entitlements of the Union under the Governance Provisions set forth in Section 11 of the Settlement Agreement. Schwartz Decl., ¶ 3.
.

Class Counsel respectfully submits that an upward adjustment of the 25% benchmark for attorneys' fee awards in common fund cases is justified because: (1) the settlement represents an excellent, timely recovery for class members in an exceedingly complex and challenging legal landscape against preeminent counsel; (2) Class Counsel took this case on a wholly-contingent basis despite facing extraordinary risks as demonstrated by the fact that about a dozen prominent firms declined to take this case on a contingency due to those risks; (3) Class Counsel skillfully litigated class members' claims by developing novel theories and arguments to defeat Defendants' "settlor function" motion to dismiss and thereafter by vigorously engaging in discovery while simultaneously engaging in complex, protracted settlement negotiations; (4) the litigation and settlement provides substantial non-monetary relief for the benefit of class members; (5) the efforts of Plaintiffs and Class Counsel were a substantial factor in causing Defendants, in connection with the negotiation of the 2022 Commercials Contract, to provide detailed information to the Union negotiators (including Plaintiff Jolliffe) concerning Plan funding and the amount of funding required to sustain the benefit structure, which led to negotiations that secured a substantial increase in the contribution rate to fund the Plan; and (6) the overwhelming majority of courts have granted a one-third fee of the monetary recovery in recent ERISA cases involving fewer risks and less valuable non-monetary relief. *See Foster v. Adams & Assocs.*, 2022 U.S. Dist. LEXIS 25071, at *28 (N.D. Cal. Feb. 11, 2022) ("a 33.3% recovery is on par with settlements in other complex ERISA class actions"), *citing Marshall v. Northrop Grumman Corp.*, 2020 U.S. Dist. LEXIS 177056, at *8 (C.D. Cal. Sep. 18, 2020). Moreover, a lodestar crosscheck confirms that a one-third fee award will only result in a 1.8 multiplier, well within Ninth Circuit standards.

Class Counsel further request the Court to approve the payment of service awards to each Class Representative in the amount of $5,000, which, if granted, will be paid from the attorneys' fees awarded by the Court.

Notice was provided to the Class as set forth in the Settlement Agreement and the Counsel's Scheduling Order (as amended). *See* Nordskog Decl., ¶¶ 4-9; Rumeld Decl. ¶¶ 1-6. The family of Ed Asner has publicly stated support for the Settlement. *See* Schwartz Decl., ¶ 4, Ex. 1 ("This settlement is a great first step in righting a terrible wrong that was done by @sagaftra to many of its members"). To date, no class member and none of the Attorneys General who received notice pursuant to CAFA have filed an objection to the Settlement, request for fees and expenses, or Service Awards.

## II.   STATEMENT OF FACTS

### A.   Background of the SAHP

The SAHP is (and each of its predecessors was) a self-insured multi-employer Taft-Hartley welfare plan subject to ERISA. The SAHP resulted from the 2017 HP Merger, which was touted in June 2016 to "strengthen the overall financial health of the plan while ensuring comprehensive benefits for all participants." Amended Complaint (ECF No. 43), ¶ 70. The 2020 Amendments were purportedly required because SAHP funding under the Union's CBAs had not kept up with the costs to provide coverage to the participants and their families, and the Trustees had been working for two years on a solution. *Id.* Three major CBAs had been negotiated and approved in 2019 and 2020 in which the funding and cost crisis and imminent doom of the benefit structure could have been addressed by the Union and its negotiators had this information been disclosed.

The SAHP, as did its predecessors, provides the health benefit to SAG-AFTRA members who qualify for the benefit under the eligibility rules established by the SAHP Trustees. To qualify for SAHP coverage, participants must meet the eligibility requirements and pay the required premiums as determined by the Trustees. Generally, participants qualify by achieving an annual threshold amount of earnings paid to the participant and reported to the SAHP for work performed under a CBA that requires the employer to make contributions to the SAHP on behalf of the participant with respect to those earnings ("Earned Eligibility").

Prior to the 2020 Amendments, the SAHP offered two levels of coverage, called plan I and plan II. The plan II earnings threshold to qualify for coverage was lower than the threshold for plan I. Residual earnings of participants age 65+ and taking a pension co-sponsored by SAG or AFTRA counted to qualify for Earned Eligibility, so long as the participant had at least $1 of sessional earnings in the year under the Dollar Sessional Rule. In addition, for participants age 65+ and taking a pension who did not have sufficient earnings to meet Earned Eligibility but who were considered "Senior Performers" by virtue of having accumulated the required length of service and earnings through past work, the SAHP provided secondary coverage to those participants (and their spouses and surviving spouses). Age & Service qualification applied to performers age 40 and older with at least 10 retiree health credits, and provided plan II coverage.

### B.    The 2020 Amendments

The 2020 Amendments provided there would nominally be two health plans sponsored by the SAHP Trustees. The existing SAHP, with modifications, would be the so-called "Active Plan." There also would be a new health reimbursement account ("HRA") plan, called the SAG-AFTRA Health Plan Senior Performers Health Reimbursement Account Plan ("HRA Plan"), for the purpose of allowing former participants in the SAHP (and its predecessors) who qualify as Senior Performers and their spouses and surviving spouses to obtain reimbursement of eligible medical expenses incurred.

Under the 2020 Amendments, as of January 1, 2021, the SAHP would no longer offer medical, drug, vision, and dental coverage for Senior Performers and their age 65+ spouses and surviving spouses through the Active Plan. Instead, Senior Performers and their age 65+ spouses would access medical, drug, vision, and dental coverage through a designated Medicare marketplace representative, Via Benefits, and would participate in the HRA Plan. Senior Performers and their age 65+ spouses and surviving spouses would be entitled to annual allocations to their HRAs of either $1,140 (for Senior

Performers with 20 or more retiree health credits) or $240 (for Senior Performers with under 20 health credits).[5] The HRA allocations would be made from SAHP Trust assets.

The 2020 Amendments also eliminated the Dollar Sessional Rule. These participants would now be required to meet the Earned Eligibility threshold and only sessional earnings counted to qualify for coverage in the Active Plan.

The 2020 Amendments shocked participants. Many were left to scramble to qualify for SAHP Active Plan coverage under the new rules, or to obtain coverage in the Medicare marketplace in the midst of the pandemic, bearing the cost above the HRA amounts. A core group of participants, including Plaintiff David Jolliffe, organized to mount a massive campaign against the 2020 Amendments and the SAHP Trustees. *See e.g.*, video featuring prominent performers at https://youtu.be/4LgRxJnxI8o.

## C.    The Risks of Litigation Challenging the 2020 Amendments

The core group also sought legal counsel to explore legal options. Many prominent class action and ERISA lawyers decided the case was too risky to take on a contingent basis. Joint Decl., ¶¶ 2-4; Joliffe Decl., ¶¶ 7-8. The group reached out to about ten prominent law firms to challenge the 2020 Amendments, but none were willing to take the case on a contingent basis, and one asked for a non-refundable $500,000 to investigate potential claims and determining if a viable complaint could be drafted. *Id*. Only one firm, CSKD, which had success in another complex and risky ERISA case involving a Taft-Hartley plan in the entertainment field (the American Federation of Musicians-Employers Pension Fund), (which many other prominent law firms also declined as too risky), agreed to take the case. *Id*.

Class Counsel (and their competitors who deemed the case too risky) knew any attack on the 2020 Amendments faced a grave risk of dismissal due to the "settlor

---

[5] The 2020 Amendments defined a "Retiree" as a participant age 65+ and who is taking a Union pension, as well as a participant age 65+ who is not taking a pension but has only residual earnings. "Retirees" include Senior Performers who are age 65+, taking a pension and have the required number of retiree health credits, and those who do not have sufficient retiree health credits to qualify as Senior Performers. Participants who are age 65+ but *not* taking a pension and who have sessional and residual earnings are not "Retirees."

function" defense. As argued in Defendants' motion to dismiss the Amended Complaint, "it is well-settled that plan sponsors do not act as fiduciaries when making decisions that concern the structure or design of the plan, including—as challenged here—decisions to merge plans and to amend a plan's benefit provisions." ECF No. 46 at 17-19, citing decisions by the Supreme Court and Ninth Circuit Court of Appeals.

Class Counsel also recognized that in addition to the settlor function defense, Defendants would also argue that they engaged in a prudent process by engaging a plethora of financial and legal advisors and conducting a series of meetings in re-drawing the eligibility requirements to qualify for Plan health coverage in the face of the Plan's declining financial condition. *See Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996); *Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt.*, 712 F.3d 705, 728, 730 (2d Cir. 2013) (applying a "heightened pleading standard" that "focuses on the process of the fiduciary's conduct preceding the challenged decision."); *Tibble v. Edison Int'l.*, 2010 U.S. Dist. LEXIS 69119, at *120 (C.D. Cal. July 8, 2010) ("even if Defendants' process … was somehow deficient, Plaintiffs' claim for damages fails if a hypothetical prudent fiduciary would have made the same … decision.").

Moreover, Class Counsel recognized that despite the view that promises of lifetime health coverage were made to Senior Performers, the Plan "specifically stated that future benefits 'are not promised, vested or guaranteed,' and it reserved the right to 'reduce, modify or discontinue benefits or the qualification rules for benefits at any time,' including with respect to retiree benefits." *See* ECF 46 at 13. Moreover: "Employers or other plan sponsors are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans." *Curtis-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78 (1995). An amendment to a plan to deprive participants of health benefits "is not a cognizable complaint under ERISA; the only cognizable claim is that the company did not do so in a permissible manner." *Id*.

What's more, any age discrimination claims based on ERISA faced grave risks because, as pointed out in Defendants' motion to dismiss (ECF 46 at 17-20), the Supreme

Court has noted, in the context of welfare benefit plans, that: (1) "ERISA does not mandate that employers provide any particular benefits, and does not itself proscribe discrimination in the provision of employee benefits," and (2) the legislative history of ERISA shows that the Senate expressly considered and rejected the inclusion of nondiscrimination provisions because it was desirable to maintain 'centralized administration' of employment discrimination claims via the EEOC. *Shaw v. Delta Airlines*, 463 U.S. 85, 91, 104 (1983), *citing* 119 CONG. REC. S30, 409-10 (1973).

Finally, direct age-discrimination claims faced grave risks as well, because the age discrimination laws do not prohibit plan rules that distinguish between employees based on criteria that merely correlate with age. Since retiree and pension status are "analytically distinct" from age, their use in determining eligibility for retiree benefits thus does not violate the ADEA. *See Ky. Ret. Sys. v. EEOC*, 554 U.S. 135, 141, 143 (2008); *Harris v. County of Orange*, 902 F.3d 1061, 1072 (9th Cir. 2018). Given the obstacles and risks posed by this caselaw, at least one firm specializing in age discrimination cases decided against filing an age discrimination class action despite receiving substantial assistance from CSKD. Schwartz Decl., ¶ 5.

Class Counsel also assumed that before implementing the 2020 Amendments, Defendants' legal advisors had received at least informal guidance from the relevant governmental agency that the 2020 Amendments did not violate the Medicare Secondary Payor Program rules and regulations. That assumption was confirmed in discovery. Schwartz Decl., ¶ 6.

Despite these formidable risks, due to their view that the 2020 Amendments represented an extreme injustice, CSKD agreed to conduct an extensive pre-suit investigation on a contingent basis. Schwartz Decl., ¶ 7. That investigation, which resulted in the drafting of the class action complaint, lasted about four months with a corresponding lodestar of about $3.8 million based on almost 5,100 hours. *Id*. Based on their careful analysis of the legal and factual issues, Class Counsel creatively crafted the Complaint to navigate the vicissitudes of ERISA and the age discrimination laws to

protect against the expected defenses and navigate around expected coverage defenses by the Plan's fiduciary liability insurers. *Id.*

### D.   The Litigation

#### 1.   Initial Motion Practice

Class Counsel filed an Amended Complaint in response to Defendants' motion to dismiss the original Complaint, which, among other things, added factual allegations further supporting fiduciary action under ERISA. Defendants moved to dismiss the Amended Complaint, making numerous arguments including that the Amended Complaint failed to plausibly allege they committed any fiduciary breaches and that the challenged conduct was taken in the "settlor," not fiduciary, function under ERISA. The Court denied that motion and Defendants' subsequent request to file an interlocutory appeal. ECF Nos. 61, 70.

#### 2.   Early Mediation

Following the Court's denial of Defendants' motions, the parties agreed to initially focus their efforts on an early mediation process under the auspices of Robert A. Meyer of JAMS, one of the country's leading mediators in complex class and ERISA cases. They focused initial discovery efforts on core information to facilitate an informed mediation. This included exchanging initial disclosures, drafting confidentiality and ESI protocol agreements, serving and responding to document requests, and the production of core relevant documents, including board minutes, reports provided to the Defendant Trustees, internal plan documents, attorneys' notes of meetings and communications and analyses by the plan attorneys, and insurance policies. *See generally* ECF No. 71 at 2-4; Joint Decl., ¶ 6.

The parties prepared two rounds of detailed mediation briefs and engaged in a full-day mediation on March 4, 2022 with Mr. Meyer. Joint Decl., ¶ 7; Meyer Decl., ¶¶ 4-6. The mediation proved unsuccessful. The parties had widely divergent views of the merits of the claims and defenses. Moreover, as expected, Defendants' fiduciary liability insurers contested coverage based on the argument that the claims were in essence

"benefits denial" claims, which are typically not covered under fiduciary liability insurance policies. *Id.* ¶ 5. Accordingly, while the parties and Mediator Meyer continued to engage in discussions, the parties reverted to litigation.

### 3. Discovery and Schedule Battles

As reflected in the parties' Joint Amended Discovery Plan filed in May 2022 (ECF No. 77), the parties had widely divergent views regarding the appropriate scope of discovery and schedule for motion practice. Plaintiffs pushed for extensive document production, including relevant emails of all the Defendant Trustees; plus depositions of each Defendant Trustee plus 15 non-parties such as the SAHP's many advisors. Defendants sought to limit document production to only 12 of the 36 Defendant Trustees, and limit Plaintiffs to only 15 depositions (including non-parties). *See* ECF No. 77.

For class certification, Defendants requested that the Court either require Plaintiffs to file their class certification motion before the substantial completion of discovery or permit Defendants to file an early motion to deny class certification before Plaintiffs completed substantial discovery. *Id.* After a hearing in which the Court determined the parties were unable to reach any common ground, the Court instructed the parties to attempt to narrow their differences. ECF No. 81. The parties' efforts to do so proved largely unsuccessful. As reflected in the parties' updated Joint Report (ECF No. 88), the parties had a strong command of the facts and their respective legal arguments and remained far apart.

After another hearing, the Court largely agreed with Plaintiffs' proposed scope of discovery and proposed schedule, which resulted in the entry of a scheduling order on July 22, 2022. *See* ECF No. 117. Plaintiffs thereupon aggressively pursued discovery against the Defendant Trustees, and the Defendants pursued discovery from the named Plaintiffs. Joint Decl., ¶ 8. The parties battled extensively over objections and productions. Schwartz Decl., ¶ 8.

### 4.    Resumed Mediation and Settlement

Simultaneous with the battles over discovery and class certification, the parties, with the extensive involvement of Mediator Meyer, continued to engage in settlement discussions. Meyer Decl., ¶ 7-8. The parties also faced the reality that the applicable fiduciary liability insurance policies were "wasting" policies, meaning that every dollar spent on the defense was one less dollar available to cover an agreed resolution or judgment. In addition, there were four layers of fiduciary liability insurance (one primary policy and three excess policies), and the insurers vigorously maintained they had a strong basis to contest coverage. Joint Decl., ¶ 9. Despite these realities, Class Counsel was unwilling to relent from zealous litigation until there was substantial progress in the negotiations to justify surrender of leverage in pressing forward with discovery and litigation. *Id*.

Eventually, due to the tireless efforts of Mediator Meyer and hard work by the parties and their counsel, sufficient progress was made in negotiations to justify a pause of the most expensive portions of formal discovery in favor of focusing on discovery targeted toward settlement. Meyer Decl., ¶ 8. The complicated nature of the issues required extensive and continuous negotiations to create an outline of the terms and structure of a settlement, refine those terms and structure, and fund the structure's monetary component. In addition, the parties engaged in extensive negotiations to structure the prospective non-monetary relief Plaintiffs required to provide future protections to the Class. After reaching an agreement in principle on the general structure and terms, the parties engaged in an extensive process to draft a complicated set of settlement documents to reflect the complex structure. Joint Decl., ¶ 10.

### E.    The Settlement

The Settlement accomplishes five primary goals of the litigation: (1) providing immediate compensation to participants age 65+ and their age 65+ spouses and surviving spouses who lost SAHP health coverage in 2021 and 2022 as a result of the 2020 Amendments; (2) providing compensation in future years to participants who would have

qualified for SAHP coverage based on Earned Eligibility under the eliminated Dollar Sessional Rule; (3) requiring the SAHP to provide information about the funding needs to SAG-AFTRA officials and negotiators for CBAs, and to provide SAG-AFTRA officials with information regarding funding projections and proposed benefit changes; (4) requiring the SAHP to enact structural provisions that will assist Senior Performers to meet the new eligibility rules; and (5) requiring the SAHP to engage professional assistance in cost-management to control costs and stem future daunting surprises.

### 1. The Settlement Provides a Monetary Recovery of up to $20.6 million

The Settlement includes a $20.6 million monetary component plus substantial non-monetary components providing valuable prospective relief and protections to the Class.

### a. $15 Million Cash Fund – Compensation for 2022-2023 Damages

Defendants and the SAHP fiduciary liability insurers have each agreed to pay $7.5 million, for a total of $15 million, which, after deducting the amount the Court approves for Class Counsel's Attorneys' Fees and Costs and any Service Awards to Plaintiffs and the costs to administer the Settlement, will be used to compensate Senior Performers and their age 65+ and surviving spouses who lost either primary or secondary SAHP coverage solely due to the 2020 Amendments. SA § 7.1. The Plan of Allocation for the Net Settlement (SA Exhibit 6) provides for the following target payments:

- **$4,400** for Senior Performers and their age 65+ spouses who lost active coverage in 2021 due to the elimination of the Dollar Sessional Rule;

- **$2,200** for those Senior Performers and their age 65+ spouses who lost active coverage in 2021 due to the other provisions of the 2020 Amendments (elimination of Senior Performer coverage and/or raising of the earnings eligibility thresholds);

- **$1,100** for Senior Performers and their 65+ spouses who first lost active coverage in 2022 due to the 2020 Amendments; and
- **$400** for age 65+ participants who lost secondary coverage (i.e., secondary to Medicare).

These payments will be automatically allocated into eligible class members' HRA accounts without the need to submit a claim (or paid via check if the Senior Performer does not have an HRA account). Depending on the amount of attorneys' fees and costs approved by the Court and Administrative Expenses incurred by the Settlement Administrator, these target payments may be increased *pro rata*.

The relative allocation to the four groups is based on the strength of each group's claims, their relative damages, and the equities. The $4,400 group generated substantial annual contributions to the SAHP via their residual-based employer contributions but now get zero corresponding benefit (other than the annual $1,140/$240 HRA allocations). The $2,200 group generally made substantially smaller annual earnings-based funding contributions to the SAHP. The $1,100 group did not lose coverage in 2021 and therefore had half the damages of those in the prior two groups who lost coverage in 2021 and 2022, and they also had an extra year's notice to obtain earnings to meet the new eligibility thresholds or obtain alternate coverage. And unlike the first three groups, who lost the SAHP primary coverage, the $400 group was already on Medicare and only lost secondary coverage from the Plan.

These payments provide a substantial net recovery of damages measured as the average cost to acquiring Medicare or Medigap coverage to most-closely replicate the scope of the SAHP coverage and taking account of the fact that under the 2020 Amendments, many eligible class members who had an HRA were allocated $1,140 or $240 per year. Joint Decl., ¶ 12.

### b.    Up to $700,000 in Annual HRA Allocations from 2023-2030

1.    In addition, the SAHP will allocate up to an additional $700,000 for each of the eight years from 2023 through 2030 (for a potential maximum of $5.6 million) to the

HRA accounts of Qualifying Senior Performers who become ineligible for Active Plan coverage in one or more of those years solely because of the elimination of the Dollar Sessional Rule. SA §10.[6] The aggregate amount of these additional HRA allocations in each year will be equal to approximately one-half of the aggregate contributions made to the SAHP in the previous year with respect to the Qualifying Senior Performers' residual earnings reported to the SAHP (which earnings will be capped at $125,000 per Qualifying Senior Performer). SA §10.2.1. That aggregate amount will be allocated to each Qualifying Senior Performer based on their relative amount of residual earnings reported to the SAHP (again subject to the $125,000 cap). SA §10.2.2. These annual payments are projected to range from approximately $438 to $4,375 per Qualifying Senior Performer. Schwartz Decl., ¶ 2. The Plan has calculated that if all of the Senior Performers who it has identified as having lost their entitlement to Plan coverage due to the elimination of the Dollar Sessional Rule have HRA accounts by May 1, 2024 as provided in the settlement, the total payments for 2023 will be over $625,000 and the average payment will be over $1,600 per Qualifying Senior Performer. *Id.*

This provision addresses the inequity of Senior Performers' earnings under the CBAs providing funding to the SAHP via employer contributions based on their residual earnings while the participants cannot qualify for Active Plan coverage based on their earnings due to the elimination of the Dollar Sessional Rule. The up to $700,000 of annual HRA allocations, in conjunction with the pre-existing annual $1,140/$240 HRA allocations, represents a substantial share of the average cost to purchase Medicare or Medigap coverage. Joint Decl., ¶ 12.

### c. Valuable Prospective Non-Monetary Relief and Protections

The Settlement also includes valuable non-monetary components that provide prospective relief and protections to the Class.

---

[6] The Settlement permits the Trustees to cease the 2023-2030 allocations only if projections of the Plan's Continuation Value are so dire that modifications to the SAHP are *required* under Article XIII, Section 3 of the Trust Agreement. SA § 10.3.

The Settlement requires the Trustees to make important disclosures and administrative changes and keep those provisions in place for at least four years after the Settlement Effective Date. See SA § 11 for details. These provisions are tailored to address specific concerns raised in the Amended Complaint.

- **Disclosures:** The SAHP will make timely disclosures to the SAG-AFTRA National Board or SAG-AFTRA Executive Committee regarding projections, reports and plans related to proposed changes to participant premiums, eligibility thresholds, or benefits, and detailed disclosures regarding the SAHP's financial condition and required funding prior to the commencement of negotiations relating to the Commercials CBA, Netflix CBA, or TV/Theatrical CBA. SA § 11.2.4. This term is critical. Plaintiffs alleged that Defendants failed to disclose SAHP funding information in connection with the 2019 and 2020 CBA processes, while secretly planning to eliminate the age 65+ demographic from SAHP coverage. After this Court denied the motion to dismiss, in connection with the negotiation of the 2022 Commercials CBA, the SAHP provided detailed information to the Union negotiators (including Plaintiff Jolliffe) concerning funding and the amount of funding required to sustain the benefit structure, which led to negotiations that secured a substantial increase in the employer contribution rate to the SAHP. Joint Decl., ¶ 13; SA, §11.2.4. The requirement to disclose funding information and benefit changes under consideration will also help prevent a repeat of the 2020 Amendments, when the SAHP Trustees blindsided participants. Had such information been timely provided prior to August 2020, the Union negotiators could have addressed funding in the CBAs and it is possible the Trustees could have been persuaded to either forgo the 2020 Amendments or limit the adverse impact on the class members.

- **Cost Consultant:** The SAHP will conduct a Request of Proposal for a cost consultant to provide advice and oral and written reports about potential cost-

saving measures. This will assist the Trustees to avoid future cost mismanagement.

- **Extra time for Seniors to Use Sessional Earnings:** The Trustees will amend the manner in which Retirees' (including Senior Performers') sessional earnings are applied for purposes of qualifying for active coverage under the SAHP, permitting Senior Performers extra time to use additional sessional earnings to qualify for SAHP coverage. The 2020 Amendments' changes to reporting and benefit periods led to age 65+ participants not being credited for sessional work done in the qualifying period but not reported by the employer in the period to the SAHP.

- **Notice of Additional Credited Earnings Opportunity:** The SAHP will make enhanced disclosures on the SAHP website and via email notifying Senior Performers about their progress for qualifying for SAHP coverage.

### F. Notice

As required by the Settlement Agreement and the Preliminary Approval Order, the Settlement Website (http://sagaftrahealthplansettlement.com) provides Settlement Class members with detailed information about the case and access to key documents, including the detailed Settlement FAQ Notice, the Settlement Agreement and its exhibits, the Amended Complaint, the motion to dismiss decision, the Preliminary Approval Order, and will include the motions for final approval and for fees, expenses and service awards. Nordskog Decl., ¶ 10. The Settlement Website was prominently displayed on all notice documents, and the Plan's website as well. The Settlement Administrator disseminated summary notice to over 100,000 Settlement class members via email. *Id.* ¶¶ 4-9. The Notice directs Settlement class members to the FAQs, includes a thorough series of questions and answers (FAQs) designed to explain the Settlement in clear terms and in a well-organized and reader-friendly format. Among other things, it includes an overview of the litigation, an explanation of the benefits available under the Settlement, and detailed instructions on how to comment on or participate in the settlement. This

notice covers all of the elements outlined in Rule 23(c)(2)(B). Critically, the summary email notice was individualized to inform class members if they were entitled to payment for damages suffered in 2021 and 2022 and if so, whether they were eligible to receive a target payment of $4,400, 2,200, $1,100 or $400. *Id.* The Settlement Administrator also sent the FAQ notice via first class mail to about 14,000 Settlement Class members for whom the SAHP does not have an email address or for bad email addresses that "bounced back." *Id.* Moreover, there was extensive coverage of the Settlement in entertainment-industry publications. Schwartz Decl., ¶ 9.

The Plan also issue Notice to in compliance with the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1715, to the U.S. Attorney General and Attorney General in each of the fifty (50) States, the District of Columbia, and the United States Territories of Guam and Puerto Rico. *See* Rumeld Decl.

Class Counsel and the Settlement Administrator have fielded numerous emails and calls to answer questions from class members. *Id*. ¶ 10; Nordskog Decl., ¶ 12. Despite this extensive notice, to date no class members have filed any objections. *Id*. ¶ 13.[7] Nor have any of the Attorneys' General. Rumeld Decl., ¶ 5.

## III.   ARGUMENT

### A.   The Court Should Grant Final Approval of the Settlement

#### 1.   The Class Action Settlement Process

Under Rule 23(e) of the Federal Rules of Civil Procedure, class actions "may be settled, voluntarily dismissed, or compromised only with the court's approval." As a matter of "express public policy," federal courts favor and encourage settlements, particularly in class actions, where the costs, delays, and risks of continued litigation might otherwise overwhelm any potential benefit the class could hope to obtain. *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992); *In re Syncor ERISA*

---

[7] Class Counsel recently received a letter from one Class Member raising concerns about the Settlement. We promptly reached out to the Class Member to discuss those concerns and answer any questions he may have, and, depending on his availability, expect to discuss with him his concerns within a week or two.

*Litig.*, 516 F.3d 1095, 1101 (9th Cir. 2008); Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* ("Newberg") §13:1 (5th ed.). "[T]here is a strong judicial policy that favors settlements, particularly where complex class action litigation is concerned.'" *In re Chrysler-Dodge-Jeep EcoDiesel Mktg., Sales Practices, & Prods. Liab. Litig.*, 2019 U.S. Dist. LEXIS 21990, at *39 (N.D. Cal. Feb. 11, 2019), *quoting Allen v. Bedolla*, 787 F.3d 1218, 1223 (9th Cir. 2015).

      2.      **The Standard for Final Approval**

The "settlement or fairness hearing is not to be turned into a trial or rehearsal for trial on the merits." *Officers for Justice v. Civil Service Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982). Moreover, a district court should not "reach any ultimate conclusions on the contested issues of fact and law which underlie the merits of the dispute, for it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements." *Id.* Rather, a district court's only role in reviewing the substance of [a] settlement is to ensure that it is 'fair, adequate, and free from collusion.'" *Lane v. Facebook, Inc.*, 696 F.3d 811, 819 (9th Cir. 2012), *cert. denied*, 571 U.S. 1003 (2013), *quoting Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998).

Rule 23(e)(2) includes a list of relevant factors to determine whether a settlement is fair, reasonable, and adequate:

(A) whether the class representatives and class counsel have adequately represented the class;

(B) whether the proposal was negotiated at arm's length;

(C) whether the relief provided for the class is adequate, taking into account:

      (i) the costs, risks, and delay of trial and appeal;

      (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

      (iii) the terms of any proposed award of attorney's fees, including timing of payment; and

(iv) any agreement required to be identified under Rule 23(e)(3); and

(D) whether the proposal treats class members equitably relative to each other.

The Ninth Circuit has identified the following factors to be used in determining whether a settlement is fair, reasonable, and adequate to all concerned:

> the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the settlement.

*Hanlon*, 150 F.3d at 1026; *see also Churchill Village, L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004). "The relative degree of importance to be attached to any particular factor will depend upon and be dictated by the nature of the claim advanced, the type of relief sought, and the unique facts and circumstances presented by each individual case." *Officers for Justice*, 688 F.2d at 625.

Furthermore, class settlements reached prior to formal class certification, like this one, require a "heightened fairness inquiry." *In re Apple Inc. Device Performance Litig.*, 50 F.4th 769, 783 (9th Cir. 2022), *quoting Roes, 1-2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1049 (9th Cir. 2019). When reviewing such a pre-certification settlement, the district court must not only explore the *Churchill* factors but also "look[] for and scrutinize[] any subtle signs that class counsel have allowed pursuit of their own self-interests . . . to infect the negotiations." *Roes*, 944 F.3d at 1043 (cleaned up).

### B.     The Settlement Satisfies the Rule 23(e)(2) Factors

#### 1.      Class Representatives and Class Counsel Are Adequate

The Class Representatives and Class Counsel have prosecuted this action on behalf of the Class with vigor. *See* Fed. R. Civ. P. 23(e)(2)(A). To negotiate a fair and reasonable settlement, "the parties [must] have sufficient information to make an informed decision about settlement." *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1239 (9th Cir. 1998);

*accord Byrne v. Santa Barbara Hospitality Services, Inc.*, 2017 U.S. Dist. LEXIS 184050, at *22 (C.D. Cal. 2017) ("The parties must have engaged in sufficient investigation of the facts to enable the court to intelligently make an appraisal of the settlement.") (cleaned up).

Class Counsel conducted an extensive investigation to evaluate potential claims and drafted complaints that satisfied the standards under ERISA and defeated Defendants' motion to dismiss and subsequent request for permission to seek interlocutory review. *See, e.g., In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000) ("significant investigation, discovery and research" supported "district court's conclusion that the Plaintiffs had sufficient information to make an informed decision about the Settlement"). Class Counsel thereafter largely won the battle over the scope of discovery and the schedule for class certification and marshaled the evidence to craft compelling bases to secure class certification and establish liability and damages to make a compelling presentation before this Court and in connection with mediation. Class Counsel also skillfully and aggressively negotiated a settlement that achieves valuable relief for the Class without the risk, expense and delay of further litigation and appeals.

Each of the Class Representatives is a Class member who was adversely affected by the alleged breaches of fiduciary duty and the 2020 Amendments. The Class Representatives were actively engaged prior to and after the commencement of this action and throughout the litigation, mediation and settlement processes. They actively participated in Class Counsel's pre-suit investigation of the claims and have continued to consult with and be responsive to counsel and the discovery process. Plaintiff David Jolliffe—a Union member for 55 years, Union negotiator for 25 years and current National Board Member and Los Angeles Vice-President—rendered invaluable assistance and knowledge to counsel and the litigation, mediation and settlement process, zealously advocating the interests of the Class members. Joint Decl., ¶ 14.

### 2. The Settlement Is the Product Of Good Faith, Informed, And Arm's-Length Negotiations, And It Is Fair

As confirmed by the Mediator, the Settlement arises out of serious, informed, and non- collusive negotiations facilitated by a highly-respected mediator. Meyer Decl., ¶¶ 9-13. Class Counsel vigorously prosecuted this action, the mediation and the Settlement. Negotiations were difficult, protracted, and often spirited. The parties' negotiations were aided by Mr. Meyer's tireless attention, including extensive "shuttle diplomacy." He played a crucial role in supervising the negotiations and helping the parties bridge their differences and evaluate the strengths and weaknesses of their respective positions. Joint Decl. at ¶ 15. The adversarial nature of the litigation and the aid provided by Mr. Meyer are factors that weigh in favor of final approval. *See Rosales v. El Rancho Farms*, 2015 U.S. Dist. LEXIS 95756, at *4 (E.D. Cal. July 21, 2015), at *16, *quoting In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011) ("presence of a neutral mediator [is] a factor weighing in favor of a finding of non-collusiveness.").

In *Bluetooth*, the court observed that "[c]ollusion may not always be evident on the face of a settlement, and courts therefore must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations." 654 F.3d 935, 947 (9th Cir. 2011) (citations omitted). The court noted that the following may be signs of such impropriety: (1) a disproportionate distribution of the settlement to counsel or where counsel receives money, but the class does not; (2) the presence of a "clear sailing" agreement; and (3) the reversion of funds to defendant. *Id*. None of those signs are present here. The Settlement Agreement (and FAQ Notice) limits Class Counsel's fee request to an amount no more than one-third of the up-to $20.6 million monetary component of the Settlement, there is no "clear sailing" agreement (*see* SA § 9.2), and because payments under the Settlement are automatic without the need to file claims, there is no reversion of the monetary benefits.

### 3.    The Settlement Provides Significant Valuable Benefits In Exchange For The Compromise Of Strong, But Risky, Claims

The Settlement provides substantial relief to the Class, considering (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of the proposed distribution plan, and (iii) the fair terms of the requested amount of attorney's fees and expenses. *See* Fed. R. Civ. P. 23(e)(2)(C). The Settlement compensates Senior Performers who, due to the 2020 Amendments, lost active (primary) or secondary health coverage in 2021 and 2022, and compensates Senior Performers from 2023-2030 if they lose coverage due to the elimination of the Dollar Sessional Rule. The Settlement also provides valuable prospective relief and protections for the Class.

### 4.    The Settlement Mitigates the Risks, Expenses, and Delays the Class would Bear with Continued Litigation

A proposed Settlement may be fair, adequate, and reasonable even though a greater recovery might be available to the class members at trial. *See Curtis-Bauer v. Morgan Stanley & Co., Inc.*, 2008 U.S. Dist. LEXIS 85028, at *13 (N.D. Cal. Oct. 22, 2008) ("Settlement avoids the complexity, delay, risk and expense of continuing with the litigation and will produce a prompt, certain, and substantial recovery for the Plaintiff class."). "[I]t is well-settled law that a proposed settlement may be acceptable even though it amounts to only a fraction of the potential recovery that might be available to the class members at trial." *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 527 (C.D. Cal. 2004); *see also In re MacBook Keyboard Litigation*, 2023 U.S. Dist. LEXIS 92063, *40 (N.D. Cal. May 25, 2023) (noting median settlement recovery in class actions is about 12.5%) and 23 ("Class Counsel achieved excellent results for the class" in settlement that "represents approximately 9% to 28% of the total estimated damages[.]").

The Settlement secures significant valuable benefits in the face of substantial risks and uncertainty of continued litigation. Plaintiffs faced substantial risks to obtain a post-trial favorable judgment. While Plaintiffs defeated Defendants' motion to dismiss,

Plaintiffs continued to face a substantial risk that some or all of the claims would be dismissed at summary judgement, trial or on appeal based on the Defendants' defenses including that the challenged conduct was "settlor," not fiduciary, conduct under ERISA.

In addition, the SAHP, via its Summary Plan Document and other communications, had advised the participants that the benefits could be reduced, modified, or eliminated at any time, which posed another substantial risk. Joint Decl., ¶ 17. Further, while Plaintiffs believe that the Defendants did not engage in a prudent process in connection with the HP Merger, or in cost management and disclosure or implementation of the 2020 Amendments following the HP Merger, it is undisputed that Defendants conducted many meetings, and received advice and numerous reports from various financial and legal advisors, which may have insulated them from liability even if the Court ultimately concluded, as a matter of fact, that the decisions Defendants made were objectively imprudent, unfair and inequitable. Joint Decl., ¶ 16.

Compromise in exchange for certain and timely provision of the benefits under the Settlement is an unquestionably reasonable outcome. *See Nobles v. MBNA Corp.*, 2009 U.S. Dist. LEXIS 59435, at *5 (N.D. Cal. June 29, 2009) ("The risks and certainty of recovery in continued litigation are factors for the Court to balance in determining whether the Settlement is fair."); *Kim v. Space Pencil, Inc.*, 2012 U.S. Dist. LEXIS 169922, at *15 (N.D. Cal. Nov. 28, 2012) ("The substantial and immediate relief provided to the Class under the Settlement weighs heavily in favor of its approval compared to the inherent risk of continued litigation, trial, and appeal, as well as the financial wherewithal of the defendant."); *Nat'l Rural Telecommunications Coop.*, 221 F.R.D. at 526 ("In most situations, unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results.") (cleaned up). Timeliness of relief in this litigation was particularly important, given that the nature of the subject matter includes health care for aging Class members. *Cf. Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1050 n. 5 (9th Cir. 2002) ("in many instances, it may be a relevant circumstance that counsel achieved a timely result for

class members in need of immediate relief"). Indeed, two named Plaintiffs, Ed Asner and Sondra James Weil, sadly passed away during the pendency of the litigation.

The Settlement is a product of the parties' assessment of the merits and defenses, the risks and uncertainty associated with continued litigation, and the possibility that Defendants might have been successful in defeating class certification, or winning summary judgment, winning at trial or at appeal, or even just dragging out the litigation long enough to wear out aging Senior Performers, many of whom have pressing health issues that increase the importance of, if not critical need, for an early resolution. *See In re Countrywide Fin. Corp. Mortg. Mktg. & Sales Practices Litig.*, 2011 U.S. Dist. LEXIS 147689, at *23 (S.D. Cal. Dec. 16, 2011) (denying plaintiff's motion for class certification); *see also Sacerdote v. New York University*, 328 F. Supp. 3d 273 (S.D.N.Y. 2018), *rev'd in part*, 9 F. 4th 95, 113-117 (2d Cir. 2021) (defense trial victory in ERISA breach of fiduciary duty case); *Wit v. United Behav. Health*, 58 F.4th 1080 (9th Cir. 2023) (reversing a district court's judgment in favor of plaintiff class that a health insurer violated ERISA by using claims processing guidelines that were more restrictive than generally accepted standards of care to adjudicate mental health and substance use disorder claims); *Vellali v. Yale Univ.*, No. 3:16-01345 (D. Conn.), June 30, 2023 Jury Verdict Form, ECF No 576 (jury verdict for defendant even though plaintiffs proved trustees breached some duties).

Plaintiffs also faced the risk that any victory in the litigation would be a pyrrhic victory if it resulted in a judgment finding Defendants breached their duties in implementing the 2020 Amendments, but that injunctive relief could not be granted to restore the benefit structure to the pre-2020 Amendments structure or any particular benefit structure. The Defendant Trustees would then be free to engage in a renewed process to cut costs and limit coverage albeit pursuant to a prudent process guided by their attorneys; or if it were ultimately determined that the insurers are not required to provide coverage for any judgment obtained, or if the insurers ceased providing coverage for defense costs, which would have imposed a significant financial burden on the SAHP.

### 5.    The Settlement Allows Class Members to Obtain Relief Easily without the Submission of any Claims or Other Proof

The distribution method for the monetary component in the Settlement provides significant benefits for Class members, as there will be no need to fill out claim forms or submit a claim. The immediate monetary relief from the Settlement will automatically be allocated to the HRA accounts of Senior Performers or alternatively paid via check for those without an HRA account.

#### a.    Class Counsel seek Reasonable Attorneys' Fees and Costs

Per the Settlement Agreement, Class Counsel seek attorneys' fees in the amount equating to no more than one-third of the Maximum Gross Monetary Settlement Amount (i.e., the $15 million Gross Settlement Fund and the maximum $5.6 million in HRA contributions from 2023-2030), or $6,866,667. SA § 9. Class Counsel and Defendants did not discuss fees at all until they negotiated the material terms and amount of the Settlement (Joint Decl., ¶ 18,) and as reflected at Section 9.2 of the Settlement Agreement, there is no "clear sailing" agreement and Defendants reserve all rights to oppose any fee request. As discussed in Section D below, Class Counsel submit that the requested amount is fair and reasonable and well-supported under well-established Ninth Circuit standards.

#### b.    The Allocation Plan Is Fair and Complies with Governing Standards

"Approval of a plan of allocation of settlement proceeds in a class action . . . is governed by the same standards of review applicable to approval of the settlement as a whole: the plan must be fair, reasonable and adequate." *In re: Cathode Ray Tube (CRT) Antitrust Litig.*, 2016 U.S. Dist. LEXIS 159099, at *78-79 (N.D. Cal. 2016). The Plan of Allocation meets this standard because it treats all class members fairly in relation to the strength of their claims. *See Khoja v. Orexigen Therapeutics, Inc.*, 2021 U.S. Dist. LEXIS 230105, at *24 (S.D. Cal. 2021) ("A plan of allocation that reimburses class members based on the extent of their injuries is generally reasonable."); *Hefler v. Wells*

*Fargo & Co.*, 2018 U.S. Dist. LEXIS 213045, at \*33 (N.D. Cal. 2018); *In re MyFord Touch Consumer Litig.*, No. 13-cv-03072-EMC (N.D. Cal. 2019), Dkt. No. 526 at 4-5 (approving settlement paying lower dollar amount based on the strength of their claims).

Here, the relative target payments from the Net settlement Amount for 2022-2023 damages complies with these standards for the reasons described above. So too do the annual HRA allocations to be made from 2023-2030, which are projected to range from approximately $438 -$4,375 per Qualifying Senior Performer.

### C.   Class Certification is Appropriate for Settlement Purposes

Nothing has changed since the Court preliminarily certified the settlement class in connection with preliminary approval. *See* ECF No. 134 at ¶¶ 1-5; Motion for Preliminary Approval, ECF 127, at 33-37 (incorporated by reference). The Court should grant final certification of the class.

### D.   The Court Should Award Class Counsel's Requested Attorneys' Fees

Despite the documnted risks, Class Counsel agreed to take this case on a contingency and successfully prosecuted class members' claims against preeminent ERISA and union counsel. Class Counsel simultaneously overcame serious litigation and insurance coverage hurdles while skillfully negotiating class members' claims to a favorable resolution. Absent counsel's efforts, the Class likely would not be receiving any monetary compensation at all. Nor would the class receive the non-monetary benefits of the Settlement. Moreover, if granted, the requested award will not decrease the projected Class Member recoveries. Schwartz Decl., ¶ 11.

In ERISA cases, when class counsel creates a common fund for the benefit of the class, they may recover a percentage of the fund as a reasonable fee. *Marshall v. Northrop Grumman Corp.*, 2020 U.S. Dist. LEXIS 177056, at \*5–7 (C.D. Cal. Sep. 18, 2020) (applying the common fund method in an ERISA case and awarding one-third of the fund as reasonable fees and collecting cases supporting one-third fee request). Class Counsel submit that this Court should follow *Marshall* and the vast majority of other

recent ERISA class fee decisions, award an upward adjustment of the Ninth Circuit's 25% benchmark, and approve Class Counsel's one-third fee request.

**E.     The Court Should Determine Class Counsel's Fee as a Percentage of the Common Fund.**

"[A] lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *Vizcaino*, 290 F.3d at 1047. Attorneys' fees are awarded as a means of ensuring the beneficiaries of a common fund share with those whose labor created the fund. *In re Washington Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1300 (9th Cir. 1994) ("WPPSS"). The percentage-of-the-fund method aligns class counsel's interests with those of the class, and properly incentivizes capable counsel not only to accept challenging cases but to push for the best result that can be achieved. *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 122 (2d Cir. 2005) (percentage method "directly aligns the interests of the class and its counsel"). For these reasons, the percentage method "is preferred when" – as here – "counsel's efforts have created a common fund for the benefit of the class." *In re Capacitors Antitrust Litig.*, 2018 U.S. Dist. LEXIS 169764, at *43 (N.D. Cal. Sept. 21, 2018); *In re Korean Air Lines Co. Antitrust Litig.*, 2013 U.S. Dist. LEXIS 186262, at *3 (C.D. Cal. Dec. 23, 2013) (recognizing that "use of the percentage-of-the-fund method in common-fund cases is the prevailing practice in the Ninth Circuit"); *Six Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990) (common fund fee is generally "calculated as a percentage of the recovery"). The same logic applies here, as Class Counsel's interest to maximize the monetary component was aligned with the Class.

The monetary component of the Settlement includes the initial $15 million fund (to pay all fees and costs and to provide compensation to class members for damages suffered in 2021-2022) plus up to $5.6 million to pay damages suffered from 2023-2030. Therefore, the monetary benefit to the class is easily quantifiable at up to $20.6 million. *See Stewart v. Apple Inc.*, 2022 U.S. Dist. LEXIS 139222, at *15 (N.D. Cal. Aug. 4,

2022) ("Ninth Circuit precedent requires courts to award class counsel fees based on the total benefits made available to class members rather than the actual amount ultimately claimed").

**F.      The Court Should Award a Fee of One-Third of the Monetary Recovery**

The Ninth Circuit's 25% "benchmark" for the fairness and reasonableness of an attorneys' fees award in a class action creating a monetary fund provides a starting point; the Court determines the appropriate percentage by "tak[ing] into account all of the circumstances of the case." *Vizcaino*, 290 F.3d at 1048; *In re Google Inc. St. View Elec. Commc'ns Litig.*, 21 F.4th 1102, 1120 (9th Cir. 2021); *Marshall*, 2020 U.S. Dist. Lexis 177056 at *7-8. And courts are further permitted to adjust the benchmark figure up or down "when special circumstances indicate that the percentage recovery would be either too small or too large in light of the hours devoted to the case or other relevant factors." *Six Mexican Workers*, 904 F.2d at 1311. The benchmark is subject to adjustment based on the Court's assessment of: "(1) the results achieved for the class; (2) the complexity of the case and the risk of and expense to counsel of litigating it; (3) the skill, experience, and performance of counsel on both sides; (4) the contingent nature of the fee; and (5) fees awarded in comparable cases." *In re Capacitors*, 2018 U.S. Dist. LEXIS 169764, at *44, *citing Vizcaino*, 290 F.3d at 1048-50; *Durham v. Sachs Elec. Co.*, 2022 U.S. Dist. LEXIS 113075, at *24 (N.D. Cal. June 27, 2022) (approving upward adjustment based on factors including risk and difficulty of the case). Courts in the Ninth Circuit "commonly find acceptable requests for attorneys' fees that represent 20% to 33.33% of the total settlement. *Gamino v. KPC Healthcare Holdings, Inc.*, 2023 U.S. Dist. LEXIS 82910, at *17 (C.D. Cal. Mar. 11, 2023); *accord Graves v. United Indus. Corp.*, 2020 U.S. Dist. LEXIS 33781, at *24 (C.D. Cal. Feb. 24, 2020).

All the *Vizcaino* factors support the requested fee.

### 1.      The Relief Obtained for the Class Is an Excellent and Timely Result.

The relief obtained for the Class is the single most crucial factor in determining the reasonableness of a fee request. *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983); *Bluetooth*, 654 F.3d at 942; *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2016 U.S. Dist. LEXIS 5383, at *169 (N.D. Cal. Jan. 14, 2016). Class Counsel achieved this result in heavily contested litigation against skilled counsel. *See, e.g., Barbosa v. Cargill Meat Solutions Corp.*, 297 F.R.D. 431, 449 (C.D. Cal. 2013 ("The quality of opposing counsel is important in evaluating the quality of Class Counsel's work.").

The direct monetary relief provided under the Settlement is substantial and, even if the Court grants the requested fee amount, will provide Class members with a net recovery of a substantial portion of their damages reasonably recoverable under ERISA (measured by the average cost of Advantage or "Medigap" coverage sufficient, in combination with Medicare, to approximate SAHP Active health coverage).[8] *See Marshall*, 2020 U.S. Dist. LEXIS 177056, at *8-10 (awarding one-third fee based on 29% gross recovery of potential damages, which it described as an "exceptional result," and citing decisions awarding one-third fee where the recovery of damages ranging from 10% - 27.6%).

Moreover, the non-monetary benefits provided by the Settlement are substantial and benefit all Class members. One of Plaintiffs' key allegations is that the SAHP Trustees failed to disclose the SAHP's funding condition and amount of funding required to sustain the benefit structure, which prevented the Union negotiators of the 2019 Commercials CBA, 2019 Netflix CBA, and 2020 TV/Theatrical CBA, including Plaintiff

---

[8] We appreciate that many Senior Performers prefer SAHP coverage to Medicare plus Medigap/Advantage coverage). The reality is that given stark difference in cost between SAHP coverage and the incremental cost to the SAHP of providing Medigap/Advantage coverage, it is questionable whether any court would hold that trustees could not, in their discretion pursuant to a prudent process, leverage Medicare to generate substantial cost savings in order to maximize and protect the current and future the scope of health coverage available to participants. Indeed, Defendants' depletion of the Retiree Reserve fund maintained to protect funding for senior benefits prior to and after the HP Merger was a major factor in the acute funding crisis that led to the 2020 Amendments.

David Jolliffe, from leveraging that information to help secure additional funding. Due to the filing of the Amended Complaint and after the Court's denial of the motion to dismiss, in connection with the negotiation of the 2022 Commercials Contract, the SAHP provided "detailed" information to the Union negotiators (including Plaintiff Jolliffe) concerning funding and the amount of funding required to sustain the benefit structure, which led to negotiations which secured a substantial increase in the contribution rate to fund the Plan. SA, §11.2.4; Joliffe Decl., ¶¶ 10-11 (explaining how the detailed information helped SAG-AFTRA negotiators "to aggressively pursue increased funding" for the for the SAG-AFTRA Health Plan"); *see also* https://www.sagaftra.org/sag-aftra-members-ratify-2022-commercials-contracts (quoting Defendant and SAG-AFTRA President Fran Dresher stating that the 2022 Commercials contract provides "more contributions to the health plan."). *See Vizcaino*, 290 F.3d at 1049 ("Incidental or nonmonetary benefits conferred by the litigation are a relevant circumstance" in determining a fee award); *Harris v. Amgen*, 2017 U.S. Dist. LEXIS 222697, at *22, *25 (C.D. Cal. Apr. 4, 2017) (awarding 45% of cash portion of the settlement amount because "the court may consider the value of injunctive or non-monetary relief in setting attorneys' fees when the value of the injunctive or non-monetary relief can be measured").

The Settlement achieves the relief for the Class now without further delay to litigate to a final judgment after trial (which was far from certain to achieve any remedy) and likely appeals. The timing of relief here is particularly important, given that nature of the subject matter involves health care and Class members most directly affected by the alleged breaches of fiduciary duty and the 2020 Amendments are aging participants. *Cf. Vizcaino*, 290 F.3d at 1050 n.5 ("it may be a relevant circumstance that counsel achieved a timely result for class members in need of immediate relief"). In fact, named Plaintiffs Ed Asner and Sondra James Weil sadly passed away during the litigation.

### 2.   Class Counsel Undertook Significant Risk in Taking this Complex Case on a Fully Contingent Basis.

The risk of the litigation is another key factor in determining a reasonable fee. *Vizcaino*, 290 F.3d at 1048; *WPPSS*, 19 F.3d at 1299 ("Contingent fees that may far exceed the market value of the services if rendered on a non-contingent basis are accepted in the legal profession as a legitimate way of assuring competent representation for plaintiffs who could not afford to pay on an hourly basis regardless whether they win or lose"); *Blum v. Stenson*, 465 U.S. 886, 903 n.* (1984) (Brennan, J., concurring) ("in tort suits, an attorney might receive one-third of whatever amount the Plaintiff recovers."). *AdTrader, Inc. v. Google LLC*, No. 2022 U.S. Dist. LEXIS 199905, at *22 (N.D. Cal. Nov. 1, 2022) (33% fee award justified by "substantial risk" and results); *c.f. In re Hyundai & Kia Fuel Economy Lit.*, 926, F.3d 539, 570, 572 9th Cir. 2019 (*en banc*)(increasing lodestar-based fee due to enhanced risk).[9]

"The rationale behind awarding a percentage of the fund to counsel in common fund cases is the same that justifies permitting contingency fee arrangements in general. . . . The underlying premise is the existence of risk—the contingent risk of non-payment." *In re Quantum Health Resources, Inc. Sec. Litig.*, 962 F. Supp. 1254, 1257 (C.D. Cal. 1997) (emphasis in original). Moreover, "risk should be assessed when an attorney . . . elects to pursue the claim on the client's behalf." *Fischel v. Equitable Life Assur. Soc'y of the United States*, 307 F.3d 997, 1009 (9th Cir. 2002); *Hyundai, supra*.

Here, the risks faced by Class Counsel were not theoretical. The undisputed record reflects that all sophisticated firms except CSKD deemed this case too risky and therefore refused to take it on a contingent basis. These risks included the unique litigation risks

---

[9] *See also Brown v. 22nd Dist. Agric. Ass'n*, 2017 U.S. Dist. LEXIS 115321, at *22 (S.D. Cal. July 21, 2017) (recognizing that "class counsel was forced to forgo other employment in order to devote necessary time to this litigation" and concluding that the substantial risk associated with taking the matter on a contingent basis warranted "an upward adjustment to the fee award"); *Ching v. Siemens Indus.*, 2014 U.S. Dist. LEXIS 89002, at *25 (N.D. Cal. Jun. 27, 2014) ("Courts have long recognized that the public interest is served by rewarding attorneys who assume representation on a contingent basis with an enhanced fee to compensate them for the risk that they might be paid nothing at all for their work.").

identified above plus the additional risk, which materialized, that the SAHP's fiduciary insurers would challenge coverage. Absent the Settlement, Defendants would assuredly have re-litigated their "settlor" function defense in connection with summary judgment, at trial, and again on appeal. There would also have been a "battle of the experts" on both liability and damages that would have been heated, with unpredictable results. *See Aarons v. BMW of N. Am., LLC*, 2014 U.S. Dist. LEXIS 118442, at *26 (C.D. Cal. 2014) ("In the absence of a settlement, it is very likely that this case could ultimately be decided at trial by a 'battle of the experts'…"). As expected, discovery revealed that Defendants engaged a long list of prominent financial, legal and other advisors in making all of the decisions changed in this action.[10] Defendants would have argued that their consultation with these advisors at numerous meetings would have supported their defense that they engaged in a prudent process that insulates them from liability even if their decision to effect the HP Merger or adopt the 2020 Amendments was ultimately deemed unwise or unfair. *See Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996) (finding no "breach[ ] [in] fiduciary duty in relying on" outside consultation); *Tibble v. Edison Int'l*, 2010 U.S. Dist. LEXIS, at *120 (C.D. Cal. July 8, 2010) ("even if Defendants' process … was somehow deficient, Plaintiffs' claim for damages fails if a hypothetical prudent fiduciary would have made the same … decision.")

As reflected in Section D(2)(d) below, given the difficult legal standards for ERISA claims, courts deem ERISA cases as uniquely risky and as a result typically award fees representing one-third of the recovery. The risks in this case are exemplified by the fact that this Court granted Defendants' motion to dismiss the complaint in *Fisher v. SAG-AFTRA*, which Class Counsel filed as an adjunct to this case.[11] The risk of little or no recovery, together with the complexity of the case and likelihood of significant additional expense and delay, weigh in favor of granting the requested fee.

---

[10] *See* ECF No. 77 at 19-22.

[11] The appeal in *Fisher* is currently pending in the Ninth Circuit. As stated above, the Settlement here requires dismissal of the *Fisher* appeal. Even though class counsel's lodestar in *Fisher* exceeds $1 million, they agreed to settle *Fisher* without payment of any fees or expenses. Schwartz Decl., ¶ 3.

Hence the contingency risk and the stage of litigation further support the amount of Class Counsel's request.

### 3. Successfully Prosecuting the Case Required a High Level of Skill.

Class Counsel's experience and the excellent result also support granting the requested fee. A fee award equating to one-third of the amount of the monetary component is justified where class counsel "has significant experience in the particular type of litigation at issue." *Lalli v. First Team Real Estate—Orange Cty.*, 2022 U.S. Dist. LEXIS 161756, at *31 (C.D. Cal. Sep. 6, 2022), citing *Marshall*, 2020 U.S. Dist. LEXIS 177056, at 11. The "prosecution and management of a complex national class action requires unique legal skills and abilities." *In re Heritage Bond Litig. v. U.S. Trust Co. of Tex., N.A.*, 2005 U.S. Dist. LEXIS 13627, at *39 (C.D. Cal. June 10, 2005) (citation omitted), and "the stated goal in percentage fee-award cases [is] ensuring that competent counsel continue to be willing to undertake risky, complex and novel litigation." *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 198 (3d Cir. 2000) (internal quotation marks and citations omitted); *see Zepada v. PayPal, Inc*., 2017 U.S. Dist. LEXIS 43672, at *64-65 (N.D. Cal. Mar. 24, 2017) (class counsel's expertise allowed for a result that "would have been unlikely if entrusted to counsel of lesser experience or capability" given the "substantive and procedural complexities" and the "contentious nature" of the case).[12]

Class Counsel are experienced and have a track record of success in high-stakes class actions, including recoveries and judgments representing the full recovery of damages. *See* Schwartz Decl., ¶12. The quality of Class Counsel's representation is reflected in their work throughout the action and in the settlement before the Court. *See Moreyra v. Fresenius Med. Care Holdings, Inc*., 2013 U.S. Dist. LEXIS 201983, at *7

---

[12] *See also Allagas v. BP Solar Int'l, Inc.*, 2016 U.S. Dis. LEXIS 187785, at *5 (N.D. Cal. Dec. 22, 2016); *Carlin v. DairyAm. Inc.*, 380 F. Supp. 3d 998, 102 (E.D. Cal. 2019) (the "breadth and depth" of plaintiffs' counsel's experience and their "'prosecution and management of a complex national class action" justified upward departure from 25% benchmark).

(C.D. Cal. Aug. 7, 2013) (the result obtained is "[t]he single clearest factor reflecting the quality of class counsels' services").

Class Counsel applied their experience from case inception forward by actively investigating the underlying facts, interviewing Class members, and filing and prosecuting class members' claims, while aggressively and zealously negotiating with the Defendants, the SAHP, and the insurers. Class Counsel defeated the motion to dismiss and for interlocutory review; largely succeeded in battles over the scope of discovery and timing of class certification proceedings; effectively pursued discovery and marshaled the facts to create a compelling liability record consistent with the vicissitudes of ERISA and the coverage provisions of the fiduciary insurance policies; and held out through multiple mediations and negotiations that lasted over one year to secure the excellent settlement. Class Counsel achieved this result against a capable and determined team of Proskauer and Cohen Weiss & Simon, who are recognized as the leading ERISA firms for Taft Hartley ERISA plans in the entertainment industry. Unlike Class Counsel, those firms, along with insurance coverage counsel retained by the Plan and its insurers, were paid approximately $4.5 million on a current, non-contingent basis. Schwartz Decl., ¶ 13. *See Andrews v. Plains All Am. Pipeline L.P.*, 2022 U.S. Dist. LEXIS 172183, at *7-8 (C.D. Cal. Sept. 20, 2022) ("[E]specially when considering that Defendants were represented by a prominent litigation firm, Class Counsel's ability to get the case this far along evinces their high quality of work."); *Barbosa v. Cargill Meat Solutions Corp.*, 297 F.R.D. 431, 449 (C.D. Cal. 2013) ("The quality of opposing counsel is important in evaluating the quality of Class Counsel's work."); *Wing v. Asarco Inc.*, 114 F.3d 986, 988–89 (9th Cir. 1997) (approving a 2.0 fee multiplier in part because of "the quality of the [defendant's] opposition").

Moreover, Class Counsel did not piggyback on investigations or enforcement actions of governmental officials, and instead secured the relief through their efforts alone. *See Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 967 (9th Cir. 2009) (court justified use of a multiplier based in part on finding that "counsel faced substantial risk

in prosecuting this action" and "did not have the benefit of fruits from underlying government actions"), *remanded on other grounds to* 2010 U.S. Dist. LEXIS 24155 (C.D. Cal. Feb. 3, 2010). Nor did they piggyback on the efforts of other counsel who secured recoveries in similar cases. Rather, CSKD's work in this case and in *Musicians* case is akin to the trailblazing work of the Schlichter Bogard firm in ERISA pension fee cases that supported a one-third award in *Marshall*. 2020 U.S. Dist. LEXIS 177056, at *11-12. Thus, the skill and expertise brought to bear by Class Counsel support the requested fee.

### 4.    A Comparison to Awards in ERISA Cases Demonstrates that the Requested Fee Is Reasonable

The one-third fee requested by Class Counsel is within the range of fees awarded by courts within the Ninth Circuit. *See Foster v. Adams & Assocs.*, 2022 U.S. Dist. LEXIS 25071, at *28 (N.D. Cal. Feb. 11, 2022) ("a 33.3% recovery is on par with settlements in other complex ERISA class actions"), *citing Marshall*, 2020 U.S. Dist. LEXIS 177056, at *8); *Nelson v. Avon Prods.*, 2017 U.S. Dist. LEXIS 26451, at *16 (N.D. Cal. Feb. 24, 2017) (awarding 33.3% and collecting cases awarding 30% or more); *Jarrell v. Amerigas Propane, Inc.*, 2018 U.S. Dist. LEXIS 58619, at *13 (N.D. Cal. Apr. 5, 2018) (33.3%); *Betancourt v. Advantage Human Resourcing, Inc.*, 2016 U.S. Dist. LEXIS 10361, at *24 (N.D. Cal. Jan. 28, 2016) (34.3%); Carlin, 380 F. Supp. at 1023 (33.3%).

Moreover, a one-third fee (or more) has been awarded in the overwhelming majority of recent ERISA class actions, which, as noted above, pose unique risks compared to other class actions. *Marshall, supra; Waldbuesser v. Northrop Grumman Corp.*, 2017 U.S. Dist. LEXIS 223293, at *8 (C.D. Cal. Oct. 24, 2017) (one-third fee); *Harris*, 2017 U.S. Dist. LEXIS 222697, at *23-24 (45% fee award); *Del Castillo v. Cmty. Child Care Council of Santa Clara Cty., Inc.*, 2021 U.S. Dist. LEXIS 202329, at *21-22 (N.D. Cal. 2021) (one-third fee); *Davis v. Washington Univ. in St. Louis*, No. 4:17-cv-01641, Dkt. 152 (E.D. Mo. Aug. 31, 2022) (one-third fee); *Lechner v. Mut. of*

*Omaha Ins. Co.*, 2021 U.S. Dist. LEXIS 23742, at \*12 (D. Neb. Feb. 8, 2021) (one-third fee); *Karg v. Transamerica Corp.*, 2021 U.S. Dist. LEXIS 261158, at \*12 (N.D. Iowa Nov. 22, 2021) (one-third fee); *Tussey v. ABB, Inc.*, 2019 U.S. Dist. LEXIS 138880, at \*13 (W.D. Mo. Aug. 16, 2019) (one-third fee); *Schwartz v. Cook*, 2017 U.S. Dist. LEXIS 102458, at \*14-16 (N.D. Cal. June 30, 2017) (one-third fee); *Krueger v. Ameriprise Fin., Inc.*, 2015 U.S. Dist. LEXIS 91385, at \*7 (D. Minn. Jul. 13, 2015) (one-third fee); *Sweda v. University of Pennsylvania*, 2021 U.S. Dist. LEXIS 239990, at \*19 (E.D. Pa. 2021) (one-third fee); *Cates v. Trustees of Columbia Univ.*, 2021 U.S. Dist. LEXIS 200890, at \*19 (S.D.N.Y. Oct. 18, 2021) (one-third fee); *Henderson v. Emory Univ.*, 2020 U.S. Dist. LEXIS 218676, at \*4-5 (N.D. Ga. Nov. 4, 2020) (one-third fee); *Cunningham v. Cornell Univ.*, No. 1:16-cv-6525, Dkt. 441 (S.D.N.Y. Dec. 22, 2020) (one-third fee); *Kelly v. Johns Hopkins University*, 2020 U.S. Dist. LEXIS 14772, at \*7 (D. Md. Jan. 28, 2020) (one-third fee); *Nicolas v. Trustees of Princeton Univ.*, No. 17-3695, Dkt. 72 (D.N.J. Dec. 22, 2020) (one-third fee); *Cassell v. Vanderbilt Univ.*, 2019 U.S. Dist. LEXIS 242062, at \*7-9 (M.D. Tenn. Oct. 22, 2019) (one-third fee).

Class Counsel's requested fee award is in line with fees approved in connection with comparable (if not less risky) settlements throughout the Ninth Circuit and in ERISA cases nationwide. It is reasonable and should be approved as such.

### 5.   A Lodestar Cross-Check Confirms the Fairness and Reasonableness of the Requested Fee Amount.

Class Counsel's collective lodestar is $3.8 million. Schwartz Decl., ¶¶ 14-18 & Exhibit 3. This does *not* include the more than $1 million lodestar in the related *Fisher* matter, for which counsel will receive no fees. Thus, if the Court grants the requested fee, counsel will receive a multiplier of only 1.8 times their lodestar in this case. That modest multiplier is well within those routinely approved in class cases in the Ninth Circuit, where multipliers in the range of three to four are commonly approved. *See, e.g., Vizcaino*, 290 F.3d at 1050-51 (upholding a multiplier of 3.65); *Feller v. Transamerica Life Ins. Co.*, 2019 U.S. Dist. LEXIS 19440, at \*43–44 (C.D. Cal. Feb. 6, 2019)

(awarding 2.97 multiple, "which is well-within the range of appropriate multipliers recognized by this Court and by other courts within the Ninth Circuit"); *Urakhchin v. Allianz Asset Mgmt. of Am., L.P.*, 2018 U.S. Dist. LEXIS 127131, at *19 (C.D. Cal. July 30, 2018) (approving 1.6 multiplier and noting multipliers ranging from 1–3 are common in the Ninth Circuit); *Negrete v. Allianz Life Ins. Co. of N. Am.*, 2015 U.S. Dist. LEXIS 168586, at *55 (C.D. Cal. Mar. 17, 2015) (awarding a 1.27 multiple on crosscheck); *Lozano v. AT&T Wireless Servs.*, 2010 U.S. Dist. LEXIS 151235, at *3 (C.D. Cal. Nov. 22, 2010) (awarding fees "in the amount of $4,625,000.00 representing a multiplier of 1.92 which is reasonable and justified"); *In re Hyundai*, 926 F.3d at 571-572 (describing 1.55 multiplier as "modest"). It is also well within those approved in ERISA cases. *See, e.g.*, *Lechner*, 2021 U.S. Dist. LEXIS 23742, at *11 (approving 1.88 multiplier); *Kelly*, 2020 U.S. Dist. LEXIS 14772, at *20 (approving 2.45 multiplier).

While not mandatory, a lodestar cross-check may be used to ensure that class counsel performed the work necessary to justify the fee sought and will not receive an undeserved windfall. *Vizcaino*, 290 F.3d at 1050. "[I]t is well established that [t]he lodestar cross-check calculation need entail neither mathematical precision nor bean counting . . . [courts] may rely on summaries submitted by the attorneys and need not review actual billing records.'" *Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 264 (N.D. Cal. 2015) (cleaned up); *see also In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 306-07 (3d Cir. 2005) (same). Lodestar method involves "multiplying the number of hours the prevailing party reasonably expended on the litigation by a reasonably hourly rate." *Staton v. Boeing Co.*, 327 F.3d 938, 965 (9th Cir. 2003).

Class Counsel's current rates[13] are reasonable in their prevailing markets for comparable legal services. *See Hope Med. Enters., Inc. v. Fagron Compounding Serv.*, LLC, 2022 U.S. Dist. LEXIS 49151, at *7 (C.D. Cal. Mar. 14, 2022) ("billing rates of

---

[13] *See Hurtado v. Rainbow Disposal Co.*, 2021 U.S. Dist. LEXIS 105692, at *17 (C.D. Cal. May 21, 2021) ("[T]he Court conducts the lodestar crosscheck by applying Class Counsel's current, rather than historic, hourly rates to all hours reasonably billed. This higher billing rate effectively compensates Class Counsel for any delay in receiving payment.").

$895 to $1,295 per hour for partners and counsel, and between $565 and $985 for associates is reasonable within the legal community of Los Angeles for attorneys of similar skill."). The Chimicles Schwartz firm accounts for vast majority (about 83%) of Class Counsel's lodestar. Judge Davila recently approved our rates. *In re MacBook*, ECF No. 455 at pages 25-26, citing cases. So too did Judge Tigar and Judge Olguin in the context of contested fee petitions. *Rodman v. Safeway Inc.*, 2018 U.S. Dist. LEXIS 143867, at *14-16 (N.D. Cal. Aug. 22, 2018); *Chambers v. Whirlpool Corp.*, 214 F. Supp. 3d 877, 899 (2016), *aff'd in part, vacated in part, and remanded on other grounds*, 980 F.3d 645 (9th Cir. 2020). Moreover, while the Chimicles Schwartz firm's practice is primarily contingent, in certain matters, they have been paid their full hourly rates on a non-contingent basis, including recently by a multi-billion dollar company. Schwartz Decl., ¶ 15.

The Johnson firm's rates have also been approved, including by this Court. *See* Johnson Decl., ¶ 9. Mr. Siedle's $1,200 rate is also within the range approved by courts. In this regard, it should be noted that Mr. Siedle is not just an attorney but is also recognized as one of, if not the, leading economic forensic analyst of ERISA and other pension plans. *See* Siedle Decl., ¶¶ 2-4. In this case, Mr. Siedle's work primarily consisted of performing complex economic analyses that proved critical in framing the complaint, analyzing the relevant documents, and negotiating the settlement. *Id.*, ¶ 9 In essence, Mr. Siedle served as Class Counsel's economic expert. Schwartz Decl., ¶ 17 Because the costs of such experts is typically an expense paid on top of any fee awarded, paying Mr. Siedle from the requested fee award will act to save money for the class and means that the requested fee is less than the one-third fee awarded in most ERISA cases, where the costs of the economic experts were paid as a litigation expense in addition to the fee. *Id*.

Notably, the reasonableness of CSKD's pre-filing lodestar is less than the projected $500,000 that one firm requested be paid as a non-refundable retainer to evaluate claims, which confirms the reasonableness of CSKD's pre-filing lodestar.

Similarly, the fact that defense counsel billed and was paid about $4.5 million, 18% *greater* than Class Counsel's collective lodestar, also confirms the reasonable of Class Counsel's lodestar.

The requested 1.8 multiplier is well within the range of multipliers routinely approved in the Ninth Circuit. Therefore, the lodestar crosscheck confirms the reasonableness of the requested percentage fee. *See, e.g., Fleming v. Impax Lab'ys Inc.*, 2022 U.S. Dist. LEXIS 125595, at *26-29 (N.D. Cal. 2022) (awarding 30% in attorneys' fees and noting that 2.6 lodestar multiplier confirmed reasonableness of the request); *Kendall v. Odonate Therapeutics, Inc.*, 2022 U.S. Dist. LEXIS 101021, at *23-24 (S.D. Cal. 2022) (2.36 lodestar cross-check multiplier confirmed reasonableness of 33.3% fee award); *Blount v. Host Healthcare, Inc.*, 2022 U.S. Dist. LEXIS 67891, at *27 (S.D. Cal., 2022) (approving 30% fee award representing a 2.4 multiplier).

## G.    The Expense Reimbursement Should Be Approved.

"Reasonable costs and expenses incurred by an attorney who creates or preserves a common fund are reimbursed proportionately by those class members who benefit[.]" *In re Media Vision Tech. Sec. Litig.*, 913 F. Supp. 1362, 1366 (N.D. Cal. 1995), *citing Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 391-92 (1970); *see also* Fed. R. Civ. P. 23(h); *Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994) (holding that attorneys may recover reasonable expenses that would typically be billed to paying clients in non-contingency matters) *Johnson v. General Mills, Inc*., 2013 U.S. Dist. LEXIS 90338, at *20-21 (C.D. Cal. June 17, 2013); *Floyd v. First Data Merch. Servs. LLC*, 2022 U.S. Dist. LEXIS 184192, at *16 (N.D. Cal. 2022) ("Class counsel is entitled to reimbursement of reasonable out-of-pocket expenses."). "The prevailing view is that expenses are awarded in addition to the fee percentage." *Williams v. SuperShuttle Int'l, Inc*., 2015 U.S. Dist. LEXIS 19341, at *6 (N.D. Cal. Feb. 12, 2015) (citations omitted).

Class Counsel seek reimbursement of $50,954.13 of expenses. Schwartz Decl., ¶¶ 18-19 and Exhibits 4-5; Johnson Decl., ¶¶ 10-11. These expenses were advanced for the benefit of the Class and were reasonably incurred and necessary to achieving the result.

*Id.* The vast majority of these expenses are fees paid to JAMS for Mr. Meyer's services. *Id.* They should be reimbursed in full.

### H. The Court Should Award $5,000 Service Awards for the Class Representatives.

Class Counsel also requests $5,000 service awards for the Settlement Class Representatives. Such service awards "are fairly typical in class action cases" and "are intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 958-59 (9th Cir. 2009). "[A] $5,000 payment is presumptively reasonable," and awards "typically range from $2,000 to $10,000." *Bellinghausen*, 306 F.R.D. at 266 (collecting cases); *see, e.g., In re Zoom Video Commc'ns, Inc. Priv. Litig.*, 2022 U.S. Dist. LEXIS 184192, at *16 (N.D. Cal. 2022); *In re Toys R Us-Del., Inc. FACTA Litig.*, 295 F.R.D. 438, 470–72 (C.D. Cal. 2014).

Service awards are appropriate here. No Class Representative was promised, nor conditioned their representation or approval of the Settlement on the expectation of a service award. They have spent many hours over the years developing the case, conferring with counsel, answering discovery requests, searching for and producing documents, and evaluating the Settlement. Joint Decl. ¶ 14. Moreover, they faced potential reputation harm in putting their name to this lawsuit.

Class Counsel have agreed that any Service Awards will be paid out of the amount awarded by the Court for Attorneys' Fees and Costs. Mr. Jolliffe, who spent an extraordinary number of hours assisting counsel, has committed to donating his Service Award to the SAG Foundation. Schwartz Decl., ¶ 20. Defendants have reserved the right to oppose Class Counsel's request for Service Awards, and each of the Plaintiffs have agreed that their support of the settlement is not contingent on receiving any service award. Schwartz Decl., ¶ 21; SA §§ 9.1, 9.2.

## IV.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court confirm its prior certification of the settlement class, grant final approval to the proposed Settlement, approve Class Counsel's request for an award attorneys' fees in the amount of $6,866,667 and reimbursement of litigation expenses in the amount of $50,954.13, and approve service awards of $5,000 to each of the Class Representatives.

Dated:  July 12, 2023                 By:     */s/ Steven A. Schwartz*
                                              Steven A. Schwartz*
                                              CHIMICLES SCHWARTZ KRINER
                                              & DONALDSON-SMITH LLP
                                              361 West Lancaster Avenue
                                              Haverford, PA 19041
                                              Tel.: 610-642-8500
                                              Fax: 610-649-3633
                                              SteveSchwartz@chimicles.com

                                              Robert J. Kriner, Jr.*
                                              CHIMICLES SCHWARTZ KRINER
                                              & DONALDSON-SMITH LLP
                                              2711 Centerville Road, Suite 201
                                              Wilmington, DE 19808
                                              rjk@chimicles.com

                                              Neville L. Johnson
                                              Douglas L. Johnson
                                              JOHNSON & JOHNSON LLP
                                              439 N. Canon Drive, Suite 200
                                              Beverly Hills, CA 90210
                                              Tel.: 310-9751080
                                              Fax.:310-975-1095
                                              njohnson@jjllplaw.com
                                              djohnson@jjllplaw.com

                                              Edward Siedle*
                                              Law Offices of Edward Siedle
                                              17789 Fieldbrook Circle West
                                              Boca Raton, FL 33496

Tel.: 561-703-5958
esiedle@aol.com

* admitted *pro hac vice*

Attorneys for Plaintiffs and the Class