O
JS-6

1

2

3

4

5

6

7

8            **UNITED STATES DISTRICT COURT**

9            **CENTRAL DISTRICT OF CALIFORNIA**

10

11    EDWARD ASNER, et al.,                 Case No. 2:20-cv-10914-CAS-JEMx

12              Plaintiffs,
                                            CLASS ACTION
13         vs.

14    THE SAG-AFTRA HEALTH FUND,            **FINAL ORDER APPROVING**
15    et al.,                               **CLASS ACTION SETTLEMENT**
                                            **AND JUDGMENT [DKT. 158]**
16              Defendants.
                                            Judge:      Hon. Christina A. Snyder
17

18

19

20         On January 1, 2017, the Screen Actors Guild-Health Plan (the "SAG Health

21    Plan") merged with the American Federation of Television and Radio Artists Health

22    Plan (the "AFTRA Health Plan") to create the SAG-AFTRA Health Plan (the

23    "Plan"). This case arises from the aftermath of the August 2020 amendments (the

24    "Amendments") to the Plan, which were implemented to cut costs by changing the

25    Plan's benefit structure and eligibility requirements. As a result, many Plan

26    participants lost coverage.

27    ///

28

Plaintiffs are participants and beneficiaries of the Plan and individuals that qualified for coverage under the Plan between January 1, 2017, and May 3, 2023 (the "Settlement Class"). On December 1, 2020, plaintiffs filed this class action against the trustees of the SAG Health Plan and the SAG-AFTRA Health Plan (the "Trustees") pursuant to the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.* ("ERISA") alleging breaches of fiduciary duties. The Trustees dispute these claims.

On April 10, 2023, plaintiffs submitted an unopposed motion for preliminary approval of class settlement along with a proposed settlement notice (the "Settlement Notice"). Dkt. 127, 128-1.

On May 3, 2023, the Court granted plaintiffs' motion for preliminary approval of class settlement (the "Preliminary Approval Order"), approved a plan for dissemination of the Settlement Notice, and set a Fairness Hearing for September 11, 2023. Dkt. 134.

On July 12, 2023, plaintiffs submitted a motion for final approval of (1) a final Settlement Agreement, (2) attorneys' fees, (3) expense reimbursement, and (4) service awards for class representatives (the "Final Approval Motion"). Dkt. 141. Defendants have opposed only the request for attorneys' fees. Dkt. 149 ("Opp.").

On September 11, 2023, the Court held the Fairness Hearing. Dkt. 156. The Court has considered: (i) the Final Approval Motion; (ii) the extensive memoranda of points and authorities submitted in support; (iii) the declarations and exhibits submitted in support; (iv) defendants' opposition to class counsel's motion for attorneys' fees; (v) the Settlement Agreement itself; (vi) the entire record in this proceeding, including but not limited to the points and authorities, declarations, and exhibits submitted in support of preliminary approval of the settlement; (vii) the form and manner of the Settlement Notice provided to the Settlement Class; (viii) two objections to the settlement, one of which was not intended as a request to reject

the settlement; (ix) the arguments advanced by all objectors and the responses provided by class counsel regarding each of the objections; (x) the absence of any objection or response by any state attorneys general, nor insurance officials from any state, after they were provided with notices required by the Class Action Fairness Act of 2005, 28 U.S.C. § 1715; (xi) the oral presentation by both class counsel and defendants' counsel at the Fairness Hearing; (xii) the oral remarks by class member Jan Hoag at the Fairness Hearing; (xiii) this Court's observations while presiding over this action and similar actions; and (xiv) the relevant law.

Based upon the foregoing considerations, the Court hereby ORDERS that the Final Approval Motion be GRANTED on the terms set forth in this Final Approval Order.

## I.    BACKGROUND.

### A. Pre-Amendments.

In 2017, the SAG Health Plan and the AFTRA Health Plan merged to form the Plan.  Dkt. 46 at 3.

From 2017-2020, participants could qualify for coverage under the Plan in several ways.[1]  Id.  First, participants could receive active coverage through "Earned Eligibility" i.e., by meeting certain earnings thresholds.  Dkt. 46 at 4.  As a general matter, performers earn both "sessional earnings" (wages earned for services performed on a certain day) and "residual earnings" (compensation for prior work that is exhibited at a later point in time).  Dkt. 46 at 3.  Before the Amendments, performers could count both types of earnings towards the earned-eligibility threshold if they had at least $1 in sessional earnings for that year (the "Dollar Sessional Rule").  Dkt. 141 at 1.

---

[1] These benefits were subject to change.  The Plan provided that future benefits "are not promised, vested or guaranteed," and reserved the right to "reduce, modify or discontinue benefits or the qualification rules for benefits at any time."  Dkt. 46 at 5.

Second, participants that did not have enough earnings to meet the earned-eligibility threshold could still qualify for coverage if they met the "Age & Service" eligibility rule requirements.  Dkt. 47 at 295.  The Age & Service qualification applied to performers age 40 and older with at least 10 retiree health credits.  Id.

Third, participants that did not have any sessional earnings could still qualify for insurance coverage secondary to Medicare if they had the requisite residual earnings.  Dkt. 46 at 4-5.

Finally, performers who were at least 65 years old ("Senior Performers") and receiving a pension (and their dependents and surviving spouses) could qualify for secondary insurance coverage through "Senior Performer Coverage" if they accrued a certain number of years of vested pension credit.  Dkt. 43 at 51.

**B. Post-Amendments.**

On August 12, 2020, the Plan announced several important changes to the Plan's benefit structure and eligibility requirements, citing increases in health costs and projected loss of contributions during the pandemic.  Dkt. 46 at 5.

Some changes affected all participants, including: collapsing the two benefit levels into one; requiring spouses to take their own employer's health coverage as their primary coverage; raising participant premiums; combining the medical and hospital out-of-network deductibles; and eliminating the out-of-network out-of-pocket maximum.  Id.

Other changes affected Senior Performers specifically.  First, the Amendments eliminated the Dollar Sessional Rule for Senior Performers who were taking pension.  Dkt. 141 at 8.  As a result, participants in this group could no longer count residual earnings towards the earned-eligibility threshold, even though such earnings were still used to calculate employer contributions.  Dkt. 43 at 86;  dkt. 46 at 6.

Second, the Amendments replaced "Senior Performer Coverage" with a newly-created Reimbursement Account Plan (the "HRA Plan").  Dkt. 46 at 6.  Senior Performers, and their age 65+ spouses and surviving spouses, would no longer receive secondary coverage from the Plan; instead, they would receive either $240 or $1,140 per year from the HRA Plan to help cover the cost of obtaining replacement coverage.  Dkt. 141 at 3.

Plaintiffs allege there were additional detrimental changes, including changes to the Age & Service eligibility criteria, base earnings years, and benefit periods.  Dkt. 43 at ¶ 89-91.

## II.   SETTLEMENT AGREEMENT

### A.  Definitions.

The capitalized terms used in this Final Approval Order shall have the meanings and/or definitions given to them in the Settlement Agreement [Dkt. 128-1], or if not defined therein, the meanings and/or definitions given to them in this Final Approval Order.

### B.  Incorporation of Documents.

This Final Approval Order incorporates and makes a part hereof:

(a) the Settlement Agreement (including the exhibits thereto); and

(b) the Court's findings and conclusions contained in its Preliminary Approval Order.

### C. Jurisdiction and Venue.

The Court has personal jurisdiction over the Parties and the Settlement Class Members.  The Court has subject matter jurisdiction over this case pursuant to 29 U.S.C.  § 1132(e)(1) including, without limitation, jurisdiction to approve the Settlement, to settle and release all claims alleged in the action and all claims released by the Settlement, to adjudicate the objections submitted to the proposed

1  Settlement by Settlement Class Members, and to dismiss the case with prejudice.
2  Venue in this District is appropriate pursuant to 28 U.S.C. § 1391.

3  **D. Definition of the Class and Settlement Class Members.**

4  The Settlement Class hereby certified by the Court is defined as:

5  > All individuals who (i) were enrolled in health coverage under the Plan
6  > at any time during the Class Period, (ii) were notified that they qualified
7  > for health coverage under the Plan for any time during the Class Period,
8  > and/or (iii) qualified or had qualified as a Senior Performer as of the
9  > beginning of or during the Class Period, but excluding the Trustee
10 > Defendants.

11 "The Plan" means the SAG-AFTRA Health Plan.  The Class Period is the
12 period from January 1, 2017 through and including May 3, 2023, i.e., the date the
13 Court issued the Preliminary Approval Order.  Dkt. 128-1 at ¶ 2.13; Dkt. 134.
14 "Senior Performer" means an individual who meets the definition of "Senior
15 Performer" under Article I, Section 1.1(v) of the HRA Plan.  Dkt. 128-1 ex. 8.  The
16 HRA Plan defines "Senior Performer" as any individual who satisfies the following
17 eligibility requirements:

18 (1) A former participant in the Active Plan who has satisfied the following
19 requirements as of their attainment of age 65 or thereafter:

20 > (i) Completed 20 Retiree Health Credits; and

21 > (ii) Commenced receipt of a pension from the SAG-Producers Pension
22 > Plan or the AFTRA Retirement Fund.

23 (2) A former participant in the SAG-Producers Health Plan or the AFTRA
24 Health Plan who has satisfied the following requirements as of their
25 attainment of age 65 or thereafter, and who, as of January 1, 2017:

26 > (i) had attained age 55;

27
28

(ii) commenced receipt of a pension from the SAG-Producers Pension Plan or AFTRA Retirement Fund; and

(iii) had at least 15 qualifying years under the AFTRA Health Plan or at least 15 pension credits under the SAG-Producers Pension Plan.

(3) A former participant in the AFTRA Health Plan who has satisfied the following requirements as of their attainment of age 65:

(i) was born on or before January 1, 1943; and

(ii) has at least 10 qualifying years under the AFTRA Health Plan.

(4) A former participant in the AFTRA Health Plan who has satisfied the following requirements as of their attainment of age 65:

(i) was born before December 1, 1937 and, as of December 1, 1992;

(ii) was vested in a regular annuity based on at least 10 years of credit under the AFTRA Retirement Plan (including at least five base years in which covered earnings were at least $2,000 or more); or

(iii) met the requirements in effect at that time for retiree coverage under the AFTRA Health Plan.

(5) A former participant in the SAG-Producers Health Plan who has satisfied the following requirements as of their attainment of age 65:

(i) had at least 10 pension credits under the SAG-Producers Pension Plan as of December 31, 2001; and

(ii) was at least age 55 as of December 31, 2002.

(6) An Occupational Disability Pensioner under the SAG-Producers Pension Plan who has at least 15 Retiree Health Credits earned under the SAG-AFTRA Health Plan and/or the SAG-Producers Health Plan. Occupational Disability Pensioners may not count any AFTRA Health Plan qualifying years as Retiree Health Credits for this purpose.

///

**E.  Settlement Terms.**

Plaintiffs have submitted an unopposed motion for final approval of class settlement. The proposed settlement has several parts.

First, the settlement creates a $15 million cash fund (the "Gross Settlement Fund") to provide immediate compensation to participants age 65+, as well as their age 65+ spouses and surviving spouses, who lost coverage in 2021 and 2022 because of the Amendments. The Plan and the Defendants' insurers will each pay $7.5 million into this fund, from which attorneys' fees and service awards will be deducted.  The remainder will be divided among four groups:

1.  $4,400 for Senior Performers and their age 65+ spouses who lost active coverage in 2021 due to the elimination of the Dollar Sessional Rule;

2.  $2,200 for Senior Performers and their age 65+ spouses who lost active coverage in 2021 due to the elimination of the Age & Service rules and/or raising of the earnings eligibility thresholds;

3.  $1,100 for Senior Performers and their 65+ spouses who first lost active coverage in 2022 due to the Amendments; and

4.  $400 for participants age 65+ who lost secondary coverage in 2021 due to the Amendments.

Eligible participants will not need to submit a claim; instead, payments will be automatically allocated into eligible class members' HRA accounts or paid via check.  Dkt. 128-1 at 90.

Second, the Plan will provide up to $700,000 in annual HRA allocations to the accounts of qualifying members who became ineligible for coverage because of the elimination of the Dollar Sessional Rule.   The aggregate amount of HRA allocations in each year will be equal to one-half of the aggregate contributions made to the Plan with respect to the qualifying members' residual earnings up to a cap of $125,000 in earnings.  Dkt. 151-1. While the actual amount disbursed will vary each

1   year, the parties predict that annual payments will range from approximately $438

2   to $4375 per qualifying performer.  Dkt. 141 at 16.  In 2023, total payments could

3   potentially reach over $625,000 with an average payment of $1,600 per qualifying

4   participant.  Id.  However, it appears likely, based on the submissions of the parties,

5   that the total payments in 2023 will be substantially less than $625,000.

6        The settlement also provides for other non-monetary relief, including

7   mandatory disclosures regarding proposed changes to the Plan, engagement with a

8   cost consultant, additional time for seniors to use sessional earnings to qualify for

9   coverage, and other enhanced disclosures.  Dkt. 141 at 17-18.

10   **F.  Objections to the Proposed Settlement.**

11        Two class members filed letters regarding the settlement.  Dkt. 155-1.  In the

12   letter submitted by Jan Hoag (the "Hoag Letter"), Ms. Hoag raised concerns over

13   whether she would receive a payment of $4,400 or $2,200 under the settlement

14   terms.  Id.  Additionally, she provided a list of recommendations for changes that

15   defendants could have implemented to improve the financial health of the Plan.  Id.

16   After speaking with plaintiffs' counsel, Ms. Hoag expressed that "it was not her

17   intent[] to ask the Court to reject the Settlement."  Dkt. 155 at 2.  Therefore, the

18   Court does not construe the Hoag Letter as an objection to the settlement.

19      Class member Jimmy Hawkins filed two letters.  In his first letter ("Hawkins

20   Letter #1"), Mr. Hawkins argues that the settlement should include "an exception

21   for those members who waived their residuals back in 1960," and that these members

22   should continue to receive lifetime coverage under the Plan.  Dkt. 155-2.  In

23   response, plaintiffs' counsel noted that this class action only alleged breach of

24   fiduciary claims rather than breach of contract, and that the defendants had the

25   contractual right to modify the Plan requirements at any time.  Dkt. 155 at 8.  In his

26   second letter ("Hawkins Letter #2"), Mr. Hawkins re-iterated his request for a

27   carveout for the "1960 membership class."  Dkt. 157-1 ex. 1.  Plaintiffs' counsel

28

filed an additional response noting that "[w]hile Plaintiffs and Class Counsel appreciate the sacrifices made by Mr. Hawkins and many other class members, both before and after the 1960 SAG strike . . . there is no basis to carve out or provide special treatment to SAG performers who worked sessional before 1960." Dkt. 157-1.  The Court has noted Mr. Hawkins' limited objection in considering the fairness and adequacy of the proposed settlement.

### G.  Notices Pursuant to 28 U.S.C. § 1715.

The Court finds that, based on the requirements of the settlement agreement and the declarations submitted in support of final settlement approval, all notices and requirements of the Class Action Fairness Act of 2005, 28 U.S.C. § 1715, have been satisfied.  More than ninety (90) days have passed since the service of the foregoing notices.  Dkt. 140.  No written objection or response to the Settlement was filed by any federal or state official, including any recipient of the foregoing notices.  Id.  No federal or state official, including any recipient of the foregoing notices, appeared or requested to appear at the Fairness Hearing.

### H.  Legal Standard.

The Court may only approve a settlement class after finding the settlement is "fair, reasonable, and adequate."  Fed. R. Civ. Pro. 23(e)(2).  In doing so, the Court must consider whether:

(A) the class representatives and class counsel have adequately represented the class;

(B) the proposal was negotiated at arm's length;

(C) the relief provided for the class is adequate, taking into account:

(i) the costs, risks, and delay of trial and appeal;

(ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

(iii) the terms of any proposed award of attorney's fees, including timing of payment; and

(iv) any agreement required to be identified under Rule 23(e)(3); and

(D) the proposal treats class members equitably relative to each other.

<u>Id.</u>

"The purpose of the [modern] Rule 23(e)(2) is [to] establish a consistent set of approval factors to be applied uniformly in every circuit, without displacing the various lists of additional approval factors the circuit courts have created over the past several decades." <u>Zamora Jordan v. Nationstar Mortg., LLC</u>, No. 2:14-CV-0175-TOR, 2019 WL 1966112, at *2 (E.D. Wash. May 2, 2019). Factors that the Ninth Circuit has typically considered include (1) the strength of plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; and (6) the experience and views of counsel. <u>Hanlon v. Chrysler Corp.</u>, 150 F.3d 1011, 1026 (9th Cir. 1998); <u>Churchill Vill., L.L.C. v. Gen. Elec.</u>, 361 F.3d 566, 575 (9th Cir. 2004).

## I. Findings and Conclusions.

The Court finds that fair and adequate notice of class members' right to object to the settlement and to appear at the Fairness Hearing in support of such an objection has been provided in the form and manner required by the Settlement Agreement, the Court's preliminary approval of class settlement, the requirements of due process, Rule 23, and any other applicable law. In particular, the Court finds that the Class Notice provided the best practicable notice of Settlement Class Members' rights and options and of the binding effect of the orders and Judgment in this case, whether favorable or unfavorable, on all Settlement Class Members. The Settlement Notice was posted on the Settlement Website and either mailed or emailed to Class

Members on July 12, 2023, as directed by the Court's Preliminary Approval Order. Dkt. 128-1; Dkt 134 ¶ 8.

The absence of objections to the Settlement by almost all class members strongly supports approval.  See, e.g., Feist v. Petco Animal Supplies, Inc., No. 3:16-cv-01369-H-MSB, 2018 WL 6040801, at *5 (S.D. Cal. Nov. 16, 2018) ("[T]he absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members.") (quoting Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc., 221 F.R.D. 523, 529 (C.D. Cal. 2004)); In re Omnivision Techs., Inc., 559 F. Supp. 2d 1036, 1043 (N.D. Cal. 2008) (same; three objections out of approximately 57,000 class members).  In response to the Class Notice, objections were filed by two Class Members.  One of the objectors, Ms. Hoag, subsequently clarified that "it was not her intent[] to ask the Court to reject the Settlement."  Dkt. 155 at 2.  The objections submitted by Mr. Hawkins did not argue that the settlement was unfair to the class as a whole but only that there should be a carveout for class members who originally waived their residuals in 1960.  As class counsel noted in response, the record does not reveal a legal basis for creating such a carveout.  Thus, this objection is overruled.

Based on its familiarity with the nature of the case, the record, the procedural history, the parties, and the work of their counsel, the Court finds that the Settlement was not the product of collusion and lacks any indicia of unfairness.  The Court finds the Settlement is fair, reasonable, and adequate to the Settlement Class considering the complexity, expense, and likely duration of the case, and the risks involved in establishing liability, damages, and in maintaining this case through trial and appeal. The Court finds that the Settlement represents a fair and complete resolution of all claims asserted in a representative capacity on behalf of the class and will fully and finally resolve all such claims.

The Settlement delivers adequate relief by providing substantial cash payments and other monetary benefits to Settlement Class Members. Pursuant to the Settlement Agreement, the Plan agreed to create a $15 million Gross Settlement Fund for Senior Performers that lost coverage because of the Amendments, and to provide up to $700,000 in annual HRA allocations to qualifying class members over the next eight years. The monetary relief will be distributed automatically to the Settlement Class via either HRA account or check; Settlement Class Members are not required to fill out a claim form to receive benefits.

In addition to all the foregoing monetary settlement benefits, the Settlement also includes prospective relief that will benefit Settlement Class Members now and into the future, which is set forth in Part 11 of the Settlement Agreement. Such relief includes mandatory disclosure requirements, mandated retention of a Cost Consultant, amendments to the Plan regarding the time period of sessional earnings used to calculate coverage, and notice of Additional Credited Earnings Opportunities.

The Court has considered the realistic range of outcomes in this matter, including the amount Plaintiffs might receive if they prevailed at trial, the strength and weaknesses of the case, the novelty and number of the complex legal issues involved, the risk that Plaintiffs would receive less than the relief afforded by the Settlement Agreement or recover nothing at trial, and the risk of a reversal of any judgment. The Settlement is well within a range of reasonableness, even when considering the value of only the monetary relief recovered on behalf of the Settlement Class and even without considering the non-monetary benefits afforded to the Settlement Class.

Before reaching the Settlement, Plaintiffs and Defendants fully and vigorously litigated their claims and defenses in extensive proceedings before this

1  Court, including Defendant's motion to dismiss and Defendant's motion for
2  interlocutory appeal.

3          The Settlement Class is and was at all times adequately represented by the
4  Class Representatives and Settlement class counsel, including in litigating this case
5  and in entering into and implementing the Settlement, and have satisfied the
6  requirements of Rule 23 and applicable law.  Class counsel have demonstrated that
7  they have competently prosecuted this action on behalf of the Settlement Class.
8  Class counsel are experienced class action lawyers with specialized knowledge in
9  complex class action litigation, fully capable of properly assessing the risks,
10 expenses, and duration of continued litigation, including at trial and on appeal.  Class
11 counsel submit that the Settlement is fair, reasonable, and adequate for the
12 Settlement Class Members.

13         The Settlement also treats class members equitably relative to each other.  The
14 Gross Settlement Fund, net of attorneys' fees and administrative expenses, will be
15 distributed to Settlement Class Members in a manner that generally corresponds to
16 the injuries resulting from the Amendments.  Specifically, funds will be distributed
17 based on the timing and amount of lost coverage suffered, with the greatest award
18 going to Senior Performers who lost active coverage with relatively little warning.
19 Additionally, HRA allocations will be apportioned among qualifying Senior
20 Performers based on the relative amount of their residual earnings reported to the
21 Plan.

22         Defendants continue to deny all allegations of wrongdoing and deny all
23 liability for the allegations and claims made in this case.  Defendants maintain that
24 they are without fault or liability but agree that this settlement avoids the burdens
25 and costs of litigation and prevents interference with the orderly operation of the
26 Plan.  Dkt. 128-1 ¶ 1.14.

27

28

The Court notes that the Settlement only provides monetary relief to Senior Performers and their family members; it does not provide any monetary relief to non-Senior Performers.  This distribution is nevertheless equitable. The record demonstrates that, while the Amendments adversely impacted all class members, Senior Performers were particularly affected.  For example, the elimination of the Dollar Sessional Rule and Senior Performer Coverage uniquely impacted Senior Performers.  As a result, it is fair that Senior Performers will receive most of the monetary relief provided by the Settlement.  The absence of any objections to the Settlement by non-Senior Performers is also a factor supporting the fairness of the Settlement.

**J.  Final Settlement Approval and Binding Effect.**

The terms and provisions of the Settlement have been entered into in good faith, and are fair, reasonable and adequate as to, and in the best interests of, the Parties and the Settlement Class Members, and in full compliance with all applicable requirements of the Federal Rules of Civil Procedure, the United States Constitution (including the Due Process Clause) and the California Constitution.  Therefore, the Settlement is approved.  The Settlement, this Final Approval Order and the Judgment shall be forever binding on the Plaintiffs and all other Settlement Class Members, as well as their heirs, beneficiaries, beneficiaries designated under the Policies, conservators, personal representatives, executors and administrators, predecessors, successors and assigns, and shall have res judicata and other preclusive effect in all pending and future claims, lawsuits or other proceedings maintained by or on behalf of any such persons, to the fullest extent allowed by law.

**K.  Releases and Covenants Not to Sue.**

The Release set forth in Paragraphs 2.53, 12.1-12.9 of the Settlement Agreement is expressly incorporated herein in all respects and is effective as of the effective date of Settlement.  The Class Members are deemed to have fully, finally,

and forever settled, released, relinquished, waived, and discharged all Released Parties from the Released Claims (as those terms are defined in the Settlement Agreement), regardless of whether or not such class members receive a monetary benefit from the Settlement, filed an objection to the Settlement or to any application by Class Counsel for an award of Attorneys' Fees and Costs or Service Awards, and whether or not the objections have been allowed.  The Plan is similarly deemed to have discharged all Released Parties from the Released claims.  Class Counsel and Class Members are deemed to have waived the Release Claims, even if they hereafter discover facts in addition to or different from those that they know or believe to be true with respect to the Released Claims.

Defendants and each Class Member are also deemed to have fully, finally, and forever settled, released, relinquished, waived, and discharged any claims against the Class Representatives that arise out of the institution, prosecution, settlement or dismissal of this action.

Each Class Member is also deemed to have fully, finally, and forever settled, released, relinquished, waived, and discharged any claims against the Released Parties, Defense Counsel, and Class Counsel that arise from the allocation of the Gross Settlement Amount or Net Settlement Amount (including with respect to any tax liability or penalties).

The Class Members, on behalf of themselves and their respective heirs, beneficiaries, executors, administrators, estates, past and present partners, officers, directors, agents, attorneys, predecessors, successors, and assigns, on their own behalves and on behalf of the Plan and the Plan, expressly agree that they, acting individually or together, or in combination with others, shall not sue or seek to institute, maintain, prosecute, argue, or assert in any action or proceeding, any cause of action, demand, or claim on the basis of, connected with, or arising out of any of

the Released Claims.  Nothing herein shall preclude any action to enforce the terms of this Settlement Agreement.

The Settling Parties and all other Class Members expressly waive to the fullest extent of the law: (i) the provisions, rights and benefits of Section 1542 of the California Civil Code, which provides that "A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party"; and (ii) the provisions, rights and benefits of any similar statute or common law of any other jurisdiction that may be, or may be asserted to be, applicable.

### L.  Permanent Injunction.

All Settlement Class Members are permanently barred and enjoined from asserting, commencing, prosecuting, or continuing any of the Released Claims, as set forth in the Settlement Agreement.

### M.  Enforcement of Settlement.

Nothing in this Final Approval Order shall preclude any action to enforce the Settlement or interpret the terms of the Settlement Agreement.  Any action which seeks to enforce or interpret the terms of the Settlement, or which seeks to interpret or avoid in any way any legal consequences of or the effect of the Settlement Agreement, the Preliminary Approval Order, this Final Approval Order, the Permanent Injunction contained in this Final Approval Order, or the Release contained in the Settlement Agreement shall be brought solely in this Court.

### III.   ATTORNEYS' FEES.

The parties disagree as to the appropriate amount of attorneys' fees to award plaintiffs' counsel.  Plaintiffs have requested $6,866,667 in attorneys' fees.  Dkt. 141 at 4.  Defendants object and request that the court "award lower, more reasonable fees." See Dkt. 149 at 19.  Plaintiffs do not contest defendants' standing to do so.

**A. Legal Standard.**

District courts must ensure that attorneys' fees awards in class action cases are reasonable.  Lowery v. Rhapsody Int'l, Inc., 75 F.4th 985, 991 (9th Cir. 2023). In the Ninth Circuit, there are "two ways to determine attorneys' fees awards in class actions: (1) the 'lodestar' method and (2) the 'percentage-of-recovery' method." Id. at 990.  "[T]he choice between lodestar and percentage calculation depends on the circumstances, but . . . 'either method may . . . have its place in determining what would be reasonable compensation.'" Six (6) Mexican Workers v. Arizona Citrus Growers, 904 F.2d 1301, 1311 (9th Cir. 1990) (third alteration in original) (quoting Paul, Johnson, Alston & Hunt v. Graulty, 886 F.2d 268, 272 (9th Cir. 1989)).

Having reviewed the history and facts of this case, the Court finds that the percentage-of-recovery method is appropriate.[2]

**B. Calculating Attorneys' Fees.**

The parties disagree on two issues regarding the percentage-of-recovery approach: (1) the value of the total recovery to the class, and (2) the appropriate percentage to use.

On the first issue, plaintiffs argue that fees should be calculated based on a total estimated maximum recovery of $20.6 million.  Dkt. 141 at 23.  This figure is the sum of the $15 million in compensation from the Gross Settlement Fund and the maximum annual HRA payments of $700,000 over the next eight years, totaling $5.6 million.

On the other hand, defendants argue that the amount of total recovery that should be counted is only $7.5 million.  In reaching this figure, they count only the $7.5 million paid into the $15 million cash fund by defendants' insurers, and they exclude the HRA payments.  Dkt 149 at 9.  In support, defendants argue that only

---

[2] The Court notes that neither party has argued for the lodestar method.

*externally* contributed money counts as part of the common fund, as opposed to internal reallocation of Plan assets.  Dkt. 149 at 9.  In addition, they argue that the HRA payments cannot be counted as part of the common fund because they are "inexact" and cannot be "accurately ascertained."  Dkt. 149 at 8.

The Court finds that the entire $15 million from the cash fund should be included for the purposes of calculating attorneys' fees.  "The touchstone for determining the reasonableness of attorneys' fees in a class action is the benefit to the class."  <u>Lowery</u>, 75 F.4th at 987.  Defendants do not cite any authority that limits the calculation of such benefit to only money that is paid into a class fund from external sources.  While some of the funds here may come from pre-existing Plan assets, the settlement still benefits the class by reallocating funds to the class members; that is, pursuant to the Settlement, class members would be getting funds (between $400-$4,400) that they would not otherwise receive now.  At the hearing, class counsel confirmed that, absent the Settlement, qualifying Senior Performers would not otherwise receive any portion of the $4,400, $2,200, $1,100, or $400 allocated to them by the Settlement.  The immediate disbursement of money to class members is a benefit to them, regardless of whether the money is externally or internally contributed.

The Court also finds that, for the purposes of calculating attorneys' fees, class recovery should include an award based on $450,000 from the future HRA allocations.

Pursuant to the Settlement, class members will not need to submit claims to receive the HRA payments; rather, payments "will be apportioned among Qualifying Senior Performers based on the relative amount of their residual earnings reported to the Plan (up to $125,000) and processed in the applicable October 1 through September 30 Base Earnings Period."  Dkt. 128-1 ¶ 10.2.2.  "[A]ny Class Members who has enrolled in an HRA account by May 1, 2024" may qualify for an allocation.

Id. ¶ 10.2.4.  Plaintiffs emphasize that "there will be no need to fill out claim forms or submit a claim."  Dkt. 141 at 27.

Defendants argue that the HRA allocations should be disregarded because they are not "sum certain."  Dkt. 149 at 8.  However, even if class members do not end up receiving the entirety of the $5.6 million in allocations over the next eight years, it appears that they will receive some amount of the potential allocation. Defendants concede that, based on current enrollment numbers, class members will receive around $450,000 in 2023 alone.  Dkt 149 at 4.  At the high end, members could receive up to $625,000, with average payments of over $1,600 per qualifying member.  Dkt. 150 at 5; Dkt. 141 at 3.  There is no reason to believe that HRA allocations will drop to zero after 2023 and such benefit to the class should be fairly considered when calculating attorneys' fees.

The cases that defendants cite are inapposite.  They rely on cases addressing "claims-made" settlements.  However, the Settlement does not provide that the HRA allocations will only be made to class members who submit claims. Claims-made settlements are subject to particular scrutiny because they often create "glaring disparit[ies] between the amount [actually] paid to the class[] and the hypothetical settlement cap."  That is why "Courts[] consider the actual or realistically anticipated benefit to the class—not the maximum or hypothetical amount—in assessing the value of a [claims-made] class action settlement."  Lowery, 75 F.4th at 992.  But here, as discussed above, a substantial portion of the HRA allocations will ultimately be paid out to class members who need not submit claims to receive their allocated amounts.  Contra Lowery, 75 F.4th at 993 (involving a claims-made settlement with a theoretical $20 million cap where only $52,841.05 was actually paid out).[3]

---

[3] Lowery is additionally distinguishable because it deals with the lodestar method for calculating attorneys' fees, rather than the percentage-of-recovery method.  75

19

The aggregate amount of annual additional allocations "will be equal to one-half of the aggregate contributions made to the Plan with respect to the Qualifying Senior Performers' residual earnings reported to the Plan" and the annual allocations "will be apportioned among Qualifying Senior Performers based on the relative amount of their residual earnings . . . (up to $125,000)." Dkt. 128-1 ¶ 10.2.2. However, at this time, it is impossible to predict what future residual earnings will be. Both parties conceded at the Fairness Hearing that they do not have projections for the actual amount of HRA payments that will be distributed in each year after 2024. As a result, it cannot be said that the Class Members have ascertainable claims at this time. Rather, the Plan has agreed to pay yet-unascertainable claims to class members up to a fixed ceiling of $700,000 per year. The only ascertainable amounts are the payments in 2023, which defendants concede will be around $450,000 "[b]ased on the number of Senior Performers who have thus far enrolled in the HRA Plan." Dkt. 149-1 ¶ 7. Further, with respect to any future HRA allocations, class counsel have not provided any estimate of the present discounted value of these payments. Thus, for purposes of awarding fees, only the $450,000 estimated payment will be considered.[4]

///

///

_____

F.4th at 991. Defendants' other cases are also distinguishable. In <u>Staton v. Boeing Co.</u>, the court only addressed the difficulties in valuing injunctive relief, not a hypothetical settlement cap. In <u>In re Apple Inc. Device Performance Litigation</u>, plaintiffs' counsel only requested attorneys' fees based on the lower bound of the settlement fund and not the hypothetical upper bound. No. 5:18-MD-02827-EJD, 2021 WL 1022866, at *6 (N.D. Cal. Mar. 17, 2021).

[4] At the Fairness Hearing, class counsel rejected the Court's proposal that fees be paid out over time based on the actual HRA payments disbursed in each year.

On the second issue, regarding the appropriate percentage for calculating attorneys' fees, the Court finds that 25% of the common fund is an appropriate attorneys' fee.

In the Ninth Circuit, 25% of a common fund is considered a presumptively reasonable amount of attorneys' fees when using the percentage-of-recovery method. See, e.g., In re Bluetooth, 654 F.3d at 942 ("[C]ourts typically calculate 25% of the fund as the 'benchmark' for a reasonable fee award, providing adequate explanation in the record of any 'special circumstances' justifying a departure."); Six (6) Mexican Workers, 904 F.2d at 1311 ("[W]e established 25 percent of the fund as the 'benchmark' award that should be given in common fund cases."). That said, "[t]he 25% benchmark rate, although a starting point for analysis, may be inappropriate in some cases." Vizcaino, 290 F.3d at 1048.

In determining whether a deviation from the 25% benchmark is warranted, courts frequently consider the Vizcaino factors: (1) the extent to which class counsel achieved exceptional results for the class; (2) whether the case was risky for class counsel; (3) whether counsel's performance generated benefits beyond the cash settlement fund; (4) the market rate for the particular field of law; (5) the burdens class counsel experienced while litigating the case; (6) and whether the case was handled on a contingency basis. In re Optical Disk Drive Prod. Antitrust Litig., 959 F.3d 922, 930 (9th Cir. 2020) (citing Vizcaino, 290 F.3d at 1048-50).

Taken altogether, the Vizcaino factors do not justify an upward deviation from the 25% benchmark in this case.

Factor one, exceptional results, does not heavily favor an upward deviation. The result here is mixed. On the one hand, plaintiffs' counsel secured a substantial benefit to the class that this Court has valued, for present purposes, at $15,450,000. Defendants argue that this is just a "small fraction" of the $200 million that plaintiffs initially set out to recover.  Dkt. 149 at 16.  They are mistaken.  In evaluating the

quality of a settlement amount, courts compare the value of the settlement against the potential damages that would have been recoverable *at trial*, not the damages plaintiffs sought in their initial pleadings.  <u>See Linney v. Cellular Alaska P'ship</u>, 151 F.3d 1234, 1242 (9th Cir. 1998) (concluding that a settlement was "fair, adequate, and reasonable" in light of the "significant" risks of going to trial); <u>Churchill Vill., L.L.C. v. Gen. Elec.</u>, 361 F.3d 566, 576 (9th Cir. 2004) (emphasis added) (concluding there was ample evidence that a settlement was fair because "recovering more than the settlement[] *at trial* would be difficult"); <u>Marshall v. Northrop Grumman Corp.</u>, No. 16-CV-6794 AB (JCX), 2020 WL 5668935, at *2 (C.D. Cal. Sept. 18, 2020) (emphasis added) (noting that "the settlement fund represents approximately 29% of Plaintiffs' claimed damages *at trial*"); <u>In re MacBook Keyboard Litig.</u>, No. 5:18-CV-02813-EJD, 2023 WL 3688452, at *9 (N.D. Cal. May 25, 2023) (emphasis added) (finding that a settlement amount was satisfactory because it represented "approximately 9% to 28% of the total estimated damages *at trial*"); <u>Carlin v. DairyAmerica, Inc.</u>, 380 F. Supp. 3d 998, 1011 (E.D. Cal. 2019) (emphasis added) ("To determine whether th[e] settlement amount is reasonable, the Court must consider the amount obtained in recovery against the estimated value of the class claims *if successfully litigated*.")

Here, plaintiffs' counsel was able to secure a substantial settlement for the class despite their uncertain odds at trial. Plaintiffs would have faced various challenges in the event this case continued.  Subsequent litigation would likely have involved re-litigation of defendants' "settlor" function defense, a lengthy and uncertain "battle of the experts," and a serious dispute as to whether evidence of a prudent decision-making process would insulate defendants from liability. Dkt. 141 at 34.

///

///

On the other hand, while Class Members certainly benefit from the $15 million Gross Settlement Fund, they benefit to varying degrees.  In particular, Class Members who are not Senior Performers receive no monetary benefit.

Factor two only slightly favors an upward deviation, as it is unclear how risky this case was.  As plaintiffs' counsel argue, nearly a dozen other firms declined to litigate this case before they came on the scene. Dkt. 141 at 5.  However, defendants argue that plaintiffs should not be rewarded for bringing "exceedingly weak claims." Dkt. 149 at 12.  As a result, the Court does not give this factor significant weight.

Factor three, non-monetary benefits, does not clearly favor deviation either. While this settlement did generate benefits beyond the Gross Settlement Fund, the parties dispute the value of such benefits.  Plaintiffs explain that the mandatory disclosure obligations are "critical" because they help union negotiators achieve better results and decrease the likelihood of future adverse changes to the Plan. Dkt. 141 at 17.  On the other hand, defendants characterize these benefits as "token administrative changes that will be largely inconsequential." Dkt. 148 at 12.  At this juncture, it is difficult to predict whether the disclosure obligations and consulting requirements will generate substantially better results for class members.  Given this uncertainty, the Court does not assign factor three significant weight.

Factor four, the market rate for comparable cases, only slightly favors deviation.  Plaintiffs cite numerous ERISA class actions where courts have awarded a one-third fee. See, e.g., Marshall v. Northrop Grumman Corp., No. 16-CV-6794 AB (JCX), 2020 WL 5668935, at *2-9 (C.D. Cal. Sept. 18, 2020) (awarding a one third fee in an ERISA class action for obtaining 29% gross recovery of potential damages, which was described as "an exceptional result on behalf of the Class"); Waldbuesser v. Northrop Grumman Corp., No. CV 06-6213-AB (JCX), 2017 WL 9614818, at *3 (C.D. Cal. Oct. 24, 2017) (awarding a one-third fee in an ERISA class action for achieving an "exceptional result").  However, defendants argue that

court usually award fees of only 20-30% for common funds valued at less than $50 million.  <u>Vizcaino</u>, 290 F.3d at 1050.  Here, the settlement result was more mixed when compared to other ERISA class actions due to the limited benefit received by non-Senior Performer class members.  As a result, the cases that plaintiffs cite are not directly on point.

Factor five, the burdens of litigating the case, also weighs against deviation. Defendants argue that class counsel spent less time, money, and resources on this case relative to other cases where courts have granted an upward deviation from the 25% benchmark.  <u>Marshall</u>, 2020 WL 566893, at *3, *9 (awarding a one-third fee because the case settled "approximately fourteen minutes before trial," meaning counsel was "fully prepared for trial" and had to "devote enormous efforts and resources to this matter"). In response, plaintiffs argue that they spent significant amounts of time and resources on this case and contend they should not be punished for resolving this case in an efficient manner. Dkt. 150 at 17-18.  While plaintiffs certainly should not be punished for efficiency, it is also true that they incurred less costs relative to the attorneys in other cases where a higher fee was granted.

Finally, factor six slightly favors an upward adjustment because plaintiffs' counsel took this case on contingency.

The Court finds that, altogether, the <u>Vizcaino</u> factors do not justify an upward adjustment from the 25% benchmark in this case.  Correspondingly, plaintiffs' counsel should be awarded 25% of the $15,450,000 benefit generated for the class, for a total of $3,862,500 in attorneys' fees.

**C. Lodestar Check.**

A lodestar cross-check confirms that $3,862,500 is a reasonable award.  To guard against an unreasonable result, the Ninth Circuit encourages district courts to "cross-check[] their calculations against a second method." <u>In re Bluetooth</u>, 654 F.3d at 944; <u>see also Vizcaino v. Microsoft Corp.</u>, 290 F.3d 1043, 1050–51 (9th Cir. 2002)

1  (applying a lodestar cross-check to ensure the percentage-of-recovery method

2  yielded a reasonable result).

3      Here, plaintiffs' counsel calculated their collective lodestar to be $3.8 million.

4  Dkt. 141 at 38.  In support, counsel submitted summary charts listing the firms that

5  worked on this case, the relevant attorneys, their hours, and their hourly rates.  Dkt.

6  142-2; Dkt. 12-3.  Defendants argue that the $3.8 million lodestar figure is inflated

7  because plaintiffs' summary charts were not sufficiently detailed and showed heavy

8  reliance on partner time.  Dkt. 149 at 15-18.  Plaintiffs respond by noting that their

9  summary charts breakdown time spent working on specific filings, that their rates

10  have been approved by other courts, and that their lodestar figure is comparable to

11  defense counsel's fees of nearly $5 million.  Dkt. 150 at 19-22.  Having considered

12  the arguments presented by both parties, the Court finds that its reported lodestar of

13  $3.8 million supports the reasonableness of a 25% fee award.

14  **IV.  EXPENSE REIMBURSEMENT.**

15      The Court hereby grants class counsel's request for reimbursement of

16  litigation expenses in the amount of $50,954.13, to be deducted from the $7.5 million

17  paid by the Plan's fiduciary liability insurers.

18  **V.  SERVICE AWARDS.**

19      The Court hereby awards service awards to the Class Representatives in the

20  amount of $5,000 each, to be deducted from class counsel's attorneys' fees and not

21  from the Gross Settlement Fund, as provided in the Settlement Agreement.

22      Based on the declarations of class counsel submitted in support of final

23  settlement approval, Plaintiffs have actively participated and assisted Class Counsel

24  in this litigation for the substantial benefit of the Settlement Class despite facing

25  significant personal limitations.  These service awards are approved to compensate

26  the Plaintiffs for the burdens of their active involvement in this litigation and their

27

28

1  commitment and effort on behalf of the Class.  The service award payments will be

2  made within 14 days after the Final Settlement Date.

3  **VI.   RETENTION OF JURISDICTION.**

4  The Court has jurisdiction to enter this Final Approval Order and the Final

5  Judgment.  Without in any way affecting the finality of this Final Approval Order or

6  the Final Judgment, for the benefit of the Settlement Class and defendants, and to

7  protect this Court's jurisdiction, the Court expressly retains continuing jurisdiction

8  as to all matters relating to the Settlement, including but not limited to any

9  modification, interpretation, administration, implementation, effectuation, and

10  enforcement of the Settlement, the administration of the Settlement and Settlement

11  Relief, including notices, payments, and benefits thereunder, the Class Notice and

12  sufficiency thereof, any objection to the Settlement, the adequacy of representation

13  by class counsel and/or the class representatives, the amount of attorneys' fees and

14  litigation expenses paid to plaintiffs' counsel, the amount of any service awards to

15  be paid to any plaintiff, any claim by any person or entity relating to the

16  representation of the Settlement Class by class counsel, to enforce the release and

17  injunction provisions of the Settlement and of this Final Approval Order and Final

18  Judgment, any remand after appeal or denial of any appellate challenge, any

19  collateral challenge made regarding any matter related to this litigation or this

20  Settlement or the conduct of any party or counsel relating to this litigation or this

21  Settlement, and all other issues related to this case and Settlement.

22  **VII.   DISMISSAL OF ACTION.**

23  This case is hereby dismissed on the merits and with prejudice, without an

24  award of attorneys' fees or costs to any party except as provided in this Final

25  Approval Order.

26  ///

27  ///

28

26

## VIII.  CONCLUSION.

The Final Approval Motion is **GRANTED** on the terms set forth in this Final Approval Order, and the Parties and their counsel are directed to implement and consummate the Settlement according to its terms and provisions as set forth in the Settlement Agreement.

**IT IS SO ORDERED.**

Dated: October 19, 2023            By: _____

HONORABLE CHRISTINA A. SNYDER
UNITED STATES DISTRICT COURT